

**USFC2011-1572-02**

{A7BAAE69-F107-4FB9-99C3-2638F319E40C}
{118242}{75-120814:124837}{080212}

# APPELLANT'S

# BRIEF

Appeal Nos. 2011-1572, 2012-1168, -1169

# United States Court of Appeals

*for the*

# Federal Circuit

U.S. COURT OF APPEALS FOR
THE FEDERAL CIRCUIT

AUG - 2 2012

JAN HORBALY
CLERK

METSO MINERALS, INC.,

*Plaintiff-Appellee,*

– v. –

POWERSCREEN INTERNATIONAL DISTRIBUTION, LIMITED
(now known as Terex GB Limited), POWERSCREEN NEW YORK, INC.
and EMERALD EQUIPMENT SYSTEMS, INC.,

*Defendants-Appellants,*

– and –

TEREX CORPORATION,

*Defendant-Appellant.*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF NEW YORK
IN CASE NO. 06-CV-1446, JUDGE ARTHUR D. SPATT

## BRIEF OF DEFENDANT-APPELLANT
## TEREX CORPORATION

VINCENT ALFIERI
MICHAEL G. BIGGERS
JOSEPH J. RICHETTI
BRYAN CAVE LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 541-2000

*Attorneys for Defendant-Appellant
Terex Corporation*

August 2, 2012

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellant Terex Corporation certifies the following:

1.  The full name of every party or amicus represented by us is:

    Terex Corporation

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

    Not applicable

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by us are:

    None

4.  The names of all law firms and the partners or associates who appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this Court are:

BRYAN CAVE LLP:  Vincent Alfieri, Michael Biggers, Joseph Richetti

MERCHANT & GOULD, P.C.:  John R. Trembath

SQUIRE, SANDERS & DEMPSEY (US) LLP :  George B. Yankwitt, Mary M. Chang, Nathan Lane III, Andrew H. Fried, Xavier Brandwajn

CLAUSS & SABATANI:  Ava R. Maynard

FORCHELLI, CURTO, SCHWARTZ, MINEO, CARLINO & COHN, LLP: Andrew E. Curto

Dated: August 2, 2012

Vincent Alfieri

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF RELATED CASES ................................................. viii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .............1

STATEMENT OF THE CASE............................................................2

    A.    Nature of the Case..........................................................2

    B.    Proceedings at Trial ......................................................3

    C.    Post-trial Proceedings ...................................................5

STATEMENT OF FACTS .................................................................6

SUMMARY OF ARGUMENT ...........................................................8

ARGUMENT ...............................................................................11

    I.    Standards of Review.......................................................11

        A.    Denial of a Motion for JMOL is Reviewed *De Novo*...............11

        B.    A New Trial Is Required Where the Jury Instructions Contain a Prejudicial Error of Law or the District Court Commits an Error of Law in Denying a Motion for a New Trial..........................................................................12

    II.    The District Court Erred by Applying the Wrong Legal Standard for Piercing the Corporate Veil, and Under the Proper Standard There Was No Evidence Justifying Disregard of Terex and Powerscreen as Distinct, Separate Corporate Entities .........................13

        A.    Terex and Powerscreen Are Not a Single Economic Entity.....15

        B.    Maintaining the Separate Corporate Existences of Terex and Powerscreen Is Entirely Just and Fair ................................27

III.    The District Court Erred in Denying Terex's Motion  for JMOL
        Because Under the Proper Legal Standard  There Was No
        Evidence On Which a Jury Could Have  Found Terex Liable for
        Direct Infringement of the '618 Patent .............................................28

IV.     The District Court Erred by Deciding Whether  Terex and
        Powerscreen Are Alter Egos and  Not Properly Instructing the
        Jury on the Issue ...............................................................................31

V.      Terex Joins the Powerscreen Appellants in Their Arguments that
        the Remaining Judgments of the  District Court Appealed from
        Should be Reversed ...........................................................................39

CONCLUSION ......................................................................................................40

ADDENDUM

PROOF OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

*3D Sys. Inc., v. Aarotech Labs., Inc.,*
    160 F.3d 1373 (Fed. Cir. 1998) ................................................................30

*3M Co. v. Mohan,*
    No. 2011-1328, 2012 WL 1949033 .........................................................33

*AMW Materials Testing, Inc. v. Town of Babylon,*
    584 F.3d 436 (2d Cir. 2009) .....................................................................11

*A. Stucki Co. v. Worthington Industrial, Inc.,*
    849 F.2d 593 (Fed. Cir. 1988) .................................................................13

*Akzona, Inc. v. Du Pont,*
    607 F. Supp. 227 (D. Del. 1984) .............................................................18

*American Protein Corp. v. AB Volvo,*
    844 F.2d 56 (2d Cir. 1988) .......................................................................35

*Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.,*
    417 U.S. 703 (1974) ..................................................................................34

*Beacon Theatres, Inc. v. Westover,*
    359 U.S. 500 (1959) ..................................................................................33

*Berkshire Life Insurance Co. v. Hagerman,*
    No. 09-CV-2037, 2010 WL 2771839 (E.D.N.Y. July 13, 2010) .............20

*Carotek v. Kobayashi Ventures, Inc.,*
    Nos. 07-CV-11163, 08-CV-5706, 2012 WL 2469676 (S.D.N.Y.
    June 28, 2012) ...................................................................................14, 21

*Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,*
    494 U.S. 558 (1990) ..................................................................................32

*Cross v. NYC Transit Authority,*
    417 F.3d 241 (2d Cir. 2005) .....................................................................11

*Fletcher v. Atex, Inc.,*
    68 F.3d 1451 (2d Cir. 1995) ......................... 14, 15, 16, 20, 23, 26, 27, 37

*Funai Electric Co., Ltd. v. Daewoo Electronics Corp.,*
    616 F.3d 1357 (Fed. Cir. 2010) ................................................................12

*G-I Holdings, Inc. v. Bennet,*
    380 F. Supp. 2d 469 (D.N.J. 2005)............................................................35

*Gordon v. N.Y.C. Bd. Of Educ.,*
    232 F.3d 111 (2d Cir. 2000) ....................................................................37

*Granfinanciera, S.A. v. Nordberg,*
    492 U.S. 33 (1989) ..................................................................................32

*Harco Nat'l Ins. Co. v. Green Farms, Inc.,*
    No. CIV.A. 1331, 1989 WL 110537 (Del. Ch. Sept 19, 1989)) ..15, 16, 37

*J.L.B. Equities, Inc. v. Ocwen Financial Corp.,*
    131 F. Supp. 2d 544 (S.D.N.Y. 2001)......................................................23

*Kalb, Voorhis & Co. v. American Financial Corp.,*
    8 F.3d 130 (2d Cir. 1993) ..................................................................14, 34

*Kertesz v. General Video Corp .,*
    No. 09-CV-1648, 2010 WL 5422524 (S.D.N.Y. Dec. 23, 2010) ............16

*Luciano v. Olsten Corp.,*
    110 F.3d 210 (2d Cir. 1997) ..............................................................12, 37

*MEMC Electric Materials, Inc. v. Mitsubishi Materials Silicon Corp.,*
    420 F.3d 1369 (Fed. Cir. 2005) ..........................................................30, 31

*Manley v. AmBase Corp.,*
    337 F.3d 237 (2d Cir. 2003) ....................................................................12

*McAnaney v. Astoria Financial Corp.,*
    665 F. Supp. 2d 132 (E.D.N.Y. 2009)................................................25, 26

*NobelpharmaAB v. Implant Innovations, Inc.,*
    141 F.3d 1059, 46 U.S.P.Q. 2d 1097 (Fed. Cir. 1998)............................11

*O'Donnell v. Club Mediterranee S.A.,*
    No. 05-CV-610, 2008 WL 794975 (E.D.N.Y. March 24, 2008) .......24, 26

*Reers v. Deutsche Bahn Ag,*
    320 F. Supp. 2d 140 (S.D.N.Y. 2004)................................................20, 27

*Rotec Industrial v. Mitsubishi Corp.,*
    215 F.3d 1246 (Fed. Cir. 2000) ...................................................................30

*Sanders v. N.Y.C. Human Resources Admin.,*
    361 F.3d 749 (2d Cir. 2004) ................................................................12, 37

*In re Ski Train Fire in Kaprun,*
    230 F. Supp. 2d 403 (S.D.N.Y. 2002)................................................22, 23

*Summit Tech., Inc. v. Nidek Co., Ltd.,*
    363 F.3d 1219 (Fed. Cir. 2004) .................................................................11

*Transmatic Inc. v. Gulton Industries, Inc.,*
    53 F.3d 1270 (Fed. Cir. 1995)....................................................................33

*U.S. v. Funds Held in the Name or for the Ben. of Wetterer,*
    899 F. Supp. 1013 (E.D.N.Y. 1995)...........................................................14

*U.S. v. Landau,*
    155 F.3d 93 (2d Cir. 1998) ........................................................................38

*United States v. Golden Acres, Inc.,*
    684 F. Supp. 96 (D. Del. 1988) ..................................................................35

*Vendetti v. Fiat Automobile S.p.A.,*
    802 F. Supp. 886 (W.D.N.Y. 1992) ...........................................................25

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,*
    751 F.2d 117 (2d Cir. 1984) ......................................................................25

*Wallace v. Wood,*
    752 A.2d 1175 (Del. Ch. 1999)...........................................................14, 21

*Wechsler v. Macke International Trade, Inc.,*
    486 F.3d 1286 (Fed. Cir. 2007) .................................................................14

*William Passalacqua Builders, Inc. v. Resnick Developers S, Inc.,*
    933 F.2d 131 (2d Cir. 1991)..................................................32, 33, 34, 35

*WMS Gaming Inc. v. International Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999) ................................................12

*Wordtech System, Inc. v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010) ...............................36, 37, 38

*Xerox Corp. v. Litton Industrial, Inc.*,
    353 F. Supp. 412 (S.D.N.Y. 1973) ...........................................20

*Zervos v. Verizon N.Y., Inc.*,
    252 F.3d 163 (2d Cir. 2001) ....................................................12

## FEDERAL STATUTES

35 U.S.C. § 271(a) ...........................................................13, 28

28 U.S.C. § 1292(a)(1) ...............................................................1

28 U.S.C. § 1292(c)(1) ...............................................................1

28 U.S.C. § 1292(c)(2) ...............................................................1

# STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, appellants provide as follows:

(a)    There have been no previous appeals in this case.

(b)    They are aware of no other case that will be directly affected by the Court's decision in this case.

## JURISDICTIONAL STATEMENT

This Court's jurisdiction to hear Appeal No. 2011-1572 is based on 28 U.S.C. §§ 1292(c)(1) and 1292(a)(1), this being an appeal from an interlocutory order granting an injunction in a case where this Court would have jurisdiction over an appeal from a final judgment. The operative injunction was entered on July 21, 2011, and Terex Corporation filed a timely Notice of Appeal on August 18, 2011.

This Court's jurisdiction to hear Appeal Nos. 2012-1168 and 2012-1169 is based upon 28 U.S.C. §1292(c)(2), these being appeals from a judgment for patent infringement that would otherwise be appealable to this Court and is final except for an accounting. Following a jury trial, the district court entered its order denying Terex Corporation's motions pursuant to Fed. R. Civ. P. 50(b) and 59(a) on December 8, 2011. Terex Corporation filed timely Notices of Appeal on January 6, 2012.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Did the district court err in denying the motion by Terex Corporation ("Terex") for judgment as a matter of law ("JMOL") that Terex was not the alter ego of Powerscreen International Distribution Limited ("Powerscreen"), where the court applied the incorrect standard and under the

correct standard the evidence could not justify disregarding that Terex and

Powerscreen are distinct and separate corporations?

2.    Did the district court err in denying the motion by Terex for JMOL

that Terex was not liable for direct infringement of United States Patent No.

5,577,618 (the "'618 patent"), where there was no evidence that Terex made,

used, sold, offered for sale in the United States or imported into the United

States the accused infringing mobile screeners?

3.    In the alternative, did the district court err in denying Terex's

motion for a new trial where it failed to allow the jury to: (a) decide whether

Terex and Powerscreen are alter egos and (b) consider the liability of Terex and

Powerscreen separately under proper jury instructions?

## STATEMENT OF THE CASE

### A.    Nature of the Case

In March 2006, plaintiff-respondent Metso Minerals, Inc. ("Metso") filed a

Complaint in the United States District Court for the Eastern District of New York

against Powerscreen International Distribution Limited (now known as Terex GB

Limited), Powerscreen New York, Inc., Emerald Equipment Systems, Inc.

(together, "Powerscreen Appellants") and Terex Corporation.  (JA0026417.)

Metso alleged that the Powerscreen Appellants and Terex infringed the '618 patent

2

by making, using, offering for sale, and/or selling within the United States, and/or importing into the United States certain mobile aggregate material processing plants. (JA0026419.)

### B.    Proceedings at Trial

Between October 18, 2010 and December 6, 2010, the district court held a jury trial. At the close of Metso's case, Terex moved for JMOL pursuant to Fed. R. Civ. P. 50(a), arguing that Metso had not offered sufficient evidence upon which a jury could find Terex liable. (JA0015721-JA0015724.) The district court purported to reserve decision on the motion, but stated at that time:

> I certainly do not agree that Terex is the silent, unknown Wall Street broker sitting in an office in New York. I heard Terex mentioned continuously during this trial. Terex apparently is Powerscreen. Terex is interchangeable with Powerscreen, according to what I heard, and is not merely an absentee owner, from the evidence that I recall. ... I think Terex is all over the place in this case.

(JA0015729-JA0015731.)

As the trial was nearing its end, Metso submitted its Amended Jury Instructions and a Proposed Verdict Form to the court. Both submissions proposed separate consideration of the liability of Terex and Powerscreen and explicitly set forth the factors to be considered in piercing the corporate veil. (JA0026629-JA0026630; JA0007907.) Terex and the Powerscreen Appellants similarly proposed that the jury consider the liability of Terex and Powerscreen separately

3

and sought to have the jury instructed regarding piercing the corporate veil.

(JA0007925- JA0007927.)

At the close of the defense, Metso moved for a declaration that Terex was a

proper party. (JA0017584.) Although the district court did not specifically rule on

this motion, it took the opportunity to formally deny Terex's prior motion for

JMOL, and in so doing stated:

> When I heard the original motion on November 9, 2010,
> my goodness, at the end of the plaintiff's case, I listened
> to the argument of both lawyers at that time, and
> although I reserved decision on the motion for judgment
> as a matter of law by Terex, I put down, Terex is not a
> mere owner. Terex is Powerscreen. Terex and
> Powerscreen are interchangeable.

(JA0017605- JA0017606.)

Thereafter, at the charging conference, the district court accepted Metso's

suggestion that, rather than follow Metso's earlier proposed jury instructions, the

jury be instructed that Terex and Powerscreen must be treated together on the issue

of infringement. (JA0017809.) At that time, Terex's counsel objected, noting that

the issue of alter ego liability was a question of fact for the jury. (Id.) The district

court responded:

> I decided that. I think I put it in the following terms,
> Terex is Powerscreen. I think I said that yesterday. So
> I'm going to have to tell that to the jury. Yes. You have
> an exception.

(JA0017810.)

The district court charged the jury and instructed the jurors that if they found the accused machines infringed the '618 patent, then they would need to answer:

> 6.  Did the plaintiff Metso prove by a preponderance of the evidence that defendant Terex GB limited formerly known as Powerscreen international distribution limited and its owner Terex Corporation – *I put them together, you notice*, have infringed US patent 618.

(JA0018289 (emphasis supplied.))  Terex's exception to the jury charge was thereafter preserved for appeal.  (JA0018299.)  On December 6, 2010, the jury returned its Verdict Sheet and answered question number 6 affirmatively. (JA0000029.)

## C.    Post-trial Proceedings

On March 3, 2011, a Judgment on the Jury Verdict was entered by the district court.  The Judgment stated:

> 7.    Defendants Terex GB Limited, formerly known as Powerscreen International Distribution Limited, and its owner Terex Corporation, infringed the '618 patent by making, using, selling and/or offering for sale in the United States, and/or importing into the United States the mobile screeners identified above as infringing the '618 patent.

(JA0000003.)

After the judgment was entered, Terex renewed its motion for JMOL pursuant to Fed. R. Civ. P. 50(b) and further moved, alternatively, for a new trial pursuant to Fed. R. Civ. P. 59.  (JA0010450.1-JA0010450.2.)  In a Memorandum

of Decision and Order ("Decision") entered on December 8, 2011, the district court denied both of Terex's motions. (JA0012976.)

On June 25, 2012, the district court ordered that Terex and the Powerscreen Appellants file an appeal bond in the amount of $50,000,000 by July 16, 2012. (JA0013059.) The required bond, in which Terex and Powerscreen have each promised to pay to Metso all damages, costs and interest that may be awarded in an amount up to $50,000,000, was executed on July 10, 2012 and docketed by the court on July 12, 2012. (JA0026671-JA0026672.)

## STATEMENT OF FACTS[1]

Terex is a global, multinational company with over 150 subsidiary companies located all over the world. (See JA0024568-JA0024570.) Appellant Powerscreen, one of those subsidiaries, is a company located in Northern Ireland, which is in the business of manufacturing and selling mobile screening plants, including the accused mobile screeners at issue in this action. (See JA0026442 at ¶ 9; JA0015770-JA0015772; JA0016125; JA0022892). Terex acquired Powerscreen in 1999 when it purchased the holding company Powerscreen

---

[1]    Terex's statement of facts is limited to those facts relevant to Terex's involvement in this case. For a more complete recitation of the facts of the case, Terex respectfully references the Powerscreen Appellants' brief. Additionally, Terex joins in Sections I through IV of the Powerscreen Appellants' brief. *See* Point V, *infra*.

International PLC, of which Powerscreen was a subsidiary. (JA0016119-JA0016120.)

Subsequent to this acquisition, Terex organized its subsidiaries such that Powerscreen was considered a part of Terex's "earth moving" division, along with other companies whose products, such as crushers, excavators and payloaders, had similar characteristics. (JA0016120-JA0016121.) Later, in early 2004, Terex re-categorized its subsidiaries, and Powerscreen became a part of the crushing and screening segment within a broader operating segment of Terex identified as "Terex Construction." (JA0016123.) Later still, in 2006, Powerscreen was placed in an operating segment of Terex called "Materials Processing." (JA0016126-JA0016127.)

From its acquisition of Powerscreen in 1999 up to the time of trial in late 2010, Terex advised its subsidiaries of "best practices" that could be shared across the business as a whole, which included leveraging their common interests to improve profitability and efficiency. (See JA0016129-JA0016130.) However, the ultimate decision-making authority for Terex subsidiaries, including Powerscreen, remained with the employees of those subsidiaries. (JA0016122.) At all times, Powerscreen retained its own general management and "its own separate P&L." (JA0016123-JA0016124.)

At no point did Terex itself manufacture or sell the accused infringing screeners. (JA0016125.) Metso's own damages expert admitted that she had seen no basis for concluding that Terex made or sold any of the accused mobile screeners. (JA0015020.) Marketing materials attributed to Terex did not contain any price terms or any other information as to the price at which screeners could be purchased. (See e.g. JA0021374) Terex's 2004 10-K explained that companies within the Terex Construction segment (not Terex itself) manufactured and marketed the referenced equipment, and that Powerscreen was the entity manufacturing and selling screens. (JA0022891-JA0022892)

Notably missing from the evidence at trial was any evidence regarding the capitalization of Terex or Powerscreen, or whether either company was insolvent, or whether dividends were paid. There was also no evidence of the absence of corporate record keeping, that any officers and directors functioned improperly, or that Terex intermingled funds with or siphoned funds from Powerscreen.

## SUMMARY OF ARGUMENT

As a global, multinational company, Terex has many subsidiaries, including Powerscreen. Like any parent company, Terex wants them to function efficiently and effectively, and to that end Terex plays a role in advising and coordinating its subsidiaries. However, in no way does Terex's involvement equate to the

domination and control necessary to ignore the separate corporate structures of Terex and Powerscreen. The district court's decision to do so was based on its failure to apply the correct legal standard for piercing the corporate veil. The court ignored the presumption that Terex and Powerscreen are distinct entities, and the evidence at trial did not establish any of the indicators of exclusive domination and control or demonstrate injustice, as required under the correct legal standard to conclude that Terex and Powerscreen are alter egos. Because there was no evidence at trial to justify piercing the corporate veil under the correct standard, the district court erred in disregarding the status of Terex and Powerscreen as separate and distinct corporations. Thus, the court's decision that Terex was liable for infringement of the '618 patent based on acts by Powerscreen must be reversed.

There was also absolutely no evidence that Terex made, used, sold, offered for sale within the United States or imported into the United States a product that infringed the '618 patent. At most, the evidence demonstrated that Terex played a minor role in marketing a limited number of the accused infringing mobile screeners. Marketing, without more, is not an act of infringement. Thus, no reasonable jury could have found Terex liable for infringement of the '618 patent. The district court's decision to deny Terex's motion for JMOL on this issue should also be reversed.

In the alternative, Terex is entitled to a new trial because the district court made a prejudicial error of law when it decided that Terex and Powerscreen were alter egos, rather than leaving that question to the jury as required by Supreme Court and Second Circuit precedent. The court also failed to properly instruct the jury. Due to the court's errors, the jury instructions did not provide the jury any opportunity to consider whether to pierce the corporate veil between Terex and Powerscreen under the correct alter ego standard or to consider separately Terex's alleged infringement of the '618 patent. Even if some evidence was presented at trial upon which to pierce the corporate veil and to hold Terex liable for infringement by some other defendant, which there was not, a correctly instructed jury could have concluded that the veil should not be pierced. As a result, the jury instructions were both erroneous and harmful to Terex, and at a minimum a new trial is warranted.

# ARGUMENT

## I.    Standards of Review

### A.    Denial of a Motion for JMOL is Reviewed *De Novo*

The denial of a motion for JMOL under Fed. R. Civ. P. 50(a) is subject to *de novo* review. *NobelpharmaAB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1064, 46 U.S.P.Q.2d 1097, 1101 (Fed. Cir. 1998). JMOL is a procedural issue not unique to patent law and is reviewed under the law of the regional circuit to which the appeal from the district court would usually lie. *Summit Tech., Inc. v. Nidek Co., Ltd.*, 363 F.3d 1219, 1223 (Fed. Cir. 2004).

According to the Second Circuit, a jury verdict may be set aside and judgment entered for the movant pursuant to Fed. R. Civ. P. 50 where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *AMW Materials Testing, Inc. v. Town of Babylon,* 584 F.3d 436, 456 (2d Cir. 2009) (quoting *Cross v. NYC Transit Auth.,* 417 F.3d 241, 248 (2d Cir. 2005)).

**B.    A New Trial Is Required Where the Jury
         Instructions Contain a Prejudicial Error
         of Law or the District Court Commits an
         Error of Law in Denying a Motion for a New Trial**

This Court will review a challenge to the jury instructions in this case under

the law of the Second Circuit. *See Funai Elec. Co., Ltd. v. Daewoo Electronics*

*Corp.*, 616 F.3d 1357, 1374 (Fed. Cir. 2010). If a jury instruction was erroneous,

and if that error was not harmless, a new trial is required. *Sanders v. N.Y.C. Human*

*Resources Admin.,* 361 F.3d 749, 758 (2d Cir. 2004). "[A] jury charge is erroneous

if the instruction misleads the jury as to the proper legal standard, or it does not

adequately inform the jury of the law." *Luciano v. Olsten Corp.,* 110 F.3d 210, 218

(2d Cir. 1997).

Denial of a motion for a new trial is also a procedural issue to be considered

here under the law of the Second Circuit. *WMS Gaming Inc. v. Int'l Game Tech.,*

184 F.3d 1339, 1361 (Fed. Cir. 1999). Such a denial will be reversed for abuse of

discretion, where (1) the district court's "decision rests on an error of law (such as

the application of the wrong legal principle) or a clearly erroneous factual finding,

or (2) its decision – though not necessarily the product of a legal error or a clearly

erroneous factual finding – cannot be located within the range of permissible

decisions." *Manley v. AmBase Corp.,* 337 F.3d 237, 245 (2d Cir. 2003) (citing

*Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir. 2001)).

II.    **The District Court Erred by Applying the Wrong
       Legal Standard for Piercing the Corporate Veil,
       and Under the Proper Standard There Was No
       Evidence Justifying Disregard of Terex and
       Powerscreen as Distinct, Separate Corporate Entities**

Terex has over 150 subsidiaries operating all over the world. (See JA0024448-JA0024452.) One of the reasons that multinational corporations operate in parent/subsidiary structures is to ensure that far reaching and disparate businesses will not be held liable for actions of other, separate businesses. Terex relies on the fact that it and its other subsidiaries will not be held liable for the acts of a single subsidiary, such as Powerscreen, based on the principle that "[m]ere ownership of stock is not enough to pierce the corporate veil." *A. Stucki Co. v. Worthington Indus., Inc.*, 849 F.2d 593, 596 (Fed. Cir. 1988). Here, the district court correctly recognized that "Terex can only be liable for Powerscreen's infringement under 35 U.S.C. §271(a) 'if the evidence reveals circumstances justifying disregard of the status of [the parent] and [the subsidiary] as distinct, separate corporations.'" (JA0012972 (*citing A. Stucki Co.*, 849 F.2d at 596).) Yet, the district court employed the wrong standard when it disregarded the status of Terex and Powerscreen as distinct, separate entities. Moreover, the evidence did not justify the court's conclusion that Terex and Powerscreen are "interchangeable" when viewed under the proper standard.

13

The law of the circuit in which the district court sits applies to determining whether to pierce the corporate veil. *See Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1295 (Fed. Cir. 2007)). According to the Second Circuit, to prevail on an alter ego claim, "a plaintiff must show (1) that the parent and the subsidiary operated as a single economic entity and (2) that an overall element of injustice or unfairness" is present if their separate existences are not disregarded. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1457 (2d Cir. 1995) (citations omitted) (applying Delaware law).[2] The degree of control required to pierce the veil is "exclusive domination and control" to the point that the controlled entity no longer has legal or independent significance of its own. *See Carotek v. Kobayashi Ventures, Inc.*, Nos. 07-CV-11163, 08-CV-5706, 2012 WL 2469676, *27 (S.D.N.Y. June 28, 2012) (*citing Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999)). These requirements stand in stark contrast to the district court's statements at trial that a corporate parent must limit itself to the status of "owner in absentia" or a "Wall Street broker" in order to maintain the separate existence of its subsidiary. (See JA001572-JA0015730; JA0017606.)

---

[2]   Since Terex is a Delaware corporation (see JA0022888), the Second Circuit would apply Delaware law. *See Kalb, Voorhis & Co. v. American Financial Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("Because a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away"); *cf. U.S. v. Funds Held in the Name or for the Ben. of Wetterer*, 899 F. Supp. 1013, 1025 (E.D.N.Y. 1995).

## A.    Terex and Powerscreen Are Not a Single Economic Entity

Among the factors to be considered in determining whether a subsidiary and parent operate as a "single economic entity" are:

> [W]hether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a façade for the dominant shareholder.

*Fletcher*, 68 F.3d at 1458 (*citing Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. CIV.A. 1331, 1989 WL 110537, at *4 (Del. Ch. Sept 19, 1989)).  A plaintiff seeking to persuade a court to disregard the corporate structure faces "a difficult task." *Id.*  "[T]he legal entity of a corporation will not be disturbed until sufficient reason appears."  *Id.*

Both Metso and the district court ignored these factors.  At trial, Metso entirely failed to demonstrate:

- the capitalization of Terex or Powerscreen;

- whether either company was insolvent;

- whether dividends were paid;

- the absence of corporate record keeping;

- whether any of the officers and directors functioned improperly;

- that corporate formalities were not observed; or

- whether Terex siphoned corporate funds from Powerscreen.

Metso simply presented *no evidence* showing that Powerscreen "functioned as a façade" for Terex. *See id.* Thus, there was insufficient evidence upon which to conclude that the corporate veil between Terex and Powerscreen should be pierced. *See Kertesz v. Gen. Video Corp .,* No. 09-CV-1648, 2010 WL 5422524, at *3 (S.D.N.Y. Dec. 23, 2010) (rejecting plaintiff's attempts to pierce the corporate veil because plaintiff's allegations "fail[ed] to address most of the factors relevant to the determination of alter ego status"). Despite the fact that the evidence was non-existent and the law was clear, the district court erroneously pierced the veil.

The limited evidence addressing the relationship between Terex and Powerscreen demonstrated an entirely proper, and indeed common, relationship of cooperation, with separation, between a corporate parent and its subsidiary. That evidence largely consisted of the testimony of Kieran Hegarty, who at the time of trial in 2010 was president of Terex's material processing segment. (JA0016128.) After Terex's purchase of the holding company, Powerscreen International PLC, in 1999, Mr. Hegarty was appointed to a position with Terex as vice president of crushing and screening international. (JA0016119.) His responsibilities included oversight of the "broad strategy" for sales and marketing of companies under Terex's crushing and screening segment, including Powerscreen. (JA0016121.)

However, the ultimate decision-making for those companies rested with employees of those respective companies. (JA0016122.)

In August 2000, Mr. Hegarty had a "change in responsibility and company" and was appointed as General Manager of Powerscreen, becoming the person primarily responsible for directing the activities of Powerscreen. (JA0014368-JA0014369; JA0016123.) In January 2004, Mr. Hegarty was appointed back to Terex as vice president of crushing and screening within the "Terex Construction" segment, where he again held general duties overseeing the financial performance and broad strategy of certain Terex subsidiaries, including Powerscreen. (JA0016123- JA0016124.) The corporate formalities of each subsidiary were strictly maintained, and each had its own general management structure and its own separate profit and loss statement. (JA0016124.)

In denying Terex's pre-verdict motion for JMOL, the district court primarily relied upon Mr. Hegarty's testimony and quoted from it:

> [THE COURT:] Terex is Powerscreen. Terex and Powerscreen are interchangeable. And the evidence is clear that that's so. As a matter of fact, it's made even clearer by the last part of the testimony, on page 3065, the testimony of Mr. Hegarty:
>
> Question: What were your responsibilities?
>
> Answer: Again, broad, the broad financial performance of three businesses. We still maintained in January 2004 each of the three businesses, Powerscreen, Finlay and Pegson. We still had its own general

management structure, its own separate P & L. I was
appointed over the three of them to just oversee the broad
financial performance and the broad strategy of the
business.

[THE COURT:] He's appointed to oversee the strategy of
the business.

Question: What does that mean? What does it
mean if you have broad responsibility for financial
performance?

[THE COURT:] This is no stockholder. Terex is no
mere owner in absentia like owning the stock, like I may
own General Electric.

(JA0017606.)

However, the district court's conclusion reflects a misunderstanding of the

law and how the law applies to the facts here. A corporate parent need not limit

itself to the status of "owner in absentia" or a "Wall Street broker," as the district

court required, in order to maintain the separate existence of its subsidiary. The

fact that Terex took an interest in the performance and "broad strategy of the

business" of its subsidiaries does not equate to "domination" or control sufficient

to disregard the corporate form. *See Akzona, Inc. v. Du Pont*, 607 F. Supp. 227,

238 (D. Del. 1984) (A parent's "general executive responsibilities" for its

subsidiary's operations that included approval over major policy decisions and

guaranteeing bank loans was insufficient to demonstrate domination and control).

Certainly, as a matter of public policy, not every parent company exercising

oversight over its subsidiaries should fear being held to be an alter ego of its subsidiaries for doing so.

Furthermore, nothing about Mr. Hegarty's testimony or duties suggests that Powerscreen was a mere façade for Terex or that Terex exercised "exclusive domination and control" of Powerscreen. Mr. Hegarty did not testify that his duties for Terex included the wholesale direction or control of Powerscreen. In fact, Mr. Hegarty testified that although Terex provided guidance to its subsidiaries, the ultimate decision-makers were employees of the subsidiary companies. While Mr. Hegarty was a vice president at Terex, the ultimate decision-maker for Powerscreen was a Powerscreen employee, Don Campbell. (JA0016122.) Likewise, when Mr. Hegarty served as General Manager of Powerscreen, it was Mr. Hegarty himself who directed the activities of Powerscreen, not someone at Terex. (JA0016123.)

Denying Terex's pre-verdict motion for JMOL, the district court also alluded to the fact that the Powerscreen logo on its products and materials contained the phrase, "Powerscreen, a Terex Company." (JA0017607; see e.g. JA0021023.) This fact is also insufficient evidence of an alter ego relationship. The Second Circuit has held that that, as matter of law, a subsidiary's identification of its parent in product materials and its use of the parent's logo, even in concert with other allegations of control, were not evidence that the two companies operated as a

"single economic entity." *Fletcher*, 68 F.3d at 1460 (use of parent's logo in promotional materials, among other factors, did not justify piercing the corporate veil); *see also Berkshire Life Ins. Co. v. Hagerman*, No. 09-CV-2037, 2010 WL 2771839, *4 (E.D.N.Y. July 13, 2010) ("the use of the [parent's] logo on [the subsidiary's] insurance documents is insufficient to demonstrate such control by [the parent]."); *Xerox Corp. v. Litton Indus., Inc.*, 353 F. Supp. 412, 418 (S.D.N.Y. 1973) (mere presence of the parent corporation's name and logo at subsidiary's retail stores and on subsidiary's employees' business cards insufficient to support alter ego liability); *Reers v. Deutsche Bahn Ag*, 320 F. Supp. 2d 140, 157 (S.D.N.Y. 2004) ("the fact that subsidiaries share a logo, or that the parent decides to present several corporations on a website in a unified fashion, is insufficient to show lack of formal separation between two entities").

Upon Terex's renewal of its JMOL motion after the jury's verdict, the district court purported to set forth additional rationales for its denial of that motion, but these too were contrary to the law and without support in fact. The district court added that when Mr. Hegarty testified that, "once Terex acquired Powerscreen, 'it became much more involved operationally, and in the terms of the business,'" this showed "more than mere ownership" and that there was "control and management." (JA0012973.) These observations reflect a continued incorrect view of the law. As set forth above, "more than mere ownership" or even "control

and management" are not the proper alter ego standards.  The bar is much higher.

*See Carotek*, 2012 WL 2469676 at *27 (*citing Wallace*, 752 A.2d at 1184 ("The

degree of control required to pierce the veil is 'exclusive domination and control ...

to the point that [the subsidiary] no longer ha[s] legal or independent significance

of [its] own.'").

Further, the district court took Mr. Hegarty's statements out of context, as is

evident from the actual testimony:

> [Terex] became more involved in best practices, for want
> of a better word, in terms of a manufacturing perspective
> in using these kind of tools, such as various
> manufacturing techniques, it could be common and
> shared across the business.  It should be leveraging
> purchasing, you know, taking a view of -- you know,
> there is one individual company that buys engines from a
> certain manufacturer.  Maybe we should leverage our
> purchasing power.  It became much more involved
> operationally, and in terms of the business.  However,
> there were certain segments of the business that was still
> felt best to run autonomously, such as in my view sales
> and marketing strategies, because it is my view that
> Terex Corporation had a very broad product portfolio,
> and the product portfolio is targeted at different customer
> segments, and sometimes different customer segments
> need to be purchased by different methodologies.  Some
> are direct relationships, some by distributors.  So that is
> why I say it was an evolving process. It wasn't an
> absolute process.  There were certain elements that were
> directed by corporate and a lot of elements that weren't.

(JA0016130.) In context, it is clear that the district court's myopic reliance on Terex's "operational involvement" with Powerscreen completely ignored the fact that this involvement was limited to sharing best practices among its subsidiaries.

Mr. Hegarty's testimony demonstrated not that Powerscreen was a "mere façade," but that Terex's influence was limited and clearly did not approach "exclusive domination and control."[3] A parent company is not required to ignore the fact that its subsidiaries could become more profitable by leveraging their common interests. *See In re Ski Train Fire in Kaprun*, 230 F. Supp. 2d 403, 411 (S.D.N.Y. 2002) ("[I]t is perfectly appropriate for a parent corporation to urge companies it owns to achieve its strategic and financial goals: that is, in fact, the purpose behind owning a portfolio of companies").

Likewise, the district court's post-verdict observations regarding the common advertising and marketing of Terex subsidiaries are wholly insufficient to support a finding of complete domination by Terex. (See JA0012973-JA0012974.)

---

[3]   Other testimony at trial also demonstrated Terex's limited role with respect to Powerscreen. Joe Daly, employed by Powerscreen, testified that Powerscreen and Pegson, another Terex subsidiary, had realigned their sales teams on the advice of Terex, who had "sort of advised them to align their dealers so that it makes a more efficient sales team." (JA0026725 at 282:23-283:4.) Daniel McCusker, who was employed by Powerscreen from 1988 until September 2005, testified that Terex "encouraged" cooperation between Powerscreen and Finlay, another subsidiary, to achieve "synergy between these companies." (JA0026749 at 93:16-19.)

As demonstrated above, common marketing or branding is not sufficient to establish alter ego liability. *See e.g. Fletcher*, 68 F.3d at 1460. The use of a common trade name (like "Terex") in advertising, "intended to be read by the consuming public, cannot create a single entity structure given the sophistication and complexity of today's corporate world." *In re Ski Train Fire*, 230 F. Supp. 2d at 411; *see also J.L.B. Equities, Inc. v. Ocwen Financial Corp.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) (failure to distinguish between parent and subsidiary on webpage held insufficient to show that the parent controls the subsidiary's marketing and operational policies).

The district court also implied that Terex's 2004 10-K stated that Terex was the designer, manufacturer and marketer of mobile crushing and screening equipment. (JA0012974.) However, when the 10-K is read in context, it is clear that the statement was that the ***companies within*** the Terex Construction segment design, manufacture and market the equipment referenced. The quoted section of the 10-K, titled "Terex Construction," listed the individual "significant manufacturing operations" within the segment and stated that Powerscreen was the entity manufacturing and selling "washing systems, ***screens*** and trommels." (JA0022891-JA0022892 (emphasis supplied).) These statements, along with the others quoted by the district court, show nothing more than a commonality of interests and reporting among Terex's subsidiaries. This is not evidence upon

which the corporate veil may be pierced. *See O'Donnell v. Club Mediterranee S.A.*, No. 05-CV-610, 2008 WL 794975, *11 (E.D.N.Y. March 24, 2008) ("that the entities use the same name and logo and annually report their operations as a consolidated group, are common in corporate conglomerate structures ... and simply establish commonality in the resources and goals of the [] entities, but do not demonstrate control or domination of one entity over the other").

Finally, the district court also purported to find an intermingling of funds between Terex and Powerscreen by stating that "Powerscreen's profits do contribute to Terex Corporation's bottom line" and that "when a distributor seeks to purchase a Powerscreen infringer, it is Terex that offers financial assistance." (JA0012973.)  However, there was no evidence (and the district court did not cite to anything in the record) of actual intermingling of corporate accounts between Terex and Powerscreen or that Terex siphoned corporate funds from Powerscreen, as required to pierce the corporate veil on this criterion.

Each Terex subsidiary "had its own general management structure, its own separate P&L." (JA0016124).  Terex prepared consolidated financial statements, but those statements segregated the financial information of Terex from its subsidiaries.  (See e.g. JA0023252.)  Consolidated financial results in publicly filed statements merely reflect compliance with the SEC requirement that corporations consolidate the results of subsidiaries for which they own a 50 percent or more

interest, and are not probative of control for veil piercing purposes. *McAnaney v. Astoria Financial Corp.*, 665 F. Supp. 2d 132, 144 n. 12 (E.D.N.Y. 2009) (*citing Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 121 n. 3 (2d Cir. 1984)).

Terex providing financing to distributors to ensure that the products of its subsidiaries were widely distributed also has no bearing on whether Terex completely dominated or controlled Powerscreen. Even evidence of loans or transfers of cash for investments directly between parent and subsidiary, which was not present here, does not establish any undue interference in the daily operations of the subsidiary or that the parent has control over its subsidiary. *See Vendetti v. Fiat Auto S.p.A.*, 802 F. Supp. 886, 895 (W.D.N.Y. 1992). Evidence of financing to third-party distributors is even further removed from the relationship between parent and subsidiary and cannot support a conclusion that Terex dominated or controlled Powerscreen such that the separate corporate existences of Terex and Powerscreen should be disregarded.

The scanty evidence presented, even when viewed in the aggregate, is legally insufficient to make a determination that Terex and Powerscreen are a "single economic entity." For example, similar facts were at issue in *Fletcher.* In that case, the facts demonstrated, *inter alia,* that (i) defendant's parent, Eastman Kodak Company ("Kodak") exerted control over defendant's expenditures and had

a "dominating presence" on defendant's board of directors; (ii) defendant's advertising, promotional literature and annual reports described its relationship with Kodak as one of control by Kodak; and (iii) Kodak employed a cash management system whereby the defendant maintained a zero-balance bank account. *Fletcher*, 68 F.3d. at 1459. Despite these facts, the Second Circuit held that there was no issue of fact to be tried with respect to the plaintiffs' alter ego theory of liability. *Id.* at 1461; *see also McAnaney*, 665 F. Supp. 2d at 144 (together, "controlling ownership interest in subsidiaries, reporting of consolidated results of such subsidiaries in public filings, and overlapping directors and officers between parent and subsidiary corporations—are commonplace as generally-accepted corporate form, and are insufficient without more, as a matter of law, to eviscerate the presumption of corporate separateness"); *O'Donnell*, 2008 WL 794975, *11 (evidence that *inter alia* – (a) subsidiary employees around the world reported indirectly to parent's offices; (b) all subsidiary entities did business under the same name and advertised using the same logo; (c) annual reports spoke of parent and all of its subsidiaries as a single, consolidated entity, combining its revenue, profits, and operations – did not, even in combination with other evidence, establish that there was such a degree of domination and control of a parent over a subsidiary that the subsidiary was "reduced to an alter ego").

### B.    Maintaining the Separate Corporate Existences of Terex and Powerscreen Is Entirely Just and Fair

The district court also failed to engage in the necessary analysis of whether injustice is present. *See Fletcher*, 68 F.3d at 1457. There was a total absence of evidence of an "overall element of injustice or unfairness" where Terex and Powerscreen are maintained as separate entities. The court suggested that the word "Terex" appearing on Powerscreen products confuses consumers; that it "means something to the people that buy it. It means they own that product. It means they put out that product. It means they manufacture that product." (JA0017607.) However, there was no evidence to suggest that Terex or Powerscreen sought to employ their corporate structures to mislead consumers or creditors, or that the dealers to whom Powerscreen sells its equipment or its end-user customers were in fact confused. There is nothing inequitable about the means by which Terex and Powerscreen market products, nor is there any injustice in preserving the separate corporate existences of Terex and Powerscreen. *See Reers*, 320 F. Supp. 2d at 157.

Additionally, Powerscreen and Terex have filed an appeal bond, executed on July 10, 2012, under which *each* have undertaken and promised to pay to Metso all damages, costs and interest that may be awarded in this matter up to $50,000,000. (JA0026670-JA0026672.) Thus, Metso cannot claim that its ability to recover damages will be thwarted by granting Terex's motion for JMOL.

27

In summary, the district court plainly applied the wrong standard in evaluating Terex's motion for JMOL, and its Decision should be reversed. The jury did not base its verdict on any facts regarding relationship between Terex and Powerscreen because the district court withheld that inquiry from it entirely. *See* Point IV, *infra*. Even so, there was nothing for a jury to consider because there was no legally sufficient evidence to establish any of the factors that may demonstrate that the two companies operate as a "single economic entity," characterized by "exclusive domination and control" of the subsidiary by its parent, or that an "overall element of injustice or unfairness" is present in preserving their separate corporate existences.

**III.    The District Court Erred in Denying Terex's Motion for JMOL Because Under the Proper Legal Standard There Was No Evidence On Which a Jury Could Have Found Terex Liable for Direct Infringement of the '618 Patent**

Metso failed to meet its burden pursuant to 35 U.S.C. § 271(a) to prove by a preponderance of the evidence that Terex made, used, sold, offered for sale within the United States or imported into the United States a product that infringed the '618 patent. The district court, denying Terex's post-verdict motion for JMOL, claimed without any support that the jury had sufficient evidence from which to conclude "that Terex itself offered for sale one or more of the infringing

Powerscreen mobile screeners. Terex has sufficiently identified itself to the world that it is the manufacturer and seller of the accused screeners." (JA0012975.)

Contrary to the district court's statement, no evidence at trial showed that Terex itself committed any act of infringement. In fact, the only evidence related to the allegation of Terex's manufacture and sale of the accused infringing products was the testimony of Kieran Hegarty, who unequivocally stated that Terex did not itself make or sell mobile screeners. (JA0016125.) Further, Metso's own damages expert, after testifying that she had reviewed a substantial amount of information regarding Powerscreen and Terex, as well as the trial transcript preceding her testimony, admitted that she had seen no basis for concluding that Terex made or sold any of the accused mobile screeners. (JA0014587- JA0014589; JA0015020.) The record establishes that Powerscreen, not Terex, was the entity manufacturing and selling the equipment at issue in the case. (See e.g. JA0015770- JA0015772; JA0026720-JA0026721 at 113:24-115:3 (discussing dates during which Powerscreen sold various accused screeners); JA0026442 at ¶ 9 ("Since in or about 1983, Powerscreen has designed, manufactured, and sold mobile screeners known as 'Chieftain'..."); JA0022892 ("[Powerscreen] and Powerscreen Limited ... manufacture and sell washing systems, screens and trommels.").)

With respect to the district court's statement (unsupported by any citation to the record) that the jury had sufficient evidence to find an offer to sell the alleged infringing products, the only evidence that could even remotely be argued to support this conclusion is that two of the eleven accused screeners appeared on Terex's website. (JA0021374; JA0024959.) However, marketing two Powerscreen products is not the same as making an offer to sell them, much less the other nine products. Liability for an "offer to sell" under Section 271(a) is determined "according to the norms of traditional contractual analysis." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) (*quoting Rotec Indus. v. Mitsubishi Corp.*, 215 F.3d 1246, 1255 (Fed. Cir. 2000)). "Thus, the defendant must 'communicate a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'" *Id.* (*quoting Rotec Indus.*, 215 F.3d at 1257.) At a minimum, an "offer to sell" must convey "a description of the allegedly infringing merchandise and the price at which it can be purchased." *Id.* (*citing 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998)).

No marketing materials attributed to Terex at trial contained price terms or any other information that would indicate the accused mobile screeners could be purchased from Terex. (See e.g. JA0021374.) Thus, there was no evidence that

Terex made any offer for sale since there was nothing a third party "could make into a binding contract by simple acceptance." *See MEMC Elec. Materials*, 420 F.3d at 1376. Coupled with the complete absence of evidence as to Terex's manufacture or sale of mobile screeners, the absence of any offer to sell demonstrates the lack of legally sufficient evidence upon which a reasonable jury could have found Terex liable for direct infringement of the '618 patent. To the extent the district court held post-trial that the jury verdict found that Terex was a direct infringer of the '618 patent, any such verdict would have been based on surmise and conjecture, warranting reversal.[4]

## IV. The District Court Erred by Deciding Whether Terex and Powerscreen Are Alter Egos and Not Properly Instructing the Jury on the Issue

Terex is alternatively entitled to a new trial because the district court's usurpation of the decision as to whether Terex and Powerscreen are alter egos, its subsequent failure to instruct the jury regarding the requirements for piercing the corporate veil, and its failure to instruct the jury to consider the liability of Terex and Powerscreen separately, constituted prejudicial errors of law.

---

[4] Indeed, the district court's reliance on the possibility that the jury could have found Terex to be a direct infringer on its own is a non sequitur since the court, erroneously, failed to allow the jury to make any such finding. *See* Point IV, *infra*.

As set forth in the Statement of the Case, the district court refused to submit the question of alter ego liability to the jury. *See* pages 4-5, *supra.* In denying Terex's post-trial motions, the court attempted to justify its action by claiming that piercing the corporate veil is an equitable remedy, and thus it was appropriate for the court to make that determination itself as a matter of law. (JA0012975.) Both the initial refusal to submit the alter ego question to the jury and the district court's post-trial analysis constituted error.

The Supreme Court has held that to determine whether a claim is to be tried by a jury, it is necessary to "examine both the nature of the issues involved and the remedy sought." *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 565 (1990); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989). The second stage of the analysis is more important than the first. *Id.* Under that analysis, alter ego liability in a damages case is a jury question.

In *William Passalacqua Builders, Inc. v. Resnick Developers S, Inc.*, 933 F.2d 131 (2d Cir. 1991), the Second Circuit applied this two-part analysis and concluded that a claim of alter ego liability was triable by a jury. First, the Second Circuit found that the view holding that piercing the corporate veil is of legal origin has greater historical support than the view that it is of equitable origin. *Id.* at 135. Next, the Second Circuit observed that the plaintiff sought monetary relief, indicating a legal action. *Id.* at 136. These factors together, along with the fact-

intensive nature of the veil-piercing inquiry, confirmed the need for a jury trial. *Id.* at 136-37.

Because the question of whether a party has the right to a jury is outside this Court's exclusive jurisdiction, the Second Circuit's application of the *Chauffeurs* and *Granfinanciera* analysis in *Passalacqua* controls here. *See 3M Co. v. Mohan*, No. 2011–1328, 2012 WL 1949033. at *3 (Fed. Cir. May 29, 2012) (applying regional circuit law in determining the right to a jury trial); *cf. Transmatic Inc. v. Gulton Industries, Inc.*, 53 F.3d 1270, 1278-79 (Fed. Cir. 1995) (the question of whether a party waived its right to a jury trial is not unique to patent law).

The district court ignored controlling Second Circuit and Supreme Court precedent and reached the wrong result on Terex's request that the issue of piercing the corporate veil be heard by the jury. As was the case in *Passalacqua*, Metso seeks money damages from both Terex and Powerscreen, and thus its claim against Terex based on the theory of alter ego liability is properly considered at law according to the *Chauffeurs* and *Granfinanciera* analysis. *See Passalacqua*, 933 F.2d at 136-37.[5]

---

[5] Although Metso also sought injunctive relief in this action, the right to a jury cannot "be impaired by any blending with a claim, properly cognizable at law, of a demand for equitable relief in aid of the legal action or during its pendency." *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510-11 (1959) (*cited in Passalacqua*, 933 F.2d at 136).

The cases cited to the contrary by the district court do not support taking the decision on piercing the corporate veil in this case away from the jury. (See JA0012975- JA0012976.)[6] *Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co.*, 417 U.S. 703 (1974), did not involve either a claim of alter ego liability or a determination of whether a claim was equitable or legal in nature. In that case, the Supreme Court disregarded the plaintiff's corporate form only because its current shareholders could not maintain the derivative action purportedly brought by the corporation. *Id.* at 713 ("where equity would preclude the shareholders from maintaining an action in their own right, the corporation would also be precluded"). Thus, failing to disregard the corporate form in *Bangor Punta* would have threatened public policy and created a significant loophole in the Federal Rules of Civil Procedure. *See id.*

In contrast, this action does not involve attributing shareholder conduct to a corporate entity, but rather protection from liability for the alleged wrongs of a separate corporate subsidiary. Such protection is well established and is at the very foundation of corporate law. *See Kalb, Voorhis & Co.*, 8 F.3d at 133 ("[A]

---

[6] The cases cited in support of the district court's finding that it rather than the jury was to decide the veil-piercing inquiry are drawn directly from the *Passalacqua* opinion. *Compare* JA0012975 *with Passalacqua*, 933 F.2d at 135. As set forth above, however, the Second Circuit concluded that the reasoning in the cases cited by the district court is *less supported* by the historical record than those holding that a claim for alter ego liability is legal in nature and should go to a jury. *Passalacqua*, 933 F.2d at 135-36.

corporation is a creature of state law whose primary purpose is to insulate

shareholders from legal liability…"). No threat to public policy results from

honoring Terex and Powerscreen's separate corporate existences. Also, *Bangor*

*Punta* was decided prior to the Supreme Court's directly controlling decisions in

*Chauffeurs* and *Granfinanciera* and did not employ the two-part analysis

established by those cases.

*United States v. Golden Acres, Inc.*, 684 F. Supp. 96 (D. Del. 1988), the

other case cited by the district court, was also decided before *Chauffeurs* and

*Granfinanciera* and likewise did not include the required two-part analysis. *See*

*G-I Holdings, Inc. v. Bennet*, 380 F. Supp. 2d 469, 475-76 (D.N.J. 2005)

(distinguishing *Golden Acres* and *Bangor Punta* on the grounds that they were

decided prior to *Granfinanciera* and directing a jury trial on a veil piercing claim).

*Golden Acres* is also clearly contrary to the law in the Second Circuit, which is the

law to be applied here. *See e.g. Passalacqua*, 933 F.2d at 137 (whether or not alter

ego factors are present "is the sort of determination usually made by a jury because

it is so fact specific"); *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 59 (2d

Cir. 1988) ("the issue of corporate disregard is generally submitted to the jury.").[7]

---

[7] The district court's citation to Fletcher's Encyclopedia is flawed for the same
reasons.

The district court's error manifested itself in and was compounded by its instruction to the jury on the issue of Terex's liability. *See* page 5, *supra*. This instruction indisputably prejudiced Terex because it prevented the jury from fulfilling its obligation to determine whether Metso had met its burden to demonstrate either that Terex had directly infringed the '618 patent or that Terex so completely dominated Powerscreen that it could be held liable for any infringement by Powerscreen. The jury had no choice but to find Terex liable in the event it found Powerscreen liable. As a consequence, Terex was prejudiced and is entitled at the very least to a new trial on the issue of its liability.

This Court's decision in *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308 (Fed. Cir. 2010), is compelling as to the need to grant a new trial. There, the jury found all of the defendants, including two employees of the corporate defendant, liable on all infringement theories. This Court examined the jury instructions and found that the they contained no statement as to the legal status of the corporate defendant or the asserted alter ego relationship with the employee defendants. *Id.* at 1310-11.

Noting that under the law applicable in the case, harmless error would not warrant reversal, this Court held that the failure to instruct the jury properly was not harmless. *Id.* at 1315. Even though the plaintiff identified evidence in the record that the corporate defendant served as the individual defendants' alter ego,

"a correctly instructed jury could have concluded otherwise." *Id.* Further, although the district court's order denying the defendants' post-trial motion had identified evidence tending to prove that the corporate defendant was not even operating as a corporation during the time of the infringement, this Court held that because the jury instructions were plainly erroneous, the proceedings rested on a mistake of law warranting a new trial. *Id.*

In the absence of JMOL in Terex's favor, a new trial must also be ordered here. The jury instruction on Terex's liability was erroneous and the resulting verdict rested on a mistake of law. The instruction failed to honor or implement the presumption that Terex and its subsidiary are distinct, separate entities. *Fletcher*, 68 F.3d at 1458 ("[T]he legal entity of a corporation will not be disturbed until sufficient reason appears") (*citing Harco Nat'l Ins. Co.*, 1989 WL 110537, at *4). It also failed to provide the jury with any instruction regarding the law of alter ego liability or the proper legal standard to apply. *See Luciano,* 110 F.3d at 218 (2d Cir. 1997) ("[A] jury charge is erroneous if the instruction misleads the jury as to the proper legal standard, or it does not adequately inform the jury of the law").

Further, the faulty jury instruction cannot be regarded as harmless. "An error is harmless only when ...it 'did not influence the jury's verdict.'" *Sanders,* 361 F.3d at 758 (*quoting Gordon v. N.Y.C. Bd. of Educ.,* 232 F.3d 111, 115-16 (2d Cir. 2000)). The faulty instruction here undoubtedly influenced the jury's

disposition as to Terex.  Under the instruction provided to it, the jury was not able

to make a separate determination that Terex itself did or did not infringe the '618

patent.  The jury was also not given any opportunity to assess whether Terex so

dominated Powerscreen that they should take the extraordinary step of

disregarding those entities' separate corporate existences.

Even assuming, *arguendo*, that there was evidence at trial suggesting a basis

upon which to pierce the corporate veil between Terex and Powerscreen, a

correctly instructed jury certainly could have concluded otherwise, and such

evidence would not preclude a new trial.  *See U.S. v. Landau*, 155 F.3d 93, 104 (2d

Cir. 1998) ("Unlike a motion for judgment as a matter of law, a motion for a new

trial may be granted even if there is substantial evidence to support the jury's

verdict"); *see also Wordtech Sys.*, 609 F.3d at 1315.  Terex was entitled to have the

jury make that determination, and the erroneous jury instruction provided by the

district court harmed Terex as a result.  At a minimum, a new trial is required.

**V.    Terex Joins the Powerscreen Appellants in Their Arguments that the Remaining Judgments of the District Court Appealed from Should be Reversed**

Terex hereby adopts and incorporates by reference the arguments set forth in Sections I through IV of the brief filed by the Powerscreen Appellants, which it will not repeat here.

## CONCLUSION

For the foregoing reasons, the judgment that Terex infringed the '618 patent

should be reversed.  Terex is entitled to judgment as a matter of law pursuant to

Fed. R. Civ. P. 50.  Alternatively, as a result of the district court's error of law in

deciding the issue of alter ego liability without submitting it to the jury, as well its

prejudicially erroneous jury instruction, a new trial should be granted on the issue

of Terex's liability.

Dated:   New York, New York
         August 2, 2012

                        Respectfully submitted,

                        BRYAN CAVE LLP

By: _____
                        Vincent Alfieri
                        Michael G. Biggers
                        Joseph Richetti
                      1290 Avenue of Americas
                      New York, New York 10104
                      (212) 541-2000

                      *Attorneys for Defendant-Appellant*
                      *Terex Corporation*

# ADDENDUM

US005577618A

# United States Patent [19]

## Rafferty

[11] **Patent Number:** **5,577,618**

[45] **Date of Patent:** **Nov. 26, 1996**

[54] **MOBILE AGGREGATE MATERIAL PROCESSING PLANT**

[76] Inventor: **Malachy J. Rafferty**, Termunbeg, Carrickmore, Omagh, County Tryone, Northern Ireland

[21] Appl. No.: **301,578**

[22] Filed: **Sep. 7, 1994**

[30] **Foreign Application Priority Data**

Sep. 7, 1993 [IE] Ireland ................... S93 0654

[51] Int. Cl.⁶ ......................................... **B07B 1/49**

[52] U.S. Cl. ........................... **209/421; 209/244**

[58] Field of Search ...................... 209/421, 313, 209/311, 235, 240, 241, 243, 244

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 983,659 | 2/1911 | Titcomb | 209/241 |
| 1,785,402 | 12/1930 | Arentzen | |
| 1,796,549 | 3/1931 | White | 209/243 |
| 3,444,987 | 5/1969 | Palmer | 198/233 |
| 4,190,526 | 2/1980 | Bachand | 209/421 |
| 4,237,000 | 12/1980 | Read et al. | 209/319 |
| 4,256,572 | 3/1981 | Read | 209/257 |
| 4,591,432 | 5/1986 | Hartl | 209/421 |
| 4,997,135 | 3/1991 | Zehr | 241/101.7 |
| 5,120,433 | 6/1992 | Osadchuk | 209/235 |
| 5,234,564 | 8/1993 | Smith | 209/241 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0284296 | 9/1988 | European Pat. Off. | 209/240 |
| 2207874 | 2/1989 | European Pat. Off. | 209/240 |
| 1415640 | 11/1975 | United Kingdom . | |
| 1414786 | 11/1975 | United Kingdom . | |
| 1449001 | 9/1976 | United Kingdom . | |
| 1480688 | 7/1977 | United Kingdom . | |
| 2223963 | 4/1990 | United Kingdom . | |
| WO85/03652 | 8/1985 | WIPO . | |

*Primary Examiner*—William E. Terrell
*Assistant Examiner*—T. Kelly
*Attorney, Agent, or Firm*—Jacobson, Price, Holman & Stern, PLLC

[57] **ABSTRACT**

An aggregate material processing plant (1) has an input hopper (5) communicating with a screen box (8) which provides three material separations. The finest material is delivered through a longitudinal conveyor (11). The two other grades are delivered to hoppers (12) (13) which feed lateral conveyors (20). Each lateral conveyor (20) has a head section (22) which pivots relative to a tail section (21) about an axis which is perpendicular to the plane of the conveyor belt (27). In addition, part of the tail section (21) pivots about an axis which extends longitudinally so that whole conveyor can be mounted in the transport position within the lateral confines of the chassis and the height of other parts of the plant.

**12 Claims, 9 Drawing Sheets**





*Fig.1*



Fig.2



*Fig. 3*



Fig. 4

Case: 11-1572    Document: 40    Page: 57    Filed: 08/02/2012



*Fig. 7*

Case: 11-1572    Document: 40    Page: 58    Filed: 08/02/2012



Fig. 8(a)

Fig. 8(b)



Fig.9(a)

Fig.9(b)

5,577,618

| 1 | 2 |

# MOBILE AGGREGATE MATERIAL PROCESSING PLANT

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The invention relates to mobile, road-hauled aggregate material processing plant such as screening plant, crushing plant for quarries, or mining plant. Examples of such plant are described in U.S. Pat. Nos. 4,237,000 (Read) and 4,256,572 (Read). In this specification, the term "aggregate material" means materials such as sand, crushed stones, bricks and any construction material, loam, mined material such as coal, or recyclable materials, timber, wood chips etc.

### 2. Prior Art Discussion

In an aggregate material processing plant generally, processing capacity is heavily influenced by the ability to quickly and effectively deliver the processed material away from the plant. To achieve this, it is known to provide lateral conveyors which extend transversely of the plant, possibly in addition to longitudinal conveyors. While the manner in which such lateral conveyors are connected to the plant is relatively simple for the operative position, where the processing plant is mobile major problems arise in ensuring that the overall width and height of the mobile plant is within certain dimensions when carrying such conveyors during transport. Another problem is ensuring safety, on-site, in movement of the lateral conveyors to a position for transport of the mobile plant. A still further problem is that of providing for easy and safe maintenance or repair of the lateral conveyors on-site or at a workshop.

In British Patent Specification No. GB-2223963 (J. McDonald) an arrangement is described whereby conveyors including a lateral conveyor are separated from the mobile plant and are then lifted by a loader onto upper support brackets mounted above the plant. These brackets significantly increase the height of the plant. Further, carrying separated conveyor sections on such brackets may be a safety hazard. It is a time-consuming and awkward exercise to separate the conveyor sections, mount them on a loader and lift them onto the brackets.

PCT Patent Specification No. WO 85/03652 (Powerscreen Int. Ltd.) describes a mobile screening apparatus in which there is a pair of opposed lateral conveyors extending on opposite sides of the apparatus. The conveyors are mounted on pivots which allow them to be pivoted from a laterally-extending operative position at 24° to horizontal to a transport position extending longitudinally at 10°–12° to the horizontal. Because the plant must accommodate the conveyors in the transport position in this manner, it must be of sufficient length to avoid a situation where they protect longitudinally beyond the plant. Another problem is that plant equipment mounted on the chassis must be narrow enough along the full length of the lateral conveyors so that they do not extend laterally. This aspect puts considerable design limitations on the plant, which may affect its processing capacity. For repair or maintenance of the lateral conveyors, access by personnel may be difficult and unsafe in some situations.

British Patent Specification No. GB 1,480,688 (Machines & Structures Ltd.) also describes a mobile screening plant having lateral conveyors. These conveyors are pivotable about a vertical axis through 180° for delivery of separated material to different stockpiles. The range of rotation appears to include a transport position at which they lie longitudinally alongside the processing plant. Accordingly,

similar problems appear to arise as for the machine described in Specification No. WO 85/03652.

In British Patent Specification No. GB 1,449,001 (Powerscreen Int. Ltd.) a mobile separating apparatus is described which has a pair of lateral conveyors. Cross-reference is made to conveyor arrangements described in GB 1,414,786 and GB 1,415,640 (Powerscreen Int. Ltd.). In these specifications, conveyors are described which rotate about a vertical pivot axis between longitudinal and lateral positions. It appears that the longitudinal positions are used for transport, thus extending the length of the plant.

Thus, while lateral conveyors have been extensively used in the past and there have been many solutions to the problems, there are still many practical problems which arise for transport of the mobile plant. These problems can be very important where the plant is frequently moved from site to site and where the plant must be transported over large distances from the place of manufacture.

## OBJECTIVES OF THE INVENTION

An object of the invention is to provide a mobile, road-hauled aggregate material processing plant which has lateral conveyors which may be moved to a transport position within the lateral and vertical dimensions of other parts of the plant without an adverse impact on plant processing capacity and effectiveness generally.

Another object is that the lateral conveyor be easily moved to the transport position in a quick, effective and safe manner.

A still further object is that the lateral conveyor may be easily moved to a maintenance position with easy access for improved safety and ease of maintenance.

## SUMMARY OF THE INVENTION

The invention provides a mobile, road-hauled aggregate material processing plant in which there is a chassis and a plant support frame which supports a raw material input hopper, a material processing means having an outlet, and a processed material outfeed delivery means. At least one lateral conveyor is incorporated in the outfeed delivery means and this has a tail section and a head section. A tail articulation means provides for movement of at least part of the tail section relative to the plant support frame from an operative position extending laterally of the chassis for outfeed of processed material, to a transport position extending substantially upright above the chassis and positioned with respect to the input hopper and the material processing means so that it does not project laterally beyond the chassis. The head articulation means connects the head and tail sections and allows relative movement of the head section from an operative position to the transport position with the head section extending longitudinally above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis. The lateral conveyor has a conveyor frame which is articulated by the tail and head articulation means and the conveyor is completed by a plurality of rollers mounted on the conveyor frame and an endless conveyor belt which defines a conveyor plane.

What has been achieved by the invention is movement of a lateral conveyor from an operative position to a transport position at which it does not extend laterally beyond the chassis and at which it does not need to extend any higher than other parts of the plant with little or no impact on other plant parts. The problem solved is a major one as heretofore,

5,577,618

3

major difficulties have arisen eves before the mobile processing plant arrives at its destination from the manufacturers. Transport regulations and ensuring safety have caused major delays and sometimes design modifications. These problems have been overcome in a very simple manner.

The phrase "plant support frame" is intended to cover any fixed support frame which is mounted on the chassis and which supports any of the parts of the plant.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention will be more clearly understood from the following description of some embodiments thereof given by way of example only with reference to the accompanying drawings in which:

FIG. 1 is a diagrammatic side view showing part of a mobile, road-hauled aggregate material processing plant of the invention in use;

FIG. 2 is a diagrammatic, cross-sectional view of part of the processing plant showing material outfeed in the lateral direction;

FIG. 3 is a diagrammatic side view showing the manner in which the plant is transported;

FIG. 4 is a perspective view, also showing the plant being transported;

FIG. 5 is a diagrammatic cross-sectional front view showing the transport position for two lateral conveyors;

FIGS. 6 and 7 are diagrammatic plan views showing articulation of a conveyor head section;

FIG. 8(a) is a front view of a lateral conveyor and FIG. 8(b) is a diagrammatic cross-sectional view showing a pivot joint for head articulation in more detail; and

FIGS. 9(a) and 9(b) are perspective views from underneath showing a lateral conveyor with particular detail of a tail articulation arrangement.

DETAILED DESCRIPTION OF SOME EMBODIMENTS

Referring to the drawings, and initially to FIGS. 1 and 2 there is shown a mobile, road-hauled aggregate material processing plant of the invention, indicated generally by the reference numeral 1. The plant 1 is in this embodiment for screening and grading of aggregate materials such as stone, rubble, loam, or mined minerals. The plant 1 comprises a chassis 2 having a pair of longitudinal beams mounted on wheels 3(a) and supported on jack legs 3(b). A plant support frame 4 is mounted on the chassis 2 and in this embodiment the frame 4 takes the form of several separate sub-frames at different parts along the length of the chassis 2.

The plant 1 comprises an input hopper 5 which is a vibratory hopper having a set of eloping grid bars 5(a), the hopper 5 being mounted over an input hopper conveyor 6. The input hopper 5 communicates with a material processing means by way of the input hopper conveyor 6 and a main internal conveyor 7 which extends centrally and longitudinally along the plant 1 above the chassis 2. The end of the main internal conveyor 7 is mounted over a material processing means, namely a sloped screen box 8 incorporating a two-deck vibrating screen giving these sizes. Further, the plant 1 comprises a processed material outfeed delivery means 10 which is mounted on the plant support frame 4 and fed from outlets of the screen box 8.

The processed material outfeed delivery means 10 comprises a longitudinal delivery conveyor 11 which extends rearwardly of the plant 1 for delivery of processed aggregate

4

material of the smallest graded size behind the plant 1 to forms stockpile as shown in FIG. 1. There are two other separations and these are delivered from the lower end of the screen box 8 into hoppers 12 and 13. Each of the hoppers 12 and 13 is mounted above a lateral conveyor, one extending on each side of the plant 1. An hydraulic control unit 14 is mounted on the frame 4 for supply and control of hydraulic fluid for the plant 1.

For clarity, the lateral conveyors are not shown in FIG. 1, however, they are shown in FIG. 2 where many parts of the plant 1 have been omitted so that the lateral conveyors are clearly illustrated. There is a pair of lateral conveyors 20 and each conveyor 20 comprises a tail section 21 and head section 22. The plant 1 also comprises a tail articulation means for movement of the tail section 21 and a head articulation means for movement of the head section 22. These are described in more detail below. The head section 22 delivers processed material to form a stockpile such as the stockpile 23 shown in FIG. 2. A safety cage 24 is mounted at the extremity of the head section 22 and this is mounted on a conveyor frame 25 which also supports rollers 26 for an endless conveyor belt 27. In this embodiment the endless conveyor belt 27 is of high-strength synthetic rubber composition, however, it is envisaged that any other type of endless conveyor belt such as a mesh arrangement could be used instead. The rollers 26 form a trough-like arrangement with a central lowermost roller and a pair of side rollers extending laterally and upwardly above the conveyor frame 25. This provides for self-centring of the belt 27.

In operation, material is delivered by a loader into the input hopper 5. Oversize material slides off the grid bars 5(a) to one side of the plant 1 and the material to be graded drops through the bars 5(a) onto the input hopper conveyor 6. This conveyor delivers the material to be graded onto the main internal conveyor 7 which delivers the material (arrow A, FIG. 2) to the top end of the screen box 8. The screen box 8 is inclined as illustrated in FIG. 1 and has two screen decks. Oversize material for the top screen deck is delivered to the hopper 13 (arrow B, FIG. 2), whereas intermediate material from above the lower screen deck is delivered to the hopper 12. The finest material is delivered out via the lateral conveyors 20 (arrow C, FIG. 2). Material which passes through both screen decks is delivered onto the longitudinal conveyor 11. Thus, there are three separations of the material which is suitable for grading, and in addition initial oversize material is delivered to one side of the input hopper 5. As shown in FIGS. 1 and 2 the arrangement of conveyors provides for very large stockpiles of materials to be generated, thus giving a high delivery capacity.

The manner in which the plant 1 is transported is shown in FIGS. 3 to 5. As shown in FIG. 3 the jack legs 3(b) are lifted out of the operative position and that part of the plant support frame 5 underneath the inlet hopper 5 is mounted on the filth wheel of a tractor 30. The plant 1 may then be hauled along a road on the wheels 3(a). As shown in FIG. 3, the longitudinal conveyor 11 is folded back on itself so that it retracts inwardly.

As is clear from all three drawings, the lateral conveyors 20 each move to a transport position where they are within the lateral confines of the chassis 2 and do not protrude above the height of the hopper 5. This is achieved by the manner in which the lateral conveyors 20 are articulated and location of the input hopper, the conveyor 7 and the screen box 8. This articulation involves the tail articulation means causing pivotal movement to an upright position above the chassis and within the lateral confines of the chassis of that part of the tail section 21 which protrudes beyond the

5,577,618

5

support frame 4. A head articulation means causes pivotal motion of the head section 22 about the tail section 21 so that they are at right angles and the head section 22 extends longitudinally above the chassis and does not project laterally beyond the chassis. When in the transport position, the head section 22 of each conveyor 20 is supported on a transverse support bracket 32 which acts as a rest or seat for the conveyor and provides stability. As is clear from FIG. 4, the belt 27 has a smaller width than the rollers 26 and therefore this provides enough play for the pivoting of the head section about the tail section.

It will also be clear from FIGS. 3 to 5 that the lateral conveyors 20 are completely accommodated above the chassis and do not project laterally beyond it. This includes the safety cages 24 mounted at the extremity of each head section 22 as these project inwardly in free space above the main internal conveyor 7. Thus, it will be appreciated that there is no need to remove any parts of the conveyor before it is moved to the transport position. Both lateral conveyors 20 are within both the lateral and height dimensions of the other parts of the plant and this provides for safety in addition to convenience and efficiency. For example, as is clear from FIG. 4, the lateral conveyors 22 do not project beyond the wheel arches 33.

Referring now to FIGS. 6 to 9 inclusive, construction of both articulation means and of the lateral conveyor is shown in more detail. The tail section 21 comprises an inner, fixed part 40 and an outer pivoting part 41. The fixed part 40, as shown in FIGS. 2 and 5 is mounted directly beneath the relevant hopper 12 or 13 and is fixed in position on a part of the plant support frame 4. The pivoting part 41 is pivotally connected by pivot joints 42 to the fixed part 40. A pair of hydraulic rams 43 is mounted between the plant support frame 4 underneath the fixed part 40 and the pivoting part 41 to pivot the pivoting part 41 of the tail section 21 about a pivot axis which extends longitudinally. The pivot joints 42 and the rams 43 form an articulation means for the tail section 21.

The outer extremity of the pivoting part 41 is tapered at 45 and supports a pivot joint 50. The pivot joint 50 together with an hydraulic ram 51 and a tapered part 52 of the frame of the head section 22 form part of the head articulation means. The head section 22 rotates about the tail section 21 and an axis through the joint 50 which extends perpendicularly to a plane defined by the conveyor belt 27. This rotation is between an in-line operative outfeed position as shown in FIG. 6 and a folded position as shown in FIG. 7.

Articulation of each conveyor 20 can provide three different conveyor positions. Two positions are the transport and operative positions already described. However, another position is where the pivoting part 41 of the tail section 21 extends laterally outwardly as shown in FIG. 7 with the head section 22 at right angles. In this position for the conveyor 20 both the tail and head sections 21 and 22 are substantially horizontal and are at a working height so that they can be accessed by personnel without the need to mount ladders or use cranes or other lifting apparatus. Furthermore, it will be appreciated that because the head section 22 extends longitudinally, parallel to the chassis 2, it requires very little lateral space and may be easily worked on in a workshop having limited space. For example, upon transport of the plant to the workshop it is only necessary for the rams 43 to be activated to rotate the pivoting part 41 of the tail section 21 from the upright position to a horizontal position so that all of the conveyor 41 is in a substantially horizontal position and is accessible.

To control movement of the head section 22 about the tail section 21, there is a fixed stop 53 mounted on the tapered

6

portion 52 of the head section frame and this abuts against a threaded adjustable stop 54 mounted on the tail frame section 45. Details of the pivot joint 50 are shown in FIG. 8(b). There is a plate 60 through which a pin 60 passes, the pin 60 being welded to a holding plate 61 which is held in position by stops Gl(A) on the plate 60. The pin 62 has various lubrication grooves 63 as illustrated and is retained by a C-clip 64 in the lower of a pair of wing plates 45(a) welded to the tail section frame 45. A bushing 65 engages the pin 62 and the former is secured to the tapered head frame part 52. Thus, the pin 62 is fixed, while the bushing 65 rotates. As shown in FIGS. 9(a) and 9(b), there is an elongate guard 68 for the exposed piston of the ram 51 when in the operative position and this rotates to a cover position as shown in FIG. 9(b). These drawings also show underneath rollers 69 for the lateral conveyor 20. Although not illustrated, in detail, the rollers 26 are in a trough configuration; having opposed pairs of partially downwardly-extending rollers and a bottom roller. This allows use of a belt of a smaller width which can accommodate the head section articulation (see FIG. 4), and which is self-centring in operation.

It will be appreciated that by use of the hydraulic control unit 14 and the various hydraulic rams each of the lateral conveyors 20 may be very quickly and easily moved between the operative and transport positions and vice versa. This is achieved by simply controlling the unit 14 and there is no need to remove any part of the conveyors such as the safety cages. When in the transport position the parts of each lateral conveyor which extend beyond the pivot joints 42 are aligned so that the conveyor belt plane is vertical and in the longitudinal direction. Thus little lateral space is required, and this space is provided by appropriate location of the other plant parts. Further, each conveyor does not extend above the normal height of the plant 1 and thus transporting of the plant 1 does not cause any dimensional problems whatsoever. It will also be appreciated that by activation of the rams the conveyors may be moved between the positions very quickly and effectively. As described above, each conveyor may be moved to a maintenance position at which the plant 1 is quite compact within a maintenance workshop and all parts of the lateral conveyor are accessible by maintenance people without the need for cranes or ladders. This is a very important safety feature. Another major advantage of the invention is the fact that automatic control of the articulation of the lateral conveyor is achieved using an existing hydraulic circuit which is provided in any event for other parts of the plant 1.

The invention is not limited to the embodiments hereinbefore described. The head articulation means may rotate the head section 22 about the pivot joint 50 to different operative positions to create several stockpiles. For example, it is envisaged that there may be no drive means for articulation of the lateral conveyors as these could be moved either manually or by help of a loader to the desired positions. Where drive means is provided, At may have any suitable power plant such as an electrical generator.

It is also envisaged that articulation means can comprise different arrangements for movement of the different sections. For example the lateral conveyor may not have a fixed part and the tail section may then extend from the lateral extremity of the chassis outwardly. In this latter embodiment all of the tail section would be pivotable. Various other arrangements can be provided for movement of the conveyor to the transport position. For example, the tail section could slide relative to the plant support frame for both translational and also rotational motion. Further, the tail

5,577,618

**7**

articulation means could comprise a universal-type joint to allow pivoting about a vertical axis for different operative lateral positions. Where drive is provided, it could alternatively be by way of motor-driven stays or slowing motors.

The conveyor belts may alternatively be of mesh construction, or indeed take the form of a set of discrete buckets, depending on the nature of the aggregate material being processed.

The mobile plant may be a mobile mining or crushing plant or any other aggregate material processing plant instead of a screening plant.

I claim:

1. A mobile, road-hauled aggregate material processing plant comprising:

a wheel mounted chassis extending in a longitudinal direction;

a plant support frame mounted on the chassis;

a raw material input hopper mounted on the plant support frame;

a material processing means mounted on the plant support frame and fed from the input hopper and having an outlet;

processed material outfeed delivery means mounted on the plant support frame and fed from the material processing means;

at least one lateral delivery conveyor incorporated in the outfeed delivery means, said conveyor comprising:
a conveyor frame tail section;
a conveyor frame head section;

a tail articulation means connecting the tail section to the support frame in such a way that at least part of the tail section is movable relative to the plant support frame from an operative position extending laterally of the chassis with respect to the longitudinal direction for outfeed of processed material, to a transport position extending substantially upright above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis;

a head articulation means connecting the head section to the tail section in such a way that the head section is movable from an operative position to a transport position with the head section extending longitudinally above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis;

a plurality of rollers mounted on the conveyor frame; and

an endless conveyor belt mounted on the rollers to complete the assembly of a lateral delivery conveyor having tail and head sections, said belt defining a conveyor plane.

2. A processing plant as claimed in claim 1, wherein:

the tail articulation means comprises a pivot joint connecting at least part of the tail section to the plant support frame, said joint having a pivot axis extending substantially longitudinally and horizontally; and

the head articulation means comprises a pivot joint connecting the tail and head conveyor frame sections and having a pivot axis extending substantially perpendicular to the conveyor plane.

3. A processing plant as claimed in claim 2 wherein the pivot joint of the head articulation means comprises a fixed pivot pin mounted on the conveyor frame tail section and a rotatable bushing mounted on the conveyor frame head section.

**8**

4. A processing plant as claimed in claim 1 further comprising a lateral support bracket mounted on the plant support frame for support of the lateral conveyor head section when in the transport position.

5. A processing plant as claimed in claim 1 wherein:

the conveyor rollers are arranged in a trough-like configuration comprising a central lower roller and a pair of side rollers extending laterally and upwardly with respect to the conveyor frame, said configuration providing for self-centring of the conveyor belt in operation; and

the conveyor belt has a substantially smaller width than the conveyor frame for accommodation of articulation of the head section.

6. A processing plant as claimed in claim 1, wherein the lateral conveyor tail section comprises:

a fixed part mounted on the plant support frame and extending laterally above the chassis and beneath the material processing means outlet; and

a pivoting part connected to the fixed part by the tail articulation means, said pivoting part being movable by the tail articulation means.

7. A processing plant as claimed in claim 1 wherein the tail and head articulation means comprise a drive means for causing movement of the lateral conveyor between the operative and transport positions.

8. A processing plant as claimed in claim 7, wherein said drive means comprises means for causing movement of the lateral conveyor to a maintenance position at which the tail section extends laterally and the head section extends longitudinally parallel to and spaced-apart from the chassis.

9. A processing plant as claimed in claim 7 wherein said tail articulation means comprises an hydraulic ram drive means mounted between the plant support frame and the tail section and said head articulation means comprises an hydraulic ram drive means mounted between the tail and head sections.

10. A processing plant as claimed in claim 9, wherein said head articulation means comprises:

a pivot joint connecting the tail and head conveyor frame sections;

a double-acting hydraulic ram mounted on one side of the pivot joint for articulation of the head section about the tail section; and

a pair of inter-engaging stop members mounted on the opposed side of the pivot joint to limit the degree of articulation of the head section about the tail section.

11. A processing plant as claimed in claim 10 wherein a stop member is adjustable to provide different limit articulation positions.

12. A mobile, road-hauled aggregate material processing plant comprising:

a wheel mounted chassis extending in a longitudinal direction;

a plant support frame mounted on the chassis;

a power plant mounted on the chassis;

a raw material input hopper mounted on the plant support frame;

a material processing means mounted on the plant support frame and fed from the input hopper and having an outlet;

processed material outfeed delivery means mounted on the plant support frame and fed from the material processing output means;

at least one lateral delivery conveyor incorporated in the outfeed delivery means, said conveyor comprising:

5,577,618

9

a conveyor frame tail section;

a conveyor frame head section;

tail articulation means comprising:

a pivot joint in the tail section; and

driving means connected to the power plant and comprising means for moving at least part of the tail section between a combined material outfeed and maintenance position extending laterally with respect to the longitudinal direction, and a tail section transport position with at least part of the tail section extending substantially upright above the chassis and positioned with respect to the input hopper and the material processing means so that it does not project laterally beyond the chassis;

a head articulation means comprising:

10

a pivot joint connecting the tail and head sections; and

driving means connected to the power plant and comprising means for moving the head section between an operative position and a position substantially perpendicular to the tail section to provide a maintenance position with the tail section extending laterally and to provide a transport position with the tail section at the tail section transport position;

a plurality of rollers mounted on the conveyor frame; and

an endless conveyor belt mounted on the rollers to complete the assembly of a lateral delivery conveyor having tail and head sections, said belt defining a conveyor plane.

* * * * *

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
METSO MINERALS, INC.,

               Plaintiff,

          -against-

POWERSCREEN INTERNATIONAL
DISTRIBUTION LIMITED, TEREX
CORPORATION, POWERSCREEN NEW
YORK, INC. and EMERALD EQUIPMENT
SYSTEMS, INC.,

               Defendants.
-------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
06-cv-1446 (ADS)(ETB)

**APPEARANCES:**

**Cohen, Pontani, Leiberman & Pavane LLP**
*Attorneys for the plaintiff*
551 Fifth Avenue, Suite 1210
New York, NY 10176
      By:   Michael C. Stuart, Esq.
            David Badanes, Esq.
            Lisa Ferrari, Esq., Of Counsel

**Squire Sanders & Dempsey LLP**
*Attorneys for all defendants*
30 Rockefeller Plaza
New York, NY 10112
      By:   George B. Yankwitt, Esq.
            Andrew H Fried, Esq.
            Mary Margaret Chang, Esq., Of Counsel

**Clauss & Sabatini, PC**
*Attorneys for defendant Terex Corporation*
1350 Broadway
Suite 1710
New York, NY 10018
      By:   Ava R. Maynard, Esq., Of Counsel

**Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP**
*Attorneys for the defendant Powerscreen New York, Inc.*
330 Old Country Road
Suite 301
Mineola, NY 11501
      By:    Andrew E. Curto, Esq., Of Counsel

**SPATT, District Judge.**

This patent infringement case involves industrial machines, called "screeners",

used primarily at construction sites to sort rock or other rubble into various piles of

similarly-sized debris. The patent at issue is United States Patent 5,577,618 ("the '618

patent"), which comprises an improvement on a screener so that the machine may be

more readily compacted for transport from site to site. The plaintiff Metso Minerals, Inc.

("Metso") alleges infringement of this patent by the defendants Powerscreen International

Distribution Limited ("Powerscreen"), Terex Corporation ("Terex"), Powerscreen New

York, Inc. ("PSNY"), and Emerald Equipment Systems, Inc ("Emerald"). The

defendants have answered and counter-claimed for a declaratory judgment of non-

infringement. Currently before the Court are (1) the plaintiff's and the defendants'

motions for claim construction, (2) the plaintiff's motion to preclude the defendants from

asserting new defenses and from relying upon new evidence, and (3) the plaintiff's and

the defendants' motions for summary judgment. Upon construction of the relevant

claims, and for the reasons set forth below, the Court (1) grants in part and denies in part

the plaintiff's motion to preclude and exclude, (2) grants in part and denies in part the

plaintiff's motion for summary judgment, and (3) denies the defendants' motion for

summary judgment.

## I. FACTUAL BACKGROUND

United States Patent 5,577,618 was granted to Malachy J. Rafferty on November 26, 1996 for a "mobile aggregate material processing plant". The patent covers an invention whose primary function is to sort debris—usually construction debris—into piles of like-sized particles. Figure 2, below, is a cross sectional drawing from the '618 patent showing the invention's preferred embodiment.



*Fig. 2*

In this preferred embodiment, the plant sits on a structure akin to a flat-bed trailer, and extends the length of the trailer. When in its operating position, the plant takes mixed debris into an input hopper, and separates the debris into one of four size groupings. The largest debris is then dumped out of the input hopper, while the remaining three groupings are placed on one of three conveyors. Two of these conveyors extend out from the sides of the plant (called "lateral conveyors"), while the third extends from the back end of the plant. The debris travels the length of these conveyors, and is dumped at the end of each to form three separate piles, each of like-sized debris. In

Figure 2, above, the lateral conveyors [20] are shown in their operative position, extending out from the plant base.

All of these functions, however, are incorporated into the prior art that preceded the '618 patent. The primary innovation claimed in the '618 patent is a way of folding the lateral conveyors so that the plant is more easily transported from worksite to worksite. Previous plants were transportable, but they were arguably less practical. For example, one cited invention required the lateral conveyors to be manually removed from the plant and stored above it for transport. Others allowed the lateral conveyors to fold onto the plant, but required that the plant be of sufficient length to accommodate the full size of the conveyors. By contrast, the '618 patent describes an invention whereby the lateral conveyors are double-jointed and fold into the plant more compactly. This is the essence of the innovation.

In exchange for the inventor's disclosure of this innovation, the United States Patent and Trademark Office issued the '618 patent, in which the patentee claimed, among other things:

> A mobile road-hauled aggregate material processing plant comprising:
>
> a wheel mounted chassis extending in a longitudinal direction;
>
> a plant support frame mounted on the chassis;
>
> a raw material input hopper mounted on the plant support frame;
>
> a material processing means mounted on the plant support frame and fed from the input hopper and having an outlet;
>
> a processed material outfeed delivery means mounted on the plant support frame and fed from the material processing means;

at least one lateral delivery conveyor incorporated in the outfeed delivery means, said conveyor comprising:
a conveyor frame tail section;
a conveyor frame head section;

a tail articulation means connecting the tail section to the support frame in such a way that at least part of the tail section is movable relative to the plant support frame from an operative position extending laterally of the chassis with respect to the longitudinal direction for outfeed of processed material, to a transport position extending substantially upright above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis,

a head articulation means connecting the head section to the tail section in such a way that the head section is movable from an operative position to a transport position with the head section extending longitudinally above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis; [and]

an endless conveyor belt . . ., said belt defining a conveyor plane.

('618 patent, col. 7.)

Thus, according to this description, the "wheel mounted chassis" that underlies the invention is outfitted with a "plant support frame". On the plant support frame is attached an "input hopper" that, in the preferred embodiment, accepts rubble of various sizes. This hopper feeds a "material processing means" that sorts the rubble into various sizes, and feeds the sorted material to the "outfeed delivery means." This outfeed delivery means comprises, in the preferred embodiment, two lateral conveyors extending off the sides of the plant. Each of these lateral conveyors is mounted with a conveyor belt and has two movable joints. The first joint is called the tail articulation means ("TAM"), and it connects the lower portion of the conveyor (the "tail section") to the plant support frame. In the preferred embodiment, this is done using a joint that runs

5

parallel to the length of the support frame. Thus, the conveyor pivots up and down relative to the support frame. The second joint is called the head articulation means ("HAM"), and it attaches the top part of the conveyor (the "head section") to the conveyor's tail section. Unlike the TAM, the HAM uses a joint that is perpendicular to the surface of the conveyor. Thus, in the preferred embodiment, the HAM can pivot the head section from side to side, but it cannot pivot it up and down. However, by using these two joints together, the conveyor can be folded into a flat L shape using the HAM and raised next to the plant support frame using the TAM. This way, the conveyor sits snugly next to the plant support frame during transport mode. Figure 4, below, shows the preferred embodiment of the invention in transport mode. The lateral conveyors [20] are shown folded into the L shape for transport.



Fig. 4

JA0007673

On March 29, 2006, the plaintiff commenced the present infringement action against all the defendants. The plaintiff did not serve PSNY with a copy of the compaint at that time. On September 4, 2008, defendants Powerscreen, Terex, and Emerald answered with ten affirmative defenses and three counterclaims, asserting, among other things, non-infringement, obviousness, invalidity, lack of standing, and laches. On October 10, 2007, these defendants moved to amend their answer and counterclaims to assert an additional defense and counterclaim of inequitable conduct, as well as to have PSNY dismissed as a defendant based on the plaintiff's failure to serve it with the complaint. On July 1, 2008, the Court granted these defendants' motion to amend, and ordered that PSNY be served within twenty days. On July 11, 2008, Powerscreen, Terex, and Emerald then filed an amended answer and counterclaims. After being served with the complaint, PSNY then filed a substantially similar answer with counterclaims on September 9, 2008. All defendants seek a declaratory judgment of non-infringement.

The plaintiff contends that the defendant Powerscreen manufactures and markets a series of mobile screeners that infringe several claims of the '618 patent (the "Accused Screening Plants"). The plaintiff additionally alleges that Terex is liable for infringement because it is the parent company to Powerscreen, and alleges that PSNY and Emerald are liable for infringement because they distributed Accused Screening Plants in New York and elsewhere.

At the close of discovery, both parties moved for claim construction and summary judgment. The defendants' motion for summary judgment is on all claims, while the plaintiff's is for all issues except obviousness, willful infringement, and damages. The

plaintiff has also moved to preclude the defendants from asserting certain defenses and to preclude certain evidence not produced during discovery.

With respect to the parties' claim construction motions, the parties have requested that the Court construe ten terms used in the '618 patent's claims. Construction of four terms was requested by both parties: "mobile, road-hauled", "chassis", "wheel", and "head articulation means." Construction of five terms was requested by only the plaintiff: "processed material outfeed delivery means", "at least one lateral delivery conveyor", "material processing means", "tail articulation means", and "belt defining a conveyor plane". Construction of one term was requested only by the defendants: "does not project laterally beyond the chassis." The construction of these terms is discussed below.

As for the plaintiff's motion to preclude and exclude, the Court grants the motion in part and denies in part. Based on this and on the construed terms of the '618 patent, the Court then grants in part and denies in part the plaintiff's motion for summary judgment, and denies the defendant's motion for summary judgment in its entirety.

## II. DISCUSSION

### A. Claim Construction

#### 1. Principals of Construction

Claim construction is a question of law exclusively for the Court. <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In construing claims, the Court interprets each claim as it would be understood by a person skilled in the relevant art. <u>Phillips v. AWH</u>

Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). For terms that do not have special meaning in the field, the Court applies generally understood meanings. Id. However, for terms that do have special meaning in the field, the Court looks to evidence of what a person skilled in the art would understand the term to mean. Id.

To construe claim terms, the Court looks first for the evidence of a term's meaning in the patent and its prosecution history. Id. at 1303. In doing this, the Court looks first to the claim in which the term appears, and then considers the term in the context of the surrounding claims and the patent specification. Id. In most cases, the "best source for understanding a technical term" is the patent specification. Id. at 1314.

Generally, patent terms should be interpreted to cover the preferred embodiments set forth in the specification. On-Line Tech v. Bodenseewerk Perkin-Elmer, 386 F.3d 1133, 1138 (Fed. Cir. 2004) ("a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct" (internal quotations and citations omitted)). However, except for certain situations, the patent claims should not be *limited* to the preferred embodiment. See, e.g., Agfa Corp. v. Creo Products Inc., 451 F.3d 1366, 1376 (Fed. Cir. 2006).

The primary exception to these rules is the construction of terms that are expressed in the means-plus-function format described in 35 U.S.C. § 112, ¶ 6. Section 112, ¶ 6 provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

JA0007676

The Federal Circuit has set forth a two step process for construing this type of claim.

First, the Court reviews the patent claim to identify the recited function for the term to be

construed. See, e.g., Callicrate v. Wadsworth Mfg., Inc., 427 F.3d 1361, 1368–69 (Fed.

Cir. 2005). Second, the Court reviews the patent specification to identify the structure or

structures in the patent specification that carry out the recited function. Id. (citing Micro

Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1257 (Fed.Cir.1999)). These

structures, and their equivalents, are incorporated into the construction of the means-plus-

function claim. See, e.g., Callicrate, 427 F.3d 1361 at 1369. In identifying the related

structures in a means-plus-function claim, "a court may not import into the claim features

that are unnecessary to perform the claimed function." Northrop Grumman Corp. v. Intel

Corp., 325 F.3d 1346, 1351 (Fed. Cir. 2003) (citing Acromed Corp. v. Sofamor Danek

Group, Inc., 253 F.3d 1371, 1382, (Fed. Cir. 2001)).

### 2. Construction of Terms

Although the parties here identify ten terms for construction, the Court finds that

construction of only five terms is necessary for resolution of the motions for summary

judgment and a proper trial of the case. These are the terms, "mobile, road-hauled",

"chassis", "wheel", "head articulation means", and "does not project laterally beyond the

chassis." Each of these terms is material to one of the defendants' non-infringement

defenses. The remaining terms are unrelated to any of the defendants' non-infringement

arguments, and therefore need not be construed.

### a. "Mobile, Road-Hauled"

Both the plaintiff and the defendants request the Court to construe the term "mobile, road-hauled." This term appears in the first sentence of claim 1, in which the patentee claims "[a] mobile, road-hauled aggregate material processing plant . . . ." The defendants request that the Court construe "mobile, road-hauled" to mean, "with a chassis mounted on wheels so that the plant can be towed or pulled along a road on its own wheels." The plaintiff opposes this definition and requests that the Court construe the term to mean, "mobile and capable of being hauled on a road, with or without any other devices." Neither party contends that "mobile, road-hauled" is a term that has special meaning within the art. Additionally, the parties agree that "road-hauled" limits the claim to an invention that can be transported on a road.

As a preliminary matter, the Court views "mobile, road-hauled" as a term with a straightforward definition for a lay person. The term "mobile" speaks for itself, and the Court may well encroach upon the province of the jury by acting as a mere thesaurus to interpret this term. Similarly, "road-hauled", in common parlance, means "capable of being hauled on a road." The term implies no additional restriction on how something is hauled on a road.

Nonetheless, the defendants contend that the patent specification limits the scope of "mobile, road-hauled." In particular, the defendants rely on the following passage from the patent specification:

> [A screening plant's] processing capacity is heavily influenced by the ability to quickly and effectively deliver the processed material away from the plant. . . . [and w]hile the manner in which such lateral conveyors are connected to the plant is relatively simple, where the processing plant is

> mobile, major problems arise in ensuring that the overall width and height
> of the mobile plant is within certain dimensions when carrying such
> conveyors during transport.

The defendants argue that this passage demonstrates that the processing plant is described as "mobile" only in the sense that it could be transported over long distances.

The defendants also point out that the patent specification describes—both in writing and in drawings—a processing plant that is pulled on its own wheels when transported over long distances. Thus, the defendants maintain that, when the patentee described the invention as "road-hauled", he meant to limit the patent to a device that was capable of being pulled or towed on a road on its own wheels.

The Court agrees that, in the context of the entire patent, the term "mobile" refers to the plant's capacity to be moved over large distances. It is sufficiently clear to the Court that the essence of the invention was to create a screening plant that be moved among sites that are miles apart, and that the term "mobile" refers to this quality. However, the Court does not find that "road-hauled" was intended to limit the invention to a device that was towed or pulled on its own wheels. Being "towed or pulled" on its "own wheels" are qualities of the preferred embodiment of the invention, but they are not qualities that are implied by the term "road-hauled" itself, nor are they qualities that the Court views as essential to the invention. See Agfa Corp., 451 F.3d at 1376 (holding that is generally improper to incorporate limitations from a patent's preferred embodiment into the patent's claims). The Court therefore construes "mobile, road-hauled" as meaning "capable of being hauled over long distances on a road, with or without other devices."

### b. "Chassis"

Both parties request construction of the term "chassis." This term appears in the patentee's claim that the invention comprises "a plant support frame mounted on the chassis." It also appears in the claim terms that describe the head articulation and tail articulation means as connecting the lateral conveyors such that, when folded for transport, the conveyors "do[] not project laterally beyond the chassis."

The defendant requests that the Court construe "chassis" to mean "a pair of longitudinal beams." The plaintiff opposes this construction, and requests that the Court construe the term to mean "a structure onto which other elements are attached or mounted." The plaintiff urges that this term should be additionally construed to include, with respect to a tire-mounted screener, "the tire or wheel assembly (also known as a bogie) (including the tires), the support jack legs, the tire mud guards, the laterally extending fixed platforms, and the axles." With respect to a track-mounted screener, the plaintiff requests the term be construed to include the "two tracks, the driven, guide and idler wheels, the frame, the roll-in bogie (including its tires, frames and mudguards), and the support jack legs."

The defendants support their narrower construction of chassis with language from the patent specification that states that "[t]he plant 1 comprises a chassis 2 having a pair of longitudinal beams mounted on wheels 3(a) and supported on jack legs 3(b)." ('618 patent, col. 3, lns. 46–48.) The defendants read this to mean that the "chassis", identified with structure number 2, is separate from the "wheels" and "jack legs", identified with

structure numbers 3(a) and 3(b), as well as the "wheel arches", identified elsewhere in the specification by structure number 33.

Further, the defendants point out that the chassis is identified in the patent's figures with a single lead line pointing to what appear to be beams running the length of the plant. See Figure 4 (above), structure 2. The defendants assert that this is especially significant in light of 37 C.F.R. § 1.84, the provision of the C.F.R. that regulates the figures included in a patent application. Section 1.84 provides in pertinent part:

> (q) Lead lines. Lead lines are those lines between the reference characters and the details referred to. . . . They must originate in the immediate proximity of the reference character and extend to the feature indicated. . . .

> (r) Arrows. Arrows may be used at the ends of the lines, provided that their meaning is clear, as follows:

>> (1) On a lead line, a freestanding arrow to indicate the entire section towards which it points;

The defendants contrast structure 2, the chassis, with structure 1, the plant itself. While structure 1 is identified with an arrow to indicate that multiple elements are incorporated into it, structure 2 is identified with only a lead line, indicating, in the defendants' view, the incorporation of only the longitudinal beams. See, Figure 4, above.

The plaintiff contends that, notwithstanding the use of different structure numbers to identify the chassis and the wheels, the patent commonly refers to a "wheel-mounted chassis," indicating that the device's wheels are part of the chassis itself. Moreover, the plaintiff contends that, notwithstanding the patentee's use of lead lines and arrows, the drawings in the patent application show that the conveyors, when folded for transport, project well beyond the "longitudinal beams." According to the plaintiff, the

chassis must comprise more than the longitudinal beams identified by the defendants

because the patent states that the folded conveyor "does not project laterally beyond the

chassis." The plaintiff argues that this can be seen in the depiction of the lateral

conveyors, 20, in Figure 4 above. The plaintiff also cites to Figures 2 and 5, below,

showing the preferred embodiment of the invention in operative and transport modes,

respectively:



While Figure 2 identifies structure 2, the chassis, by pointing to the end of the

longitudinal beams identified by the defendant, Figure 5 shows the collapsed conveyors

extending well past these longitudinal beams to the very edge of the wheel arches,

structure 33.

    If possible, the Court is obligated to construe a patent so that the preferred

embodiment is incorporated into the patent. On-Line Tech, 386 F.3d at 1138 ("a claim

interpretation that excludes a preferred embodiment from the scope of the claim is rarely,

if ever, correct" (internal quotations and citations omitted)). Here, the patent's figures

show that, in the preferred embodiment, the device's conveyors extend beyond the

longitudinal beams when folded for transport. According to this cannon, the Court must

construe the chassis as comprising more than the longitudinal beams identified by the defendant.

Nevertheless, the defendants cite to <u>Hockerson-Halberstadt, Inc. v. Avia Group Intern., Inc.</u>, 222 F.3d 951, 956 (Fed. Cir. 2000) for the proposition that, because the diagrams are apparently not drawn to scale, they cannot be used to interpret the relative dimensions of the invention. However, <u>Hockerson</u> stands only for the proposition that a court should not infer "precise proportions" and "particular sizes" from un-scaled patent drawings. <u>Id.</u> at 957. That is not what the Court is doing here. Figures 5 and 4 both plainly show the collapsed conveyor arms extending to the very extremity of the wheel arches. This is not a "precise proportion" being shown, but rather an important component of the design. Thus, the Court finds that "chassis" must necessarily include not just the "longitudinal beams," but also the wheels and wheel arches of the invention in its preferred embodiment.

Nonetheless, there remains the more difficult question of how "chassis" should be defined more generally. The Court is wary of explicitly defining "chassis" to incorporate structures that are found only in the preferred embodiment of the invention. For similar reasons, the Court is also reluctant to explicitly construe "chassis" to include or exclude parts of the "tracks" on a "track-mounted screener." Unfortunately, the patent itself offers little in the way of generic description of a chassis, except to state that the "plant support frame" is mounted on it.

Finding the intrinsic evidence wanting, the Court finds most helpful the defendant Powerscreen's Spare Parts Listings for its mobile screeners. In its listing, Powerscreen

uses the terms "track chassis" and a "wheel chassis" to refer to the entire assembly of supports, wheels, tracks, and other related parts on which would rest the other operative structures of the screening plant. (Decl. of Michael C. Stewart, Jun. 30, 2009, Ex. 29, PS 4511, 13.; Decl. of Steven A. Whyte, Jun. 29, 2009, ¶ 18.) In the Court's view, this is evidence that "chassis", as used by one skilled in the art, refers to the entire assembly that rests beneath the functional parts of the screener. The evidence is particularly probative because, unlike the plaintiff, Powerscreen has no vested interest in using "chassis" in this manner. The Court finds this extrinsic evidence to be consistent with the intrinsic evidence in the patent itself, particularly the requirement that the chassis incorporate the wheels and the wheel arches in the preferred embodiment. The Court therefore construes the term "chassis" to mean "the entire assembly of parts that rest beneath the plant support frame."

### c. "Wheel"

Both parties request that the Court construe the term "wheel." This term appears in the claim provision that the invention comprise "a wheel mounted chassis extending in a longitudinal direction." ('618 patent, col. 7.)

The defendants assert that "wheel" means "a circular rim with a rubber tire that revolves on an axle and rides directly on the road." The plaintiffs contend that "wheel" has the broad dictionary and "common sense" meaning of:

> a circular frame of metal, wood, or other hard material that may be solid, partly solid, or spoked and that has a hub at the center for attachment to or suspension from an axle on which it may revolve and bear a load; a circular framework often with cogs or teeth on the rim used to transmit or modify force and motion in machinery or a mechanical contrivance. A wheel includes, but is not limited to, a rim on which a rubber tire is

mounted, a sprocket wheel (both a driven wheel, and [a] non-driven or idler wheel) used on a track of a tracked machine, a guide wheel used on a track of a tracked machine, and an endless track of a tracked machine.

The defendants maintain that the definition of "wheel" is limited by the patent specification's provision that "the plant 1 may then be hauled along a road on the wheels 3(a)." The defendants argue that this description makes clear that "wheel" was intended to refer to a wheel that rides directly on a road. The defendants further object to the plaintiff's inclusion of an "endless track of a tracked machine" in its definition of "wheel." The defendant asserts that tracks (such as would conventionally appear on a military tank) are treated as separate structures from wheels in the construction industry. Since the patentee made no reference to "tracks" in the '618 patent, tracks should not be incorporated into the definition of "wheel".

The plaintiff asserts that "wheel" has a common, non-technical, meaning, and that nothing in the patent contravenes this. The plaintiff also notes that Powerscreen's own documents refer to the track assemblies of Powerscreen's track-mounted screeners as including "wheels." (See Whyte Decl., ¶ 25.)

Neither party argues that "wheel" has a special technical meaning in the relevant art. Nonetheless, the entirety of the patent document suggests that the "wheels" on which the device is mounted must be wheels on which the device rides. The essence of the invention is that it is easily movable, and the inclusion of wheels in the design directly serves this goal. Thus, "wheel" cannot refer, as the plaintiff requests, to a "circular framework often with cogs or teeth on the rim used to transmit or modify force and motion in machinery or a mechanical contrivance."

However, the Court also rejects the defendants' definition of "wheel" as limited to a wheel that is tire-mounted and rides directly on the road. This may be the manner of wheel depicted in the preferred embodiment of the invention, but the patent claims themselves are amenable to other types of wheels. To limit the claims to tire-mounted wheels riding directly on the road would improperly import elements of the preferred embodiment into the claim itself.

The Court also rejects the plaintiff's assertion that "wheel" includes the "endless track on a tracked machine". This definition is unsupported by intrinsic or extrinsic evidence. The patent never mentions "tracks" or "tracked machines", and an endless track conflicts in several ways with the dictionary definition the plaintiffs urge for "wheel"—not the least of which is that an endless track is not "circular." The opinion of the plaintiff's expert, Steven A. Whyte, that an endless track would be understood to be a "wheel" by one skilled in the art is similarly unsupported by reference to any extrinsic material. The Court thus rejects this contention.

As such, the Court attaches to the term "wheel" a modified form of its generic, dictionary meaning that excludes wheels not used for bearing the plant's weight and moving it, but includes wheels that are not merely tire-mounted. Thus, the Court construes wheel to mean: "a circular frame that has a hub at the center for attachment to or suspension from an axle, on which it revolves, and that serves to bear the weight of the screening plant."

#### d. "Head articulation means"

Both parties request that the Court construe the term "head articulation means"

("HAM"). The term appears in claim 1, which states that the invention comprises:

> a head articulation means connecting the head section to the tail section in
> such a way that the head section is movable from an operative position to
> a transport position with the head section extending longitudinally above
> the chassis and positioned with respect to the input hopper and material
> processing means so that it does not project laterally beyond the chassis.

The parties agree that "head articulation means" is a means-plus-function claim that

should be construed pursuant to 35 U.S.C. § 112, ¶ 6. The first step of the construction of

this term is thus the identification of the term's function, after which the Court must

identify the structures set forth in the specification that carry out this function.

The plaintiff maintains that the recited function of the HAM is to "connect[] the

head section to the tail section in such a way that the head section is movable from an

operative position . . . to a transport position." (Pl.'s Opp. to Def.'s Mot. for Cl. Const. at

5.) The only structure the plaintiff identifies as necessary for carrying out this function is

a "pivotal connection."

The defendant urges that the recited function of the HAM is:

> connecting the head section to the tail section in such a way that the head
> section is movable from an operative position to a transport position with
> the head section extending longitudinally above the chassis and positioned
> with respect to the input hopper and material processing means so that it
> does not project laterally beyond the chassis.

(Defs.' Mem. L. Cl. Const. at 21.) The structures the defendant claims are necessary for

carrying out this function are:

> [a] pivot joint, hydraulic ram, a tapered part of the frame of the head
> section, along with a fixed stop mounted on the tapered part of the head

> section frame which abuts against a threaded adjustable stop mounted on
> the tail frame section, a plate through which a pin passes, the pin being
> welded to a holding plate which is held in position by stops on the plate,
> the pin having various lubrication grooves, a C-clip in the lower of a pair
> of wing plates welded to the tail frame, and a bushing which engages the
> pin and which is secured to the tapered head frame so that the pin is fixed,
> while the bushing rotates.

(Id. at 21.)

The Court finds that the function identified by the plaintiff fails to incorporate language that describes the full functioning of the HAM. In the Court's view, while the key verb in the relevant function is "connecting", the recited function is nonetheless connecting *in a certain manner to facilitate a named end*—namely, connecting in such a way that the conveyor can fold compactly. The Court thus adopts as the relevant function for the HAM the entirety of the paragraph that follows "head articulation means" in the patent claim, and so adopts a definition of the function as identified by the defendants. As for the structures that carry out this function, the Court finds that, while more than "a pivotal connection" is properly incorporated into the term, not all of the structures identified by the defendants need to be incorporated.

To identify the structures associated with the recited function, the Court first looks to the patent specification. Here, the specification states that:

> The pivot joint 50 together with an hydraulic ram 51 and a tapered part 52
> of the frame of the head section 22 form part of the head articulation
> means. . . . [T]here is a fixed stop 53 mounted on the tapered portion 52 of
> the head section frame and this abuts against a threaded adjustable stop 54
> mounted on the tail frame section 45. Details of the pivot joint 50 are
> shown in FIG. 8(b). There is a plate 60 through which a pin 60 passes, the
> pin 60 being welded to a holding plate 61 which is held in position by
> stops [61(A)] on the plate 60. The pin 62 has various lubrication grooves
> 63 as illustrated and is retained by a C-clip in the lower of a pair of wing
> plates 45(a) welded to the tail frame 45. A bushing 65 engages the pin 62

and the former is secured to the tapered head frame 52. Thus, the pin 62 is fixed, while the bushing 65 rotates. As shown in FIGS. 9(a) and 9(b), there is an elongate guard 68 for the exposed piston of the ram 51 when in the operative position and this rotates to a cover position as shown in FIG. 9(b).

('618 patent, cols. 5–6, lns. 39–41, 66–12.) This section describes in detail the "nuts and bolts" of the connection between the head section and the tail section, all of which are associated with the HAM.

The Court finds that only some of the named structures from these passages should be incorporated into the claim itself. In the Court's view, the first criteria for determining whether a structure described in the specification carries out the recited function is whether it connects the head section to the tail section. If it does, then the Court should inquire as to whether the structure connects the head section to the tail section in the way recited in the function.

Here, the "fixed stop" and the other "stops" do not connect the head section to the tail section, nor do the lubrication grooves in the pin or the C-clip. These elements are therefore not incorporated into the claim. By contrast, the pivot joint itself, the connecting pin, the bushing, the wing plates, and the holding plate all connect the head section to the tail section, and allow the head section to be folded snugly against the plant support frame. These structures are therefore incorporated into the claim. As for the "tapered part of the head section", this structure is identified in the specification as "form[ing] part of the head articulation means," but nonetheless is excluded as a part of the claim term. The head section—including the tapered part of it—is what is connected to the tail section, and does not itself do the connecting. See, e.g., Northrop Grumman

Corp. v. Intel Corp., 325 F.3d 1346, 1352 (Fed. Cir. 2003) (holding that a means claim with the function of "monitoring" did not incorporate the signals that were monitored). As the tapered part of the head section does not connect the head and tail sections, it is not incorporated into the HAM.

As for the hydraulic ram, this, too connects the head section to the tail section, but is not properly incorporated into the claim. While the specification describes the hydraulic ram as part of the HAM, the specification elsewhere states that "it is envisaged that there may be no drive means for the articulation of the lateral conveyers as they could be moved either manually or by help of a loader to the desired positions." Generally, when a specification sets forth alternative structures to carry out a function, each explicitly described structure is incorporated into the means-plus-function claim. Micro Chemical, Inc. v. Great Plains Chemical Co., Inc., 194 F.3d 1250, 1258 (Fed. Cir. 1999) ("Identification of corresponding structure may embrace more than the preferred embodiment. A means-plus-function claim encompasses all structure in the specification corresponding to that element and equivalent structures.").

Here, the Court views the cited language as stating that the HAM could connect the head section to the tail section *without* the hydraulic ram described elsewhere in the specification. That is, the specification sets forth a specific alternative embodiment in which no structure exists to "drive" or move the head section about the tail section. In this alternative embodiment, the hydraulic ram and its equivalents are not incorporated into the means-plus-function claim. As such, the Court does not incorporate the hydraulic ram as a necessary element of the HAM.

JA0007690

The plaintiff further contends that the specification provides that "[t]he invention is not limited to the embodiments hereinbefore described," and that the structures associated with the HAM should therefore not be limited to those described in the specification. However, the Court finds that this broad assertion is insufficient to overcome the general rule that a means-plus-function claim is limited to the specific structures associated with the recited function in the specification. See Fonar Corp. v. General Elec. Co., 107 F.3d 1543, 1551 (Fed. Cir. 1997) (holding that a general statement that alternative structures may be used to carry out the function of a means-plus-function claim, without identifying the alternative structures, does not expand the scope of the means-plus-function claim).

Notwithstanding this general rule, the plaintiff also maintains that the only structure that should be incorporated into the HAM is "a pivotal connection," because this is the only structure "necessary" to carry out the recited function. The plaintiff appears to argue that, because the head section could be connected with the tail section using any number of structures in lieu of those described in the specification, the only structure that cannot be replaced—the "pivotal connection"—should be the only structure incorporated into the HAM.

This misstates the basic tenets of means-plus-function claim construction. Unlike ordinary claim construction, a means-plus-function term is construed to incorporate all of the structures described in the specification that carry out the term's function. The fact other, unnamed, structures could carry out the same function is immaterial; the named structures (and their equivalents) define the claim term. See Nomos Corp. v. Brainlab

USA, Inc., 357 F.3d 1364, 1368 (Fed. Cir. 2004) ("a means clause does not cover every means for performing the specified function" (internal quotations omitted)). Hence, the Court incorporates into the HAM the actual structures that form the "pivotal connection" that the plaintiff identifies as essential.

The cases that the plaintiff relies on in support of its argument, Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1331–32 (Fed. Cir. 2004), Asyst Technologies, Inc. v. Empak, Inc., 268 F.3d 1364, 1370 (Fed. Cir. 2001), Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1257-58 (Fed. Cir. 1999), and Northrop Grumman Corp., 325 F.3d at 1352, are similarly inapposite. Each of these cases stands for the proposition that structures that are superfluous or antecedent to performing a named function should not be incorporated into a mean-plus-function claim. This is not the case here, where each of the incorporated structures actually carries out the named function.

The plaintiff also argues that the HAM does not comprise, among other things, a "pivot joint", a "bushing", or a "pivot pin", because these elements are explicitly recited as part of the HAM in the patent's dependent claims. The plaintiff contends that, by incorporating these structures into claim 1, the Court would improperly collapse the dependant claims into the same definition as claim 1. The plaintiff cites to Wenger Mfg., Inc. v. Coating Machinery Systems, Inc., 239 F.3d 1225, 1233 (Fed. Cir. 2001), for the proposition that the doctrine of claim differentiation precludes this. Wenger provides that, even when interpreting means-plus-function claims, the Court should strive to interpret various claims so as to differentiate them in scope. Id.

Notwithstanding <u>Wenger</u>, the Court finds that the teachings of <u>Laitram Corp. v.</u> <u>Rexnord, Inc.</u> and <u>Nomos Corp. v. Brainlab USA, Inc.</u> control. These cases provide that "claim differentiation, which is a 'guide, not a rigid rule,' does not override the requirements of § 112, ¶ 6 when the 'claim will bear only one interpretation.'" <u>Nomos,</u> 357 F.3d at 1368 (quoting <u>Laitram,</u> 939 F.2d 1533, 1538 (Fed. Cir. 1991) (internal quotations omitted)). Here, except for the removability of the hydraulic ram, the specification supplies only one set of structures that perform the function of the HAM. Thus, in the Court's view, with the single exception of the hydraulic ram, the HAM will bear only one interpretation—one that incorporates these structures. The doctrine of claim differentiation does not alter this outcome.

> The Court therefore construes the function of the "head articulation means" to be:
>
> connecting the head section to the tail section in such a way that the head section is movable from an operative position to a transport position with the head section extending longitudinally above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis.

The Court finds the following structures to be necessary to carry out this function: a pivot joint, a connecting pin, a bushing, wing plates, and a holding plate. "Head articulation means" is therefore interpreted to incorporate these structures, and their equivalents.

### e. "does not project laterally beyond the chassis"

The defendants request that the Court construe the term "does not project laterally beyond the chassis." The term appears twice in claim 1, once at the conclusion of the "tail articulation means" limitation and once at the conclusion of the "head articulation means" limitation. In each instance, the term describes the way the lateral conveyors fold

when the plant is in transport mode. That is, the conveyor folds so that it "does not project laterally beyond the chassis."

The defendants propose that this term be interpreted to mean that "no elements of the lateral conveyor extend or protrude beyond the longitudinal beams." The plaintiffs object to the replacement of "chassis" with "longitudinal beams", and further urge the Court to construe "project" to mean "to jut out: extend beyond a given line."

As discussed above, the Court construes "chassis" to encompass more than just the longitudinal beams described by the defendants. The use of "chassis" in this part of the patent must conform to the Court's construction, and the Court therefore rejects the defendants' request that "chassis" be replaced with "longitudinal beams" in the construction of "does not project laterally beyond the chassis."

With respect to interpretation of the word "project", neither party argues that this term has a special technical meaning in this context. The Court finds that the entirety of the patent, including the drawings of the preferred embodiment, belie the defendants' argument that the term "project" would admit of elements that extend, even minimally, beyond the device's chassis. Thus, the Court finds the term "does not project laterally beyond the chassis" to mean "does not extend, in any amount, laterally beyond the chassis".

### B. As to the Plaintiff's Motion to Exclude Evidence and Preclude the Assertion of New Defenses

Before addressing the parties' motions for summary judgment, the Court first addresses the plaintiff's motion to exclude certain evidence and preclude the defendants from asserting certain "new" defenses. Specifically, the plaintiff seeks to prevent the

defendants from asserting (1) that the Accused Screening Plants do not infringe the '618 patent because their folded conveyors extend beyond their chasses (when "chassis" is defined as it is herein), and (2) that the '618 patent is invalid based on obviousness in view of PCT Patent Application WO 85/03652 (called "Erickson"), taken in combination with U.S. Patent No. 4,245,732 (called "Couperus"). Additionally, the plaintiff seeks to exclude evidence relating to the distance that the conveyors of the Accused Screening Plants extend beyond their chasses when folded.

The Court denies the plaintiff's first request to preclude. The plaintiff asserts that the defendant has not previously disclosed this non-infringement defense that the conveyors of the Accused Screening Plants protrude laterally beyond their chasses when folded. However, the plaintiff's own expert, Stephen A. Whyte, stated in his report that the lateral conveyors of the Accused Screening Plants "when folded, do not project beyond the chassis or, *in the event that they do*, extend so minimally relative to the overall width of the machine as to be substantially the same as not projecting beyond the chassis." (Chang Decl., Sept. 3, 2009, Ex. 15, ¶ 34. (emphasis added)). The plaintiff's expert report thus explicitly admits of the possibility that the conveyors on the Accused Screening Plants extend past their wheel bases when folded. Moreover, the defendants' expert report openly asserts that they conveyors overhang the wheel bases this way.

In the Court's view, the plaintiff was thus sufficiently aware of this issue prior to the defendants' motion for summary judgment. Moreover, it is at all times the plaintiff's burden to prove that the accused devices contain all of the elements of the relevant patent. Here, the positioning of the lateral conveyors during transport is a key element of the

'618 patent. The Court will allow the defendant to argue at summary judgment and trial that the plaintiff cannot meet its burden on this issue.

However, the Court grants the plaintiff's motion to preclude the defendants' new obviousness defense. The plaintiff contends that the defendants asserted for the first time in their motion for summary judgment that the '618 patent is obvious in light of the combination of the Erickson patent application and the Couperus patent. The plaintiff admits that the defendant identified both the Erickson and the Couperus documents during discovery, but asserts that the defendants never argued prior to their motion for summary judgment that their combination made the '618 patent obvious. The defendants do not contend that they previously asserted the Couperus and Erickson combination makes the '618 patent obvious. Rather, they assert that the prior identification of these documents allows the defendants to now argue that, in combination, they render the '618 patent obvious.

Generally, a party can be compelled during discovery to clarify the affirmative defenses asserted in its pleadings to simplify proceedings at trial. See, e.g., Nimkoff v. Dollhausen, No. 08-cv-2856 (ADS)(WDW), --- F.R.D. ----, 2009 WL 3245886, *4 (E.D.N.Y. Oct. 5, 2009) (Wall, MJ) (discussing the use of contention interrogatories to clarify contentions). Here, the plaintiff did request by interrogatory that the defendants clarify their obviousness defenses. The defendants responded by listing a number of patent and patent application documents, including both the Erickson and Couperus documents. Then, in their expert report, the defendants also identified in greater detail how these documents rendered the '618 patent obvious. The defendants' expert report

contains several explanations of how certain documents and devices, individually and in combination, allegedly render the '618 patent obvious. One combination that the report does not contain, however, is the combination of the Erickson and Couperus documents.

The Court finds the defendants' expert report to be wide ranging in listing bases for the defendants' obviousness defense. As such, the absence of the Erickson/Couperus combination argument in this and all other documents that preceded the defendants' motion for summary judgment is notable. The defendants had every opportunity to raise obviousness defenses during discovery and in fact did so. The Court views the defendants' failure to timely raise this particular defense as a waiver, and grants the plaintiff's motion to preclude on this issue.

Finally, the Court also grants the plaintiff's motion to exclude certain evidence not disclosed during discovery. In support of its motion for summary judgment, the defendants submitted to the Court an affidavit by Joseph Daly, a product engineer manager and an employee of Powerscreen, dated September 3, 2009. In this affidavit, Daly asserts that he reviewed design drawings for several of the Accused Screening Plants that were prepared using Powerscreen's computer aided design ("CAD") software. Using this software, Daly determined that the Accused Screening Plants' conveyors overhang their chasses (as defined by the plaintiff) by up to 13.3 inches. The defendants have at no time produced the drawings on which Daly relies, nor did they provide the plaintiffs with Daly's opinion on the issue until filing their summary judgment motion.

The plaintiff asserts that both the drawings on which Daly relies, and Daly's derivative opinion evidence, should be excluded at summary judgment and trial. The Court agrees. During discovery, the plaintiff requested that the defendants produce:

> all documents and things concerning the research, design, and development of defendants' Mobil Aggregate Material Processing Plants, including without limitation schematics, drawings, and blueprints.

(Stuart Decl., Aug. 13, 2009, Ex. C at 22.) In spite of this, the defendants did not produce the drawings in question, which, in the Court's view, are responsive to this request. There has been no showing that the defendants' failure was either substantially justified or harmless. Thus, the appropriate sanction under the Federal Rules of Civil Procedure is the exclusion of this evidence. Fed. R. Civ. P. 37 ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.") The Court therefore grants the plaintiff's motion to exclude the drawings of the Accused Screening Plants on which Daly relied, as well as Daly's related testimony.

Both parties have requested that the opposing party pay its attorneys' fees and expenses related to these motions to preclude and exclude. The Court declines to grant either request, and directs each party to pay its own fees and costs.

**C. As to the Parties' Motions for Summary Judgment**

The plaintiff has moved for partial summary judgment seeking that the Court: (1) find that the Accused Screeners infringe the '618 patent, (2) strike all of the defendants' affirmative defenses except obviousness, and (3) dismiss all of the defendants'

counterclaims. The defendants have also moved for summary judgment, requesting that the Court: (1) dismiss all of the plaintiff's claims on the basis of non-infringement, and (2) preclude the plaintiff from asserting willful infringement and enhanced damages.

The Court finds there are some genuine issues of material fact with respect to the plaintiff's motion for summary judgment, and therefore grants in part and denies in part the plaintiff's motion for summary judgment pursuant to Fed. R. Civ. P. 56(d)(1), which provides:

> If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue. The court should so determine by examining the pleadings and evidence before it and by interrogating the attorneys. It should then issue an order specifying what facts--including items of damages or other relief--are not genuinely at issue. The facts so specified must be treated as established in the action.

Finding genuine issues of material fact on all issues with respect to the defendants' motion for summary judgment, the Court denies the defendants' motion in its entirety.

## 1. Legal Doctrine

It is well-settled that summary judgment under Fed. R. Civ. P. 56(c) is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" within the meaning of Fed. R. Civ. P. 56 when its resolution "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue is

"genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir.1995) (citing United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962) (per curiam), and Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (2d Cir. 1989)).

Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). However, the nonmoving party cannot survive summary judgment by casting mere "metaphysical doubt" upon the evidence produced by the moving party. Matsushita, 475 U.S. at 586. Summary judgment is appropriate when the moving party can show that "little or no evidence may be found in support of the nonmoving party's case." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).

To prevail on a summary judgment motion in the patent infringement context, the defendants must show that a reasonable trier of fact could not find that the accused devices infringe every element of a claim or its substantial equivalent. Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1423 (Fed. Cir. 1997). Generally, literal infringement and infringement by the doctrine of equivalents is an issue of fact for the jury. Cook Biotech Inc. v. Acell, Inc., 460 F.3d 1365, 1373 (Fed. Cir. 2006). However, a

Court should grant summary judgment where no reasonable fact finder could find

equivalence. Sage Prods., Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1423 (Fed. Cir.

1997). With respect to infringement under the doctrine of equivalents, the Supreme

Court has declined to articulate specific language to define the doctrine, stating instead:

> An analysis of the role played by each element in the context of the
> specific patent claim will [] inform the inquiry as to whether a substitute
> element matches the function, way, and result of the claimed element, or
> whether the substitute element plays a role substantially different from the
> claimed element.

Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co., 520 U.S. 17, 40, 117 S.Ct.

1040 (1997).

### 2. As to Infringement

The Court first addresses the issue of infringement with respect to both parties'

motions for summary judgment. To prevail on its own motion for summary judgment,

the plaintiff must show that the accused devices contain all elements of the claim at issue.

By contrast, the defendants will prevail by showing that even a single element is not

incorporated into the accused devices. The defendants contend that there are three issues

that preclude a finding of infringement and warrant a finding of non-infringement.

Namely, the defendants claim that:

> (1) the lateral conveyors of each and every Accused Screening Plant
> project laterally beyond the chassis of that plant when in the transport
> position;
>
> (2) none of the Accused Screening Plants has the head articulation means
> claimed in the '618 patent; and
>
> (3) Accused Screening Plants with a chassis mounted on tracks do not
> have a "wheel mounted" chassis and are not "mobile, road-hauled."

The plaintiff contests each of these **contentions**, and **asserts** that all of these elements are incorporated into the Accused Screening Plants, thus warranting a finding of infringement.

### a. As to Whether the Accused Screening Plants Contain Conveyors that "Project Laterally Beyond the Chassis" When in Transport Mode

The defendants argue that the Accused Screening Plants "project laterally beyond the chassis" because they project beyond the "longitudinal beams" that they maintain define the term "chassis". As the Court has rejected this construction in favor of a construction of "chassis" to mean "the entire assembly of parts that rest beneath the plant support frame," this argument fails.

The defendants also claim that, even if "chassis" is interpreted as the Court has done, the Accused Screening Plants do not infringe the '618 patent because their lateral conveyors extend beyond the wheel base and associated parts of the screeners when in transport mode. The plaintiff has moved to preclude the defendants from asserting this argument, but, as discussed above, that motion is denied. However, also as discussed above, the Court has precluded the defendants from relying on evidence derived from certain design drawings of the Accused Screening Plants that were not produced in discovery.

The Court finds that, even with the preclusion of certain of the defendants' evidence, there is a genuine issue of material fact with respect to whether the lateral conveyors of the Accused Screening Plants literally infringe this element of the '618 patent. The plaintiff's expert, Steven A. Whyte, has stated that his observations and

measurements demonstrate that the lateral conveyor arms of the accused screeners do not extend beyond the chassis when in transport mode, and has appended photographs that appear to support this opinion. (Whyte Decl., ¶ 23, Ex. 2, photos 18–21.) As discussed above, however, Whyte admits of the possibility that the conveyors do in fact protrude beyond the chassis, and the defendants' expert claims the same. Thus, there is a genuine issue of material fact with respect to this issue.

The plaintiff nevertheless argues that, even if the conveyors on the Accused Screening Plants do extend beyond their chasses when folded, the plaintiff is entitled to summary judgment under the doctrine of equivalents. According to the plaintiff, there is no genuine issue as to the fact that, if the conveyors protrude beyond their chasses, they protrude so minimally as to infringe the relevant term by equivalents. The defendants urge just the opposite, insisting that, if the conveyors on the Accused Screening Plants that protrude any amount, they cannot as a matter of law be equivalent to a term that requires that the conveyors "do not" protrude beyond the chassis when in transport position.

As a general matter, infringement—especially by equivalency—is an issue of fact for the jury. Cook Biotech, 460 F.3d at 1373. Here, taking the evidence in the best light for the defendants and resolving all ambiguities in their favor, the Court finds that the plaintiff is not entitled to summary judgment with respect to infringement by equivalents on this issue. The defendants' expert, Frank J. Loeffler, has opined that the lateral conveyors of the Accused Screening Plants extend beyond their chasses in a way that fails to solve the problems solved by the '618 patent. The Court finds this sufficient to

raise a material issue of fact as to whether the Accused Screening Plants infringe this important element of the '618 patent by equivalents.

Conversely, the Court also finds that the defendants are not entitled to summary judgment on this issue, either. The defendants argue that a plant whose conveyors extend beyond its chassis—even minimally—cannot infringe by equivalents the element here that describes the conveyor as "not" extending beyond the chassis. The defendants analogize this case to Moore U.S.A., Inc. v. Standard Register Co., 229 F.3d 1091, 1106 (Fed. Cir. 2000), a case concerning a patent for envelopes with adhesive strips, wherein the adhesive strip was described as extending "a majority" of the length of the relevant envelope. In Moore U.S.A., the Federal Circuit held that this claim term would not be extended by the doctrine equivalents to cover similar envelopes whose adhesive strips extended only 48% of their length. The defendants argue that, just as in Moore U.S.A. there was a binary difference between adhesive strips that extend a majority of the length of the envelope and those that do not, there is here similarly a binary difference between conveyors that extend beyond the chassis and those that do not.

The defendants contend that their argument is supported by the fact that the '618 patent describes a relatively simple device. According to the defendants, the patentee could easily have used alternative language to cover conveyors that protruded only minimally beyond the chassis, but chose not to. Thus, the defendants assert, the claim term must be limited to conveyors that do not extend beyond the chassis of the device.

The Court agrees that the relevant description in the '618 patent is relatively simple. However, there is evidence that a device whose conveyors project only

minimally beyond the chassis would operate in all material functions the same as one whose conveyors do not. To construe the patent as strictly as the defendants urge would provide would-be infringers with a simple roadmap for evasion. Avoiding this is in fact a primary basis for the doctrine of equivalents itself. In the Court's view, the edge of the chassis serves as a practical linguistic reference point to describe one of the desired functions of the plant—namely, that it fold compactly. The fact that the conveyors strictly remain within the chassis is not necessarily an essential part of the design.

While Moore U.S.A. has similar facts to the present case, the Court views it as distinguishable because, in Moore U.S.A., the court also relied on the doctrine of claim vitiation to limit the doctrine of equivalents. The doctrine of claim vitiation states that, if applying the doctrine of equivalents would essentially eliminate a claim limitation, then the doctrine of equivalents should not be applied. In Moore U.S.A., the court held that to allow adhesive strips that extended a "minority" of the length of the envelope to be equivalent to those that extend a "majority" of the length would vitiate the term "majority." 228 F.3d at 1106. Here, however, even if minimally protruding conveyors were deemed to be equivalent to non-protruding conveyors, the term "does not project laterally beyond the chassis" would still limit the patent. It would do so in the sense that the term would be read to require that the conveyors not *materially* protrude beyond the chassis. To be sure, the patentee could have included the word "materially", but did not. Nevertheless, the Court finds that, on balance, a reasonable jury could find that the Accused Screening Plants could infringe this claim term by equivalents.

Finally, the defendants contend that the plaintiff is estopped from arguing infringement by equivalents in this context, based on the prosecution history of the '618 patent. The defendants assert that, in prosecuting the '618 patent, the patentee amended the patent "'to more clearly indicate' the transport position as 'having no elements extending laterally of the chassis.'" (Defs.' Resp. to Pl.'s Mot. for Sum. J. at 8 (quoting Yankwitt Decl. Ex. D at MP000086).) According to the defendants, the doctrine of prosecution estoppel provides that, upon making such amendments, the plaintiff relinquished its right to later claim infringement of this term by equivalents.

The Court finds that this argument is without merit. Generally, the doctrine of prosecution estoppel applies only to claim limitations that were added during prosecution to render a device patentable. See Conoco, Inc. v. Energy & Environmental Intern., L.C., 460 F.3d 1349, 1363–64 (Fed. Cir. 2006). Here, the original patent application for the '618 patent included the text in question. That is, the application provided that the conveyor "does not project laterally beyond the chassis" when in transport mode. At no time did the plaintiff amend the patent to add or modify this language. Further, there is no indication that "the prosecution history [] evince[s] a clear and unmistakable surrender of subject matter" with respect to equivalents of the claim term in question. Id. (internal citations and quotations omitted). Thus, the Court denies summary judgment to both parties on the issues of both literal infringement and infringement by equivalents with respect to this claim term.

**b. As to Whether the Accused Screening Plants Contain the "Head Articulation Means" Described in the '618 Patent.**

As discussed above, "head articulation means" is a means-plus-function claim element. Under Section 112 ¶ 6, this element literally encompasses both the structures incorporated into the claim and those structures' equivalents. For a structure to infringe a means-plus-function claim element, the structure must both carry out the recited function of the element (or its equivalent), and contain the structures incorporated into the element (or their equivalents). See Al-Site Corp. v. VSI Intern., Inc., 174 F.3d 1308, 1320–21 (Fed. Cir. 1999).

The defendants argue that the Accused Screening Plants do not infringe the '618 patent because the plants' head articulation means do not include (1) a tapered part of the head section, (2) a C-clip, (3) a threaded adjustable stop, (4) a fixed stop, (5) or a hydraulic ram that connects the head section to the tail section. However, the Court has construed "head articulation means" as not incorporating any of these elements, and therefore the defendants' argument fails. The defendants do not contest that the Accused Screeners contain all of the structural elements, or the equivalents thereof, that the Court has construed as incorporated into the HAM. As such, there is no genuine issue of material fact with regard to whether the Accused Screening Plants contain all of the elements, or their equivalents, that are incorporated into the HAM. The Court therefore grants the plaintiff's motion for summary judgment with respect to this fact, and it is to be taken as true at trial. Fed. R. Civ. P. 56(d)(1).

The defendants nonetheless contend that the Accused Screening Plants do not infringe the "head articulation means" limitation of the '618 patent because the conveyors

in the Accused Screening Plants "protrude laterally beyond the chassis" when folded. The defendants point out that it is the function of the HAM to connect the head and tail sections such that, when folded, the conveyor "does not protrude laterally beyond the chassis." The plaintiff argues, as above, that summary judgment is appropriate in its favor because the lateral conveyors of the Accused Screening Plants do not protrude beyond their chasses, or they protrude so minimally as to be equivalent to those that do not protrude.

The Court agrees that it is the function of the HAM to connect the head and tail sections such that the conveyors do not protrude laterally beyond the chassis when folded. As discussed above, the Court also finds that there are genuine issues of material fact with respect to whether the conveyors of the Accused Screening Plants extend beyond the chassis when folded. There are also genuine issues of fact as to whether conveyors that protrude minimally beyond the chassis may be deemed equivalent to those that do not. Thus, while there is no genuine issue of material fact as to whether the structures of the HAM are present in the Accused Screening Plants, there is a genuine issue of material fact as to whether these structures carry out the recited function of the HAM or its equivalent. Thus, except as described above, the Court therefore denies both parties' motions for summary judgment with respect to this issue.

### c. As to Whether the Accused Screening Plants Mounted on Tracks are "Mobile, Road-Hauled" and have "Wheel Mounted Chasses"

The parties agree that a number of the Accused Screening Plants are mounted on tracks, as opposed to being mounted on wheels with tires on them. The defendants contend that these devices do not infringe the '618 patent as a matter of law because they

are not "mobile, road-hauled", and they do not have "wheel mounted chasses." The plaintiffs assert the opposite, and seek summary judgment on this issue in their own favor.

The Court first addresses the issue of whether the track-mounted screeners are "mobile, road-hauled". The defendants assert that the track-mounted screeners are not "mobile, road-hauled", because they are not capable of being hauled on a road without the use of an additional trailer that comprises its own set of wheels. However, as discussed above, the Court has construed "mobile, road-hauled" to mean "capable of being hauled over long distances on a road, with or without other devices." The defendants do not contest, and in the Court's view, there is no basis to contest, that the track-mounted screeners in question meet this definition of "mobile, road-hauled". Thus, the Court finds there is no genuine issue of fact with respect to whether the track-mounted screeners in question are "mobile, road-hauled."

The defendants also argue that the track-mounted screeners do not have "wheel mounted chasses." According to the defendants, the definition of "wheel" does not encompass "tracks", either literally or by equivalent, and thus the track-mounted screeners are not "wheel mounted". To the contrary, the plaintiff argues that the track-mounted screeners have chasses that are nonetheless "wheel mounted", because the chasses are mounted on a number of wheels that drive and guide the track parts that come into contact with the ground.

The Court finds that this is most appropriately a question for the jury. In the Court's view, there are material issues of fact with respect to how the tracks operate and

what role their wheels play in their functioning. As such, the Court denies summary judgment to both the plaintiff and the defendants with respect to the issue of whether the track-mounted screeners have "wheel mounted chasses".

### d. As to the Remaining Infringement Issues

The defendants do not contest that the Accused Screening Plants contain the other elements of claim 1 of the '618 patent. Thus, based on this admission and on the opinion of the plaintiff's expert, Steven A. Whyte, the Court finds there are no genuine issues of material fact with respect to infringement of the rest of the elements of claim 1 of the '618 patent, and grants summary judgment in the plaintiff's favor on this issue.

### D. As to the Remaining Issue in the Defendants' Motion for Summary Judgment

In addition, the Defendants request that that Court preclude the plaintiff from claiming willful infringement and enhanced damages "because Defendants' [sic] have asserted reasonable defenses." (Defs.' Mot. Sum. J. at 55.) As the defendants have offered virtually no argument or law in support of this request, the Court denies this motion by the defendants.

### E. As to the Remaining Issues in the Plaintiff's Motion for Summary Judgment

In addition, the plaintiff moves for summary judgment on the following issues: (1) the plaintiff's alleged lack of standing to sue, (2) whether the plaintiff failed to properly mark its screeners with identifying patent information, (3) the defendants' affirmative defenses of failure to state a claim and lack of personal jurisdiction over PSNY, (4) the validity of the defendants' reservation of the right to assert additional affirmative defenses, (5) dismissal of the defendants' invalidity claims under 35 U.S.C.

§§ 101, 102, and 112, (6) dismissal of the defendants' claim that the plaintiff failed to name the correct inventor on the '618 patent, (7) dismissal of the defendants' inequitable conduct claim, and (8) dismissal of the defendants' laches claim.

In response, the defendants have withdrawn: (a) their affirmative defense of failure to mark, (b) their affirmative defense of failure to state a claim, (c) their affirmative defense of lack of personal jurisdiction over PSNY, and (d) their affirmative defenses of invalidity under 35 U.S.C. § 101. The defendants have not addressed their general defense of invalidity under 35 U.S.C. § 102 except in the context of failure to name the proper inventor, nor have they addressed the reservation of the right to assert new affirmative defenses. The defendants oppose the remainder of the plaintiff's motion.

### 1. As to the Plaintiff's Standing to Sue

The defendants have asserted in their counterclaim that the plaintiff lacks standing to sue on the '618 patent because the plaintiff does not have good title to the patent. The plaintiff argues there are no genuine issues of material fact with respect to this claim, and that it should therefore be dismissed. The Court agrees.

The plaintiff has explained the chain of title of the '618 patent as follows: Malachy Raferty was the original patentee, and thus held title to the patent when it was issued in 1996. In 1999, Raferty then sold the patent to the plaintiff (then organized under a different name), who continues to hold the title. The defendants claim that the plaintiff lacks good title because, under United Kingdom law, the proper title to the '618 patent was held by Rafferty's employer, Masterskreen. Thus, Rafferty's sale of the

patent title to the plaintiff in 1999 was invalid, because Rafferty had no title to sell. According to the defendants, the plaintiff's title to the '618 patent is therefore defective.

However, apparently aware of this issue, Masterskreen (now operating under a new name) executed a quitclaim deed for the '618 patent in favor of the plaintiff on March 27, 2006, two days before the plaintiff filed the present suit. (Yankwitt Decl., Ex. 36.) Thus, even if Masterskreen, rather than Rafferty, was the true holder of the '618 patent in 1999, the March 27, 2006 quitclaim transfer cured any defect in title.

The defendants also argue that Rafferty did not have proper title to the '618 patent because he failed to name Richard Byrne as the sole inventor or co-inventor of the subject matter of the '618 patent. As discussed below, the defendants asserted a similar argument in the context of the law pertaining to inventorship and inequitable conduct. For the reasons set forth below, the Court rejects the defendants' arguments on this issue. The Court thus grants summary judgment in favor of the plaintiff with regard to the issue of standing.

### 2. As to the Defendants' Invalidity Defense Based on 35 U.S.C. § 102

In their answers, the defendants generally asserted the invalidity of the '618 patent based on 35 U.S.C. § 102. The plaintiff has moved to dismiss this defense.

Generally, patents are presumed valid. 35 U.S.C. § 282. At the summary judgment phase, a defendant who claims invalidity must therefore "come forward with evidence that, if credited, could satisfy" the clear and convincing evidence standard required to show a patent to be invalid. System Management Arts Inc. v. Avesta Technologies, Inc., 87 F.Supp.2d 258, 263 (S.D.N.Y.2000). Here, and as discussed in

part below with respect to 35 U.S.C. § 102(f), the defendants have not pointed to

evidence that would support a finding of invalidity under 35 U.S.C. § 102, and the Court

therefore grants summary judgment in the plaintiff's favor with regard to Section 102.

### 3. As to the Defendants' Invalidity Defense Based on 35 U.S.C. § 112

The defendants contend that, "if . . . this Court accepts Plaintiff's proposed claim

construction that would expand the asserted claims of the '618 patent to screening plants

with a track mounted chassis, then, as a matter of law, the asserted claims would be

invalid under Section 112, paragraph 1 [which requires a written description of the

invention]." (Defs.' Resp. to Pl.'s Mot. for Sum. J.) The defendants contend that,

because there is no mention of "tracks" in the written description of the patent, the

patent's description would be fatally insufficient if it encompassed track-mounted

screeners.

The Court finds this argument by the defendants to be without merit. There is no

requirement that a patent specification describe every embodiment of the patented device.

The only law to which the defendants cite, ICU Medical, Inc. v. Alaris Medical Systems,

Inc., 558 F.3d 1368, 1377 (Fed. Cir. 2009) stands for the general proposition that a failure

to sufficiently describe an invention results in invalidity. Here, the Court is satisfied that

the patent specification fully describes the preferred embodiment of the invention. The

fact that the patent might encompass other embodiments—including devices with endless

track elements—does not alter this conclusion that the full-description requirement has

been met. The Court therefore grants the plaintiff's summary judgment motion

dismissing the defendants' affirmative defense of invalidity under 35 U.S.C. § 112.

### 4. As to the Defendants' Reservation of the Right to Assert Additional Defenses

The defendants have asserted as one of their affirmative defenses the right to assert additional, unnamed affirmative defenses. The plaintiff has moved to strike this "affirmative defense." The Court finds the issue not ripe for adjudication, as the defendants are not currently seeking to amend their answers to assert additional affirmative defenses. The Court therefore declines to rule on the issue.

### 5. As to the Defendants' Counterclaim that the '618 Patent Improperly Fails to Name Richard Byrne as an Inventor

The defendants assert that the '618 patent is invalid because a former employee of Masterskreen, Richard Byrne, was either an unnamed co-inventor or the unnamed sole inventor of the device described in the '618 patent. If the defendants assertion is accurate, this would be a basis under 35 U.S.C. § 102(f) for invalidating the '618 patent. The plaintiff denies that Byrne was either a co-inventor or the sole inventor of the '618 patent subject matter, and moves for summary judgment on this claim.

At the time Rafferty applied for the '618 patent, Byrne was working for Rafferty as an engineer at Masterskreen. Byrne, who now works for a subsidiary of defendant Terex, asserts that he, and not Rafferty, conceived of the '618 subject matter. Byrne thus maintains that he should have been named on the patent. The plaintiff argues by contrast that Byrne did no more than execute Rafferty's conceptual design of the invention, and that Rafferty is the true inventor.

Under Federal Circuit law, a party challenging the inventorship of an issued patent must prove that the named inventor was not the true inventor by clear and

convincing evidence. See, e.g., Eli Lilly and Co. v. Aradigm Corp., 376 F.3d 1352, 1357 (Fed. Cir. 2004). The Federal Circuit has stated that "the case law is unequivocal that an [putative] inventor's testimony respecting the facts surrounding a claim of derivation or priority of invention cannot, standing alone, rise to the level of clear and convincing proof." Price v. Symsek, 988 F.2d 1187, 1194 (Fed. Cir. 1993). Thus, even when a witness claims to have been the true inventor of a disputed patent, the patent holder is entitled to summary judgment denying this claim unless the challenging party produces evidence that corroborates the witness's allegation. Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1461 (Fed. Cir. 1998).

Here, Byrne's testimony is not corroborated by any other witnesses. However, the defendants argue that Byrne's testimony is corroborated by drawings of the '618 subject matter that he prepared and signed, as well as the logbooks he kept of his work while at Masterskreen. The plaintiff disputes these contentions. The plaintiff asserts that these drawings show that Byrne drew elements of the subject matter of the '618 patent, but that they do not indicate whether or not Byrne invented the subject matter. According to the plaintiff, Byrne admitted as much in his deposition by testifying that "[o]nly [his] testimony" would show that he in fact invented the subject matter depicted in his logbooks. (Byrne Depo. at 190:17.)

Generally, one who assists an inventor in executing his conceptual design by applying ordinary skill in the art is not a co-inventor. See, e.g., Sewall v. Walters, 21 F.3d 411, 416 (Fed. Cir. 1994). Here, Byrne worked as an engineer for Rafferty, and the fact that Byrne executed signed drawings is not inconsistent with Rafferty being the true

inventor of the '618 subject matter. The Federal Circuit has repeatedly cautioned against crediting the uncorroborated testimony of a person who, after the fact, claims to have been the true inventor of a device. Price, 988 F.2d at 1194. Here, to allow Byrne to use his drawings to corroborate his claims to inventorship would, by extension, mean that draftsmen could generally rely on their drawings for that purpose. Thus, for a whole class of people generally involved in the development of new devices, a valid claim to inventorship could be asserted with nothing more than the draftsman's testimony and his drawings completed at the direction of a superior. The Court finds this to be inconsistent with the general rule the Federal Circuit has articulated on this issue. In the Court's view, the drawings on which the defendants rely are not sufficiently independent of Byrne's testimony to satisfactorily corroborate it. See Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1461 (Fed. Cir. 1998) (citing Knorr v. Pearson, 671 F.2d 1368, 1373 (C.C.P.A. 1982) ("[S]ufficient circumstantial evidence of an independent nature can satisfy the corroboration rule.")).

The defendants nevertheless argue that discovery issues with respect to the drawings and logbooks themselves create issues of fact with respect to inventorship. While the plaintiff produced four large scale drawings of the '618 subject matter that Byrne completed while at Masterskreen, the defendants assert that there are at least three other similar large scale drawings that the plaintiff did not produce. The plaintiff also did not produce any of the logbooks that the defendants claim Byrne kept while at Masterskreen. The plaintiff does not admit that these documents ever existed, but also asserts that, if they did, they were destroyed in the normal course of business before

litigation was commenced. The defendants state that, at best, this explanation is suspicious.

While this dispute over the production of documents gives the Court some pause, the Court finds that it is ultimately inapposite to the analysis above. Even had the plaintiff produced all of the drawings and logbooks the defendants claim existed, Byrne's own testimony was that these items would not have indicated whether or not Byrne was the originator of the ideas depicted. Thus, the Court grants summary judgment in favor of the plaintiff on this issue, and dismisses the defendants' inventorship invalidity claim.

### 6. As to the Defendants' Counterclaim of Inequitable Conduct

The defendants have asserted that the plaintiff acted inequitably in the prosecution of the '618 patent by failing to disclose to the Patent and Trademark Office ("PTO") (1) that Richard Byrne was the true inventor of the subject matter, and (2) the existence of three devices sold in the United States at the time of application that were properly "prior art" for the '618 patent. As discussed above, the Court finds there are no triable issues of fact with respect to whether Richard Byrne is the true inventor of the subject matter of the '618 patent. However, with respect to the plaintiff's alleged failure to disclose prior art, the Court does find issues of fact.

Generally, "[a] patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." Digital Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1313 (Fed. Cir. 2006) (citing Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1330-31 (Fed.Cir.2004)). Thus,

"[t]o successfully prove inequitable conduct, the accused infringer must present evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO]." Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1365 (Fed. Cir. 2008) (internal quotations and citations omitted).

Here, the defendants allege that, at the time of the filing of the '618 patent application, the patentee failed to inform the PTO of the existence of three devices: the Masterstock 70, the Masterstock 80, and the Dominator. The parties agree that each of these devices is a screening plant with elements in common with the '618 patent. Further, the plaintiff does not deny that the patentee failed to disclose these screeners to the PTO. Rather, the plaintiff asserts, first, that the Masterstock 70 and 80 screeners were subsumed by another device that the patentee did disclose, and that they therefore were not required to be disclosed to the PTO. As for the Dominator, the plaintiff contends that no Dominator was sold in the United States prior to the '618 filing, and therefore it was similarly unnecessary to disclose it to the PTO under the relevant law.

The Court finds that there is no issue of triable fact with respect to the disclosure of the Masterstock 70 and Masterstock 80 screeners. Generally, "a withheld otherwise material reference is not material if it is merely cumulative to, or less relevant than, information already considered by the examiner." Larson Mfg. Co. of South Dakota, Inc. v. Aluminart Products Ltd., 559 F.3d 1317, 1327 (Fed. Cir. 2009). Here, the only relevant element that the defendants contend is shared by the Masterstock screeners and the '618 patent is the hinge design for the lateral conveyors. (Defs.' Resp. to Pl. Mot.

Summ. J. at 19.) However, the defendants admit that this hinge design is also present in U.S. Patent No. 3,444,987, which the patentee did disclose to the PTO. (Defs.' Resp. to Pl.'s Rule 56.1 Stmt., ¶ 315.) As such, disclosure of the Masterstock 70 and 80 devices would have been cumulative of the already-disclosed '987 patent. The failure to disclose the Masterstock screeners was therefore not material, and their omission does not affect the validity of the '618 patent.

As for the omission of the Dominator, the plaintiff primarily asserts that the patentee was not obligated by law to disclose the existence of the Dominator because, during the relevant time period, it was sold exclusively overseas. The defendants agree with this basic statement of the law, but contend that at least one Dominator was sold in the United States during the relevant time period.

Generally, a patentee is not obligated to disclose an otherwise relevant device if the device was not sold in the United States more than a year before the '618 patent application was filed. See 35 U.S.C. § 102(b). Here, the '618 patent was filed on September 7, 1994, so the relevant issue is whether any Dominator screener was sold in the United States prior to September 7, 1993.

The defendants assert that an invoice to "Masterskreen Chicago" for a Dominator, dated May 27, 1993, proves that a Dominator was sold in the United States prior to September 7, 1993. The plaintiff does not deny the existence of the invoice, but makes two responses. First, the plaintiff points out that the invoice in question was addressed to "Masterskreen International, Ltd., c/o Masterskreen Chicago, Chicago, IL." (Yankwitt Decl., Ex. G, MN000207.) At the time of the invoice, the Dominator was manufactured

and sold by Masterskreen International, Ltd. The plaintiff argues that the sale recorded by this document was from Masterskreen International to itself, and only "care of" Masterskreen Chicago. In short, this was a transfer of assets rather than a "sale" for purposes of Section 102(b). Second, the plaintiff asserts that the invoice reflects a shipping date of May 1993, and that given the remoteness of the manufacturing facilities for the Dominator in the United Kingdom, it is likely that the machine did not arrive at its destination in the United States until after September 7, 1993.

The Court finds that there are genuine issues of fact with respect to whether a Dominator was sold in the United States before September 7, 1993. First, the name on the invoice in question is ambiguous, and taking it in the best light for the non-moving party, the Court finds that a reasonable jury could infer that the Dominator was purchased by Masterskreen Chicago, and that Masterskreen Chicago is a separate entity from Masterskreen International, Ltd. Second, there are nearly three and a half months between the invoice date and September 7, 1993. Even given the claimed remoteness of the manufacturing plants for the Dominator, the Court finds that a reasonable jury could infer from this invoice that a Dominator arrived at its destination in the United States before September 7, 1993. The Court also finds that a reasonable jury could infer from the totality of the evidence that, if the patentee was aware of the pre-September 1993 sale of at least one Dominator in the United States, the exclusion of the Dominator as "prior art" was intentional. The Court therefore denies the plaintiff's motion for summary judgment with respect to this issue.

**7. As to the Defendants' Counterclaim/Defense of Laches**

The defendants assert that the doctrine of laches should be applied in this case to limit the plaintiff's recovery, if any, to damages from sales after the lawsuit was commenced. The defendants state that they began selling the Accused Screening Plants in the United States in 2000, and that despite the plaintiff's knowledge of this, the plaintiff did not file the present suit until 2006. The defendants assert that during this time, the plaintiff lost and destroyed files relevant to the litigation, and that this materially prejudiced them. The plaintiff states that any document destruction during this period was routine and immaterial, and that much of the delay in filing suit was due to settlement negotiations.

The Court finds that summary judgment on this issue is inappropriate. Generally, "[t]o prove laches, a defendant must show that the plaintiff delayed filing suit an unreasonable and inexcusable length of time after the plaintiff knew or reasonably should have known of its claim against the defendant; and . . . the delay resulted in material prejudice or injury to the defendant." Wanlass v. General Elec. Co., 148 F.3d 1334, 1337 (Fed. Cir. 1998) (internal quotations and citations omitted). Here, even considering settlement negotiations, the period between discovery of the alleged infringement and the filing of suit is significant. Further, the plaintiff admits to having permitted the destruction in 2005 of the entirety of the patent prosecution file held by the U.S. attorney who filed the '618 application. While the plaintiff claims that all of the documents in this file were duplicates of those held by others, the Court finds that the destruction of this file alone raises genuine issues of fact with respect to the defendants' assertion of laches.

The Court therefore denies the plaintiff's summary judgment motion with respect to this issue.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the plaintiff's motion to preclude and exclude is granted in part and denied in part as set forth in this decision; and it is further

**ORDERED** that the plaintiff's motion for summary judgment is granted in part and denied in part as set forth in this decision; and it is further

**ORDERED** that the defendants' motion for summary judgment is denied in its entirety; and it is further

**ORDERED** that the parties shall file a joint pre-trial order with the Court consistent with the Court's individual practices by March 8, 2010, and it is further

**ORDERED** that the parties shall appear by telephone for a final pre-trial conference before United States Magistrate E. Thomas Boyle on Thursday, March 11, 2010, at 11:00 a.m., and shall appear for a final pre-trial conference before this Court on Monday, March 15, 2010 at 9:00 a.m.

**SO ORDERED.**

Dated: Central Islip, New York
January 28, 2010

                            */s/ Arthur D. Spatt*
                              ARTHUR D. SPATT
                       United States District Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
METSO MINERALS, INC.,

                           Plaintiff,

            -against-

POWERSCREEN INTERNATIONAL
DISTRIBUTION LIMITED, TEREX
CORPORATION, POWERSCREEN NEW
YORK, INC. and EMERALD EQUIPMENT
SYSTEMS, INC.,

                           Defendants.
-------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
06-cv-1446 (ADS)(ETB)

**APPEARANCES:**

**Cohen, Pontani, Leiberman & Pavane LLP**
*Attorneys for the plaintiff*
551 Fifth Avenue, Suite 1210
New York, NY 10176
            By:    Michael C. Stuart, Esq.
                   Lisa Ferrari, Esq., of Counsel

**Squire Sanders & Dempsey LLP**
*Attorneys for all defendants*
30 Rockefeller Plaza
New York, NY 10112
            By:    George B. Yankwitt, Esq.
                   Mary Margaret Chang, Esq.
                   Andrew H Fried, Esq., of Counsel

**Clauss & Sabatini, PC**
*Attorneys for defendant Terex Corporation*
1350 Broadway
Suite 1710
New York, NY 10018
            By:    Ava R. Maynard, Esq., of Counsel

JA0007783

**Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP**
*Attorneys for the defendant Powerscreen New York, Inc.*
330 Old Country Road
Suite 301
Mineola, NY 11501
      By:    Andrew E. Curto, Esq., of Counsel

**SPATT, District Judge.**

The defendants in this case, Powerscreen International Distribution Limited

("Powerscreen"), Terex Corporation ("Terex"), Powerscreen New York, Inc.

("PSNY"), and Emerald Equipment Systems, Inc. ("Emerald") presently move for

reconsideration of the Court's previous order in this case, dated January 28, 2010,

regarding claim construction, summary judgment, and evidentiary rulings. For the

reasons that follow, the Court grants the defendants' motion in part and denies it in

part. The Court also now rules on certain aspects of the plaintiff's previous motion

for summary judgment that it has not yet decided.

## I. BACKGROUND

The relevant facts in this case are set forth in detail in the Court's previous

decision in this matter. See Metso Minerals, Inc. v. Powerscreen Intern. Distr. Ltd.,

681 F.Supp.2d 309 (E.D.N.Y. 2010) ("Metso I"). Familiarity with that decision is

assumed, and the Court here only briefly outlines the pertinent background in this

case.

Plaintiff Metso Minerals, Inc. ("Metso") holds United States Patent 5,577,618

("the '618 patent") for a "mobile aggregate material processing plant," a large

industrial machine that is generally used to separate mixed rubble into piles of like-

sized particles. The primary innovation claimed in the '618 patent is a method of

2

folding the conveyors of the patented invention so that the plant is more easily transported. Metso asserts that the defendants manufacture and sell machines (called "screeners") that infringe the '618 patent (the "Accused Screeners"). The defendants deny infringement as well as the validity of the '618 patent.

In <u>Metso I</u>, the Court construed the claims of the '618 patent pursuant to <u>Markman v. Westview Instruments, Inc.</u>, 52 F.3d 967 (Fed. Cir. 1995) (en banc), <u>aff'd</u> 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). In addition, the Court at that time considered motions by the plaintiff and the defendants for summary judgment, as well as a motion by the plaintiff to exclude certain evidence. Based on its construction of the '618 patent, the Court in <u>Metso I</u> granted in part and denied in part the plaintiff's motion for summary judgment, and totally denied the defendants' motion for summary judgment. The Court also granted the plaintiff's motion excluding certain drawings and testimony from being entered into evidence.

Now, the defendants have moved pursuant to Local Civil Rule 6.3 for reconsideration of portions of the Court's rulings on each of these motions. First, the defendants seek reconsideration of the Court's denial of the defendants' motion for summary judgment with respect to willful infringement. Second, the defendants seek reconsideration of the Court's construction of the claim terms "head articulation means" and "chassis". Third, the defendants seek reconsideration of the Court's exclusion of certain drawings and testimony from consideration at the trial. Fourth, the defendants seek reconsideration of the Court's grant of summary judgment in

3

favor of the plaintiffs finding that the "head articulation means" is present in the

Accused Screeners.  The plaintiff opposes each of these requests.

In addition, the plaintiff has submitted a letter request that the Court rule on

certain aspects of its previously-submitted motion for summary judgment.  The Court

now makes those rulings.

## II. DISCUSSION

### A. Legal Standard on a Motion for Reconsideration

A motion for reconsideration in the Eastern and Southern Districts of New

York is governed by Local Civil Rule 6.3.  In general, "[t]he standard for granting [a

motion for reconsideration] is strict, and reconsideration will generally be denied

unless the moving party can point to controlling decisions or data that the court

overlooked—matters, in other words, that might reasonably be expected to alter the

conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d

Cir. 1995).  In addition, a Rule 6.3 motion "may not advance new facts, issues, or

arguments not previously presented to the court." Lehmuller v. Incorporated Village

of Sag Harbor, 982 F.Supp. 132, 135 (E.D.N.Y. 1997) (citing Walsh v. McGee, 918

F.Supp. 107, 110 (S.D.N.Y.1996)).  However, a motion for reconsideration may be

granted to "'correct a clear error or prevent manifest injustice.'" Virgin Atlantic

Airways, Ltd. v. National Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)

(quoting 18 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 4478

at 790).  Ultimately, the decision of whether to grant a motion for reconsideration

rests within the sound discretion of the district court. Kapsis v. Bloom, 08-cv-3092, 2009 WL 414001, at *1 (E.D.N.Y. Feb. 17, 2009).

## B. As to Willful Infringement

In their motion for summary judgment, the defendants requested that the Court find, as a matter of law, that the defendants had not willfully infringed the '618 patent. The Court denied that motion, stating that "the defendants have offered virtually no argument or law in support of this request." Metso I, 681 F. Supp. 2d at 334. In their motion for reconsideration, the defendants point out that they discussed willful infringement at some length in their previous summary judgment briefing. The defendants thus request that the Court consider these arguments anew. Having reviewed the defendants' previous filings, the Court agrees that it did not directly address the defendants' arguments on this issue in Metso I. Therefore, the Court now briefly addresses those arguments.

To prevail on a claim of willful infringement, a plaintiff must show by clear and convincing evidence that an infringer knew or should have known that there was an objectively high risk that he was infringing the relevant patent. See In re Seagate Technology, LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007). In addition, a defendant may demonstrate a lack of willful infringement by showing the presence of "both legitimate defenses to infringement claims and credible invalidity arguments." Black & Decker, Inc. v. Robert Bosch Tool Corp., 260 Fed. Appx. 284, 291 (Fed. Cir. 2008).

The defendants maintain that they are entitled to summary judgment denying the plaintiff's claim for willful infringement, because the defendants advance "both legitimate defenses to infringement claims and credible invalidity arguments." Id. Specifically, the defendants assert that they are entitled to summary judgment denying willful infringement because: (1) their non-infringement defenses, described in Metso I, are valid, (2) the defendants attempted to design around the '618 patent, (3) the '618 patent was invalid because it was obvious and because Richard Byrne was not named as an inventor, and (4) the '618 patent is unenforceable because the plaintiff engaged in inequitable conduct while prosecuting it.

In Metso I, the Court directly addressed (1) the defendants' non-infringement defenses, (2) the propriety of naming of Richard Byrne as an inventor, and (3) the plaintiff's alleged inequitable conduct during patent prosecution. Consistent with that discussion, the Court finds that there are genuine issues of fact with respect to whether these defenses preclude a finding of willful infringement.

As for the defendants' assertion that a willfulness finding is barred by (1) the obviousness of the '618 patent and (2) the defendants' attempts to design around the '618 patent, the Court notes that both parties have submitted substantial evidence and argument on each of these issues. Having reviewed this evidence and argument, the Court finds that there are genuine issues of fact regarding whether either issue precludes a finding of willful infringement. The defendants' motion for reconsideration concerning the Court's denial of summary judgment regarding willful infringement is therefore denied.

## C. As to the Construction of the Claim Term "Head Articulation Means"

The '618 patent claim term "head articulation means" is a means plus function claim, and therefore must be construed by first identifying the function of the term, and then identifying the structures that carry out this function. Metso I, 681 F. Supp. 2d at 322. In Metso I, the Court stated in this regard:

> The Court . . . construes the function of the "head articulation means" to be:
>
> connecting the head section to the tail section in such a way that the head section is movable from an operative position to a transport position with the head section extending longitudinally above the chassis and positioned with respect to the input hopper and material processing means so that it does not project laterally beyond the chassis.
>
> The Court finds the following structures to be necessary to carry out this function: a pivot joint, a connecting pin, a bushing, wing plates, and a holding plate. "Head articulation means" is therefore interpreted to incorporate these structures, and their equivalents.

Id. at 326.

The defendants do not challenge the Court's determination of the function of the head articulation means. However, the defendants do seek reconsideration of the Court's determination of which structures carry out this function. Namely, the defendants contend that the head articulation means should be construed to additionally comprise a "C-clip," the "tapered parts" of the head and tail sections of the conveyor, and a "hydraulic ram."

The Court addressed the construction of the term "head articulation means" in significant detail in Metso I, and specifically discussed the basis for the exclusion of the "C-clip," the "tapered parts", and the "hydraulic ram". Id. at 322–26. Having

7

reviewed the defendants' submissions in support of reconsideration, the Court finds

that there is no basis to alter the Court's previous construction of the term "head

articulation means." The plaintiff's motion for reconsideration as to the construction

of this term is therefore denied.

### D. As to the Construction of the Claim Term "Chassis"

In <u>Metso I</u>, the Court construed the claim term "chassis" to mean "the entire

assembly of parts that rest beneath the plant support frame." <u>Id.</u> at 321. The

defendants now challenge this construction, and advance a more limited construction

of "chassis" that does not comprise, among other things, the wheels, wheel arches,

tires, or support jacks that rest beneath the plant support frame.

The defendants challenge the Court's ruling based in large part on the Court's

use of defendant Powerscreen's spare parts catalogue in construing the term

"chassis." As described in <u>Metso I</u>, the Court construed the term "chassis" in part

based on a Powerscreen spare parts catalogue that appeared to identify as a "chassis"

the entire assembly of parts resting beneath the plant support frame of a screener. <u>Id.</u>

at 321. The Court held that this evidence was consistent with the intrinsic evidence of

the meaning of "chassis"—particularly the necessity that the term include the wheels

and wheel arches—and therefore construed the term as described above. <u>Id.</u>

The defendants maintain that the spare parts catalogue on which the Court

relied was not prepared contemporaneously with the drafting of the '618 patent, and

that the catalogue is thus not an appropriate source for construing the term "chassis".

Generally, a claim term has the meaning ascribed to it by those skilled in the art "as

of the effective filing date of the patent application." Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005). The defendants interpret this rule to suggest that the Court should not consider evidence of the meaning of a claim term—such as the Powerscreen spare parts manual—that post-dates the drafting of that term.

The Court finds that the defendants' arguments do not merit any adjustment to the Court's construction of the term "chassis." First, assuming that Powerscreen's spare parts manual was drafted after the '618 patent was prepared, the Court nevertheless finds that the manual provides circumstantial evidence of the meaning of "chassis" at the time the patent was drafted. While it is possible that the understanding of the term "chassis" evolved after the '618 patent was prepared, there is no evidence to support that contention. Rather, the Court finds it more likely that the Powerscreen spare parts manual reflected the same understanding of chassis that existed at the time the '618 patent was drafted, even if the manual itself was prepared later. Moreover, even without considering this extrinsic evidence, the Court finds that the construction of the term "chassis" as set forth in Metso I is correct.

The Court has reviewed the defendants' other arguments with respect to this term and found them to be without merit. The Court therefore denies the defendants' motion for reconsideration of the construction of the claim term "chassis."

**E. As to the Exclusion of Certain Evidence**

The defendants further challenge the Court's exclusion of certain drawings of the Accused Screeners prepared by Joseph Daly, a Powerscreen product engineer manager. In Metso I, the Court excluded these drawings from evidence, as well as

9

any derivative testimony based on them, because the drawings were not previously

provided to the plaintiffs. The defendants now request that the Court permit the use

of this evidence because, among other reasons, the drawings were not created until

after the close of discovery. The Court does not view this reason, or any of the

defendants' other proffered arguments, as a compelling basis to now permit the

evidence excluded in Metso I. The Court therefore denies the defendants' motion to

reconsider the exclusion of this evidence.

### F. As to the Court's Partial Summary Judgment that the "Head Articulation Means" is Present in the Accused Screeners

Finally, the defendants challenge the Court's previous finding that the "head

articulation means" is present in the Accused Screeners. The defendants assert

essentially three bases for this challenge: *First*, the defendants contend that the

Court's current construction of "head articulation means" is wrong, and maintain that

the correct construction would preclude partial summary judgment. *Second*, the

defendants note that, under the Court's current construction of the term, the "head

articulation means" comprises "wing plates" and a "holding plate". However,

because there is no evidence showing that the Accused Screeners have either "wing

plates" or a "holding plate", it was improper for the Court to grant a summary

judgment finding that the Accused Screeners contain a "head articulation means".

*Third*, the defendants note that the Court defined the "head articulation means" to

function so as to permit the conveyors to fold so that they do not "project laterally

beyond the chassis." Metso I, 681 F. Supp. 2d at 362. However, the Court elsewhere

found that there are material issues of fact as to whether the conveyors on the

Accused Screeners do or do not "project laterally beyond the chassis." See id. at 332. According to the defendants, the Court's finding that the head articulation means is present in the Accused Screeners is inconsistent with the Court's concurrent holding that there are issues of fact as to whether the conveyors of the Accused Screeners project beyond the chassis.

The Court has already addressed the defendants' contention that the present construction of "head articulation means" is erroneous, and found that there is no basis for modifying the present construction of this term. The Court therefore does not find this to be a sound basis for overturning its grant of partial summary judgment on this issue. However, the Court finds the defendants' other two bases for reversing the grant of summary judgment to be compelling.

With respect to the presence of "wing plates" and a "holding plate" in the Accused Screeners, the Court agrees with the defendants that the plaintiff has not submitted evidence that supports a finding that these structures are in the Accused Screeners. The plaintiff does not deny this failing, but rather contends that the defendants have either conceded, or waived their right to contest, this issue. However, in reviewing the parties' papers, and particularly the parties' Rule 56.1 statements, the Court finds that the defendants did not concede the presence of wing plates or holding plates in the Accused Screeners. Further, the Court finds that any failure to deny the presence of these structures is mitigated by the fact that the plaintiff never asserted that the "head articulation means" comprises "wing plates" or

a "holding plate". Thus, the defendants were under no obligation to affirmatively deny the presence of these structures in the Accused Screeners.

Ultimately, the plaintiff retains the burden of proving infringement, and the Court finds that at this point, the plaintiff has not proven that the Accused Screeners have the "wing plate" or "holding plate" elements (or their equivalents) that form part of the "head articulation means". Thus, the Court reverses its previous ruling, and denies the plaintiff's motion for partial summary judgment with respect to the presence of a "head articulation means" in the Accused Screeners.

The Court also agrees with the defendants that the Court's finding that the Accused Screeners have a "head articulation means" conflicts with the Court's finding that there are issues of fact as to whether the conveyors on the Accused Screeners "protrude laterally beyond the chassis." As construed by the Court, the "head articulation means" must allow the conveyors to fold so that they do not protrude beyond the chassis. A structure that fails to carry out this function is not a "head articulation means" within the meaning of the '618 patent. Having found that there are issues of fact as to whether the alleged head articulation means on the Accused Screeners carry out this function, the Court must, for this reason also, reverse its previous ruling with respect to the presence of a "head articulation means" in the Accused Screeners.

Therefore, at trial, the plaintiff will retain the burden of showing that the screeners have a "head articulation means", as described in the '618 patent and construed by the Court.

JA0007794

### G. As to the Plaintiff's Request for Additional Summary Judgment Rulings

In its motion for summary judgment, the plaintiff sought a finding that the defendants of infringed claims 1 through 7 and claim 9 of the '618 patent. In Metso I, the Court addressed the contested elements of claim 1, and then in addition granted the plaintiff partial summary judgment with respect to the uncontested elements of that claim. 681 F. Supp. 2d at 334. However, at that time, the Court did not address the uncontested elements of claims 2 through 7 and claim 9, in spite of the fact that the plaintiff had requested summary judgment with regard to those claim elements. On May 3, 2010, the plaintiff submitted a letter to the Court requesting that the Court rule on this request. The defendant does not oppose this relief on its merits, but rather contends that the plaintiff has improperly and untimely moved for reconsideration of Metso I. In reviewing the relevant papers, the Court agrees with the plaintiff that the Court has not yet ruled on the plaintiff's request for summary judgment with respect to claims 2 through 7 and 9, and deems it appropriate to do so now.

Claims 2 through 7 and 9 of the '618 patent are derivative claims, and expressly incorporate claim 1. Thus, because there are genuine material issues of fact with respect to whether the Accused Screeners infringe all elements of claim 1, there remain triable issues of fact as to the infringement of claims 2 through 7 and 9. However, each of claims 2 through 7 and 9 contain additional elements that are not dependant on claim 1. Thus, the plaintiff seeks a finding that the Accused Screeners contain each of these additional, non-dependant, elements.

JA0007795

Having reviewed the parties' summary judgment papers, the Court agrees that the defendants do not challenge the presence of the additional elements described in claims 4 through 6, and also finds that the plaintiff has submitted evidence showing the presence of these elements. Thus, the Court grants partial summary judgment in favor of the plaintiff with respect to the additional, non-dependant, elements of claims 4 through 6.

Unlike claims 4 through 6, claims 2 and 3 contain additional, non-dependant elements that are related to the "head articulation means". As the defendants have presented evidence generally challenging the presence of the "head articulation means" in the Accused Screeners, summary judgment is not appropriate with respect to these additional elements that are related to the "head articulation means".

However, the defendants do not challenge the additional elements of claims 2 and 3 that are unrelated to the "head articulation means", and the plaintiff has submitted evidence showing that the Accussed Screeners contain these elements. Thus, the Court grants partial summary judgment in favor of the plaintiff with respect to the additional elements of claims 2 and 3 that do *not* relate to the "head articulation means". The Court denies summary judgment with respect to the elements of claims 2 and 3 that do relate to the "head articulation means".

As for claims 7 and 9, the defendants challenge whether the Accused Screeners infringe the additional elements found in those claims. Claim 7 reads:

> 7. A processing plant as claimed in claim 1 wherein the tail and head articulation means comprise a drive means for causing movement of the lateral conveyor between the operative and transport positions.

14

('618 patent, col. 8, lns. 23–26.) Claim 9 reads:

> 9. A processing plant as claimed in claim 7 wherein said tail articulation means comprises an hydraulic ram drive means mounted between the plant support frame and the tail section and said head articulation means comprises an hydraulic ram drive means mounted between the tail and head sections.

(Id., col. 8, lns. 32–36.)

Claim 7 specifically describes a "tail and head articulation means" that "comprise[s] a drive means for causing movement of the lateral conveyor between the operative and transport positions." ('618 patent, col. 8, lns. 24–26.) However, the defendants submitted evidence at summary judgment showing that the drive means in the Accused Screeners—that is, the hydraulic ram—is not part of the "tail and head articulation means". As described in Metso I, 681 F. Supp. 2d. at 323, the function of the head articulation means includes connecting the head section to the tail section. The tail articulation means is presumed to have a parallel function, including connecting the tail section to the plant support frame. By contrast, the defendants' evidence at summary judgment showed that the hydraulic ram in the Accused Screeners connects the *head section* of the conveyor to the *plant support frame*, and does not connect the head section to the tail section, or connect the tail section to the plant support frame. Thus, at least arguably, the Accused Screeners do not contain the "tail and head articulation means . . . [with] a drive means" that is described in claim 7. Summary judgment with respect to the additional elements in claim 7 is therefore not appropriate.

Claim 9 is similar to claim 7, except that claim 9 *explicitly* states that hydraulic rams must connect the head section to the tail section, and connect the tail section to the plant support frame. Again, the defendants' evidence shows that the hydraulic ram on the Accused Screeners does neither of these things, but rather connects the head section directly to the plant support frame. For this reason, summary judgment with respect to the additional elements in claim 9 is also not appropriate. Thus, the Court denies the plaintiff's motion for summary judgment with respect to the additional elements of claims 7 and 9 of the '618 patent.

## III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the defendants' motion for reconsideration of the Court's rulings on willful infringement, claim construction, and exclusion of evidence is denied; and it is further

**ORDERED** that the defendants' motion for reconsideration of the Court's finding that the Accused Screeners have a "head articulation means" is granted, and the Court reverses its partial grant of summary judgment in this regard, and denies the plaintiff's previous motion for a finding as a matter of law that the Accused Screeners have a "head articulation means"; and it is further

**ORDERED** that the plaintiff's motion for summary judgment with respect to the independent elements of claims 4 through 6 is granted; and it is further

**ORDERED** that the plaintiff's motion for summary judgment with respect to the independent elements of claims 2 and 3 is granted *except* to the extent that these

claims contain additional elements related to the "head articulation means"; and it is further

ORDERED that the plaintiff's motion for summary judgment with respect to the independent elements of claims 7 and 9 is denied.

**SO ORDERED.**

Dated: Central Islip, New York
July 9, 2010

/s/ Arthur D. Spatt
ARTHUR D. SPATT
United States District Judge

17

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
METSO MINERALS, INC.,         :
        Plaintiff,        :

                    :     **JUDGMENT ON JURY VERDICT**

       v.             :

                    :
POWERSCREEN INTERNATIONAL  :
DISTRIBUTION LIMITED now known as  :
TEREX GB LIMITED, TEREX CORPORATION,  :   CV-06-1446 (ADS)
POWERSCREEN NEW YORK, INC., and  :
EMERALD EQUIPMENT SYSTEMS, INC.,  :
        Defendants.     :
------------------------------------------------x

SPATT, U.S.D.J.

    The Court hereby enters Judgment on the jury verdict rendered on December 6, 2010 as

follows:

## I.   **GENERAL VERDICT**

    The jury issued a general verdict on the following issues:

### A.   **PATENT INFRINGEMENT**

    1.     The following mobile screeners literally infringe claim 1 of plaintiff's U.S. Patent

No. 5,577,618 ("the '618 patent"):

> Chieftain 1400, tire-mounted
> Chieftain 1800, tire-mounted
> Chieftain 2100, tire-mounted
> Chieftain 2100, track-mounted
> H5163, track-mounted

    2.     The following mobile screeners do not literally infringe claim 1 of plaintiff's

'618 patent:

> Chieftain 1400, track-mounted
> Chieftain 1700, tire-mounted
> Chieftain 1700, track-mounted
> Chieftain 1800, track-mounted
> Chieftain 2100X, track-mounted
> Chieftain 2400, track-mounted

1

3. The following mobile screeners infringe claim 1 of plaintiff's '618 patent under the doctrine of equivalents:

> Chieftain 1400, track-mounted
> Chieftain 1700, tire-mounted
> Chieftain 1700, track-mounted
> Chieftain 1800, track-mounted
> Chieftain 2100X, track-mounted
> Chieftain 2400, track-mounted

4. The following mobile screeners literally infringe claims 2, 3 and 7 of the '618 patent:

> Chieftain 1400, tire-mounted
> Chieftain 1400, track-mounted
> Chieftain 1700, tire-mounted
> Chieftain 1700, track-mounted
> Chieftain 1800, tire-mounted
> Chieftain 1800, track-mounted
> Chieftain 2100, tire-mounted
> Chieftain 2100, track-mounted
> Chieftain 2100X, track-mounted
> Chieftain 2400, track-mounted
> H5163, track-mounted

5. The following mobile screeners do not literally infringe claim 9 of the '618 patent:

> Chieftain 1400, tire-mounted
> Chieftain 1400, track-mounted
> Chieftain 1700, tire-mounted
> Chieftain 1700, track-mounted
> Chieftain 1800, tire-mounted
> Chieftain 1800, track-mounted
> Chieftain 2100, tire-mounted
> Chieftain 2100, track-mounted
> Chieftain 2100X, track-mounted
> Chieftain 2400, track-mounted
> H5163, track-mounted

2

6.     The following mobile screeners infringe claim 9 of the '618 patent under the doctrine of equivalents:

> Chieftain 1400, tire-mounted
> Chieftain 1400, track-mounted
> Chieftain 1700, tire-mounted
> Chieftain 1700, track-mounted
> Chieftain 1800, tire-mounted
> Chieftain 1800, track-mounted
> Chieftain 2100, tire-mounted
> Chieftain 2100, track-mounted
> Chieftain 2100X, track-mounted
> Chieftain 2400, track-mounted
> H5163, track-mounted

7.     Defendants Terex GB Limited, formerly known as Powerscreen International Distribution Limited, and its owner Terex Corporation infringed the '618 patent by making, using, selling and/or offering for sale in the United States, and/or importing into the United States the mobile screeners identified above as infringing the '618 patent.

8.     Defendant Powerscreen New York, Inc. infringed the '618 patent by making, using, selling and/or offering for sale in the United States, and/or importing into the United States the mobile screeners identified above as infringing the '618 patent.

9.     Defendant Emerald Equipment Systems, Inc. infringed the '618 patent by making, using, selling and/or offering for sale in the United States, and/or importing into the United States the mobile screeners identified above as infringing the '618 patent.

**B.     THE DEFENSE AND COUNTERCLAIM OF PATENT OBVIOUSNESS**

10.     Claims 1 to 7 and 9 of plaintiff's '618 patent are not invalid as obvious under 35 U.S.C. § 103 in view of the prior art.

3

JA0000003

### C.   DAMAGES FOR PATENT INFRINGEMENT

11.   Plaintiff is awarded money damages against the defendants as a reasonable royalty for the use that the defendants have made of plaintiff's '618 patent in the amount of $ 15,800,000.

12.   Plaintiff did not prove that the sales of crushers should be included in the royalty base in calculating the money damages awarded to plaintiff.

### D.   WILLFUL PATENT INFRINGEMENT

13.   The defendants infringed plaintiff's '618 patent willfully.


## II.   ADVISORY VERDICT

The jury issued an advisory verdict on the following issues:

### A.   THE DEFENSE OF LACHES

1.   The defendants did not prove that the plaintiff is not entitled to recover damages for acts that occurred before it filed this lawsuit on March 29, 2006 because: (1) plaintiff delayed filing this lawsuit for an unreasonably long and inexcusable period of time, and (2) the defendants have been prejudiced in a significant way as a result of the plaintiff's delay in filing this lawsuit.

### B.   THE DEFENSE AND COUNTERCLAIM OF INEQUITABLE CONDUCT

2.   The defendants did not prove that the inventor, Malachy Rafferty, breached the duty of candor and good faith and committed inequitable conduct in the United States Patent and Trademark Office during the prosecution of the application for the '618 patent by failing to disclose material information with the intent to mislead the U.S. Patent Office Examiner.

Dated: _MARCH___ _3__, 2011

_____
ARTHUR D. SPATT, U.S.D.J.

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X

METSO MINERALS, INC.,

Plaintiff,

-against-

**MEMORANDUM OF
DECISION AND ORDER**
06-cv-1446 (ADS)(ETB)

POWERSCREEN INTERNATIONAL
DISTRIBUTION LIMITED, now known as
TEREX GB LIMITED, TEREX
CORPORATION, POWERSCREEN NEW
YORK, INC. and EMERALD EQUIPMENT
SYSTEMS, INC.,

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★   MAY 2 6 2011   ★

LONG ISLAND OFFICE

Defendants.

-------------------------------------------------X

APPEARANCES:

**Cohen, Pontani, Leiberman & Pavane LLP**
*Attorneys for the plaintiff*
551 Fifth Avenue, Suite 1210
New York, NY 10176
     By:   Michael C. Stuart, Esq.
            Lisa Ferrari, Esq., of Counsel

**Squire Sanders & Dempsey LLP**
*Attorneys for all defendants*
30 Rockefeller Plaza
New York, NY 10112
     By:   George B. Yankwitt, Esq.
            Mary Margaret Chang, Esq.
            Andrew H Fried, Esq., of Counsel

**Clauss & Sabatini, PC**
*Attorneys for defendant Terex Corporation*
1350 Broadway
Suite 1710
New York, NY 10018
     By:   Ava R. Maynard, Esq., of Counsel

**Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP**
*Attorneys for the defendant Powerscreen New York, Inc.*
330 Old Country Road
Suite 301
Mineola, NY 11501
      By:     Andrew E. Curto, Esq., of Counsel

**SPATT, District Judge.**

After a seven week trial, the jury in this case found that the defendants had

infringed claims 1 through 7 and 9 of United States Patent No. 5,577,618 ("the '618

patent"), which is held by the plaintiff, Metso Minerals, Inc. ("Metso Minerals"). The

plaintiff now moves to permanently enjoin the defendants from engaging in activity

that infringes the '618 patent. For the reasons that follow, the Court grants this

motion.

## I. BACKGROUND

The Court described the background of the '618 patent in detail in its previous

decision in this case, Metso Minerals, Inc. v. Powerscreen Intern. Distr. Ltd., 681 F.

Supp. 2d 309 (E.D.N.Y. 2010), and familiarity with that decision is assumed. In

general terms, the '618 patent is for a "mobile aggregate material processing plant," a

large industrial machine that is generally used to separate mixed rubble into piles of

like-sized particles. The primary innovation claimed in the '618 patent is a method of

folding the conveyors of the patented invention so that the plant is more easily

transported. Metso Minerals practices the '618 patent, manufacturing and selling

processing plants—called "screeners"—that incorporate the patent's innovations.

The plaintiff Metso Minerals commenced the present law suit in 2006,

alleging that the defendants manufactured and sold products that infringed the '618

2

patent. Following discovery, claim construction, and summary judgment, the plaintiff tried its case to a jury in late 2010. At the trial, the defendants challenged the validity of the '618 patent, but on December 6, 2010, the jury returned a verdict rejecting this challenge, and finding that the defendants had willfully infringed claims 1 through 7 and 9 of the '618 patent. On January 19, 2011, the plaintiff made the present motion for a permanent injunction precluding the defendants from any future infringing activity. Specifically, the plaintiff seeks to enjoin, among other things, the sale or distribution in the United States of the defendants' Chieftain 1400, Chieftain 1700, Chieftain 1800, Chieftain 2100, Chieftain 2100X, Chieftain 2400, and H5163 mobile screeners, in both tire-mounted and track-mounted form.

The defendants oppose the plaintiff's motion in its entirety. However, the defendants also request, in the alternative, that if the Court does issue an injunction, the injunction not take effect until the defendants complete the redesign of their line of screeners to avoid infringement of the '618 patent. The defendants maintain that they will finish this redesign project no later than the end of June 2011.

## II. DISCUSSION

### A. eBay and the Legal Standard for a Permanent Injunction

In 2006, the United States Supreme Court held that, for a post-verdict permanent injunction to issue in a patent case, a plaintiff must satisfy the traditional equitable test for a permanent injunction. eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006). In particular, the Court held that for an injunction to issue, "[a] plaintiff must demonstrate: (1) that it has

3

suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." Id. A district court applies this four factor test in its sound discretion. i4i Ltd. Partnership v. Microsoft Corp., 598 F.3d 831, 861 (Fed. Cir. 2010) ("Factual findings made in support of the injunction are reviewed for clear error; the district court's conclusion as to each eBay factor is reviewed for abuse of discretion.").

In addition, in two separate concurrences in eBay, seven of the nine Justices noted that, while the Supreme Court had rejected the general rule that a verdict of infringement alone provided a basis for a permanent injunction, courts still ought to be conscious of the fact that a permanent injunction is granted in many or most patent cases where infringement is proven. eBay, 547 U.S. at 395–96. Four of these seven concurring Justices further noted that this precedent was particularly relevant to cases where the patent holder practiced the patent that was infringed. Id. at 396.

With this guidance in mind, this Court now applies the four factor test.

## B. Irreparable Injury

The first of the four permanent injunction factors requires the Court to consider whether the plaintiff has suffered an irreparable injury as a result of the defendants' infringement. This factor necessarily overlaps with the second factor, the adequacy of remedies at law, and thus much of the Court's present discussion will apply to that second factor as well.

The ultimate basis for asserting and irreparable injury in the patent context lies is the patent holder's statutory right to exclude others from practicing the patent. <u>See, e.g.</u>, <u>Acumed LLC v. Stryker Corp.</u>, 551 F.3d 1323, 1328 (Fed. Cir. 2008) ("The essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent."); 35 U.S.C. § 154(a)(1). However, the Supreme Court and the Federal Circuit have made it clear that the mere violation of the right to exclude alone does not necessarily result in irreparable injury. <u>See, e.g.</u>, <u>eBay</u>, 547 U.S. at 392; <u>Voda v. Cordis Corp.</u>, 536 F.3d 1311, 1329 (Fed. Cir. 2008) (affirming the denial of a permanent injunction after a finding of infringement where the patent holder did not practice the patent). Rather, courts must also look to the business effects of the infringement when determining whether a plaintiff has been irreparably injured.

In this regard, the Court looks both to the businesses of the patent holder and the infringer. As the four concurring Justices in <u>eBay</u> noted, an injunction is not appropriate when, "an injunction, and the potentially serious sanctions arising from its violation, can be employed as a bargaining tool to charge exorbitant fees to companies that seek to buy licenses to practice the patent." 547 U.S. at 396 (internal citations omitted); <u>accord</u> <u>MercExchange, L.L.C. v. eBay, Inc.</u>, 500 F. Supp. 2d 556, 569, 588 (E.D. Va. 2007) (on remand from Supreme Court, declining to grant injunctive relief where it appeared that the patent holder was "merely seeking an injunction as a bargaining chip to increase the bottom line."). Likewise, those Justices opined that, "[w]hen the patented invention is but a small component of the

5

product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest." Id. Similarly, where the patent infringement has only minimally affected the plaintiff's business, it will be more challenging to show irreparable injury. See Presidio Components Inc. v. American Technical Ceramics Corp., 723 F. Supp. 2d 1284, 1336–37 (S.D. Cal. 2010) (denying a permanent injunction where plaintiff did not practice its patent and did not "provide at least some data on any specific sales or customers lost, or what its share of the market is"); but see Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306, 1330 (Fed. Cir. 2008) (questioning in dissent the "high burden" applied by the district court in denying preliminary injunction in Praxair, Inc. v. ATMI, Inc., 479 F. Supp. 2d 440 (D. Del. 2007), a case in which the plaintiff did practice the patent in question but failed to provide specific evidence of lost customers or diminished market share).

By contrast, when a plaintiff can show that infringement caused a loss of value in its business that is difficult to quantify—such as market share, goodwill, or reputation—then the plaintiff is more likely to have been irreparably injured. See, e.g., i4i, 598 F.3d at 862 (evidence that the plaintiff was caused to "lose market share and change its business strategy to survive" was sufficient to show irreparable harm); Verizon Services Corp. v. Vonage Holdings Corp., 503 F.3d 1295, 1310 (Fed. Cir. 2007) (upholding grant of permanent injunction where plaintiff provided evidence that infringement resulted in "lost sales", "price erosion", and "lost opportunities to

6

sell other services to the lost customers"). Similarly, while a patent holder may not

show irreparable injury based *solely* on its past refusal to license a patent, courts have

nevertheless found that such a refusal to license does weigh in favor of finding

irreparable injury. See, e.g., Presidio Components, 723 F. Supp. 2d at 1337

("Presidio's unwillingness to license the '356 patent weighs in favor of finding

irreparable injury."); Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc., 579

F. Supp. 2d 554, 560–61 (D. Del. 2008) (noting that a refusal to license a patent to a

direct competitor favors a finding of irreparable injury).

Considering all of these factors, the Court here finds that the plaintiff has

suffered irreparable injury from the defendants' infringement of the '618 patent. The

plaintiff practiced the '618 patent and sold screeners that embodied the described

technology, and refused to license that patent to any other person. In addition, having

reviewed the record at trial, the Court is satisfied that there is sufficient evidence that

the plaintiff competed with the defendants for customers, and that the plaintiff lost

market share to the defendants as a result of the defendants' infringement. In the

Court's view, this loss of market share is difficult to quantify, as it includes a loss of

unknown opportunities for positive references, repeat sales, and expanded goodwill.

The first factor therefore weighs in favor of the plaintiff.

The defendants object to this conclusion on several grounds. First, the

defendants assert that there were several other participants in the market for

screeners, and that because the plaintiff and the defendants were thus not "head-to-

head" competitors, there is no showing of irreparable harm. (See Defs.' Opp. at 4

7

(citing <u>Presidio Components</u>, 723 F. Supp. 2d at 1336 and <u>Humanscale Corp. v.</u>

<u>CompX Intern. Inc.</u>, No. 09-cv-86, 2010 WL 1779963, *3 (E.D. Va. 2010)).)

However, the defendants cite to no authority from the Federal Circuit—and the Court

is aware of no such authority—stating that irreparable harm will exist only when a

patent holder competes in a two-competitor market. Rather, Federal Circuit authority

in the preliminary injunction context suggests that this is not a requirement to show

irreparable harm—particularly when, as here, there is some indication that other

market competitors may also be infringers. See <u>Polymer Technologies, Inc. v.</u>

<u>Bridwell</u>, 103 F.3d 970, 975 (Fed. Cir. 1996) ("The fact that other infringers may be

in the marketplace does not negate irreparable harm. A patentee does not have to sue

all infringers at once. Picking off one infringer at a time is not inconsistent with being

irreparably harmed."). In addition, the Court has reviewed the district court opinions

relied on by the defendants suggesting that a showing of irreparable harm depends on

a two-competitor market, and finds that, to the extent that those cases are not

distinguishable from the present case, they are neither binding nor persuasive.

Similarly, the Court is not persuaded by the defendants' second contention,

that the plaintiff has waived its right to seek injunctive relief by failing to seek this

relief until the present. Obviously, the standard for preliminary injunctive relief in

this regard is different from the standard for permanent injunctive relief, and the

plaintiff's decision not to seek preliminary injunctive relief does not indicate a lack of

irreparable harm.

JA0000012

## C. Sufficiency of Remedies at Law

In the patent context, the second prong of the permanent injunction test is generally treated in tandem with the first prong. See Acumed, 551 F.3d at 1327–29 (analyzing the prongs of irreparable harm and adequate remedy at law together); MercExchange, L.L.C., 500 F. Supp. 2d at 569 n. 11 (on remand from Supreme Court, stating that "[t]he irreparable harm inquiry and remedy at law inquiry are essentially two sides of the same coin"). Here, for reasons substantially similar to the reasons for finding irreparable harm, the Court finds that the remedies at law available to the plaintiff are insufficient. As noted above, the Court is satisfied that there is evidence supporting the loss of market share as a result of the defendants' infringement, and that this harm would continue if the defendants did not cease to infringe the '618 patent. The Court also finds that the effects of this loss of market share, including the loss of goodwill and other intangibles, are not readily compensable by money damages. This factor thus also favors the plaintiff.

## D. Balance of Hardships

The Court also finds that the balance of hardships in this case moderately favors the plaintiff. With reasonable certainty, if an injunction does not issue, the plaintiff will face a hardship in the loss of market share. By contrast, most of the hardship that the defendants will face from an injunction will derive from the defendants' inability to sell infringing machines in the future. That hardship, however, is not cognizable. See i4i, 598 F.3d at 863 ("[N]either commercial success, nor sunk development costs, shield an infringer from injunctive relief. [The

9

defendant] is not entitled to continue infringing simply because it successfully exploited its infringement." (internal citations omitted)); Broadcom Corp. v. Qualcomm Inc., 543 F.3d 683, 704 (Fed. Cir. 2008) ("At the outset, we note that '[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.'" (quoting Windsurfing Int'l, Inc. v. AMF, Inc., 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986)).

Nevertheless, the defendants assert that they face a cognizable hardship in that an immediate injunction would force them to cancel contracts for screener sales that have already been consummated, resulting in unwarranted reputational damage. It is in part based on this hardship, as well as the Federal Circuit's preference for the gradual imposition of injunctive relief, that the injunction in this case does not take effect immediately, as discussed in detail below.

**E. Public Interest**

Finally, the Court must consider the public's interest in granting or denying injunctive relief here. While the public has a general interest in the effective enforcement of patent law, courts analyzing this factor nevertheless also look more specifically at the direct effect that an injunction would have on the public. See i4i, 598 F.3d at 863 ("the touchstone of the public interest factor is whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects"). Thus, the public interest factor may favor an infringer when injunctive relief will result in a

10

socially valuable technology becoming unavailable or substantially more expensive. See, e.g., Presidio Components, 723 F. Supp. 2d at 1339 (finding that the public interest favored not enjoining the defendant from employing a patented technology of "unusual social interest", when the patent holder did not practice the patent); Advanced Cardiovascular Systems, 579 F. Supp. 2d at 561 ("A strong public interest in maintaining diversity in the coronary stent market has been previously recognized by this court and the Federal Circuit").

Here, there is no indication that consumers who seek to purchase products embodying the '618 patent technology will be unable to do so, or that these consumers would be forced to pay an unreasonable price to purchase them from the plaintiff. Nevertheless, the defendants have asserted that certain of their customers contracted to purchase infringing screeners from them prior to the jury's verdict of infringement, and that these customers—and potentially those customers' customers—would be unfairly harmed by the precipitous grant of an injunction. While the Court finds that this consideration does not tip the balance of this factor in favor of the defendants, the Court does finds that it supports the "sunset" provision in the Court's injunctive order, as discussed below.

**F. The "Sunset" Provision in the Court's Injunctive Relief**

Having weighed the four factors to be considered in granting permanent injunctive relief, the Court finds that all four factors favor the plaintiff, and that injunctive relief is appropriate. However, the defendants have asserted that they are redesigning their entire line of infringing screeners to avoid infringement of the '618

11

patent, and that this redesign will be completed by the end of June 2011. The defendants thus request that, if the Court does grant the injunctive relief, the Court issue an injunction that does not take effect until after its redesign efforts are concluded.

In general, the Federal Circuit has expressed a preference for injunctive relief that is tailored to minimize disruptions to businesses and consumers. See Broadcom, 543 F.3d at 704 (affirming an injunction with a delayed commencement because the injunction balanced the plaintiff's interests with a desire to avoid market disruptions); Verizon Services, 503 F.3d at 1311 n. 12 (declining to address the issue of whether a delay in injunction was appropriate because a delay was not requested by defendant, but noting that "[the plaintiff] had a cognizable interest in obtaining an injunction to put an end to infringement of its patents; it did not have a cognizable interest in putting [the defendant] out of business."). Here, the defendants have indicated that they will have completed the redesign of their screener line by the end of June 2011, and that, presumably, no orders for infringing screeners will remain pending after that date. The Court thus finds that, in light of the balance of hardship and public interest considerations discussed above, it is appropriate in this case to delay the implementation of injunctive relief until July 11, 2011. Therefore, the injunction set forth below reflects this determination.

## G. Contours of the Injunctive Relief

In addition to their arguments opposing injunctive relief in whole, the defendants also oppose a number of specific aspects of the plaintiff's proposed

12

injunction. The Court has considered these objections, as well as the plaintiff's responses to them, and issues the following injunction:

Commencing Monday, July 11, 2011, the defendants are hereby enjoined for the life of the '618 patent from manufacturing, using, or selling any of the devices found at trial to infringe the '618 patent—namely, defendants' Chieftain 1400, Chieftain 1700, Chieftain 1800, Chieftain 2100, Chieftain 2100X, Chieftain 2400, and H5163 mobile screeners, in both tire-mounted and track-mounted form. See Oakley, Inc. v. Sunglass Hut Intern., 316 F.3d 1331, 1346 (Fed. Cir. 2003) (noting that a sufficiently specific injunctive order should "'limit its prohibition to the manufacture, use, or sale of the specific infringing devices'" (quoting Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc., 986 F.2d 476, 479–80 (Fed. Cir. 1993)). The defendants are further enjoined from marketing similar, but putatively non-infringing screeners, using the screener names listed above.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the plaintiff's motion for injunctive relief is granted, and the Court issues the injunction described above in this decision.

**SO ORDERED.**

Dated: Central Islip, New York
May 26, 2011

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge

13

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
METSO MINERALS, INC.,

                Plaintiff,

            -against-

POWERSCREEN INTERNATIONAL
DISTRIBUTION LIMITED, now known as
TEREX GB LIMITED, TEREX
CORPORATION, POWERSCREEN NEW
YORK, INC. and EMERALD EQUIPMENT
SYSTEMS, INC.,

              Defendants.
-------------------------------------------------------X

**ORDER**
06-cv-1446 (ADS)(ETB)

**APPEARANCES:**

**Cozen O'Connor**
*Attorneys for the plaintiff*
277 Park Avenue
New York, NY 10172
        By:    Michael C. Stuart, Esq.
                 Lisa Ferrari, Esq., of Counsel

**Squire Sanders & Dempsey LLP**
*Attorneys for all defendants*
30 Rockefeller Plaza
New York, NY 10112
        By:    George B. Yankwitt, Esq.
                 Mary Margaret Chang, Esq.
                 Andrew H Fried, Esq., of Counsel

**Merchant & Gould, P.C.**
*Attorneys for all defendants*
1050 17th Street
Suite 1950
Denver, CO 80265
        By:    Jon Trembath, Esq., of Counsel

**Clauss & Sabatini, PC**
*Attorneys for the defendant Terex Corporation*
1350 Broadway
Suite 1710
New York, NY 10018
      By:    Ava R. Maynard, Esq., of Counsel

**Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP**
*Attorneys for the defendant Powerscreen New York, Inc.*
330 Old Country Road
Suite 301
Mineola, NY 11501
      By:    Andrew E. Curto, Esq., of Counsel

**SPATT, District Judge.**

On May 26, 2011, the Court issued a permanent injunction in this case, which is set forth in the Court's Order of that date. On July 8, 2011, in response to various motions by the parties concerning that injunctive order, the Court submitted to the parties a proposed revised injunctive order. Having reviewed the parties' responses to that proposed injunctive order, the Court now vacates the injunctive order set forth in the May 26, 2011 Order in this case, and enters the following injunction:

> Commencing Monday, July 25, 2011, the defendants are hereby enjoined for the life of United States Patent No. 5,577,618 (the "'618 patent") from making, using, offering to sell, and selling any of the devices found at trial to infringe the '618 patent—namely, defendants' Chieftain 1400, Chieftain 1700, Chieftain 1800, Chieftain 2100, Chieftain 2100X, Chieftain 2400, and H5163 mobile screeners, in both tire-mounted and track-mounted form, within the United States, and importing into the United States any of these devices, and from inducing others to make, use, offer to sell, and sell these devices in the United States and to import these devices into the United States. The defendants are

further enjoined for the life of the '618 patent from making, using, offering to sell, and selling within the United States, and importing into the United States, and from inducing others to make, use, offer to sell, and sell in the United States and to import into the United States similar but putatively non-infringing screeners using the screener names listed above. For the sake of clarity, this injunction does not apply to individual devices with respect to which infringement by the defendants has already occurred as of Monday, July 25, 2011, as the plaintiff will be monetarily compensated for this infringement.

Finally, with regard to the calculation of the appropriate bond to be posted pending appeal, the Court agrees that such calculation is premature at this time.

**SO ORDERED.**

Dated: Central Islip, New York
July 21, 2011

_/s/ Arthur D. Spatt_
ARTHUR D. SPATT
United States District Judge

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
METSO MINERALS, INC.,

                    Plaintiff,

          -against-

POWERSCREEN INTERNATIONAL
DISTRIBUTION LIMITED, now known as
TEREX GB LIMITED, TEREX
CORPORATION, POWERSCREEN NEW
YORK, INC. and EMERALD EQUIPMENT
SYSTEMS, INC.,

                    Defendants.
-------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
06-cv-1446 (ADS)(ETB)

**APPEARANCES:**

**Cozen O'Connor**
*Attorneys for the Plaintiff*
277 Park Avenue
New York, NY 10172
          By:    Michael C. Stuart, Esq.
                 Lisa Ferrari, Esq., of Counsel

**Squire Sanders & Dempsey LLP**
*Attorneys for all the Defendants*
30 Rockefeller Plaza
New York, NY 10112
          By:    George B. Yankwitt, Esq.
                 Mary Margaret Chang, Esq.
                 Andrew H Fried, Esq., of Counsel

**Merchant & Gould, P.C.**
*Attorneys for all the Defendants*
1050 17th Street
Suite 1950
Denver, CO 80265
          By:    Jon Trembath, Esq., of Counsel

**Clauss & Sabatini, PC**
*Attorneys for the Defendant Terex Corporation*
1350 Broadway
Suite 1710
New York, NY 10018
      By:    Ava R. Maynard, Esq., of Counsel

**Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP**
*Attorneys for the Defendant Powerscreen New York, Inc.*
330 Old Country Road
Suite 301
Mineola, NY 11501
      By:    Andrew E. Curto, Esq., of Counsel

**SPATT, District Judge.**

The Defendants in this patent infringement case, Powerscreen International Distribution Limited ("Powerscreen"), Terex Corporation ("Terex"), Powerscreen New York, Inc. ("PSNY"), and Emerald Equipment Systems, Inc. ("Emerald"), have filed several post-trial motions. The Court now addresses four of these motions: (1) a renewed motion for judgment as a matter of law; (2) a motion for a new trial; (3) a motion for a new trial on the basis of newly discovered evidence; and (4) a motion for judgment as a matter of law, or, alternatively, for a new trial, filed only by the Defendant Terex. For the reasons that follow, the Court denies the Defendants' motions in their entirety and therefore will not enter judgment as a matter of law in their favor or grant a new trial.

## I. BACKGROUND

The Court described the background of the relevant patent in detail in its previous decision in this case, Metso Minerals, Inc. v. Powerscreen Intern. Distr. Ltd., 681 F. Supp. 2d 309 (E.D.N.Y. 2010) ("Metso I"), and familiarity with that

2

decision is assumed. Nevertheless, the Court restates this information as a

background for the decision.

United States Patent 5,577,618 (the "'618 patent") was granted to Malachy

J. Rafferty on November 26, 1996 for a "mobile aggregate material processing

plant". The patent covers an invention whose primary function is to sort debris—

usually construction debris—into piles of like-sized particles. Figure 2, below, is a

cross sectional drawing from the '618 patent showing the invention's preferred

embodiment.



*Fig. 2*

In this preferred embodiment, the plant sits on a structure akin to a flat-bed

trailer, and extends the length of the trailer. When in its operating position, the

plant takes mixed debris into an input hopper, and separates the debris into one of

four size groupings. The largest debris is then dumped out of the input hopper,

while the remaining three groupings are placed on one of three conveyors. Two of

these conveyors extend out from the sides of the plant (called "lateral conveyors"),

3

while the third extends from the back end of the plant. The debris travels the length

of these conveyors, and is dumped at the end of each to form three separate piles,

each of like-sized debris. In Figure 2, above, the lateral conveyors [20] are shown

in their operative position, extending out from the plant base.

All of these functions, however, are incorporated into the prior art that

preceded the '618 patent. The primary innovation claimed in the '618 patent is a

way of folding the lateral conveyors so that the plant is more easily transported

from worksite to worksite. Previous plants were transportable, but they were

arguably less practical. For example, one cited invention required the lateral

conveyors to be manually removed from the plant and stored above it for transport.

Others allowed the lateral conveyors to fold onto the plant, but required that the

plant be of sufficient length to accommodate the full size of the conveyors. By

contrast, the '618 patent describes an invention whereby the lateral conveyors are

double-jointed and fold into the plant more compactly. This is the essence of the

innovation.

Based on this innovation, the United States Patent and Trademark Office

issued the '618 patent, in which the patentee claimed, among other things:

> A mobile road-hauled aggregate material processing plant
> comprising:
>
> a wheel mounted chassis extending in a longitudinal direction;
>
> a plant support frame mounted on the chassis;
>
> a raw material input hopper mounted on the plant support frame;
>
> a material processing means mounted on the plant support frame and
> fed from the input hopper and having an outlet;

a processed material outfeed delivery means mounted on the plant
support frame and fed from the material processing means;

at least one lateral delivery conveyor incorporated in the outfeed
delivery means, said conveyor comprising:
a conveyor frame tail section;
a conveyor frame head section;

a tail articulation means connecting the tail section to the support
frame in such a way that at least part of the tail section is movable
relative to the plant support frame from an operative position
extending laterally of the chassis with respect to the longitudinal
direction for outfeed of processed material, to a transport position
extending substantially upright above the chassis and positioned
with respect to the input hopper and material processing means so
that it does not project laterally beyond the chassis,

a head articulation means connecting the head section to the tail
section in such a way that the head section is movable from an
operative position to a transport position with the head section
extending longitudinally above the chassis and positioned with
respect to the input hopper and material processing means so that it
does not project laterally beyond the chassis; [and]

an endless conveyor belt . . ., said belt defining a conveyor plane.

('618 patent, col. 7.)

Thus, according to this description, the "wheel mounted chassis" that

underlies the invention is outfitted with a "plant support frame". On the plant

support frame is attached an "input hopper" that, in the preferred embodiment,

accepts rubble of various sizes. This hopper feeds a "material processing means"

that sorts the rubble into various sizes, and feeds the sorted material to the "outfeed

delivery means." This outfeed delivery means comprises, in the preferred

embodiment, two lateral conveyors extending from the sides of the plant. Each of

these lateral conveyors is mounted with a conveyor belt and has two movable joints.

The first joint is called the tail articulation means ("TAM"), and it connects the

5

lower portion of the conveyor (the "tail section") to the plant support frame.  The second joint is called the head articulation means ("HAM"), and it attaches the top part of the conveyor (the "head section") to the conveyor's tail section.  By using these two joints together, the conveyor can be folded into a flat L shape using the HAM and raised next to the plant support frame using the TAM.  This way, the conveyor sits snugly next to the plant support frame during transport mode.  Figure 4, below, shows the preferred embodiment of the invention in transport mode.  The lateral conveyors [20] are shown folded into the L shape for transport.



*Fig.4*

The Plaintiff Metso Minerals commenced the present law suit in 2006, alleging that the Defendants manufactured and sold products that infringed the '618 patent.  Following discovery, claim construction, and summary judgment, the Plaintiff tried its case to a jury in late 2010.  At the seven-week trial, the Defendants challenged the validity of the '618 patent, but on December 6, 2010, the jury returned a verdict rejecting this challenge, in part finding that no asserted claim of the '618 patent would have been obvious to a person of ordinary skill in the art at

6

the time of the invention. The jury concluded that the Defendants had willfully

infringed, either literally or by equivalents, claims 1, 2, 3 and 7 of the '618 patent

with respect to the manufacture and sale of eleven screening machines in the United

States over a ten year period. In addition, the jury issued an advisory verdict

denying the defenses of laches and inequitable conduct. The jury awarded the

Plaintiff $15.8 million in damages. On March 3, 2011, the Court entered Judgment

on the jury verdict.

 After the conclusion of the trial, both the Plaintiff and the Defendants have

filed a large number of post-trial motions. In this Decision and Order, the Court

will now address only those particular filings relating to the Defendants' motions

for judgment as a matter of law and for a new trial.

<b>II. DISCUSSION</b>

**A. <u>Relevant Law</u>**

 **1. The Renewed Motion for Judgment as a Matter of Law**

 Pursuant to Federal Rule of Civil Procedure 50(b) ("Fed. R. Civ. P. 50(b)"

or "Rule 50(b)"), a renewed judgment as a matter of law ("JMOL") may be made

"at the close of all the evidence" and after the verdict. A motion for JMOL may be

granted where "there is no legally sufficient evidentiary basis for a reasonable jury

to find [in favor of the non-moving] party." Fed. R. Civ. P. 50(a). In patent cases, a

motion for JMOL pursuant to Rule 50(b) is reviewed under the law of the regional

circuit. <u>Exergen Corp. v. Wal-Mart Stores, Inc.</u>, 575 F.3d 1312 ,1317 (Fed. Cir.

2009).

7

When ruling on a motion for JMOL, the court must "'consider the evidence in the light most favorable to the [non-moving party] and . . . give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence.'" Concerned Residents for the Env't v. Southview Farm, 34 F.3d 114, 117 (2d Cir. 1994), cert. denied, 514 U.S. 1082, 115 S. Ct. 1793, 131 L. Ed. 2d 721 (1995), (quoting Smith v. Lightning Bolt Prods., Inc., 861 F.2d 363, 367 (2d Cir. 1988)). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 120 S. Ct. 2097 (2000); Meloff v. New York Life Ins. Co., 240 F.3d 138, 145 (2d Cir. 2001). Accordingly, when ruling on a motion brought pursuant to Rule 50, the court may not rule on the credibility of the witnesses or the weight of the evidence. Caruso v. Forslund, 47 F.3d 27, 32 (2d Cir. 1995). In other words, the court may not itself weigh credibility or otherwise consider the weight of evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury. See Williams v. County of Westchester, 171 F.3d 98, 101 (2d Cir. 1999).

In order to grant a motion for JMOL, there must be a "'complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [and women] could not arrive at a verdict against [it].'" Concerned Residents, 34 F.3d at 117,

8

(quoting Song v. Ives Lab., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992)); Mattivi v.

South African Marine Corp. "Huguenot", 618 F.2d 163, 168 (2d Cir. 1980).

"The same standard that applies to a pre-trial motion for summary judgment

pursuant to Fed. R. Civ. P. 56 also applies to motions for judgment as a matter of

law during or after trial pursuant to Rule 50." Piesco v. Koch, 12 F.3d 332, 341 (2d

Cir. 1993); see also the Advisory Committee Note to 1991 Amendment of Fed. R.

Civ. P. 50. This Rule is well and clearly explained in the seminal case of This Is

Me, Inc. v. Elizabeth Taylor, 157 F.3d 139 (2d Cir. 1998). In Taylor, the Court

commented that the then recent adoption of the term "judgment as a matter of law"

to replace both the term "directed verdict" and the term "judgment N.O.V." was

intended to call attention to the close relationship between Rule 50 and 56. 157

F.3d at 142. The Court then went on to explain the basis for granting a post-verdict

Rule 50 motion, as follows:

> A district court may not grant a motion for a judgment as a matter
> of law unless "the evidence is such that, without weighing the
> credibility of the witnesses or otherwise considering the weight of
> the evidence, there can be but one conclusion as to the verdict that
> reasonable [persons] could have reached." Cruz v. Local Union
> No. 3, Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154–55 (2d Cir.
> 1994) (quoting Simblest v. Maynard, 427 F.2d 1, 4 (2d Cir. 1970))
> (internal quotation marks omitted). Weakness of the evidence does
> not justify judgment as a matter of law; as in the case of a grant of
> summary judgment, the evidence must be such that "a reasonable
> juror would have been compelled to accept the view of the moving
> party." Piesco, 12 F.3d at 343.

Id.; see also Fabri v. United Techs. Int'l Inc., 387 F.3d 109, 119 (2d Cir. 2004)

(same); Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir.

2004).

JA0012929

A JMOL is thus "proper only if 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.'" Fiacco v. City of Rensselaer, 783 F.2d 319, 329 (2d Cir. 1986) (quoting Simblest, 427 F.2d at 4). Such motions "should be granted cautiously and sparingly." 9A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2524, at 252 (1995); Japan Airlines Co. Ltd. v. Port Auth. of New York & New Jersey, 178 F.3d 103, 112 (2d Cir. 1999). In order to grant a new trial, the court must find that the verdict is "seriously erroneous" or constitutes a "miscarriage of justice." Smith, 861 F.2d at 370; Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir. 1983).

### 2. The Motion for a New Trial

Under Federal Rule of Civil Procedure 59 ("Fed. R. Civ. P. 59" or "Rule 59"), a court "may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). "'A motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133 (2d Cir. 1998) (quoting Song v. Ives Labor, Inc., 957 F.2d 1041, 1047 (2d Cir. 1992)). The general grounds for a new trial are that (1) the verdict is against the clear weight of the evidence; (2) the trial court was not fair; (3) substantial errors occurred in the admission or rejection of evidence or the giving or refusal of instructions to the

10

jury; or (4) damages are excessive.  12 Moore's Federal Practice, § 59.13[1] at 59-43 (3d Ed. 2005).

In evaluating a Rule 59 motion, the trial judge's duty is essentially to see that there is no miscarriage of justice.  Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir. 1978).  However, in general, as stated above, a motion for a new trial should not be granted unless the Court is "convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice."  Sorlucco v. N.Y.C. Police Dep't, 971 F.2d 864, 875 (2d Cir. 1992); see also Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005); Smith v. Nurse Carpenter, 316 F.3d 178, 183 (2d Cir. 2003); Hugo Boss Fashions, Inc. v. Fed. Ins. Co., 252 F.3d 608, 623 (2d Cir. 2001).

In comparison to a Rule 50 motion for judgment as a matter of law, the Second Circuit has held that the standard for a Rule 59 motion in some respects is less onerous for the moving party in two ways: first, "[u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict."  DLC Mgmt. Corp, 163 F.3d at 134. Second, in deciding a Rule 59 motion "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."  Id.

Federal Rule of Civil Procedure 60(b)(2) ("Fed. R. Civ. P. 60(b)(2)" or "Rule 60(b)(2)") provides that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . newly discovered evidence that, with reasonable diligence could not have been discovered in time to move for a new trial under Rule 59(b)."  Fed. R. Civ. P. 60(b)(2).  Evidence is

11

considered "newly discovered" for the purposes of Rule 60(b)(2) "if it existed at the time of the prior adjudication but . . . was discovered by the movant only after the entry of judgment." Johnson v. Askin Capital Mgmt., L.P., 202 F.R.D. 112, 114 (S.D.N.Y. 2001) (quoting Walker v. Dep't of Veteran Affairs, No. 94 Civ. 5591, 1995 WL 625689, at *1 (S.D.N.Y. Oct. 25, 1995)). The moving party who seeks relief from judgment pursuant to Rule 60(b)(2) must meet an "onerous standard" by showing that: 1) the newly discovered evidence was of facts in existence at the time of the dispositive proceeding; 2) he was justifiably ignorant of those facts despite due diligence; 3) the evidence is admissible and of such importance that it probably would have changed the outcome; and 4) the evidence is not merely cumulative or impeaching. United States v. Int'l Bhd. of Teamsters ("Teamsters"), 247 F.3d 370, 392 (2d Cir. 2001).

The standard for newly discovered evidence under Rule 59 is identical to that under Rule 60(b)(2). Brocuglio v. Proulx, 478 F. Supp. 2d 297, 300 (D. Conn. 2007) ("Whether moving on the basis of presentation of new evidence under Rule 59(e) or Rule 60(b)(2), the standard for newly discovered evidence is the same.") (internal quotation marks and citation omitted).

One of the present motions is also based upon Rule 60(b)(3), which provides that "[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for . . . fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." Fed. R. Civ. P. 60(b)(3). A party seeking relief pursuant to Rule 60(b)(3) must establish by clear and convincing evidence that the

opposing party engaged in fraud or other misconduct. See Fleming v. New York Univ., 865 F.2d 478, 484 (2d Cir. 1989). Moreover, "[t]o prevail on a Rule 60(b)(3) motion, a movant 'must show that the conduct complained of prevented the moving party from fully and fairly presenting his case.'" State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 176 (2d Cir. 2004) (internal citation omitted).

Finally, the Defendants also argue for a new trial on the basis of the catch-all provision of Rule 60, which is subsection (b)(6). It is well established that the appropriate occasion for Rule 60(b)(6) relief is limited to cases where the movant can show "extraordinary circumstances" or "extreme hardship." United States v. Harris, 367 F.3d 74, 80 (2d Cir. 2004) (citing United States v. Cirami, 563 F.2d 26, 32 (2d Cir. 1977)). However, Rule 60(b)(6) does, "confer[ ] broad discretion on the trial court to grant relief when appropriate to accomplish justice." Matarese v. LaFevre, 801 F.2d 98, 106 (2d Cir. 1986). Indeed, clause (6) has been characterized as "a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by [Rule 60(b)' s] preceding clauses." Cirami, 563 F.2d at 32. Nevertheless, relief under clause (6) is only appropriate where all of the more specific clauses of Rule 60(b) are inapplicable. See Teamsters, 247 F.3d at 391-92 ("Controlling cases have held that if the reasons offered for relief from judgment can be considered in one of the more specific clauses of Rule 60(b), such reasons will not justify relief under Rule 60(b)(6)") (citations omitted).

The granting of a new trial is extraordinary relief, and one that "is properly granted only upon a showing of exceptional circumstances." Id. at 391.

**B. As to The Defendants' Motions for a New Trial and Judgment as a Matter of Law**

In addition to the Defendants' motion for a new trial on the basis of newly discovered evidence addressed above, the Defendants have filed two additional motions which the Court will now address— a renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) ("Def. Mem. 2") and a motion for a new trial pursuant to Fed. R. Civ. P. 59 ("Def. Mem. 3"). In sum, the Defendants believe they are entitled to a new trial or judgment as a matter of law on the issues of literal infringement, infringement by equivalents, willful infringement, invalidity, and damages. The two motions at issue overlap extensively in their relevant facts and legal arguments. Thus, for sake of efficiency, the Court will consider the numerous subjects addressed in both motions simultaneously. The Court will then address the one remaining argument which appears only in the Defendants' motion for a new trial.

**1. As to the Alleged Errors Regarding Claim Terms**

First, in their motion for a new trial, the Defendants argue that the Court erroneously charged the jury in the context of infringement. Specifically, the Defendants allege that the Court (1) erroneously instructed the jury on the meaning of "chassis" and "wheel-mounted chassis", (2) did not correctly instruct the jury regarding the correct standard for determining whether the "head articulation means" limitation was literally infringed; and (3) vitiated the "does not project laterally beyond the chassis" limitation when it permitted the jury to apply the doctrine of equivalents. The Defendants similarly allege in their renewed motion

14

for judgment as a matter of law that no reasonable, properly instructed jury could have concluded that (1) the accused track mounted screeners have "wheel mounted chasses" as the claims require; (2) any accused screener met the "head articulation means" limitation; and (3) as a matter of law, that the doctrine of equivalents was applicable to the "does not project laterally beyond the chassis" limitation.

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard, or does not adequately inform the jury on the law." Cameron v. City of New York, 598 F.3d 50, 68 (2d Cir. 2010). In order to justify a new trial, the jury instruction must be both erroneous and prejudicial. Millea v. Metro-North R. Co., 658 F.3d 154, 163 (2d Cir. 2011); see Sulzer Textil AG v. Picanol NV, 358 F.3d 1356, 1363 (Fed. Cir. 2004). An erroneous jury instruction is prejudicial unless "the court is convinced that the error did not influence the jury's verdict." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000). In addition, Fed. R. Civ. P. 50 provides that if a jury returns a verdict for which there is not a legally sufficient basis, then the district court may direct entry of judgment as a matter of law. This is Me, 157 F.3d 139, 142 (2d Cir. 1998).

### a. "Chassis"

The first major source of contention in the post-trial motion context, raised in the Defendant's motion for a new trial, involves the term "chassis." This word is utilized in the patentee's claim that the invention comprises "a plant support frame mounted on the *chassis*." The claim term also appears in the description of the "head articulation means" as connecting the head section to the tail section in such a way that the head section "does not project beyond the *chassis*."

In the parties' claim construction motions, the parties requested the Court to construe this term. The Defendants requested a narrower definition—they asked the Court to construe "chassis" to mean "a pair of longitudinal beams." The Plaintiff requested a broader definition—it asked the Court to construe the term to mean "a structure onto which other elements are attached or mounted," such that it would include the tires, tracks, and wheels running on the tracks. For reasons outlined in an earlier decision, the Court construed "chassis" to mean "the entire assembly of parts that rest beneath the plant support frame," which included the "wheels, tracks, and other related parts on which would rest the other operative structures of the screening plant." Metso I, 681 F. Supp. 2d at 321. The Court also recognized at that time that that the chassis incorporate[d] the wheels and the wheel arches in the preferred embodiment." Id.

The Defendants thereafter challenged this construction, and advanced a more limited construction that did not comprise, among other parts, the wheels, wheel arches, tires, or support jacks that rest beneath the plant support frame. The Court rejected this challenge.

At the conclusion of the trial, the Court instructed the jury that the claim term "chassis" "includes the wheels or tires and the wheel arches . . . [and] also includes the tracks and assembly on which the tracks rotate and are mounted because these elements are beneath the functional parts of the screener." (Trial Tr., at 5346:6-9.)

First, in their motion for a new trial, the Defendants argue that the Court erred in its original definition of the term "chassis" by defining it to include more

16

than the pair of longitudinal beams.  However, the reasoning underlying the original claim construction determination by this Court remains, and therefore, the Court does not see any reason to alter its earlier decision.

Second, the Defendants allege that in the jury instructions the Court materially and improperly changed its construction of "chassis" after the close of the evidence.  The Defendants claim that the explicit inclusion of tracks and the track assembly in the definition of chassis to the jury was significantly prejudicial in that it increased the lateral width of the term, because the tracks and track assembly are not "*beneath* the plant support frame" as defined in the claim construction, but rather are laterally to the side of, and partially below, the plant support frame.  According to the Defendants, this, in turn, increased the width of the "chassis" by the width of the tracks.  In addition, by including wheels and wheel arches in the definition of "chassis," the Defendants assert that this also inappropriately expanded the width of the chassis.

In the previous claim construction decision by this Court, the term "chassis" was defined to mean "the entire assembly of parts that rest beneath the plant support frame."  Metso I, 681 F. Supp. 2d at 321.  When the Court charged the jury, it reiterated this definition and stated that the claim "chassis" "includes the wheels or tiers and the wheel arches . . . [and] also includes the tracks and assembly on which the tracks rotate and are mounted because these elements are beneath the functional parts of the screener." (Trial Tr., at 5346:6-9. )

In Metso I, the Court did express a hesitation to explicitly construe "chassis" to include or exclude part of the tracks on a "track-mounted screener."  681 F.

17

Supp. 2d at 321. However, that reluctance was specifically connected to the intrinsic evidence only, which the Court found wanting. Although the Court found that the definition of "chassis" had to necessarily include more than just longitudinal beams and other structures found only in the preferred embodiment, i.e., the wheels and wheel arches of the invention, the Court struggled with the "tracks" in the accused screeners, because that specific structure does not appear in the patent's preferred embodiment. In other words, based upon the intrinsic evidence of the patent alone, the Court was reluctant to include or exclude "tracks" as part of the definition of "chassis."

However, the Court thereafter relied upon the extrinsic evidence of Powerscreen's Spare Parts Listings for its mobile screeners, in which it used the terms "track chassis" and a "wheel chassis" to refer to the "entire assembly of supports, wheels, tracks, and other related parts on which would rest the other operative structures of the screening plant." Metso I, 681 F. Supp. 2d at 321. In the Court's view, this was evidence that one skilled in the art would define "chassis" as referring to the *entire assembly* that rests beneath the functional parts of the screener, and that this was consistent with the intrinsic evidence in the patent itself. Thus, when the Court construed the term "chassis" in the claim construction decision to mean "the entire assembly of parts that rest beneath the plant support frame," the Court implicitly defined the term to include the supports, wheels, tracks, and other related parts on which the operative structures of the screener, i.e., the functional parts of the screener, would rest.

18

Of course, to "change[] the rules of the game" and alter the construction of
key claim terms after the case had been tried would not be permitted.  See Johns
Hopkins Univ. CellPro. Inc., 152 F.3d 1342, 1357 (Fed. Cir. 1998).  However, that
is not the circumstance at hand.  The Defendants are comparing the Court's
instruction to the jury with the Court's prior dicta—not the Court's actual claim
construction.  Accordingly, the Court's claim construction and the Court's jury
instruction are consistent with one another and there is no need to consider whether
a change in construction was manifestly prejudicial.  Therefore, the Court will not
award a new trial on the basis of the term "chassis" as utilized in the jury
instructions.

### b. "Wheel Mounted Chassis"

The next contentious patent term, argued in both the renewed motion for
judgment as a matter of law and the motion for a new trial, is "wheel mounted
chassis."  The Defendants make several arguments based solely on this phrase in
both of their respective motions.

The patent claims asserted by the Plaintiff require that a mobile, road-hauled
aggregate processing plant have a "wheel mounted chassis."  At the claim
construction and summary judgment stage, the Defendants argued that the accused
*track* mounted screeners could not have "wheel mounted chasses" as required under
the patent claims for a finding of infringement.  According to the Defendants, the
definition of "wheel" did not encompass "tracks", either literally or by equivalent,
and thus the track-mounted screeners could not be considered "wheel mounted".

19

To the contrary, the Plaintiff argued that track mounted screeners had chasses that are nonetheless "wheel mounted," because the chasses were mounted on a number of wheels that drove and guided the track parts that came into contact with the ground. The Court declined to grant summary judgment in favor of either party on this ground, because it found that this was a question most appropriate for the jury because material issues of fact existed with respect to how the tracks operated and what role their wheels played in their functioning.

At the charge conference, the Defendants again raised the argument that even if the jury were to determine that track assemblies somehow have wheels, it would be insufficient to decide that those screeners have "wheel mounted chasses" as required under the terms of the patent. The Defendants objected to an instruction to that effect, claiming that the proffered charge would deprive the jury of the ability to decide what is or is not a "wheel mounted chassis" within the claim limitation. These arguments were taken into consideration by the Court.

In the charge, the Court instructed the jury "to decide whether the Defendants' screeners on a track-mounted chassis have 'wheels.'" The Court further charged that "if an accused Powerscreen screener is mounted on tracks," they were to determine "whether or not the tracked chassis of that screen has wheels, as I have defined the term 'wheels.'" The jury thereafter found that two of the track-mounted screeners—the Chieftain 2100 and the H5163—literally infringed this requirement of the '618 patent claim. The jury also found that the four other track-mounted screeners—the Chieftain 1400, the Chieftan 1700, the

Chieftan 1800, and the Chieftain 2100X—infringed this requirement of the '618 patent under the doctrine of equivalents.

In the Defendant's renewed motion for judgment as a matter of law, the Defendants argue that because these six accused screeners are mounted on tracks, not wheels, that they could not be found to have infringed the '618 patent, either literally or under the doctrine of equivalents. Their position hinges on the assertion that the Court erroneously instructed the jury in such a way that it impermissibly abrogated the "wheel mounted chassis" limitation of the asserted claims. The Defendants reason in their motion that because the Court defined "chassis" to include the tracks and track assembly on track mounted screeners, and thereby instructed the jury that it needed only to find that the track-mounted screeners had wheels to conclude that those screeners infringed, that the Court essentially erased the words "mounted" and "chassis" from the patent specifications.

In addition, the Defendants claim that the Court in effect told the jury to ignore evidence that a wheel mounted chassis was fundamentally different from a track mounted chassis. In support of the Defendant's motions, they contend that the industry generally categorizes screeners as being either track-mounted or wheel-mounted, and that they are intended for different environments and both are structured and perform differently. Thus, because "[t]hey do not perform the same functions in the same way to achieve the same result," the Defendants argue that no reasonable jury could have concluded that Powerscreen's track-mounted screeners had a wheel-mounted chassis as required by claim 1 and the asserted dependent

21

claims of the '618 patent. The Defendants repeat these claims in their motion for a new trial, arguing that the Court's instructions constitute prejudicial error.

At its core, the Defendants' argument is that the jury instruction changed the relevant inquiry from a "wheel mounted chassis" to simply whether a screener had "wheels". On the other hand, the Plaintiffs assert that their witness, Stephen Whyte, testified that the track-mounted screeners did infringe the "wheel mounted" chassis claim of the '618 patent, either literally or under the doctrine of equivalents.

As the Court explained in its previous claim construction opinion, the Plaintiff raised a genuine issue of material fact as to whether a track-mounted screener could nevertheless have a chassis that was "wheel-mounted," if the chassis is mounted on a number of wheels that drive and guide the track parts that come in contact with the ground. In addition, the Court properly instructed the jury that the definition of "chassis" included tracks, wheels, or any other part that rested beneath the plant support frame. Thus, when the Court instructed the jury, it did so in accordance with the Court's interpretation of what a track mounted screener with a wheel-mounted chassis would be. The jury did not have free reign, without constraint, to find that a track-mounted screener with a wheel anywhere in the screening plant would be infringing. Rather, the Court specifically instructed that the jury was to determine "whether or not the tracked *chassis* of that screen has wheels." Thus, the issue before the jury was whether the assembly of parts that rested beneath the plant support frame contained wheels, and the factual issue of whether a track-mounted screener could nevertheless have a wheel-mounted chassis was thereby properly before the jury. The instruction was not erroneous and

certainly did not warrant a new trial. Also, in this regard, the Court does not find

that there was a complete absence of evidence supporting the jury's verdict to

warrant a judgment as a matter of law.

### c.  "Head articulation means"

Another claim term that is a source of contention in the post-trial context is

"head articulation means" ("HAM"). The claim term HAM is undisputedly a

means plus function claim, and therefore must be construed by first identifying the

function of the term, and then identifying the structures that carry out this function.

In the Court's previous claim construction decision, it construed the function of this

claim to mean:

> connecting the head section to the tail section in such a way that
> the head section is movable from an operative position to a
> transport position with the head section extending longitudinally
> above the chassis and positioned with respect to the input hopper
> and material processing means so that it does not project laterally
> beyond the chassis.

Metso I, 681 F. Supp. 2d at 326. In addition, the Court found the following

structures to be necessary to carry out this function: "a pivot joint, a connecting pin,

a bushing, wing plates, and a holding plate." The HAM was therefore interpreted to

incorporate these specific structures and their equivalents.

Thereafter, the Defendants did not oppose the Court's definition of the

HAM function, but did challenge the Court's determination of which structures

carry out this function. Specifically, the Defendants contended that the HAM

should be construed to additionally comprise a "C-clip," the "tapered parts" of the

head and tail sections of the conveyor, and a "hydraulic ram." In the

23

reconsideration decision, <u>Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.</u>, 722 F. Supp. 2d 316 (E.D.N.Y. 2010) ("<u>Metso II</u>"), the Court stated that it had already discussed the basis for excluding those terms in <u>Metso I</u> and found no reason to alter the Court's previous construction of the HAM. However, the Court did reverse its determination with respect to whether all of the required structures of the HAM, as laid out in <u>Metso I</u>, were actually present in the accused screeners and found that the existence of two elements—wing plates and a holding plate—remained a question of fact.

At the trial, the Court instructed the jury with regard to the HAM by stating that one of the issues it had to decide with respect to infringement of the claim one was:

> First, whether or not the mechanism that causes a lateral conveyor of the accused Powerscreen screeners to fold and unfold, allows that lateral conveyor to fold into a transport position so that the lateral conveyor "does not project laterally beyond the chassis" of the screener.
>
> Second, whether or not that mechanism has "wing plates" and "a holding plate."

(Trial Tr., at 5337:24-5338:12.)

The Defendants make several arguments with regard to this claim term, which are substantially the same in both their motion for a new trial and their renewed motion for judgment as a matter of law.

First, the Defendants contend that the Court did not give specific, explanatory instructions as to the "means-plus-function" limitation format so that it did not adequately inform the jury of the law. The Defendants assert that the Court

24

should have charged the jury that to find infringement it needed to conclude that (1) the accused screeners performed the specified function *exactly*, and (2) the defined structures or their equivalents were the required means for performing that function. At the outset, the Court rejects this argument. The instruction to the jury clearly delineated two steps for the jury—first, to determine whether the function of the accused screeners was the same as that of the HAM, and second, to determine whether the defined structures at issue were contained in the mechanism that performed that function.

Second, the Defendant argues that the accused screeners do not perform the same exact function that was defined in the claim construction, specifically the "connecting" portion of the limitation, that the HAM was to "connect[] the head section to the tail section." Metso I, 681 F. Supp. 2d at 326. The Defendants claim that the folding mechanism in the accused screeners that causes the movement of the side conveyors does not connect the head section to the tail section, but connects the head section to the plant support frame. Thus, because the Court did not instruct the jury with regard to this particular function, the Defendants allege that this led the jury to an incorrect result that warrants a new trial or judgment as a matter of law of non-infringement.

The Court agrees with the Plaintiff that its instruction was not improper.

In its summary judgment decision, the Court agreed that the function of the HAM was to connect the head and tail sections so that the conveyors do not protrude laterally beyond the chassis when folded and deemed there to be no genuine issue of material fact as to whether the structures carried out the recited

function of the HAM or its equivalent.  However, in the reconsideration decision, the Court determined that the only factual issue remaining with regard to the HAM's function was whether the conveyors on the accused screeners "protrude[d] laterally beyond the chassis," and that a structure that failed to carry out this function was not a HAM within the meaning of the '618 patent.  The Court explicitly said that "there are issues of fact as to whether the alleged [HAM] on the accused screeners carry out this function," implicitly rejecting any other issue of fact with regard to the function of the HAM.  Therefore, the Court properly instructed the jury to make a determination only as to this aspect of the HAM's function and a new trial or judgment as a matter of law is not warranted on this basis.

Third, the Defendants acknowledge that part of the function, to enable to the head section to be moved from the operative position to the transport position, is accomplished by the accused screener's folding mechanism at issue.  However, the Defendants claim that the function of the accused folding mechanism is not exactly the same because "the arrangement of the struts in combination with the hydraulic cylinders . . . at the same time provides support for the lateral conveyer in the operating position when the conveyors have a load on them."  Thus, the Defendants argue that the accused folding mechanism operates in an entirely different manner and does not achieve the same result as required by the claimed function of the HAM.  The Court disagrees.

The fact that the folding mechanism in the accused screeners performs the claimed function and also performs an additional function, does not change the

26

finding that the structure actually performs the recited function. "[A]n accused device that contains the same feature as the patented device cannot escape infringement because in it that feature performs an additional function it does not perform in the patented device. Radio Steel & Mfg. Co. v. MTD Products, Inc., 731 F.2d 840, 848, 221 U.S.P.Q. 657 (Fed. Cir. 1984).

Fourth, the Defendants reassert their earlier and rejected argument that the Court's determination of the structures required to perform the claimed function were unduly narrow, and should include elements such as tapered parts and a hydraulic ram. The Court sees no reason to alter its earlier decision in this regard.

### d. "Not Project Laterally Beyond the Chassis"

The last claim term that forms the basis for several arguments in the Defendants' motion for a new trial and renewed motion for judgment as a matter of law is that the side conveyors "not project laterally beyond the chassis" when in the transport position.

At trial, the jury found that six of the accused screeners infringed the Plaintiff's patent under the doctrine of equivalents. In the Defendants' motions, they assert that as a matter of law, there could not be a theory of infringement by equivalence for the limitation that the side conveyors "not project laterally beyond the chassis" when in the transport position. The Defendants have two bases for this argument.

The first contention of the Defendants is that the vitiation doctrine applies, so that the trier of fact could not have reached an equivalence analysis. The claim-vitiation doctrine provides that "an element of an accused product or process is not,

as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation." Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1358 (Fed. Cir. 2005) (citing Warner–Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 29, 117 S. Ct. 1040, 137 L. E. 2d 146 (1997)). "There is no set formula for determining whether a finding of equivalence would vitiate a claim limitation . . . . Rather, courts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." Freedman, 420 F.3d at 1359. "Claim vitiation applies when there is a 'clear, substantial difference or a difference in kind' between the claim limitation and the accused product." Trading Techs. Int'l, Inc. v. eSpeed, Inc., 595 F.3d 1340, 1355 (Fed. Cir. 2010) (quoting Freedman, 420 F.3d at 1360). "It does not apply when there is a 'subtle difference in degree.'" Id. The doctrine of equivalents does not allow recapture of subject matter excluded by a deliberate claim-drafting decision. Planet Bingo, LLC v. GameTech Int'l, Inc., 472 F.3d 1338, 1344 (Fed. Cir. 2006).

The Court agrees with the Defendants that the "doctrine of equivalence cannot be used to erase 'meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.'" Conopco, Inc. v. May Dep't Stores Co., 46 F.3d 1556, 1562 (Fed. Cir. 1994) (internal citation omitted)); see, e.g., Tronzo v. Biomet, Inc., 156 F.3d 1154, 1160 (Fed. Cir. 1998) (noting that the finding of all shapes to be equivalent structures would entirely

vitiate the limitation requiring a "generally conical shape"). However, the Court finds that the vitiation doctrine is not applicable in the present case.

The claim to "not project laterally beyond the chassis" can lead to several variations of infringement, from insubstantial projection so that the doctrine of equivalents is applicable, to substantial projection so that the vitiation doctrine could apply. The Court has previously rejected the Defendants' argument that there is a binary difference between conveyors that extend beyond the chassis and those that do not. Cf. Moore U.S.A., Inc. v. Standard Register Co., 229 F.3d 1091, 1106 (Fed. Cir. 2000). The Court at that time found that "even if minimally protruding conveyers were deemed to be equivalent to non-protruding conveyors, the term 'does not project laterally beyond the chassis' would still limit the patent." Metso I, 681 F. Supp. 2d at 332. In addition, the Plaintiff's expert witness stated that the projection of the lateral conveyors was "so minimal that it is of no consequence." (Trial Tr., at 2368:9-2369:19.) While the Defendants contend that the Plaintiff expands the scope of their limitation to the exact opposite –"does project"—this is not the case. Rather, it is a question of degree. The Plaintiff's expert merely testified that the projection was so minimal that it was essentially the same as not projecting. This would likely not have been the case had the projection been more substantial.

The second contention of the Defendants is that Metso is estopped from asserting infringement by equivalence of the claim limitation that the lateral conveyors "not project laterally beyond the chassis" while in the transport position because of arguments made to the Patent and Trademark Office ("PTO") during the

29

prosecution of the '618 patent.  In particular, the Defendants point to the following statements:

- "Claims 1 and 12 are further amended to more clearly indicate what constitutes the operative position and the transport position, the former having elements extending laterally of the chassis, the latter having *no elements extending laterally of the chassis*."

- "[I]t is more clearly recited that:

  • the tail section is connected to the plant frame, and it extends laterally for operation and substantially upright *without projecting laterally beyond the chassis for transport* . . .

  • the head articulation means renders the head section movable to extend longitudinally above the chassis and thereby be positioned with respect to other parts of the plant *so that it does not project laterally beyond the chassis.*

Prosecution history estoppel may, as a matter of law, prevent a patentee from subsequently relying on the doctrine of equivalents for a particular claim limitation. Bai v. L & L Wings, Inc., 160 F.3d 1350, 1354 (Fed. Cir. 1998). The Defendants in the present case rely on estoppel by argument, not by amendment. In order for this form of estoppel to apply, there must be a "clear and unmistakable" surrender of the equivalent asserted by the patentee. See Litton Sys. v. Honeywell, Inc., 140 F.3d 1449, 1458 (Fed. Cir. 1998) (requiring a "clear and unmistakable surrender" in order for argument-based estoppel to apply).

Here, the Court does not find that any of the statements made to the PTO or by Mr. Rafferty's lawyers at trial, clearly and unmistakably abandoned an infringement claim of mere minimal projection beyond the chassis under the

doctrine of equivalents. The only thing indicated by these statements is the importance of the actual claim to not project laterally beyond the chassis. They do not simultaneously preclude an eventual finding that a minimal projection beyond the chassis could be found to equivalently infringe.

In sum, the Court does not find that a new trial or JMOL is warranted in light of this claim term.

### 2. As to the Alleged Errors Regarding Obviousness

The next subject area that forms the basis for several arguments in the post-trial motions of the Defendants is the defense of obviousness. Because it is addressed extensively in both the motion for a new trial and the renewed motion for judgment as a matter of law, each will be addressed separately.

#### a. Motion for a New Trial

In the Defendants' motion for a new trial, the Defendants claim that the Court committed highly prejudicial errors in instructing the jury on the rules governing the Defendants' obviousness defense. First, the Defendants allege that the Court erred in failing to instruct the jury that the Defendants needed only to show obviousness by a preponderance of the evidence in view of Defendants' reliance on prior art not cited to the PTO. Second, the Defendants allege that the Court erred in instructing the jury that only fully operational or functional products could be considered prior art.

As to the first ground, at the trial, the Court instructed the jury that in light of all of the prior art of the '618 patent, obviousness must be shown by clear and convincing evidence. The Defendants claim that this was not the appropriate

31

standard with respect to prior art that was not disclosed to the PTO.  In support of this argument, the Defendants cite to KSR Intern. Co. v. Telexflex, Inc., 550 U.S. 398, 426, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007), in which the Supreme Court found that while there is a presumption of validity when the PTO approves a claim in light of the prior art, that presumption is much diminished where the PTO never considered certain prior art.  However, the Supreme Court explicitly did not address whether the failure to disclose prior art to the PTO voided the presumption of validity.  Id.  More importantly, the Supreme Court did not hold that the standard of evidence was lowered for a defense of obviousness when certain prior art was not disclosed to the PTO.

Moreover, since the filing of the post-trial motions, the Supreme Court has decided the exact issue it declined to decide in KSR.  In Microsoft Corp. v. i4i Limited Partnership, 564 U.S. __, __ Slip Op. at 5-6, (June 9, 2011),  the Supreme Court rejected the contention that a preponderance standard must apply when an invalidity defense rests on evidence that was never considered by the PTO in the examination process.  Thus, there is no longer any basis for the Defendants' argument that the instruction of a clear and convincing evidentiary standard was improper.

Although the Defendants make much out of the Supreme Court's dicta that "the challenger's burden to persuade the jury of its invalidity defense by clear and convincing evidence may be easier to sustain," the Supreme Court did not hold that this particular language was essential to include in a jury instruction.  Rather, the Supreme Court stated that "[i]n this respect . . . we have no occasion to endorse any

32

particular formulation." The Court went on only to state that "a jury instruction on

the effect of new evidence *can*, and when requested, most often should be given. . .

to consider that it has heard evidence that the PTO had no opportunity to evaluate

before granting the patent." Id. at 17 (emphasis added).

The Court in this case rejected the Defendants' requested charge that

"[w]hile Defendants must still prove invalidity by clear and convincing legal

evidence, Defendants may more easily do so if the prior art that they contend

renders a claim obvious and invalid was not considered by the examiner and is

more pertinent that the prior art that was considered." (DE No. 469.)  However, the

Court instructed the jury as follows:

> A granted patent is presumed to be valid, but that presumption of
> validity can be overcome if clear and convincing evidence is
> presented that proves the patent is invalid.  One example of a way
> in which the presumption can be overcome is if the United States
> Patent Office has not considered, for whatever reason, prior art that
> would invalidate the patent."

(Trial Tr., at 5323-4.)  This instruction sufficiently complied with the Supreme

Court's direction to instruct the jury "to consider that it has heard evidence that the

PTO had no opportunity to evaluate before granting the patent." Microsoft Corp.,

Slip Op. at 17.

As for the second ground, the Defendants claim that the following

instruction to the jury was erroneous:

> For any machine that you may determine is prior art, the
> Defendants must prove by clear and convincing evidence how that
> particular machine operated before September 7, 1993, in the
> manner that the Defendants allege is pertinent to the claims of the
> '618 patent, and *that that machine, if any, was fully operational
> and functional in that respect.*

(Trial Tr., at 5369:3-9.) The Defendants argue that this instruction was erroneous because there is no requirement that a preexisting machine be "fully operational and functional" for it to qualify as prior art for purposes of obviousness. They further assert that because they had no obligation to prove that the Dominator or Masterstock conveyors were fully operational and functional, they did not do so at trial, and therefore the imposition of this requirement of proof after all the evidence had been submitted was manifestly unfair.

Under 35 U.S.C. § 103(a), a patent is invalid "if the differences between the [claimed] subject matter . . . and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." The Federal Circuit has recently expressly noted that "a reference need not work to qualify as prior art." Geo M. Martin Co. v. Alliance Machine. Sys. Intern. LLC, 618 F.3d 1294, 1302 (Fed. Cir. 2010). Thus, the Defendants are correct that the Court's instruction in this regard was erroneous.

However, the Court does not find that this error resulted in substantial prejudice. An erroneous jury instruction is prejudicial unless "the court is convinced that the error did not influence the jury's verdict." Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000). In this case, even if the Dominator mobile screener and the MasterStock 70/80 conveyors were considered prior art to the '618 patent, there was still sufficient evidence from which the jury could conclude that the '618 patent was not obvious in view of these two machines. The Defendants' own expert, Frank Loeffler, acknowledged that combining these

references would not result in the invention claimed in the '618 patent because the combination omitted any teaching of a stop to prevent the head section of the folded lateral conveyor from folding beyond 90°. The Defendants contend that this addition of a stop, to make the patent nonobvious, cannot be sufficient because the Court did not construe the patent claims to require stops. They also point out that stops were well-known to one of ordinary skill in the relevant field. However, this was an issue of fact for the jury, and they concluded, notwithstanding the instruction with regard to functionality and optionality, that the defense of invalidity on the ground of obviousness was without merit.

In addition, there was sufficient evidence to conclude that the Defendants proved by a clear and convincing standard that the Dominator and MasterStock 70/80 were fully operational and functional. For example, Anthony Parascando testified that he and his father purchased the Dominator machine in August 1993, had it for five or six years, and then gave the machine to a man named Bill Griffits. (Trial Tr., at 3593:7-24.) Though testified to explicitly, there is nothing to indicate that this machine was not fully operational and functional, and the clear implication of Parascando's testimony is that the machine worked for its intended purpose. In addition, Richard Byrne testified to invoices of MasterStocks and Dominators being sold into the US about 1990. (Trial Tr. 3323:4-7.; 3340:19-21.) Again, the clear implication of this testimony is that these two conveyors were fully operational and functional.

Thus, the addition of the instruction to the jury to find that the machines qualified as prior art only if they were fully operational and functional was not

35

substantially prejudicial. The jury's conclusion as to whether the Dominator and the Masterstock conveyors were prior art was not influenced by the imposition of an "operability" requirement, because that was not a point of contention in this case. Therefore a new trial is not warranted on this ground.

### b. Renewed JMOL

In the Defendants' renewed motion for judgment as a matter of law, the Defendants assert that no reasonable jury, properly instructed on the governing law, would have had a legal basis for finding the '618 patent was not invalid as obvious. The Defendants further advance the contention that consistent with the teachings of KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398, 416, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007), that the claimed invention in the present case was a combination of familiar elements which yielded no unexpected results. The Court has previously rejected this argument, agreeing with the Plaintiff that it was a proper issue for the jury as to whether the results were unexpected or not. The Court sees no reason to now disturb a decision that was properly in the province of the jury. Therefore, the Defendants' motion for summary judgment as a matter of law on the ground that no reasonable jury could have concluded that all asserted claims were not invalid as obvious under 35 U.S.C. § 103 is denied.

### 3. As to the Alleged Errors Regarding Willful Infringement

At trial, the Court charged the jury with regard to willful infringement as follows:

> Willful infringement is established where it is shown that:
>
> The Defendant was aware of the [Plaintiff's] patent.

36

The Defendant had no reasonable basis for reaching a good faith conclusion that its making, using or selling its device avoided infringement of the patent.

Willful infringement may also be established where it is shown that a defendant did not exercise due care to determine whether or not it was infringing Plaintiff's patent, once the Defendant acted in reckless disregard of the claims of the Plaintiff's patent.

One factor to consider with respect to a Defendant's good faith and due care is whether the Defendant obtained and followed competent legal advice from counsel after having actual notice of Plaintiff's patent, and before beginning or continuing the allegedly infringing activities. Competent legal advice means an opinion by counsel based on a reasonable examination of the facts and law relating to the validity and infringement issues, consistent with the standards and practices generally followed by competent lawyers.

No factor by itself requires a finding of willful or nonwillful infringement. In considering whether the Defendant's infringement was willful, you should consider the totality of the circumstances, and all of the evidence demonstrating the Defendant's intentions.

(Trial Tr., at 5392:1-5393:16.) Again, because this issue is addressed extensively in both the motion for a new trial and the renewed motion for judgment as a matter of law, each will be addressed separately.

### a. Renewed Judgment as a Matter of Law

In the Defendants' renewed motion for judgment as a matter of law, the Defendants argue that no reasonable jury, properly instructed on the law, would have had a legally sufficient evidentiary basis to find that the Defendants willfully infringed the '618 patent.

As stated under In re Seagate Technology, LLC, 497 F.3d 1360 (Fed. Cir. 2007), a willful infringement analysis requires two steps. First, "a patentee must show by clear and convincing evidence that the infringer acted despite an

37

objectively high likelihood that its actions constituted infringement of a valid patent

. . . . The state of mind of the accused infringer is not relevant to this objective

inquiry." Id., 497 F.3d at 1371. Then, if this inquiry is satisfied, "the patentee must

also demonstrate that this objectively-defined risk was either known or so obvious

that it should have been known to the accused infringer." Id. The Defendants claim

that neither of these prongs was satisfied.

    With regard to the first prong, the Defendants contend that the jury did not

have a legally sufficient basis to find, by clear and convincing evidence, that the

Defendants were objectively reckless. In order to support this contention, the

Defendants point to both their non-infringement defense and the invalidity defense

of obviousness.

    The existence of an objective risk of infringement is "determined by the

record developed in the infringement proceeding." Id. The objective prong is not

established when the accused infringer puts forward a reasonable defense to

infringement, even if the jury ultimately reaches a verdict of infringement. See

Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc., 620 F.3d 1305, 1319

(Fed. Cir. 2010) (holding that the objective prong for willful infringement is

generally not met "where an accused infringer relies on a reasonable defense to a

charge of infringement"); DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567

F.3d 1314, 1336 (Fed. Cir. 2009) (finding that an accused infringer presented a

substantial question of noninfringement which precluded a finding of objective

recklessness despite the jury's ultimate finding of infringement).

38

In this case, the Court does not find that the Defendants presented a substantial question of noninfringement.

First, although the Defendants maintain that their defenses were objectively reasonable because of the Court's denial of the Plaintiff's motion for summary judgment, that ruling is not determinative. The Court's determination that there were factual disputes regarding infringement does not preclude a subsequent finding of willful infringement. The Court merely found that the Defendants provided sufficient evidence to give rise to a genuine issue of material fact with regard to its claims. Just because "an issue [i]s submitted to a jury does not automatically immunize an accused infringer from a finding of willful infringement . . . ." Depuy Spine, 567 F.3d at 1337. It is a case specific inquiry.

Second, the Defendants contend that in the first place there was only a trial issue because of the Court's construction of the term "chassis." However, the Court has previously rejected the Defendants' construction of certain claim terms as a matter of law. Cf. Cohesive Techs., Inc. v. Waters Corp., 543 F.3d 1351, 1374 (Fed. Cir. 2008) (upholding district court's finding of no willful infringement where a disputed claim term could have reasonably been construed differently and in a manner under which the defendant's product would not have infringed). The Defendants cannot rely upon rejected definitions of claim terms to pose a hypothetical substantial noninfringement defense.

Third, the Defendants assert that even under the Court's construction of certain claim terms, the question of infringement was "hotly contested at trial." (Def. Mem. 2, at 14.) However, the Court agrees with the Plaintiff that the

Defendants' non-infringement defense was merely relegated to arguing that the accused screeners contained elements or features that the '618 claim did not have, such as the existence of hydraulic rams and a pair of struts. Moreover, the Defendants maintain that they proved that track mounted accused screeners do not meet the "wheel mounted chassis" limitation. However, as determined above, that is not correct. The Defendants' own witness Tony Weir admitted that the accused screeners had a number of types of "wheels," and therefore based upon the Court's earlier claim construction, this issue of infringement was not a "close call" as the Defendants have characterized. In addition, the Defendants did not present a defense at trial to infringement under the doctrine of equivalents. (See, e.g., Trial Tr., at 3886-90.)

The Defendants are correct that a finding of objective recklessness cannot be based merely upon a comparison of the accused screeners with an illustration of the preferred embodiment, as the Plaintiff suggests. See Johnson & Johnston Assocs. Inc. v. R.E. Serv. Co., Inc., 285 F.3d 1046, 1052 (Fed. Cir. 2002) ("Infringement, either literally or by equivalents, does not arise by comparing the accused product 'with a preferred embodiment described in the specification' . . .") However, the law of infringement does require a comparison of the accused product with the patent claims, and in fact this was the crucial inquiry at trial.

Thus, overall, the Court does not find that the Defendants' non-infringement defense was so compelling and substantial as to preclude a finding of willful infringement. The Defendants' pretrial invalidity defenses were subject to

40

reasonable argument, but it based its entire non-infringement pretrial case on an improper construction of essential claim terms.

As to the Defendants' contention that they presented credible invalidity arguments regarding obviousness, the Defendants point to proof introduced at the trial regarding a previous machine called the Dominator, which was manufactured by MastersKreen International, the company owned by the patent applicant, which met all of the limitations of claim 1 of the '618 patent except that it did not fold as required by the HAM. The Defendants also maintain that they put forth evidence that the missing limitation was met by other standalone conveyors manufactured and sold by MastersKreen. Neither of these devices were disclosed to the PTO.

While the Court recognizes that the Defendants' claim was not a frivolous assertion of obviousness, it also does not find that the Defendants made a substantial and compelling case of obviousness. The Court agrees with the Plaintiff that the Defendants' analysis does not take into account the secondary considerations of non-obviousness, such as the commercial success of the invention, and the failure of anyone to develop the invention for more than a decade. In addition, and most compelling, the Defendants do not indicate when they became aware of these previous machines. Thus, it does not appear that the Defendants had knowledge of the alleged "prior art" at the time of the infringement to lead to an invalidity defense that would overcome a finding of willful infringement.

With regard to the second prong, the Defendants contend that they put forward compelling evidence which demonstrated that they conducted a reasonable

41

investigation of the scope of the '618 patent, undertook to design around it, and believed it had successfully done so.

However, the Court agrees with the Plaintiff that the Defendants cannot escape a finding of willful infringement by "evincing ostrich-like, head-in-the-sand behavior." (Pl. Opp. Mem. 3, at 13.) Putting aside that the Defendants' companies employed a large number of attorneys whom they could have consulted, the Defendants' opinion of non-infringement was based on a cursory understanding of the patent claims. Richard Byrne only read an abstract of the '618 patent (Trial Tr., at 3555) and Daniel McCusker and Joe Daly relied upon the "opinions" of Neill Suitor to form their own sentiments. (McCusker Dep., at 98, 115 and Daly Dep., at 135-17–136-11.) Neill Suitor, however, did not testify as to the basis of his opinions on patent infringement. Finally, Keiran Hegarty based his post-infringement opinion of non-infringement solely on his discussions with the above mentioned employees and also did not bother to read the '618 patent himself. (Trial Tr., at 3081-2, 3087-90, 3109-12). While it may have been reasonable for Hegarty to rely on the company's engineers, those engineers should have, at the very least, read the actual patent.

As for the fact that the Defendants did not present evidence that they obtained an exculpatory opinion of counsel before commencing infringing activity, the Court agrees that this is not itself sufficient for a finding of willful infringement, for there must be "objective recklessness" before failure to obtain an exculpatory opinion of counsel can establish willful infringement. Seagate, 497 F.3d at 1371. "However, the [Seagate] court did not hold that after willful infringement is

42

established, it is improper to consider whether the infringer exercised adequate investigation of any adverse patents." Spectralytics, Inc. v. Cordis Corp., 649 F.3d 1336, 1348 (Fed. Cir. 2011). With the size and resources of the Defendant companies, it is highly probative and proper for this Court to consider that no evidence was presented that a qualified legal opinion was sought.

Thus, because neither the Defendants' noninfringement or invalidity defenses presented a "close factual call[]," the Court does not find that a finding of willfulness was precluded. See Uniloc USA, Inc. v. Microsoft Corp., 640 F. Supp. 2d 150, 177 (D. R.I. 2009). Accordingly, the renewed motion for judgment as a matter of law on the ground that no reasonable jury, properly instructed on the law, would have had a legally sufficient evidentiary basis to find that the Defendants willfully infringed the '618 patent, is denied.

### b. New Trial

The Defendants raise various similar arguments with regard to the finding of willful infringement in the context of their motion for a new trial. The Defendants argue in this motion that the jury was improperly instructed as to willful infringement. Specifically, the Defendants assert that: (1) the Court erred in instructing the jury that the Defendants had a duty to exercise "due care"; and (2) it was prejudicial error to instruct the jury that whether the Defendants obtained opinion of counsel is "[o]ne factor to consider with respect to a defendant's good faith and due care."

The Seagate ruling in 2007 dramatically changed the relevant inquiry for a willful infringement analysis. The core of this decision was that the threshold for

willful infringement should be higher than simply the duty to exercise due care, which was something more akin to negligence. The <u>Seagate</u> Court's explicit holding was that "proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness." <u>Seagate</u>, 497 F.3d at 1371.

This Court's instruction, though mentioning due care, did not lower the threshold for willful infringement back to pre-<u>Seagate</u> levels. Rather, the Court's instruction embodied the concept of objective recklessness. The Court properly charged the jury that willful infringement could be found when there was "no reasonable basis for reaching a good faith conclusion that its making, using or selling its device avoided infringement of the patent" or "once the Defendant acted in reckless disregard of the claims of the Plaintiff's patent." This instruction follows the guidance of <u>Seagate</u> that a patentee need to demonstrate that the infringer acted "despite an objectively high likelihood that its actions constituted infringement of a valid patent." <u>Seagate</u>, 497 F.3d at 1371.

The Court did not instruct as to what <u>Seagate</u> expressly overruled—that there was a presumption of willful infringement flowing from an infringer's failure merely to exercise the affirmative duty of due care to avoid infringement. Rather, this Court instructed that it was one factor, among many, under "the totality of the circumstances . . . demonstrating the Defendants' intentions." In fact, the Court explicitly stated that due care was only relevant "once the Defendant acted in reckless disregard of the claims of the Plaintiff's patent."

In addition, <u>Seagate</u> made it clear "that there is no *affirmative* obligation to obtain opinion of counsel." <u>Seagate</u>, 497 F.3d at 1371; <u>Voda v. Cordis Corp.</u>, 536

44

F.3d 1311, 1327 (Fed. Cir. 2008) ("The <u>Seagate</u> decision also clarified that there is 'no affirmative obligation to obtain opinion of counsel' in order to avoid liability for willful infringement"); <u>see also</u> <u>Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.</u>, 383 F.3d 1337, 1345 (Fed. Cir. 2004) ("When the defendant had not obtained legal advice, is it appropriate to draw an adverse inference with respect to willful infringement? ¶ The answer, again, is 'no.' ").

Because there was no affirmative duty on the part of the Defendants to seek advice of counsel, the Court was correct to inform the jury during the trial not to draw an adverse inference from the fact that the Defendants were not relying on the advice of counsel as a defense to Metso's allegations of willful infringement. Notwithstanding this statement, it was also appropriate for the Court to subsequently instruct the jury in the charge to consider advice of counsel as one relevant factor in their analysis. In the Court's view, the Federal Circuit would not completely remove advice of counsel from a determination regarding willful infringement. <u>See Seagate</u>, 497 F.3d at 1369 (finding that "whether or not an alleged infringer sought the advice of counsel is 'crucial to the [willfulness] analysis.'"). In fact, the Federal Circuit considers advice of counsel to be of such significance that "good faith" reliance on "competent and objective counsel" that provides "exculpatory advice" has been held sufficient, standing alone, to defeat a claim of willful infringement. <u>See Vulcan Eng'g Co., Inc., v. Fata Aluminum, Inc.</u>, 278 F.3d 1366, 1378-79 (Fed . Cir. 2002).

The proposition of the Defendants that the issue of advice of counsel should not be considered as a factor in the willful infringement analysis is simply not

supported by the language of Seagate.  See Tyco Healthcare Group, LP v. Applied Med. Res. Corp., No. 06 Civ. 151, 2009 WL 5842063, at *2 (E.D. Tex. Mar. 30, 2009) ("neither Seagate nor [Knorr-Bremse System Fuer Nutzfahrzeuge v. Dana Corp., 383 F.3d 1337, 1345 (Fed. Cir. 2004)] hold that the trier of fact cannot take the failure to seek advice of counsel into account.").  Knorr-Bremse held that even though an adverse inference could not be drawn from the alleged infringer's failure to obtain the advice of counsel, it also held that it was proper for the fact finder to consider the totality of circumstances.  See also Franklin Elec. Co., Inc. v. Dover Corp., No. 05 Civ. 598, 2007 WL 5067678, at *8 (W.D. Wis. Nov.15, 2007) (holding that Defendant's failure to seek advice of counsel "goes to the second component of the Seagate test—what [D]efendant knew or should have known with respect to the likelihood of infringement.").  The Seagate court cited Knorr-Bremse with approval, and the Court sees no reason to doubt its validity.  "In short, Seagate does not foreclose the possibility that the trier of fact could consider the failure to seek an opinion of counsel when determining whether the second prong of the willfulness test is satisfied, so long as it does not automatically draw an adverse inference from such a failure." Tyco, 2009 WL 5842063, at *2 n.3.

Thus, the Defendants' motion for a new trial on the ground of an improper jury instruction with regard to willful infringement is denied.  After reviewing the evidence, as well as the parties' arguments, the Court finds that the jury determination was reasonable and based on the evidence in finding that the Defendants willfully infringed the Plaintiff's patent.

46

### 4. As to the Alleged Errors in Admitting the Royalty Rate Evidence

Finally, in the Defendants' motion for a new trial, they allege one additional ground—that the Court erred in admitting the expert testimony of Catharine Lawton regarding a 10% royalty rate in the calculation of damages.

Royalty rates in this context are statutorily based upon 35 U.S.C. § 284, which states that "[u]pon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. The common approach to calculate a reasonable royalty is "called the hypothetical negotiation or the 'willing licensor-willing licensee' approach, [which] attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009) (citing Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)). Both parties in the present case adopted the hypothetical negotiation approach, and therefore both parties must accept **the fact** that any reasonable royalty analysis "necessarily involves an element of approximation and uncertainty." Spectralytics, Inc. v. Cordis Corp., 649 F.3d 1336, 1345 (Fed. Cir. 2011) (quoting Unisplay, S.A. v. Am. Elec. Sign Co., Inc., 69 F.3d 512, 517 (Fed. Cir. 1995)); Boston Scientific Corp. v. Johnson & Johnson, 550 F. Supp. 2d 1102, 1120 (N.D. Cal 2008) ("The reasonably royalty analysis involves an approximation of the market as it would have hypothetically developed . . . ). The

47

well-settled methodology for analyzing whether a royalty damages conclusion is reasonable is the 15-factor test set forth in <u>Georgia-Pacific Corp.</u> 318 F. Supp. at 1116.

The Defendants previously sought to exclude Ms. Lawton's expert opinion testimony through a motion *in limine* and simultaneous Daubert motion.  At a proceeding before this Court, the Defendants argued that she relied on licensing agreements which (1) were not relevant to the technology at issue; (2) occurred outside the territory of the United States; (3) were not all licensing agreements but rather supply agreements; and (4) dealt with trade dress and trademarks, not patents.  The Plaintiff pointed out that it was an issue of the totality of the analysis under all of the <u>Georgia-Pacific</u> factors.  At that time, the Court found that Lawton's testimony was admissible and that the Defendants' contentions could be properly raised in cross-examination.

At the trial, Ms. Lawton testified that in March 2000, if the Plaintiff and Powerscreen had engaged in a hypothetical negotiation, they would have agreed to a running royalty rate of 10% of net sales of accused infringing screeners, and that the total royalties should be $27,822,614.  She based this conclusion, in part, on certain licensing information, which led her to utilize a range of potential royalty rates from 4 percent to 10 percent as a general starting place for her analysis. (Trial Tr., at 2031:16-18.)

The Defendants now allege again that she based her analysis upon licensing agreements which were unreliable and irrelevant, so that her entire damages analysis should be excluded.  On the other hand, the Plaintiff points out that Ms.

Lawton's analysis did not rest entirely on these license agreements, but rather used them only as a general starting part in her analysis of licensing customs in the industry. The Plaintiff also emphasizes that she thoroughly evaluated all of the relevant <u>Georgia-Pacific</u> factors in her damages opinion. <u>See Georgia-Pacific Corp.</u>, 318 F. Supp. at 1120. In response, the Defendants point out that Ms. Lawson cannot start with a fundamentally flawed premise, and then adjust it based on legitimate considerations specific to the facts of the case, because this nevertheless ultimately results in a flawed conclusion.

The Defendants are correct that only license agreements from the same or comparable industry are probative for purposes of establishing a reasonable royalty rate. The relevant question then is whether the license agreements relied upon by Ms. Lawton are sufficiently analogous to a hypothetical license of the '618 patent at issue in this case. The Defendants recognize that a handful of the agreements utilized by Ms. Lawson were licenses to use patented technology, but assert that any license not for a "mobile screener" should not have been considered. In addition, the Defendants point out that most of the agreements relied upon by Ms. Lawton took place outside of the United States. However, as the Court previously ruled in the context of the same *in limine* motion, neither of these considerations necessarily means that the license agreements were "radically different from the hypothetical agreement under consideration" so that they would not be probative to the analysis. <u>Lucent</u>, 580 F.3d at 1327-28.

Although Ms. Lawson's starting point was critical to the legitimacy of her conclusion, her initial premise was not ultimately flawed as the Defendants

contend, so that her testimony should have been excluded. Ms. Lawson recognized that there was limited similar licensing information available for her to utilize, and thus she looked at the information she obtained through the lens of Factor No. 12, "the portion of the profit or selling price that's customary in the industry." Thus, she did not attempt to construe this licensing information as royalties received by the patentee for the licensing of the patent in suit, as in Factor No. 1, but rather used it to glean insight into Metso's licensing approach in the industry.

The Court sees no reasons to retreat from its initial determination that Ms. Lawton's expert testimony was "not only relevant, but reliable", as required under Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). Ms. Lawson has 25 years of experience in the area of patent infringement damages, and extensively reviewed the information available to her reach her conclusions. In addition, she engaged in a thorough analysis of the 15 Georgia-Pacific factors as it related to the facts of this case. This is not a case where an expert impermissibly relied on improper licensing agreements and then only considered a few of the Georgia-Pacific factors, finding one particular factor to be controlling. Cf. ResQNet.com, Inc. v. Lansa, Inc, 594 F.3d 860, 870 (Fed. Cir. 2010). This is also not a case where an expert ignored certain highly relevant licensing agreements and relied on extraneous market information. Cf. I.P. Innovation L.L.C. V. Red Hat, Inc., 705 F. Supp. 2d 687, 690-91 (E.D. Texas 2010). Although Ms. Lawson did disavow reliance on a prior agreement concerning the patent-in-suit, Ms. Lawson did so because they it was a purchasing

agreement, and she therefore believed that it was "not the type of information that would be relied upon for purposes of determining what damages would be an infringement situation." (Trial Tr., at 2050: 17-20.)

Finally, this is not the case where a damages calculation lacked a sufficient evidentiary basis. Cf. Lucent, 580 F.3d 1301. The Defendants do not cite a case, and the Court has not found one, where an expert's opinion was rejected for relying on all the arguably relevant licensing agreements available and then thoroughly considering all the Georgia-Pacific factors, as was the case here. The Defendants' disagreements are with Ms. Lawson's conclusion, not her methodology, and any contentions by the Defendants in this regard go to the weight, not the admissibility, of her opinion. See i4i, 598 F.3d at 854. The Defendants had both an opportunity to cross-examine Ms. Lawson and to present their own expert testimony. The jury chose to accept Ms. Lawson's analysis, as was their rightful choice.

Thus, there were no substantial errors in the admission of evidence with regard to the expert testimony by Ms. Lawson that would warrant a new trial.

### 5. As to the Allegations of Newly Discovered Evidence

As this ground for a new trial was analyzed independently, the Court refers to its earlier discussion on the matter. See supra II.B.

## C. As to the Motion by the Defendant Terex for Judgment as a Matter of Law or, Alternatively, for a New Trial

Finally, the Court will address the motion by the Defendant Terex Corporation for judgment as a matter of law, or alternatively for a new trial, on the

issue of whether the Plaintiff proved infringement by the Defendant Terex Corporation. The Defendants maintain, as they have from the beginning stages of this case, that the only connection Terex Corporation has to this case is that it is the corporate parent of the Defendant Powerscreen International Distribution, Ltd.

Terex can only be liable for Powerscreen's infringement under 35 U.S.C. § 271(a) "if the evidence reveals circumstances justifying disregard of the status of [the parent] and [the subsidiary] as distinct, separate corporations." A Stucki Co. v. Worthington Indus., Inc., 849 F.2d 593, 596 (Fed. Cir. 1988). To determine whether the necessary dominion and control exists for the Court to pierce the corporate veil, the Court must examine several factors, including (1) the sharing of a common office, staff, and ownership; (2) the intermingling of funds; (3) the treatment of the corporations as one, not separate, profit centers; (4) the lack of the conventions of corporate existence; and (5) any inadequate earnings. Williams Passalacqua Builders Inc. v. Resnick Developers S. Inc., 933 F.2d 131, 139 (2d Cir. 1991); Farber v. NP Funding II L.P., No. 96 Civ. 4322, 1997 WL 913335, at *2 (E.D.N.Y. Dec. 9, 1997). In applying these factors, "there is a presumption of separateness . . . which is entitled to substantial weight." American Protein Corp. v. AB Volvo, 844 F.2d 56, 60 (2d Cir.1988), cert. denied, 488 U.S. 852, 109 S. Ct. 136, 102 L. Ed. 2d 109 (1988) (internal citation omitted).

Terex previously made a Rule 50(a) motion at the close of the Plaintiff's case to dismiss the complaint against it because there was no evidence that Terex committed any infringing acts under 35 U.S.C. § 271(a). The Court reserved decision with regard to this ground. Thereafter, at the close of all of the evidence,

Terex again moved for judgment as a matter of law on the ground that it was not liable for an infringement. The Court at that time stated that "Terex is Powerscreen. Terex and Powerscreen are interchangeable. And the evidence is clear that that's so." (Trial Tr., at 4722:1-3.) The Defendants do not present any argument that would negate this finding. Rather, there was ample evidence to demonstrate this synonymy.

For example, Kieran Hegarty, at the time of trial, was both the President of Terex's Material Processing business unit and an employee of Powerscreen. (Trial Tr., at 3100-3101.) Hegarty testified that his responsibilities at Terex were the broad financial performance of Powerscreen and that he was appointed to oversee the strategy of the business as a whole. He also testified that once Terex acquired Powerscreen, "it became much more involved operationally, and in the terms of the business. . ." His testimony made clear that there was more than mere ownership in this case. There was control and management that, as the Court previously found, "goes beyond alter ego." (Trial Tr., at 4723-18).

Moreover, every infringing screening machine bore the name of the Terex Corporation. The name Terex also appears on Powerscreen's advertising brochures and on Powerscreen's website. In fact, Terex advertises Powerscreen's screeners on the Terex Corporation website.

In addition, the Defendants contend that there was no intermingling of funds. However, it appears that Powerscreen's profits do contribute to Terex Corporation's bottom line. In addition, when a distributor seeks to purchase a Powerscreen infringer, it is Terex that offers financial assistance. In the world of

53

complex corporate structures, there does not need to be the sharing of a monetary safe to justify a finding of intermingling of funds.

As a final example, Terex stated in its December 31, 2004 year end 10k that it "designs, manufactures and markets three primary categories of equipment . . . [including] mobile crushing and screening equipment." Terex even went on to state that these products "are currently marketed principally under the Terex brand name and the following brand names, including in some cases the use of the Terex name in conjunction with these historic brand names: . . . . Powerscreen. . ."

Individually, none of these facts is sufficient. However, the culmination and combination of these facts inevitably leads to one conclusion. The evidence put forth at trial demonstrates the treatment of the corporations as one, not separate, profit centers. The Court agrees with the Plaintiff that "Terex Corporation represents to the word that it is the manufacturer and seller of the infringing mobile screeners." (Pl. Opp. Mem. 3, at 4.)

This is not the case where there is mere stock ownership. See, e.g., A. Stucki, 849 F.2d at 596 (noting that the plaintiff pointed to no evidence supporting the assertion of control and domination over the subsidiary beyond the acquisition of stock); Milgo Elec. Corp. v. United Business Communications, 623 F.2d 645, 660, 206 USPQ 481, 492 (10th Cir.), cert. denied, 449 U.S. 1066, 101 S. Ct. 794, 66 L. Ed. 2d 611 (1980) ("Mere ownership of stock is not enough to pierce the corporate veil"). In this case, although the Defendant's contend otherwise, this finding by this Court of alter ego liability is not based merely on the fact that

54

Powerscreen was acquired by Terex and is a subsidiary three times removed, or based merely on "branding."

Beyond alter ego liability, there was sufficient evidence to find that Terex Corporation was a direct infringer. For a finding of infringement, there need only be one infringing act to, without authority, make, use, offer to sell, or sell any patented invention. SRI Int'l, Inc. v. Internet Sec. Sys., Inc., 647 F. Supp. 2d 323, 338 (D. Del. 2009), aff'd, 402 Fed App'x 530 (Fed. Cir. 2010). While the Defendants contend that the Plaintiff did not present any evidence whatsoever that Terex itself committed any acts of direct infringement, the Court finds that the jury had sufficient evidence from which to conclude that Terex itself offered for sale one or more of the infringing Powerscreen mobile screeners. Terex has sufficiently identified itself to the world that it is the manufacturer and seller of the accused screeners.

The Defendants point out that piercing the corporate veil is typically a question of fact for the trier of fact to determine upon all of the evidence. See Wm. Passalacqua Builders, Inc., 933 F.2d at 137 (whether or not those factors . . . that will justify ignoring the corporate form and imposing liability on affiliated corporations or shareholders are present in a given case is the sort of determination usually made by a jury because it is so fact specific."). However, while this is generally the case, this is not a hard and fast rule to be followed by a trial court. Instead, there may be times where it is appropriate for a court to decide that as a matter of law, the equitable remedy of corporate veil piercing is appropriate. See Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R. Co., 417 U.S. 703, 713,

94 S. Ct. 2578, 2584, 41 L. Ed. 2d 418 (1974) ("[T]he corporate form may be disregarded in the interests of justice where it is used to defeat an overriding public policy. . . . In such cases, courts of equity, piercing all fictions and disguises, will deal with the substance of the action and not blindly adhere to the corporate form."); United States v. Golden Acres, Inc., 684 F. Supp. 96, 103 (D. Del. 1988) ("Piercing the corporate veil is an action that sounds in equity."), Fletcher, Cyc. Corp. § 41 (1990 perm. ed.) ("Since the doctrine of piercing the corporate veil is an equitable one that is particularly within the province of the trial court, the right to a jury trial on the issue of piercing the corporate veil does not exist.").

In sum, the Court cannot say that there "exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming 'that reasonable and fair minded [persons] could not arrive at a verdict against [it].' " Luciano v. Olsten Corp., 110 F.3d 210, 214 (2d Cir. 1997) (quoting Cruz v. Local Union No. 3, 34 F.3d 1148, 1154 (2d Cir. 1994)) (alterations in original). Thus, the motion for judgment as a matter of law on the ground that no reasonable, properly instructed jury could have concluded that Terex committed any act of direct infringement, is denied.

In addition, the Court cannot say that the rulings in this case were erroneous or that the verdict was a miscarriage of justice. Therefore, the motion for a new trial on this additional ground is also denied.

56

**D. As to the Defendants' Motion for a New Trial on the Basis of Newly Discovered Evidence**

### 1. The Motion

The Court will first consider the motion filed by all four Defendants on April 5, 2011, pursuant to Fed. R. Civ. P. 59(a)(1)(A), 60(b)(2), 60(b)(3) and 60(b)(6), for an order granting a new trial on the basis of newly discovered evidence ("Def. Mem. 1").

The Defendants argue in their motion that it was recently revealed that Michael Rafferty, the inventor and applicant of the '618 patent, as well as a critical fact witness, has a compensation scheme with the Plaintiff Metso pending success in this litigation. In particular, the Defendants claim that Rafferty told Cornelis Hoogendoorn, the President of Keestrack N.V. ("Keestrack"), a Belgian manufacturer of mobile screeners, that Metso had won a $15.8 million dollar verdict in this case, and that Rafferty had an agreement with Metso to receive 1.5 percent of any recovery obtained by Metso in the litigation. (Hoogendoorn Dec., ¶¶ 2-3.). The Defendants maintain that they repeatedly tried to obtain information of this nature throughout the discovery process, and that Rafferty wrongfully withheld this information and "that goes to the crux of the integrity of Plaintiff's case." (Def. Mem. 1, at 2.) The Defendants put forth a declaration by Hoogendoorn, in which he claims that Rafferty told him about this compensation agreement at a Las Vegas trade show and Hoogendoorn then communicated this message to the Defendant Powerscreen, who, coincidentally, was at this very same trade show.

JA0012977

In response to the Defendants' motion for a new trial, the Plaintiff states that there is no factual basis for this motion, because Hoogendoorn is a witness whose statements are false and lack credibility. More importantly, the Plaintiff points out that this evidence would only have been useful for impeachment purposes and thus, even if admissible, would not have changed the outcome of the case and thereby cannot provide the basis for a new trial. Also of importance is the Plaintiff's allegation that Hoogendoorn is an interested witness because his company, Keestrack, is allegedly also infringing the '618 patent and Metso has indicated their intent to pursue litigation against them in the future.

Both sides acknowledge that Benjamin Hansbury, Metso's designated corporate representative and a Rule 30(b)(6) witness, testified in a deposition that Rafferty requested a compensation arrangement with Metso, but that Metso had declined. The Defendants did not pursue questioning Hansbury again about the possibility of such a compensation agreement when he testified at the trial. It is also undisputed that the Defendants asked Rafferty himself at his videotaped deposition, subsequently shown at the trial, whether he had "any agreement whatsoever, regarding the payment of fees or expenses in connection with this proceeding." (Rafferty Tr., at 351:21-23.) Rafferty answered "No." (Id., at 351:24.)

### 2. As to Whether the Defendants' Motion for a New Trial on the Basis of Newly Discovered Evidence Should be Granted

The newly discovered evidence alleged by the Defendants is that Rafferty was promised a percentage of Metso's damages or settlement award; or, in other words, a contingency-based compensation agreement existed.

The Plaintiff does not assert that this evidence was not "newly discovered" by the Defendants. Nor does the Plaintiff argue that the Defendants were not diligent in discovering this evidence. Instead, the Plaintiff disputes the existence of any compensation agreement in the first instance and argues that this "newly discovered" evidence (1) would not be admissible at the trial; (2) would not be likely to change the original trial's outcome; and (3) is cumulative and impeaching. The Court will discuss each of these considerations in turn.

#### a. Whether the Defendants Have Sufficiently Established Newly Discovered Evidence

As a preliminary matter, it is necessary to determine whether the Defendants have sufficiently established the existence of newly discovered evidence in the first instance. The Defendants assert that Hoogendoorn's declaration has established that a compensation scheme exists between the Plaintiff Metso and its key witness, Michael Rafferty. The Plaintiff, on the other hand, argues that the allegation is untrue and that no compensation scheme exists to reward Rafferty from the recovery in this litigation.

The motion in this case is based on alleged newly discovered evidence of what is essentially a perjury allegation by a witness. Mr. Hansbury testified in his deposition that Rafferty had requested an arrangement where he would share in the

proceeds of any damages or settlement but that the Plaintiff refused to agree to his request. The Defendants claim that this statement was false because the request was in fact granted. In addition, Rafferty was questioned at his deposition in Northern Ireland whether any such agreement existed and his answer was "no." Thus, the "threshold inquiry is whether the evidence demonstrates that the witness in fact committed perjury." United States v. Stewart, 433 F.3d 273, 297 (2d Cir. 2006) (quoting United States v. White, 972 F.2d 16, 20 (2d Cir. 1992)). "To have this Court vacate its prior order, the moving party was obligated to show reasonable inquiry sufficient to support the allegations . . ." Nassau-Suffolk Ice Cream, Inc. v. Integrated Res., Inc., 683 F. Supp. 452, 454 (S.D.N.Y. 1988).

The Defendants have attempted to demonstrate the existence of this newly discovered evidence through the submission of a single declaration by Hoogendoorn, recounting a conversation he had with Rafferty regarding the alleged compensation scheme. The Plaintiff does not refute this declaration with an affidavit from Rafferty himself. However, the Plaintiff does submit two counter declarations from Hansbury and Pekka Pohjoismaki, the Senior Vice President of Metso's Crushing and Screening Business Unit. Both individuals deny any knowledge of a contract, agreement, promise, understanding, arrangement or deal between Metso and Rafferty that Metso would pay Rafferty any money that Metso ultimately would receive from the Defendants as a result of this litigation.

The Court agrees with the Plaintiff that there appears to be sufficient reasons to believe that Hoogendoorn's declaration is suspect and lacks credibility. See United States v. Donald, 417 Fed App'x 41, 44 (2d Cir. 2011) (finding that district

60

court's refusal to hold an evidentiary hearing was not an abuse of discretion where court determined affidavits impeaching testimony were suspect and lacked credibility). As the Plaintiff points out, Hoogendoorn had been informed that Metso intended to pursue a case against his company for a similar cause of action of patent infringement and therefore Hoogendendoorn has a direct financial interest in seeing Metso lose this lawsuit. Moreover, there is a real possibility that Hoogendendoorn misunderstood the statements that Rafferty supposedly made regarding a compensation scheme.

In addition, although the Defendants claim that there exist other indicia of reliability, this is simply not the case. The Defendants only point to one other circumstance to bolster Hoogendoorn's declaration —that Rafferty had previously requested such an arrangement of the Plaintiff. However, Hansbury unequivocally testified to that fact in his deposition, and this occurrence alone does not lend credence to the conclusion that the arrangement was in fact put in place.

The Defendants emphasize in their supporting memoranda that the Plaintiff only insists that "there is no agreement between Mesto and Mr. Rafferty concerning compensation to be paid to Mr. Rafferty *in connection with this lawsuit.*" (Pl. Opp. Mem. 1, at 2.) Thus, the Defendants argue that the Plaintiff's response does not deny that compensation has been or will be provided to Rafferty *not* in connection with this lawsuit. However, the Defendants are conjecturing on the basis of semantics alone. Moreover, the gist of their "newly discovered evidence" is exactly that—evidence that Rafferty stood to gain from a damages award or settlement *in*

*connection with this lawsuit.* Thus, the Court rejects the Defendants' argument in this regard.

On a motion for a new trial based on newly discovered evidence, the Defendant carries a "heavy burden" to show that relief is warranted. United States v. Garcia-Alvarez, 541 F.3d 8, 17 (1st Cir. 2008); accord United States v. Gigante, 982 F. Supp. 140, 176 (E.D.N.Y. 1997), aff'd, 166 F.3d 75 (2d Cir. 1999), cert. denied, 528 U.S. 1114, 120 S. Ct. 931, 145 L. Ed. 2d 811 (2000). Here, the Court finds that the Defendants have failed to carry this heavy burden.

Nevertheless, even if this Court were to find that the Defendants have sufficiently put forward newly discovered evidence of the existence of a compensation agreement between the Plaintiff and their key witness, this evidence would still not warrant the granting of a new trial in consideration of the necessary factors set forth below.

### b.  Whether the Evidence Would Have Been Admissible

First, the Court acknowledges that evidence of a compensation agreement between Metso and Rafferty would likely have been admissible at the trial. The Defendants argue that it would be admissible under two alternative grounds: (1) to impeach Hansbury's testimony; or (2) as a declaration against Rafferty's interests because he was "unavailable" under Federal Rule of Evidence 804(b)(3).

The Court does not need to address the second ground because evidence of a compensation agreement could have been admitted to impeach Hansbury's testimony. Hansbury testified at his deposition that no such agreement existed. Specifically, Hansbury was asked, "[d]id Malachy Rafferty ever give you a price

for his cooperation?" to which Hansbury replied "[h]e suggested that [he] would be interested in if we were successful in our litigation a portion of the damages or any settlement that we might receive." (Hansbury Dep., at 59.) Hansbury then testified that he later told Rafferty "[t]hat we were not interested in sharing any damages or settlement in the case." However, if evidence of a compensation agreement was uncovered, this would be in direct contradiction to Hansbury's deposition testimony.

The Plaintiff argues that testimony of a compensation agreement would not have been admissible as impeachment evidence against Hansbury because there is no reason to conclude that he would have been involved in this type of scheme. However, Hansbury himself stated in his declaration that "[i]t is likely that I would have been a participant in any discussions or negotiations concerning such a contract, agreement, promise, understanding, arrangement or deal with Mr. Rafferty because of my previous dealings with Mr. Rafferty and because I have been the Metso executive in the United States with supervisory responsibility for this litigation." (Rafferty Decl., at ¶ 5.)

Therefore, the Court finds that this evidence would be admissible as impeachment evidence against Hansbury.

### c. Whether the Evidence Would Have Changed the Outcome

The next crucial consideration, assuming arguendo that newly discovered evidence actually exists, is whether evidence of a compensation agreement would have changed the outcome of the trial. The Defendants claim that Rafferty's credibility was crucial to the Plaintiff's claim, so that if the jurors had learned of

63

this agreement, they likely would have reached a different verdict. The Defendants maintain that this is particularly true with respect to obviousness and inequitable conduct, because the video deposition of Rafferty's testimony shown at trial was so essential to those defenses.

The Court recognizes that if an important witness lied, it is a serious matter. "Payment ... to a witness to testify in a particular way, payment of money to prevent a witness's attendance at a trial and the payment . . . to make him 'sympathetic' . . . are all payments which are absolutely indefensible . . ." N.L.R.B. v. Thermon Heat Tracing Sevs., Inc., 143 F.3d 191 (5th Cir. 1998) (quoting In re Robinson, 151 A.D. 589, 136 N.Y.S. 548, 556 (N.Y. App. Div. 1912), aff'd 209 NY 354, 103 N.E. 160 (1913)). Rafferty was certainly an important witness at the trial, if not a key witness, but that alone is not determinative. Rather, the central issue is whether "the alleged perjury was of such importance that it probably would have changed the outcome," Teamsters, 247 F.3d at 391, that is, whether the jury would have decided differently had the Defendants had knowledge of the alleged compensation scheme.

This Court is satisfied that the particular misstatement or falsehood in question, even if true and unequivocally to be condemned, is not of a nature to have likely changed the outcome and therefore does not undermine the Court's confidence in the jury's verdict. "[O]rdinarily newly discovered evidence which goes only to the credibility of a witness is not a sufficient basis for granting a motion for a new trial." Gill v. United States, 184 F.2d 49, 55 (2d Cir. 1950); see also United States v. Int'l Bhd. Of Teamsters, 179 F.R.D. 444, 447-48 (S.D.N.Y.

64

1998) ("It is well established that evidence offered solely to impeach the credibility of a witness does not meet the stringent standards for relief under Rule 60(b)(2)."). The Defendants argue that the evidence that would have been elicited if Rafferty and Hansbury were truthful in their depositions and if the Plaintiff had been forthcoming in discovery, does not concern merely the credibility of Rafferty and Hansbury, but rather goes to the heart of the integrity of the entire Plaintiff's case. The Court disagrees.

As an initial matter, the Defendants had another material basis for questioning Rafferty's credibility at the trial, even without the existence of a compensation agreement. Hoogendoorn's declaration states that Rafferty told him that "if Mesto did not win its lawsuit, Metso would 'go after him' in connection with moneys he had been paid for the patent." (Hoogendoorn Decl., at ¶ 3.) Although the Defendants attempt to characterize this as "newly discovered evidence," that is inaccurate. Due to the nature of the patent ownership in this case, this consequence of the litigation was always a reasonable possibility. It was clear to all those involved from the initial stages of this case that if the Plaintiff lost its patent infringement suit on the grounds of obviousness or invalidity of the patent, then Metso could initiate a cause of action against Rafferty in connection with moneys that he had been paid for the patent. Whether Rafferty had something to gain as a result of Metso recovering in this litigation or had something to lose a result of Metso being defeated in this litigation, they are flip sides of the same coin. The Defendants even acknowledge that "[b]ecause Mr. Rafferty was promised a windfall if Plaintiff succeeded in this litigation *and because he believed he was*

65

*subject to liability for assigning the Patent to Plaintiff if Plaintiff failed in this action,* Mr. Rafferty had every incentive to ensure an outcome favorable to Plaintiff." (Def. Mem. 1, at 7.)  If Mr. Rafferty had an incentive to withhold documents and information from the Defendants, that incentive already existed and could have been presented to the jury.

Furthermore, the Court is not persuaded that this evidence goes beyond attacking the credibility of Rafferty.  The Defendants argue that the whole of Rafferty's testimony would be tainted and that "Rafferty could have been excluded altogether as a witness on behalf of Metso."  However, the operative word in that statement is "could."  On occasion, and rarely, courts have held that disclosure of the compensation agreement alone is not a sufficient remedy and that payments by a party to a witness would render that witness incompetent to testify.  See Golden Door Jewelry Creations, Inc., v. Lloyds Unerwriters Non-Marine Assoc., 865 F. Supp. 1516, 1524–26 (S. D. Fla. 1994), aff'd in relevant part 117 F.3d 1328, 1335 n.2 (11th Cir. 1997) (barring party from introducing testimony of a fact witness as a sanction for compensating that witness); N.L.R.B.,143 F.3d at190 (same).

However, whether the Court would exclude Rafferty as a witness is a discretionary decision that would rest with this Court.  The appropriate remedy may also be to give the opposing party access to the terms of the agreement between the paying party and the compensated witness.  Many courts, including courts in this Circuit, have found that a compensated fact witness is competent to testify as long as the fact that payments were made to that witness is disclosed to the trier of fact. See Jamaica Time Petroleum, Inc. v. Federal Ins. Co., 366 F.2d 156, 158 (10th Cir.

1966) (finding that an agreement to pay a reward or "[t]he payment of the reward affects the credibility of the witness and the weight to be given his testimony. These factors are not determinative of competence to testify."); <u>Goldstein v. Exxon Research and Eng'g Co.</u>, No. 95 Civ. 2410, 1997 WL 580599, at *6 (D. N.J. Feb. 28, 1997); <u>New York v. Solvent Chem. Co.</u>, 166 F.R.D. 284, 291 (W.D.N.Y. 1996) (holding that the appropriate sanction was to require the defendant to disclose the nature of the agreement with the witness).

In sum, the "newly discovered evidence" put forward by the Defendants would go only to credibility and therefore may not have changed the outcome at trial.

### d. Whether the Evidence Is Merely Cumulative or Impeaching

Finally, for the reasons set forth above, the Court similarly finds that evidence of this compensation agreement, if true, would be cumulative and only impeaching material if admitted at the trial.

Again, the Defendants had ample ammunition with which to question Rafferty's credibility without evidence of this alleged compensation agreement, because the Defendants were aware of the high stakes of the litigation and the potential consequences for Rafferty if Metso were to lose this litigation. Accordingly, any indication that Rafferty also had something to gain if the litigation were successful would be merely cumulative of the evidence already in the Defendant's hands, which evidence could have been brought out by the Defendants at trial. The Defendants state that they had no duty to question Hansbury again at the trial regarding the existence of a compensation agreement. This is true.

67

However, there was nothing to prevent the Defendants from questioning Hansbury with regard to other potential consequences of this litigation as to Rafferty, such as whether Metso could or would pursue an action against Rafferty if the company lost this suit due to invalidity of the patent or obviousness.

In addition, as set forth above, this evidence at issue in this motion would be introduced only for impeachment purposes. This is the precisely why the "newly discovered evidence," with reasonable certainty, would probably not change the outcome of the trial. The evidence could only have been used to impeach Rafferty's credibility and suggest that Rafferty had a motive to lie at his deposition. However, it is well established that "evidence offered solely to impeach the credibility of a witness does not meet the stringent standards of relief under Rule 60(b)(2)." Teamsters, 170 F.R.D. 447-48. Although the Defendants argue that it wouldn't be used just for impeachment value but to "question the integrity of the entire Metso prosecution," (Def. Reply Mem. 1, at 7), the Court does not agree with that assertion.

Accordingly, the Court finds that the Defendants have not sufficiently demonstrated to the Court that they are entitled to a new trial on the basis of newly discovered evidence.

### 3. As to the Defendant's Motion for a New Trial on the Basis of Fraud, Misrepresentation, or Misconduct

Although the Defendants' motion is substantially centered on the basis of "newly discovered evidence," the Defendants also move this Court for a new trial on the basis of "fraud . . ., misrepresentation, or misconduct of an opposing party."

The parties do not devote much of their briefing to this issue. In fact, the Plaintiff does not address this ground at all in its opposition. In short, the Defendants allege that failure to produce requested discovery constitutes misconduct under Rule 60(b)(3) if the failure prevents a litigant from "fully and fairly" presenting their case. State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 176 (2d Cir. 2004). The failure to produce discovery in the present case is the Plaintiff's alleged failure to come forward with information evidencing that a compensation agreement was in place. In addition, the moving party here, the Defendants, question Rafferty's and Hansbury's "candor" in their depositions when they denied that such an agreement exists.

It is true that a litigant "need not show that the outcome would have been different absent [the] misconduct" in order to establish that it was prevented from fully and fairly litigating its case. Catskill Dev. L.L.C. v. Park Place Entm't Corp., 286 F. Supp. 2d 309, 315 (S.D.N.Y. 2003). Rather, the Defendants only need to demonstrate that the "undisclosed material either would have been important as evidence at trial or would have been a valuable tool  for obtaining meaningful discovery." Id. This burden is not met with evidence that is merely "cumulative, insignificant, or of marginal relevance." Id.

The Defendants point out that Hoogendoorn's declaration raises a "strong inference" that key documents and testimony were wrongfully withheld from the Defendants. (Def. Mem. 1, at 7.) However, that is not the appropriate standard. A party seeking relief pursuant to Rule 60(b)(3) must establish by *clear and convincing evidence* that the opposing party engaged in fraud or other misconduct.

69

See Fleming v. New York Univ., 865 F.2d 478, 484 (2d Cir. 1989). The

Defendants' declaration of the Hoogdendoorn evidence, without any other indicia

of reliability, is insufficient to meet the clear and convincing standard to allege that

the Plaintiff in this case engaged in fraud or other misconduct. Thus, the Court

need not address whether the Defendants were prevented from "fully and fairly"

presenting their case. In any event, this was an unlikely result in the present case, in

light of the Defendants' opportunity to impeach Rafferty's testimony through other

means, as set forth above.

Therefore, the Defendant's motion for a new trial on the grounds of fraud or

misrepresentation pursuant to Rule 60(b)(3) is denied.

### 4. As to the Defendant's Motion for a New Trial on the Basis that it Accomplishes Substantial Justice

Finally, the Defendants point out in the same motion that Rule 60(b) has a

catch-all provision that grants the trial court discretion to relieve a party from a final

judgment "when appropriate to accomplish justice . . ." Matarese v. LaFevre, 801

F.2d 98, 106 (2d Cir. 1986) (citation and internal quotations omitted); Rule

60(b)(6). Bearing in mind the extensive discussion set forth above, the Court does

not find that justice would not be accomplished if this motion is denied. In

addition, this case does not present circumstances in which the specific clauses of

Rule 60(b) are inapplicable. Teamsters, 247 F.3d at 391-92 ("Controlling cases

have held that if the reasons offered for relief from judgment can be considered in

one of the more specific clauses of Rule 60(b), such reasons will not justify relief

under Rule 60(b)(6)") (citations omitted). The Defendants appropriately moved

70

under Rule 60(b)(2) and 60(b)(3), and therefore, relief under clause (6) is inappropriate.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Defendants' renewed motion for judgment as a matter of law; motion for a new trial; motion for a new trial on the basis of newly discovered evidence; and Defendant Terex's motion for judgment as a matter of law, or, alternatively, for a new trial, are all denied.

**SO ORDERED.**

Dated: Central Islip, New York
December 8, 2011

_____*/s/ Arthur D. Spatt*_____
ARTHUR D. SPATT
United States District Judge

JA0012991

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
METSO MINERALS, INC.,

                    Plaintiff,

        -against-

 POWERSCREEN INTERNATIONAL
DISTRIBUTION LIMITED, now known as
TEREX GB LIMITED, TEREX
CORPORATION, POWERSCREEN NEW
YORK, INC. and EMERALD EQUIPMENT
SYSTEMS, INC.,

                    Defendants.
-------------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
06-cv-1446 (ADS)(ETB)

**APPEARANCES:**

**Cozen O'Connor**
*Attorneys for the Plaintiff*
277 Park Avenue
New York, NY 10172
          By:    Michael C. Stuart, Esq.
                 Lisa Ferrari, Esq., of Counsel

**Squire Sanders & Dempsey LLP**
*Attorneys for all the Defendants*
30 Rockefeller Plaza
New York, NY 10112
          By:    George B. Yankwitt, Esq.
                 Mary Margaret Chang, Esq.
                 Andrew H Fried, Esq., of Counsel

**Merchant & Gould, P.C.**
*Attorneys for all the Defendants*
1050 17th Street
Suite 1950
Denver, CO 80265
          By:    Jon Trembath, Esq., of Counsel

1

**Clauss & Sabatini, PC**
*Attorneys for the Defendant Terex Corporation*
1350 Broadway
Suite 1710
New York, NY 10018
      By:    Ava R. Maynard, Esq., of Counsel

**Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP**
*Attorneys for the Defendant Powerscreen New York, Inc.*
330 Old Country Road
Suite 301
Mineola, NY 11501
      By:    Andrew E. Curto, Esq., of Counsel

**SPATT, District Judge.**

The Plaintiff Metso Minerals commenced the present law suit in 2006, alleging that the

Defendants Powerscreen International Distribution Limited ("Powerscreen"), Terex Corporation

("Terex"), Powerscreen New York, Inc. ("PSNY"), and Emerald Equipment Systems, Inc.

("Emerald"), manufactured and sold products that infringed United States Patent 5,577,618 (the

"'618 patent"). Following discovery, claim construction, and summary judgment, the Plaintiff

tried its case to a jury in late 2010. At the seven-week trial, among other defenses, the

Defendants challenged the validity of the '618 patent, but on December 6, 2010, the jury

returned a verdict rejecting this challenge. The jury found, in part, that no asserted claim of the

'618 patent would have been obvious to a person of ordinary skill in the art at the time of the

invention. The jury concluded that the Defendants had willfully infringed, either literally or by

equivalents, claims 1, 2, 3 and 7 of the '618 patent with respect to the manufacture and sale of

eleven screening machines in the United States over a ten year period. In addition, the jury

rendered an advisory verdict denying the defenses of laches and inequitable conduct.

On March 3, 2011, the Court entered Judgment on the jury verdict, including the jury's

two advisory verdicts. With regard to the defense of laches, the Court entered judgment that

"[t]he defendants did not prove that the plaintiff is not entitled to recover damages for acts that occurred before it filed this lawsuit on March 29, 2006 because: (1) plaintiff delayed filing this lawsuit for an unreasonably long and inexcusable period of time, and (2) the defendants have been prejudiced in a significant way as a result of the plaintiff's delay in filing this lawsuit."

With regard to the defense and counterclaim of inequitable conduct, the Court entered judgment that "[t]he defendants did not prove that the inventor, Malachy Rafferty, breached the duty of candor and good faith and committed inequitable conduct in the United States Patent and Trademark Office during the prosecution of the application for the '618 patent by failing to disclose material information with the intent to mislead the U.S. Patent Office Examiner."

Federal Rule of Civil Procedure 52(a)(1) ("Fed. R. Civ. P. 52(a)(1)") provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1); See N.A.A.C.P. v. AcuSport, Inc., 271 F. Supp. 2d 435, 471 (E.D.N.Y. 2003) ("Under the modern Federal Rules of Civil Procedure, the court is required to make and explain its own independent findings of fact and conclusions of law in an equitable action even where an advisory jury has rendered a verdict.") DeFelice v. Am. Int'l Life Assurance Co. of New York, 112 F.3d 61, 65 (2d Cir. 1997) (noting that a trial court that uses an advisory jury must make both "its own factual findings and conclusions, in reliance upon the advisory jury's verdict if the court so chooses, and . . . explain how it arrived at those findings and conclusions").

An advisory verdict is not binding on the court making those findings. See Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 907 (2d Cir. 1993) ("A district court is not bound

3

by the findings of the advisory jury, which it is free to adopt in whole or in part or to totally

disregard." (quoting Sheila's Shine Prods., Inc. v. Sheila Shine, Inc., 486 F.2d 114, 122 (5th

Cir.1973))); Felker v. Pepsi-Cola Co., 101 F.3d 109 (2d Cir.1996) (unpublished opinion)

(upholding trial court's rejection of advisory jury findings). The Court "need only make brief,

definite, pertinent findings and conclusions upon the contested matters; there is no necessity for

over-elaboration of detail or particularization of facts." See the Advisory Committee Note to

1946 Amendment of Fed. R. Civ. P. 52.

Therefore, according to the provision of Fed. R. Civ. P. 52(a)(1), the Court makes the

following findings of fact and conclusions of law and thereby modifies the final entry of

judgment as set forth below.

## I. LACHES

The Defendants assert that the doctrine of laches should be applied in the present case to

limit the Plaintiff's recovery, if any, to damages from sales after the lawsuit was commenced

because (1) Metso delayed filing this lawsuit for an unreasonably long and inexcusable period of

time, and (2) the Defendants were prejudiced in a significant or material evidentiary way due to

Metso's delay in filing this lawsuit. The Defendants state that they began selling the accused

screening plants in the United States in 2000, and that despite the Plaintiff's knowledge of this,

the Plaintiff did not file the present suit until 2006. The Defendants assert that during this time,

the Plaintiff lost and destroyed files relevant to the litigation, and that this caused material

prejudice. The Plaintiff states that any document destruction during this period was routine and

immaterial, and that much of the delay in filing suit was due to settlement negotiations.

Previously, this Court found that summary judgment on this issue was inappropriate.

Here, even considering settlement negotiations, the period between
discovery of the alleged infringement and the filing of suit is significant. Further,

4

the Plaintiff admits to having permitted the destruction in 2005 of the entirety of the patent prosecution file held by the U.S. attorney who filed the '618 application. While the Plaintiff claims that all of the documents in this file were duplicates of those held by others, the Court finds that the destruction of this file alone raises genuine issues of fact with respect to the Defendants' assertion of laches.

Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd., 681 F. Supp. 2d 309, 339-340 (E.D.N.Y. 2010) ("Metso I").

The Court now finds that the Defendants have failed to establish the first element of the laches defense; namely, an unreasonable delay by the Plaintiff Metso in bringing suit. In addition, even if it is assumed that this first element was established, the Court finds that the Defendants have suffered neither economic nor evidentiary prejudice.

## A. **Relevant Law**

The defense of laches is a "question primarily addressed to the discretion of the trial court which must consider the equities of the parties." Gardner v. Panama R.R. Co., 342 U.S. 29, 30, 31, 72 S. Ct. 12, 13, 96 L. Ed. 31 (1951) (per curiam). "[Laches] is an equitable defense that bars a plaintiff's equitable claim when he [or she] is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." Ikelionwu v. U.S., 150 F.3d 233, 237 (2d Cir. 1998) (internal quotations and citations omitted). In a patent case in particular, the defense of laches arises when a patentee "neglect[s] or delay[s] ... bringing suit to remedy an alleged wrong, which taken together with lapse of time and other circumstances, causes prejudice to the adverse party and operates as an equitable bar." Gasser Chair Co., Inc. v. Infanti Chair Mfg., Corp., 60 F.3d 770, 773 (Fed. Cir. 1995) (quoting Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1028–29 (Fed. Cir. 1992) (en banc)). "The remedy for inequitable conduct is the 'atomic bomb' of patent law" because it renders the entire patent unenforceable. Therasense, Inc. v. Becton, Dickinson and Co., 649 F.3d 1276, 1288 (Fed. Cir. 2011).

5

To demonstrate laches, the defendant must prove by a preponderance of the evidence: (1) unreasonable and inexcusable delay in filing suit, and (2) material prejudice resulting from the delay. Aukerman, 960 F.2d at 1032–33. A rebuttable presumption of laches arises in patent infringement cases for delays longer than six years. Id. at 1034. Nevertheless, because it is an equitable doctrine, laches does not operate in a rigid fashion. The reasonableness of a delay in bringing suit depends on the facts and circumstances of each case. Gasser, 60 F.3d at 773; Aukerman, 960 F.2d at 1032.

### B. **Presumption of Laches**

As stated above, "a delay of more than six years after the . . . inventor knew or should have known of the issuance of the patent will produce a rebuttable presumption of laches." Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 988 F.2d 1157, 1163 (Fed. Cir. 1993).

In mid-February 2000, in Northern Ireland and the United Kingdom, Powerscreen first displayed to the public the same models of the mobile screeners at issue here. In May 2000, Metso's U.K. attorneys notified Powerscreen via letter that their mobile screeners infringed Metso's patent. However, the display only took place outside of the U.S. and Metso's communication only concerned the European patent which corresponds to the '618 patent. The Plaintiff claims that it was not aware of the Defendants' infringing sales in the U.S. until December 2000.

However, the relevant time period is measured from the time the Plaintiff knew *or reasonably should have known* of the Defendants' alleged infringing activities to the date of suit. Aukerman, 960 F.2d at 1032 (emphasis added). This lawsuit was filed on March 29, 2006. The

6

Court finds that the Plaintiff Metso reasonably should have known of its claim before March 29, 2000.

The first U.S. sale was on March 9, 2000 and this was after displays of the same infringing mobile screeners in parts of Europe. Although the Plaintiff alleges that these displays could not have placed it on notice that the Defendants were selling infringing mobile screeners in the U.S. at that time, it certainly put them on notice of the strong possibility of U.S. sales occurring in the near future. In addition, Mr. Benjamin Hansbury was the global product manager of mobile screens for Metso, which meant he was responsible for activity in all global markets. This also leads to the conclusion that Metso reasonably should have known of the infringement at this time.

Therefore, the Defendants have proven a delay of six years plus a few weeks, which technically invokes the presumption of prejudice. Even though the relevant time period is just over six years, it is nevertheless appropriate in this case to give the Defendants the presumption of laches as a matter of equity. See Hearing Components, 600 F.3d at 1375 (affirming the district court's application of a presumption of prejudice when a delay of six years minus a day was proven). Accordingly, the presumption shifts to Metso the burden of producing evidence that would show either that Metso's delay was reasonable under the circumstances or that the Defendants suffered neither economic nor evidentiary prejudice. Id.; see Aukerman, 960 F.2d at 1038 (the presumption of laches can be rebutted "by offering evidence to show an excuse for the delay or that the delay was reasonable" or by offering evidence 'sufficient to place the matters of [evidentiary] prejudice and economic prejudice genuinely in issue.'"). Once the presumption of laches has attached, "the defendants could have remained utterly mute on the issue of prejudice

7

and nonetheless prevailed." <u>Hall v. Aqua Queen Mfg., Inc.</u>, 93 F.3d 1548, 1554 (Fed. Cir. 1996).

## C. <u>As to Whether the Delay was Unreasonable or Inexcusable</u>

Although the presumption of prejudice typically applies when the delay is longer than six years, there are several ways in which a plaintiff can rebut this presumption. As this Court charged the jury at the trial:

> Facts and circumstances that can justify a long delay can include:
>
> 1. Being involved in other litigation during the period of delay.
> 2. Being involved in negotiations with the Defendants during the period of delay.
> 3. Economic hardship during the period of delay.
> 4. The amount of infringing activity by the Defendants in the United States known to Metso during the period of delay.
>
> (Trial Tr. at 5380–81.)

In the present case, Metso was involved in other litigation during the period of delay. In March 2005, Metso commenced a lawsuit in the U.K. against Defendant Powerscreen alleging that the same mobile screeners at issue here infringed Metso's corresponding U.K. patent. Mr. Hansbury testified that during the period of delay, "[w]e were quite active during that period, and, as I say, reacting and working with our lawyers and considering and preparing for the initiation of the litigation in the U.K." (Trial Tr. at 504:3-6.) Although the Defendants have pointed out that the ongoing litigation must involve the patent at issue, the Court finds that litigation of the corresponding European patent to the U.S. '618 patent is sufficient to meet this requirement.

In addition, Metso has presented evidence that it was involved in negotiations with the Defendants during the period of delay. From approximately March 2002 until March 2005, Metso and the Defendant Powerscreen exchanged several letters concerning the relevant patent

JA0012999

infringement in an effort to resolve the present dispute. While the substance of these letters was not admitted at trial, the dates and general subjects of the correspondences were in evidence. Moreover, Mr. Hansbury testified at the trial that the two parties "exchanged correspondence back and forth between [their] lawyers . . . [and] had a meeting in London" with regard to these claims. (Trial Tr. at 475: 23-25.) The Court recognizes that the majority of the earlier dated discussions were centered on infringement of the corresponding European patent. Nevertheless, these are negotiations that would have most likely resolved issues of infringement with regard to the U.S. patent as well. Furthermore, by April 2003, the correspondence did specifically reference the U.S. '618 patent. (Plaintiff's Trial Exhibit ("PTX") 32.) Although the parties' communications were "sporadic" and "marked by long hiatuses" according to the Defendants, this does not preclude a finding that negotiations nevertheless occurred. See Haworth, Inc. v. Herman Miller, Inc., 856 F. Supp. 354, 357-58 (W.D. Mich. 1994) ("Although plaintiff's pursuit of negotiations with defendant during this period cannot be characterized as consistent, plaintiff did advise defendant of the [law] suit, and plaintiff's continuing intent to enforce its patents . . ."). The Plaintiff's correspondence with the Defendants evinced a clear intent to enforce its patents.

For the reasons set forth above, the Court finds that Metso has rebutted the presumption that it unreasonably and inexcusably delayed in filing the present suit. Therefore, it was the Defendants' burden to demonstrate by a preponderance of the evidence that Metso unreasonably and inexcusably delayed in filing the present suit. The Court finds that the Defendants have not met this burden.

9

## D. As to Whether the Delay Resulted in Evidentiary Prejudice

Even assuming, *arguendo*, that the Plaintiff Metso has not sufficiently rebutted the first

element of laches, it has rebutted the presumption that there was economic or evidentiary

prejudice to the Defendants.

As explained by the Federal Circuit,

"Material prejudice ... may be either economic or evidentiary. Evidentiary, or
'defense' prejudice, may arise by reason of a defendant's inability to present a full
and fair defense on the merits due to the loss of records, the death of a witness, or
the unreliability of memories of long past events, thereby undermining the court's
ability to judge the facts.... Economic prejudice may arise where a defendant and
possibly others will suffer the loss of monetary investments or incur damages
which likely would have been prevented by earlier suit."

Aukerman, 960 F.2d at 1033 (citations omitted). Evidentiary prejudice "must consist of some

separate disadvantage resulting from the delay, such as loss of records, unavailability of

evidence, etc., that prevents a party from proving a separate claim or defense." Hearing

Components, Inc. v. Shure Inc., 600 F.3d 1357, 1376 (Fed. Cir. 2010).

The Defendants at trial argued evidentiary or "defense" prejudice because the files of

U.S. Patent attorney John Holman were destroyed during the period of delay. (See Trial Tr. at

119:7-15) ("The facts are that the attorney who represented Mr. Rafferty in his dealing with the

patent office destroyed his file concerning the application for a patent five years after Metso

made a claim of infringement, and the attorney testified under oath that he could not remember

anything. He destroyed his file after telling Metso he would be destroying his file. He destroyed

his file five years after Metso first made a claim that Powerscreen was infringing a patent.").

The Plaintiff acknowledges that in October 2005, Mr. Holman's law firm destroyed its

file relating to the prosecution of the '618 patent along with approximately 30,000 to 40,000

10

other files when the storage facility housing those files was about to be demolished, pursuant to a newly enacted two-year retention policy. However, the Plaintiff asserts that there are only two categories of documents that were contained in this file: (1) communications with the U.S. Patent Office, which would have been part of the public record; and (2) communications with the law firm of Cruikshank & Co. in Dublin, Ireland, which were retained in the files of the Cruikshank law firm and produced to the Defendants during pre-trial discovery. Mr. Holman never communicated directly with Mr. Rafferty, so that the file would not contain this type of communication. (Trial Tr. at 4599:2.)

Three other grounds of evidentiary prejudice were raised during the pre-trial depositions and post-trial briefing. First, as to the destruction of drawings and logbooks, the Court finds that the lack of this type of evidence did not prejudice the Defendants. Second, the Court finds that destruction of invoices was similarly not prejudicial because the Defendants acknowledge that such invoices were independently procured by the Defendants from public litigation records. In addition, the Defendants did not present any evidence that invoices were destroyed after the time at which the Plaintiff should have reasonably been aware of infringement.

Third, the Court finds that the allegation that the memory of Mr. Rafferty faded over time is not sufficient to support a finding of laches. This is undoubtedly an inevitable part of complex litigation. Even if this infringement case were pursued immediately in March 2000, the Defendants desired Mr. Rafferty to recall events almost a decade prior, namely as to what had taken place prior to September 1993. Moreover, the Court does not agree with the Defendants that Mr. Rafferty's memory was affected with regard to whether he understood his duty of candor and disclosure to the Patent and Trademark Office ("PTO") during the prosecution of the patent. Mr. Rafferty's recollection as to whether he intended to mislead the PTO is not the type

11

of fact that would be affected by a delay in this case. In addition, if Mr. Rafferty had discussed this topic with his attorneys, it would have been privileged and inaccessible to the Defendants. Finally, the Defendants waited two and a half years after the commencement of the present suit to depose Mr. Rafferty in Northern Ireland. This undeniably contributed to whatever memory issues they now allege.

Therefore, the Court finds that the Plaintiff has sufficiently rebutted any presumption of evidentiary prejudice. Accordingly, it was the Defendants' burden to demonstrate it suffered prejudice in a significant way as a result of the Plaintiff's delay in filing this lawsuit. The Defendants have not met this burden.

### E. Other Equitable Considerations

Finally, the Court notes that the jury found that the Defendants willfully infringed the '618 patent. This is another equitable factor weighing against the Defendants in determining whether to apply laches. See Odetics, Inc. v. Storage Tech. Corp., 919 F. Supp. 911, 924 (E.D. Va. 1996), overruled on other grounds by Odetics, Inc. v. Storage Tech. Corp., 116 F.3d 1497 (Fed. Cir. 1997). As the Court has explained in a companion decision to this memorandum and order, there was sufficient evidence from which the jury could conclude that there was objective recklessness and it was proper for the Court to instruct the jury to consider the Defendants' refrain from obtaining advice of counsel as one relevant factor in a willful infringement analysis. Due to the fact there was both a legally and factually supportable finding of willful infringement, this factor further compels the Court to dismiss the defense of laches in the present case.

In sum, Metso has adequately rebutted the presumption of laches "by offering evidence to show an excuse for the delay or that the delay was reasonable" or by offering evidence 'sufficient to place the matters of [evidentiary] prejudice and economic prejudice genuinely in

12

issue.'" Aukerman, 960 F.2d at 1038. At all times, the Defendants bore the ultimate burden of persuasion as to the affirmative defense of laches and the Court judges the facts of unreasonable delay and prejudice on the totality of the evidence. The Court therefore enters judgment that the defendants have not met their burden to demonstrate the defense of laches and that the Plaintiff may recover damages for acts that occurred before it filed this lawsuit on March 29, 2006.

## II. INEQUITABLE CONDUCT

The Defendants also allege that Metso's '618 patent is unenforceable due to inequitable conduct. In particular, the Defendants assert that Malachy Rafferty, the inventor of the '618 patent, failed to disclose the Dominator mobile screener as prior art to the U.S. PTO during the prosecution of the application of the '618 patent. The Court has previously held that because disclosure of the MasterStock 70 and 80 conveyors would have been cumulative of the already-disclosed '987 patent, the failure to disclose it was not material, and therefore the omission does not affect the validity of the '618 patent. Metso v. Powerscreen, 681 F. Supp. 2d 309, 338 (E.D.N.Y. 2010). Therefore, the only alleged prior art at issue is the Dominator screener.

### A. Relevant Law

Generally, "[a] patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." Digital Control, Inc. v. Charles Mach. Works, 437 F.3d 1309, 1313 (Fed. Cir. 2006) (citing Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1330-31 (Fed. Cir. 2004)). "To prove inequitable conduct, the accused infringer must provide evidence that the applicant (1) misrepresented or omitted material information, and (2) did so with specific intent to deceive the PTO." Am. Calcar, Inc. v. Am. Honda Motor Co., Inc., 651 F.3d 1318, 1334 (Fed. Cir. 2011). The materiality required to

13

establish inequitable conduct is, in general, but-for materiality. Id. "When an applicant fails to disclose prior art to the PTO, that prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art." Id. Deceptive intent can be inferred from indirect and circumstantial evidence. However, that "inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008). "In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference." Therasense, Inc. v. Becton, Dickinson and Co., 649 F.3d 1276, 1289 (Fed. Cir. 2011) (citing Molins PLC v. Textron, Inc., 48 F.3d 1172, 1181 (Fed. Cir. 1995)). Intent and materiality are separate requirements. Id. at 1290 (citing Hoffmann–La Roche, Inc. v. Promega Corp., 323 F.3d 1354, 1359 (Fed. Cir. 2003)).

**B. Materiality**

The Defendants allege that there is one aspect of the Dominator mobile screener that is unique and therefore its nondisclosure was material for that reason. This relevant feature is the vertical folding of the lateral conveyor about a horizontal axis. However, because the Court finds that in view of the teachings of Smith, Osadchuk, Hartl and Zehr, which were all considered by the PTO during the prosecution of the application for the '618 patent, the Dominator's disclosure would have been cumulative. See Honeywell Int'l Inc. v. Universal Avionics Sys. Corp., 488 F.3d 982, 1000 (Fed. Cir. 2007) ("Information cumulative of other information already before the Patent Office is not material."). Therefore, the Defendants have

14

not proven by clear and convincing evidence that the Dominator was prior art that but-for its non-disclosure, the PTO would not have allowed the claim.

## C. Intent

Even assuming, *arguendo*, that materiality was established by the Defendants sufficient to meet a clear and convincing standard, the Defendants have not demonstrated that the applicant made a deliberate decision to withhold the reference and that is the single most reasonable inference to be drawn from the evidence.

At a videotaped deposition in Ireland, Mr. Rafferty testified that he signed the requisite duty to disclose as part of his patent application, but he did not have a complete understanding as to what this meant. He stated that he left it in the hands of the person he was paying to do it— the Irish law firm of Cruikshank & Co. of Dublin Ireland. (Rafferty Dep. 312:2-3.) The Court recognizes that "inventors represented by counsel are presumed to know the law." Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1385 (Fed. Cir. 2001). However, Mr. Rafferty also testified that he had a legitimate reason for not disclosing the Dominator mobile screener to Cruikshank. He understood that the Dominator was "different" from his claimed invention, and therefore believed he was not required to disclose it. (Rafferty Dep. at 436:2-4.)

The Court, as well as the jury, had the opportunity to observe the demeanor of Mr. Rafferty at this deposition and make a credibility determination that he was not being "evasive," as the Defendants accuse him to be. See Monon Corp. v. Stoughton Trailers Inc., 239 F.3d 1253, 1263-64 (Fed. Cir. 2001) (deferring to a district court's credibility determination regarding intent to deceive the PTO because the testimony was "'a coherent and facially plausible story that is not contradicted by extrinsic evidence,' and the trial court evidently believed him.") (internal citation omitted). Moreover, it was not the Plaintiff's burden to prove Mr. Rafferty's honest intent.

Rather, it was the Defendants' burden to meet the requisite clear and convincing standard that his intent was deceptive. "The patentee need not offer any good faith explanation unless the accused infringer first carried his burden to prove a threshold level of intent to deceive by clear and convincing evidence." <u>Star Scientific, Inc.</u>, 537 F.3d at 1368.

Accordingly, the Court finds, as the jury did, that there was a reasonable inference to be drawn from the evidence as to Mr. Rafferty's intent other than deceptiveness. The Defendants have not sufficiently met the requisite clear and convincing standard for the intent element of the Defendants' inequitable conduct defense. <u>See M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc</u>, 439 F.3d 1335, 1341 (Fed. Cir. 2006) ("When the absence of a good faith explanation is the only evidence of intent . . . that evidence alone does not constitute clear and convincing evidence warranting an inference of intent.").

Therefore, the Court enters judgment that the defendants did not prove that the inventor, Malachy Rafferty, breached the duty of candor and good faith and committed inequitable conduct in the United States Patent and Trademark Office during the prosecution of the application for the '618 patent by failing to disclose material information with the intent to mislead the U.S. Patent Office Examiner.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that judgment be entered denying the defense of laches and the defense and counterclaim of inequitable conduct.

16

**SO ORDERED.**

Dated: Central Islip, New York
December 8, 2011

>    _/s/ Arthur D. Spatt_
>    ARTHUR D. SPATT
>    United States District Judge

JA0013008

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
METSO MINERALS, INC.,

               Plaintiff,

        -against-

 POWERSCREEN INTERNATIONAL
DISTRIBUTION LIMITED, now known as
TEREX GB LIMITED, TEREX
CORPORATION, POWERSCREEN NEW
YORK, INC. and EMERALD EQUIPMENT
SYSTEMS, INC.,

               Defendants.
----------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
06-cv-1446 (ADS)(ETB)

**APPEARANCES:**

**Cozen O'Connor**
*Attorneys for the Plaintiff*
277 Park Avenue
New York, NY 10172
      By:    Michael C. Stuart, Esq.
              Lisa Ferrari, Esq., of Counsel

**Squire Sanders & Dempsey LLP**
*Attorneys for all the Defendants*
30 Rockefeller Plaza
New York, NY 10112
      By:    George B. Yankwitt, Esq.
              Mary Margaret Chang, Esq.
              Andrew H Fried, Esq., of Counsel

**Merchant & Gould, P.C.**
*Attorneys for all the Defendants*
1050 17th Street
Suite 1950
Denver, CO 80265
      By:    Jon Trembath, Esq., of Counsel

1

**Clauss & Sabatini, PC**
*Attorneys for the Defendant Terex Corporation*
1350 Broadway
Suite 1710
New York, NY 10018
      By:    Ava R. Maynard, Esq., of Counsel

**Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP**
*Attorneys for the Defendant Powerscreen New York, Inc.*
330 Old Country Road
Suite 301
Mineola, NY 11501
      By:    Andrew E. Curto, Esq., of Counsel

**SPATT, District Judge.**

The Defendants in this patent infringement case, Powerscreen International Distribution Limited ("Powerscreen"), Terex Corporation ("Terex"), Powerscreen New York, Inc. ("PSNY"), and Emerald Equipment Systems, Inc. ("Emerald"), and the Plaintiff Metso Minerals, Inc. ("Metso"), have filed a number of post-trial motions. The Court now addresses four of the Plaintiff's motions: (1) a motion for treble damages, pursuant to 35 U.S.C. § 284; (2) a motion for pre- and post-judgment interest; (3) a motion for an accounting for supplemental damages, pursuant to 35 U.S.C. § 284; and (4) a motion for attorneys' fees and costs, pursuant to 35 U.S.C. § 285.

## I.     BACKGROUND

For purposes of this Decision and Order, the Court will state only the background information that is relevant to the issue of damages.

On March 26, 2006, the Plaintiff Metso initiated the present case against the Defendants. In the Complaint, Metso requested an award of damages with prejudgment interest; an injunction; a finding of willful infringement and treble damages; attorneys' fees and costs; and "such other and further relief as this Court or a jury may deem just and proper." (Docket Entry

2

"DE" No. 1.)  On March 29, 2010, in the Joint Pretrial Order, Metso specifically requested

damages pursuant to 35 U.S.C. § 284, and stated that "this claim is exceptional, entitling Metso

to its attorney fees under 35 U.S.C. § 285."  (DE No. 311.)

On October 8, 2010, shortly before the trial, Metso filed a "Statement Regarding

Damages and Other Relief Sought" in accordance with this Court's individual rules, which

bifurcated the requested damages award under 35 U.S.C. § 284.  (DE No. 403.)  In this

statement, Metso specifically described the following categories of damages it was seeking: (1)

monetary damages from the initial infringement through September 30, 2007; (2) trebling of

monetary damages for willful infringement; (3) pre-judgment interest; (4) monetary damages for

infringement after October 1, 2007; (5) post-judgment interest; (6) costs and expenses; (7)

attorneys' fees.  This was the first time that the Plaintiff divided its damages claim into

infringement before and after October 1, 2007—the date that fact discovery had ended.  The

Defendants did not object to this specific aspect of Metso's claims for relief.

At the trial, Metso sought to demonstrate damages using a hypothetically negotiated

royalty based on the factors outlined in Georgia–Pacific Corp. v. U.S. Plywood Corp., 318 F.

Supp. 1116, 1120 (S.D.N.Y. 1970).  The parties presented opposing damages experts.  Catherine

Lawton, Metso's expert, concluded that Metso was entitled to $15,874,098.80, computed from a

royalty base of $158,740,988, at a 10% royalty rate on the sale of 1,271 units from 2000 through

September 30, 2007.  Christopher Vellturo, the Defendants' expert, estimated a total lump sum

damages award of $431,000 from the same $158,740,988 royalty base with regard to the same

infringing products.  Thus, Vellturo opined that Metso was entitled to approximately .27% of the

total infringing sales.  In other words, his opinion was that "Metso would have accepted less than

1 percent of their revenues at a hypothetical negotiation."  (Trial Tr. at 4469:2-5.)

After a seven week trial, at the charging conference, the Court rejected Metso's request to

charge the jury to only consider damages up until October 2007, the close of fact discovery.

Thus, the damages question on the Jury's verdict Form read as follows:

> Please state the amount of monetary damages you award the Plaintiff Metso
> against the Defendants for the *total amount* of reasonable royalties for the use that
> the defendants have made of the Metso's '618 patent.

The jury awarded the Plaintiff Metso a verdict of 15.8 million.  In addition, the jury found that

the Defendants willfully infringed Metso's '618 patent.

The Court will now assess the Plaintiff's various pecuniary related motions.

## II.    MOTION FOR TREBLE DAMAGES

Consistent with Metso's Complaint (DE No. 1) and "Statement Regarding Damages and

Other Relief Sought" (DE No. 403), Metso now requests an award of enhanced damages

pursuant to 35 U.S.C. § 284.

Based on a review of the evidence in this case, the findings and conclusions made and set

forth in this and separate contemporaneous Orders, and the totality of the circumstances, the

Court concludes that a doubling of the damage award to Metso is appropriate in this case.

### A.  Relevant Law

Section 284 of the patent statute provides that damages may be enhanced up to three

times the compensatory award.  Such an enhancement is appropriate where "the infringer acted

in wanton disregard of the patentee's patent rights, that is, where the infringement was willful."

Read Corp. v. Portec, Inc., 970 F.2d 816, 826 (Fed. Cir. 1992); see Electro Med. Sys., S.A. v.

Cooper Life Sciences, Inc., 34 F.3d 1048, 1056 (Fed. Cir. 1994).  However, "a finding of willful

infringement does not mandate that damages be enhanced, much less mandate treble damages."

Read Corp., 970 F.2d at 826.  Thus, the jury's finding that the Defendants willfully infringed

4

various claims of the '618 patent is a necessary but not automatic basis for enhancing the damages award in this case.

As explained by the Federal Circuit,

> the paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances. The court must consider factors that render defendant's conduct more culpable, as well as factors that are mitigating or ameliorating.

Id. (citing cases); see i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 858–59 (Fed. Cir. 2010).

To assist the trial court in determining whether to enhance a damages award, the Read court listed a number of factors that the court was to consider. These factors include: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) the duration of the defendant's misconduct; (7) remedial action by the defendant; (8) the defendant's motivation for harm; and (9) whether the defendant attempted to conceal its misconduct. Read Corp., at 826-27; see also Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 183 (Fed. Cir. 1994).

To enable appellate review, the district court "is obligated to explain the basis for the [enhanced] award, particularly where the maximum amount is imposed." Read Corp., 970 F.2d at 828.

## B. As to the Application of the Relevant Enhancement Factors

As an initial matter, the Court rejects the Defendants' argument that the Court may not enhance the Plaintiff's damages because the predicate finding of willful infringement is erroneous as a matter of law. As the Court addresses in a separate contemporaneous Order, the

5

Defendants have not established that there were erroneous jury instructions in this regard or that

or that there was insufficient evidence from which to conclude that Defendants willfully

infringed the '618 patent.

Therefore, the Court now sets forth the reasons for doubling the award, paralleling the

factors set forth in Read Corporation v. Portec Inc.

1. **Whether There was Deliberate Copying and Whether the Defendants Had a Good Faith Belief of Patent Invalidity and/or Non-Infringement**

First, the Court finds that the Defendants willfully and deliberately copied the '618 patent

and did not form a well-supported good faith belief of non-infringement. The Defendants

admitted at the trial that they were aware of Metso's '618 patent during the 1998 design of the

Defendants' infringing mobile screeners. (Trial Tr. at 2706.) The Defendants now contend that

they put forward compelling evidence that demonstrated that they conducted a reasonable

investigation of the scope of the '618 patent; undertook to design around it; and believed it had

successfully done so. However, even if their belief of non-infringement was subjectively in good

faith, this is negated by the Court's finding that the Defendants evinced ostrich-like, head-in-the-

sand behavior. See Video Views, Inc. v. Studio 21, Ltd., 925 F.2d 1010, 1021 (Fed. Cir. 1991)

("[O]ne who undertakes a course of infringing conduct may neither sneer in the face of the

copyright owner nor hide its head in the sand like an ostrich."); National Business Forms &

Printing, Inc. v. Ford Motor Co., No. 08 Civ. 1906, 2009 WL 3570387, at *6 (S.D. Tex., Oct.

30, 2009) (an infringer "cannot be naive and be like ostriches and put their heads in the sand and

ignore obvious facts" and then later claim entitlement to status as an "innocent infringer.").

The Defendants' opinion of non-infringement at the initial stages of the development of

their infringing screeners was based upon Richard Byrne's cursory understanding of the patent

claims. In fact, he had no knowledge of U.S. patent law and merely read the "abstract" of the

6

'618 patent. Moreover, General Manager of Powerscreen Keiran Heagarty ultimately decided two years later, "based on experience in the industry, based on [his] own personal judgment" that the screener did not infringe. (Trial Tr. at 3808.) However, Heagarty was neither an engineer nor a U.S. patent attorney, and did not even read the patent itself. Most importantly, the Defendants did not present any evidence to demonstrate that they obtained an exculpatory opinion of counsel before commencing the infringing activity (Trial Tr. at 2707), even though the Defendants employed a large number of attorneys whom they could have consulted. See Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1581–82 (affirming a district court's enhancement of damages, in part because willfulness was based on the fact that "[n]o written opinion of counsel on either invalidity or noninfringement of any of the three . . . patents was offered . . .").

Therefore, the first two factors, (1) whether the infringer deliberately copied the ideas or design of another, and (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed, strongly support enhancing the damage award. In the Court's view, they are indicative of willful conduct and a lack of good faith on the part of the Defendants.

## 2. **Whether the Defendants Engaged in Litigation Misconduct**

"Litigation misconduct generally involves unethical or unprofessional conduct by a party or his attorneys during the course of adjudicative proceedings." Old Reliable Wholesale, Inc. v. Cornell Corp., 635 F.3d 539, 549 (Fed. Cir. 2011). "Typically, 'litigation misconduct' refers to bringing vexatious or unjustified suits, discovery abuses, failure to obey orders of the court, or acts that unnecessarily prolong litigation." i4i Ltd. Partnership, 598 F.3d at 859.

7

The Plaintiff has pointed to 31 instances of what it characterizes as litigation misconduct on the part of the Defendants. This litany of occurrences appears to be an attempt to throw as much proverbial mud against the wall as possible with the hope that the Court will sift through to see what sticks. While the Plaintiff claims that the Defendants' litigation misconduct has been significant, pervasive, continuous, unrelenting and intentional with the clear goal of harassing Metso, its witnesses and its counsel, the Court is not convinced that is rises to that level.

There is no doubt that this case has been contentious and that there were several instances of not entirely commendable behavior throughout the long history of litigation between these parties. Many varieties of misconduct can support a district court's finding of enhanced damages. See Eon-Net LP v. Flagstar Bancorp, 653 F.3d 1314, 1324 (Fed. Cir. 2011). However, based upon this Court's review of the case law in the Federal Circuit, none of the instances in the present case rise to the level of litigation misconduct. Cf. Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 54 S. Ct. 146, 78 L. Ed. 293 (1933) (affirming dismissal of a patentee who had purchased the silence of another inventor whose testimony would have provided grounds to invalidate the patents); Eon-Net LP, 653 F.3d at 1324 (counsel destroyed relevant documents, failed to engage in the claim construction process in good faith, and displayed a "lack of regard for the judicial system" as well as a "cavalier attitude" towards the "patent litigation process as a whole"); Mathis v. Spears, 857 F.2d 749, 752 (Fed. Cir. 1988) (party "blatantly misled[ ] the PTO" and then "attempted to employ the courts as handmaidens to its iniquity").

No such litigation misconduct is present here. First, the few references to inadequate compliance with certain Local Civil Rules do not rise to the level of litigation misconduct. Similarly, the Defendants' submission to the Court of an unexecuted draft consulting agreement

between Mr. Rafferty and Metso was not undoubtedly meant to mislead the Court in believing that the agreement was in place so as to constitute litigation misconduct. Cf. ICU Med., Inc. v. Alaris Med. Sys., Inc., 558 F.3d 1368, 1380 (Fed. Cir. 2009) (party made "multiple, repeated misrepresentations" to the court); Aptix Corp. v. Quicktum Design Sys., Inc., 269 F.3d 1369, 1374-75 (Fed. Cir. 2001) (affirming the district court's award of attorney fees when the non-prevailing party engaged in the "extreme litigation misconduct" of falsifying evidence). Rather, the Defendants' counsel pointed out that the purpose of submitting the consulting agreement was "to attempt to show the Court that Metso has been attempting to shield Mr. Rafferty from us from day one." (Feb. 4, 2008 Hearing Tr. at 8.)

Third, the Court is cognizant of Judge Boyle's reluctance to issue an Amended Letter of Request for Examination Out of the Jurisdiction to the Defendants because their overly broad discovery requests in the U.K. caused delay, despite being warned that pre-trial discovery was limited there. However, the Court cannot say that the overly broad discovery requests, even under these circumstances, would rise to the level of litigation misconduct. Finally, the Defendants' counsel did act inappropriately during a deposition, calling the Plaintiff's counsel an "ass" on the record. However, he subsequently apologized to the Court for this misbehavior, and Judge Boyle recognized, as this Court does, that "people can get excited and tempers flare." While this Court unequivocally condemns this sort of unsportsmanlike behavior, "name calling" is not the type of litigation misconduct to warrant enhanced damages.

Most, if not all, of the examples cited by the Plaintiff can be construed merely as vigorous advocacy. Thus, this factor weighs against multiplying the damages award.

### 3. Whether the Defendants' Size and Financial Condition Warrant Trebling

Terex Corporation, one of the Defendants, is a multi-national conglomerate. Terex has itself stated in a press release issued post-trial that the sales of its infringing screeners in 2010 were approximately $10.4 million and that a patent infringement damages award of $15.8 million will not have a "material impact on Terex's consolidated business or overall operating results." While the Defendants assert that Terex specifically did not sell any of the accused screeners and that sales by Powerscreen, its indirect subsidiary, only account for a very small portion of Terex's consolidated revenues, this contention is without merit. The Court fully explains in a separate contemporaneous Order that Terex is equally liable for infringement because the evidence revealed circumstances justifying disregard of the status of the parent and the subsidiary as distinct, separate corporations. Therefore, it is clear that Terex's size and financial condition weigh in favor of the enhancement of damages in this case.

### 4. Whether the Case Was Close

As fully explained in a companion decision to this Decision and Order, the Court does not find that the Defendants presented a substantial question of noninfringement so as to make it a close case. However, the defenses that were raised had enough merit to at least present the question of noninfringement to the jury. This is precisely why the Court found at the summary judgment stage that there were genuine issues of material fact warranting a trial. Even after the close of all the evidence, the Court refused to grant the Plaintiff judgment as a matter of law on the issue of infringement. (Trial Tr. at 4729.)

Therefore, the Court finds that this factor does not weigh in favor of enhancing the damages award.

### 5. The Duration of the Defendants' Misconduct

The Defendants began their infringement in March 2000 and continued to do so until the effective date of the permanent injunction. Thus, the Defendants continued to sell the infringing screeners during the entire four and one-half **year** pretrial period, throughout the trial itself, and even post-verdict. Overall, the infringing activities took place over 11 years, which the Court finds to be a significant period of time.

The Defendants point out that the duration of infringing activity is a product of the Plaintiff's own dilatory conduct. It is true that the Plaintiff took over six years from the date of infringement to file the present action. However, there were several justifications for this delay, including communications with the Defendants regarding possible negotiation. Moreover, a delay in filing is no excuse for the infringement that continued to occur throughout the trial and even after the verdict, which in and of itself amounts to a significant period of time. The explanation that the Defendants are only filling orders for mobile screeners taken before the judgment is also not a compelling excuse.

Accordingly, the Court finds that this factor weighs in favor of the enhancement of damages.

### 6. Whether the Defendants Took Any Remedial Action

After the Plaintiff initially notified the Defendants of the infringement, the Defendants continued to sell the accused screeners and did not take any remedial action. While the Defendants may have believed they had designed around Metso's patent, as explained above, they did so in an ostrich-like manner. Moreover, although it would have potentially taken time and resources to do so, the Defendants had an alternative mobile screener design that was

11

noninfringing which it could have implemented. Thus, this factor also weighs in favor of enhancement.

### 7. **The Defendants' Motivation for Harm**

The Defendants' intentions with regard to infringement weigh against enhancement. The Court finds that the Defendants' motivation to infringe was not malicious, but was due to competitive reasons. Even the Plaintiff admits in its motion that "Powerscreen wanted to copy the design in the '618 patent and its commercial embodiment because they needed to do so to improve Powerscreen's market share in the mobile screener business." (Pl. Mem. at 5.)

### 8. **Whether the Defendants Attempted to Conceal Their Misconduct**

As for the final consideration, the Court finds that the Defendants made no attempts to conceal their misconduct, and that this factor weighs against a damages enhancement. The accused screeners were prominently displayed at trade shows, press releases, manuals, and sales brochures.

### C. <u>Whether an Enhancement to the Damages Award is Warranted</u>

On one hand, the Court finds that the Defendants deliberately copied Metso's patent; intentionally precluded themselves from forming a good faith belief of noninfringement; are a multi-national conglomerate with considerable finances; engaged in infringing activities for a substantial period of time; and did not take any remedial action when notified of the infringement. On the other hand, the Court finds that there was no egregious litigation misconduct; the Defendants presented legitimate defenses; the motivation for harm was not sinister; and the Defendants made no attempts to conceal their misconduct.

Accordingly, the Court finds that the Defendants' conduct was egregious in certain respects and entailed sufficient culpability to warrant a doubling of the damage award. In

12

particular, the Defendant's willful infringement and ostrich-like behavior with regard to its conducting a scope of the Plaintiff's patent are factors that weigh in favor of enhancing the damage award. On the other hand, a full enhancement of treble damages is not appropriate in light of the mitigating factors, especially the lack of litigation misconduct. Thus, the $15,800,000 damage award to Metso is enhanced to double that amount, namely to the sum of $31,600,000.

It is worth noting that this conclusion means that Metso will be entitled to $31,600,000 for the time period of March 2000 through October 2007, although the Defendants' profits during that time total $32,862,311. (Trial Tr. at 1758:10-19.) In this regard, the Plaintiff contends that doubling the damages award will not sufficiently compensate them in light of the Defendants' significant profits. However, this argument is without merit. The statutory authority states only that the court may increase the *damages* up to three times the amount found or assessed. See 35 U.S.C. § 284. There is an "important distinction between 'damages' and 'profits,' and the relevance of this distinction to the 1946 amendment of the statute." Aero Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 505, 84 S. Ct. 1526, 2542, 12 L. Ed. 2d. 457 (1964). "The present statutory rule is that only 'damages' may be recovered. These have been defined by this Court as 'compensation for the pecuniary loss he (the patentee) has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts." Id. (citing Coupe v. Royer, 155 U.S. 565, 582, 15 S. Ct. 199, 206, 39 L. Ed. 263 (1893)). This is precisely why the Federal Circuit has held that the treble damages provision of § 284 does not apply to the recovery of profits under § 289. See Braun Inc. v. Dynamics Corp. of America, 975 F.2d 815, 824, 24 U.S.P.Q.2d 1121, 1128 (Fed. Cir. 1992).

13

Overall, the Court finds that a doubling of the total damages award based upon a 10%
reasonable royalty rate along with a supplemental damages award and pre- and post- judgment
interest, is an adequate damages award to totally compensate Metso for the Defendants'
infringement.

### III.   MOTION FOR PRE- AND POST-JUDGMENT INTEREST

In addition to a motion for enhancing the damages award, the Plaintiff Metso moves (1)
for an award of pre-judgment interest on all pre-judgment damages, and (2) under 28 U.S.C.
§ 1961 for an award of post-judgment interest on all pre-judgment damages, including any
interest and any enhancement to the pre-judgment damages award, as well as on any post-
judgment damages.

### A. Relevant Law

According to the Federal Circuit, prejudgment interest is designed to compensate for the
delay a patentee experiences in obtaining money he, she, or it would have received sooner if no
infringement occurred, while enhanced damages, on the other hand, are in the nature of
punishment. Beatrice Foods Co. v. New England Printing and Lithographing Co., 923 F.2d
1576, 1580 (Fed. Cir. 1991) (quotations omitted, citing Paper Converting Machine Co. v.
Magna–Graphics Corp., 745 F.2d 11, 23 (Fed. Cir. 1984)). As a result, pre-judgment interest can
only be applied to the primary or actual damage portion and not to the punitive or enhanced
portion of a damage award. Id. (quotations omitted, citing Underwater Devices Inc. v.
Morrison–Knudsen Co., 717 F.2d 1380, 1389 (Fed. Cir. 1983)).

Pre-judgment interest is provided for by statute. Section 284 states that damages for
patent infringement include "a reasonable royalty for the use made of the invention by the

14

infringer, *together with interest* and costs as fixed by the court." 35 U.S.C. § 284 (1994)

(emphasis added).

The Supreme Court has spoken directly on the issue of pre-judgment interest. In <u>General</u>

<u>Motors Corporation v. Devex Corporation</u>, 461 U.S. 648, 103 S. Ct. 2058, 76 L. Ed. 2d 211

(1983), the Court said:

> The standard governing the award of prejudgment interest under § 284 should be consistent with Congress' overriding purpose of affording patent owners complete compensation. In light of that purpose, we conclude that prejudgment interest should ordinarily be awarded. In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into as reasonable royalty agreement. . . .
>
> . . .
>
> We do not construe § 284 as requiring the award of prejudgment interest whenever infringement is found. That provision states that interest shall be "fixed by the court," and in our view it leaves the court some discretion in awarding prejudgment interest. For example, it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the patent owner has been responsible for undue delay in prosecuting the lawsuit. There may be other circumstances in which it may be appropriate not to award prejudgment interest. We need not delineate those circumstances in this case. We hold only that prejudgment interest should be awarded under § 284 absent some justification for withholding such an award.

<u>General Motors Corp. v. Devex Corp.</u>, 461 U.S. 648, 655-657, 103 S. Ct. 2058, 76 L. Ed.

2d 211 (1983) (footnotes omitted).

"Unlike post-judgment interest for which the interest rate is set by statute [discussed

infra] there is no mandatory interest rate and no standard rate for calculating an award of

prejudgment interest." <u>TiVo, Inc. v. Echostar Comm'ns Corp.</u>, No. 04 Civ. 1, 2006 U .S. Dist.

LEXIS 64291, 2006 WL 6830818, at *5 (E.D. Tex. Aug. 17, 2006). "The Federal Circuit has

given district courts great discretion when determining the applicable interest rate for an award

of prejudgment interest." <u>IPPV Enterprises, LLC v. EchoStar Commc'n Corp.</u>, No. 99 Civ. 577,

15

2003 U.S. Dist. LEXIS 3530, 2003 WL 723260, at *3 (D. Del. Feb. 27, 2003) (citation omitted); see Uniroyal, Inc. v. Rudkin–Wiley Corp., 939 F.2d 1540, 1545 (Fed. Cir. 1991) (granting district courts "wide latitude" in this regard).

Although courts have selected different rates, most often courts will award either the prime rate or the U.S. Treasury rate. TiVo, Inc., 2006 U.S. Dist. LEXIS 64291, 2006 WL 6830818, at *6, (collecting cases). "Courts have recognized that the prime rate best compensate[s] a patentee for lost revenues during the period of infringement because the prime rate represents the cost of borrowing money, which is 'a better measure of the harm suffered as a result of the loss of the use of money over time.'" IMX, Inc. v. LendingTree, LLC, 469 F. Supp. 2d 203, 227 (D. Del. 2007) (citing Mars, Inc. v. Conlux USA Corp., 818 F. Supp. 707, 720-21 (D. Del. 1993), aff'd, 16 F.3d 421 (Fed. Cir. 1993)).

With regard to post-judgment interest, the patent statute states that post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court. . . ." 28 U.S.C. § 1961. Section 1961 further provides that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." Id. The Supreme Court has stated that "[t]he purpose of post-judgment interest is to compensate the successful plaintiff for being deprived of compensation for the loss from the time between the ascertainment of the damage and the payment by the defendant." Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 835–36, 110 S. Ct. 1570, 108 L. Ed. 2d 842 (1990) (internal quotations and citation omitted).

As with pre-judgment, the Federal Circuit defers to the relevant circuit for interpretation of the post-judgment statute. Transmatic Inc. v. Gulton Indus. Inc., 180 F.3d 1343, 1347–48 (Fed. Cir. 1999).

## B. As to Whether the Plaintiff's Request for Pre- and Post-Judgment Interest Should be Granted

### 1. Pre-Judgment

The Court sees no justification to deny the Plaintiff pre-judgment interest under § 284. See General Motors Corp., 461 U.S. at 657. While the Defendants assert that the Plaintiff has unreasonably delayed in filing this action, the Court has previously rejected this contention in denying the defense of laches in a companion decision to this Decision and Order. Accordingly, the Court concludes that prejudgment interest is appropriate for both the jury's award of damages and any supplemental damages that will be awarded pre-judgment. Nickson Indus., Inc. v. Rol Mfg. Co., Ltd., 847 F.2d 795, 800 (Fed. Cir. 1988) (noting that prejudgment interest generally "should be awarded from the date of infringement to the date of judgment.") (citing General Motors Corp., 461 U.S. at 656).

Prejudgment interest shall be calculated using the Treasury Rate, compounded annually. See Bio-Rad Lab. Inc., v. Nicolet Instrument Corp., 807 F.2d 964, 969 (Fed. Cir. 1986) ("The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court."). This Court has previously noted that "[t]he . . . Treasury Bill rate is the cost of raising funds by the Government. Corporations are more likely to borrow at the prime rate. Thus, in the Court's view the prime rate is more reflective of [the patentee's] cost of funds than the . . . Treasury Rate." Stryker Corp. v. Intermedics Orthopedics, Inc., 891 F. Supp. 751, 833 (E.D.N.Y. 1995) (Spatt, J.). However, the patentee in Stryker pointed to trial testimony as to why the prime rate was warranted. Id. ("According to the

17

plaintiff, use of the prime rate is appropriate because that rate (i) more accurately reflects the costs of the plaintiff's borrowing during the time of infringement than the 3 month Treasury Bill rate, and (ii) compares closely with the plaintiff's rate of returns on investment.").

In the present case, the Plaintiff has offered no factual or evidentiary support as to why this higher rate should be awarded. See Laitram Corp. v. NEC Corp., 115 F.3d 947, 955 (Fed. Cir. 1997) ("The district court found that there was no evidence that [the patentee] borrowed money at a higher rate, what that rate was, or that there was a causal connection between any borrowing and the loss of the use of the money awarded as a result of [the] infringement. . . . We hold therefore that there was no abuse of discretion in the district court's choice of prejudgment interest."). Therefore, the Court sees no reason to doubt that the Treasury Bill rate will fully compensate Metso in this case. See Itron, Inc. v. Benghiat, No. 99 Civ. 501, 2003 U.S. Dist. Lexis 15039, at *54 (D. Minn. Aug. 29, 2003) (Although Benghiat's proposal for using the short-term prime rate would certainly give him a greater return, Benghiat has presented no evidence that the Treasury Bill rate will not sufficiently compensate him.").

However, the Court does find that prejudgment interest should be compounded, "because the incremental profits [the patentee] would have earned on the lost sales over the infringement period would have been invested in a manner resulting in yearly accrued growth. In addition, although not dispositive in and of itself of the issue of compounding interest, the Court notes that [the Defendants'] infringement was willful." Stryker Corp., 891 F. Supp. at 833.

The Plaintiff contends that the end date for applying pre-judgment interest has not yet taken place because no meaningful "judgment" has yet been entered. See Westinghouse Credit Corp. v. D'Urso, 371 F.3d 96, 98, 104 (2d Cir. 2004) ("The demarcation between the [pre-judgment and post-judgment time] period occurs when a meaningful judgment is entered. . . .

18

[When] a judgment . . . correctly determines liability, but errs in applying the appropriate method to calculate damages . . . such a judgment was not ascertained in a meaningful way for the purposes of post-judgment interest."). In support of this argument, the Plaintiff points out that the Court has not yet awarded Metso any attorneys' fees and has not awarded additional supplemental damages for the infringing period after September 2007 onward. The Court disagrees. A Judgment on the jury verdict rendered on December 6, 2010 was entered by this Court on March 3, 2011. At that time, the Plaintiff was awarded money damages in the amount of $15,800,000, which was supported by the evidence. See Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 836, 110 S. Ct. 1570, 108 L. Ed. 2d 842 (1990). While this amount of damages only reflected infringing sales that took place before October 2007, the Plaintiff is entirely responsible for that outcome. Moreover, this judgment expressly included the jury's advisory verdicts with regard to laches and inequitable conduct. This determination of liability and award of damages undeniably demarcated between 35 U.S.C. § 284 and 28 U.S.C. § 1961. Therefore, pre-judgment interest will be applied from the date infringement began for each infringing model up until March 3, 2011.

Accordingly, after reviewing the parties' submissions, the Court finds that pre-judgment interest should be awarded to Metso according to the following method. Interest shall be awarded for infringement during the period beginning March 9, 2000, and running through March 3, 2011. Interest shall be calculated using the average U.S. Treasury Bill rate during that same period and shall be compounded annually based upon the actual number of infringing sales in each year. The number of sales shall be based upon the sales figures submitted by the parties at trial, plus the figures to be determined in any accounting that the Court will order for the period from October 2007 through March 3, 2011. (See infra.)

JA0013027

The Court will order the parties to meet and confer to jointly arrive at a calculation of pre-judgment interest according to the formula prescribed above. The Court will then amend its judgment to encompass the proper amount of interest.

### 2. Post -Judgment

The Court finds, in accordance with relevant statutory authority, that the Plaintiff should be awarded post-judgment interest under 28 U.S.C. § 1961 for any money judgment in this case. This includes the patent infringement damages awarded by the jury, any supplemental patent infringement damages awarded, as well as the prejudgment interest on both the jury's damages award and the supplemental damages award.

## IV.   MOTION FOR AN ACCOUNTING FOR SUPPLEMENTAL DAMAGES

### A.  The Plaintiff's Motion for an Accounting For Supplemental Damages and the Defendants' Objections

On March 14, 2011, the Plaintiff Metso moved pursuant to 35 U.S.C. § 284 for an accounting of supplemental damages and for an award of these supplemental damages for the Defendants' infringing sales that were not considered by the jury and were not included in the jury's damages award. The Plaintiff is seeking to recover damages for the period from October 2007, the close of fact discovery, through July 25, 2011, the effective date of the permanent injunction. In particular, Metso moves for: (1) an accounting to determine damages caused by the Defendants' infringement during this time period; (2) an award of the supplemental damages; and (3) any enhancement of a supplemental damages award in accordance with Metso's other motions for trebling and pre- and post-judgment interest.

The Plaintiff claims that proof of infringement damages at the trial was delineated from the initial infringement in March 2000 until October 2007, in accordance with United States Magistrate Judge Thomas Boyle's discovery deadlines. This was the same relevant time period

20

that formed the basis for the opinion of Catharine Lawton, the Plaintiff's damages expert at the trial. Thus, the Plaintiff alleges that the jury's damages award was based upon evidence of damages presented at trial, which did not include any infringing activity which took place from October 2007 onward.

The Plaintiff maintains that a motion for an accounting of supplemental damages is standard practice in patent infringement cases to ensure that a plaintiff is fully compensated for all damages suffered as a result of a defendant's patent infringement. In addition, the Plaintiff asserts that these damages cannot be waived and that the Court is mandated to award these damages consistent with binding statutory, Federal Circuit, and Supreme Court authority.

On the other hand, the Defendants contend that the Plaintiff Metso is not entitled to supplemental damages, either from the date fact discovery closed through the verdict or from the date of the verdict through the permanent injunction. The Defendants raise three alternative grounds for why supplemental damages are not warranted and thereby why this Court should not order that the Defendants produce a supplemental accounting.

First, the Defendants argue that an accounting cannot be awarded because of a failure of proof on the issue of damages at the trial. Essentially, the Defendants argue that Metso is now improperly attempting to remedy its failure of proof at the trial as to post-October 2007 sales. Their contention is that Metso bears the burden of proving damages for its patent infringement claim, and Metso could have presented evidence through its damages expert of reasoned estimates of Powerscreen's post-October 2007 sales from publically available UCC filings or from extrapolations of data Powerscreen had already produced. In addition, the Defendants assert that Metso could have requested the Court to take supplemental discovery on this point but did not do so.

21

Second, the Defendants allege that Metso waived any right to an accounting by excluding a request for such relief in the Complaint or the Pretrial Order. In particular, the Defendants assert that because any issue of an accounting was omitted from the Pretrial Order, it is waived.

Third, the Defendants claim that Metso is untimely and improperly requesting an accounting and that this violates the Seventh Amendment of the Constitution. Specifically, the Defendants contend that Metso's request for an accounting invites the Court to reexamine the jury's verdict.

## B. Relevant Law

Section 284 states that "the court *shall* award the claimant damages adequate to compensate for the infringement" and "[w]hen damages are not found by a jury, the court *shall* assess them." 35 U.S.C. § 284 (emphases added). The Court applies Second Circuit law to procedural issues and Federal Circuit law to substantive and procedural issues "pertaining to patent law." Aero Prods. Int'l, Inc. v. Intex Recreation Corp., 466 F.3d 1000, 1016 (Fed. Cir. 2006); see also Fiskars, Inc. v. Hunt Mfg. Co., 279 F.3d 1378, 1381 (Fed. Cir. 2002) (noting that Federal Circuit law controls "the distinctive characteristics of patent damages law").

The Federal Circuit has explicitly held that a patent holder is entitled to supplemental damages for infringing sales that the jury did not consider and that precede entry of a permanent injunction. See Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1212 (Fed. Cir. 2010) ("we have noted that a patentee is 'not fully compensated' if 'the damages award did not include future lost sales.'" (quoting Carborundum Co. v. Molten Metal Equip. Innovations, Inc., 72 F.3d 872, 881 (Fed. Cir. 1995)); see also Fresenius USA, Inc. v. Baxter Int'l, Inc., 582 F.3d 1288, 1303 (Fed. Cir. 2009) ("A damages award for pre-verdict sales of the infringing product does not fully compensate the patentee because it fails to account for post-verdict sales of repair parts.").

22

## C. As to Whether the Plaintiff's Request for a Supplemental Accounting Should be Granted

### 1. Post-Verdict

Courts routinely grant motions for a further accounting where the jury did not consider certain periods of infringing activity *post*-verdict. See, e.g., Corp. v. Acres Gaming, Inc., Nos. 97 Civ. 1383 and 98 Civ. 1462, 2001 U.S. Dist. LEXIS 23416, at *52–54, (D. Nev. Aug. 1, 2001) (noting that "accountings appear to be standard practice," based on authorities in which accountings were granted for post-verdict periods not considered by juries); Stryker v. Davol, Inc., 75 F. Supp. 2d 746, 747 (W.D. Mich. 1999) (granting a motion for an accounting of infringing activities during the period after the jury's verdict up until the granting of the patentee's motion for a permanent injunction); Maxwell v. J. Baker, Inc., 879 F. Supp. 1007, 1011 (D. Minn. 1995), rev'd on other grounds, 86 F.3d 1098 (Fed. Cir. 1996) (finding that a plaintiff was entitled to an accounting for sales during the post-verdict period not considered by the jury); Mikohn Gaming Whelan Assoc., Inc. v. Jaslow Dental Lab., Inc., 609 F. Supp. 1325, 1327 (E.D. Penn. 1985) ("Plaintiff's motion seeks a further accounting for the . . . licenses sold after the last day of the trial . . . . The plaintiff is entitled to such an accounting."). The Court sees no reason to depart from this practice. In fact, the Defendants do not state a persuasive justification to deny that Metso is entitled to supplemental damages from the time of the verdict through the entry of the permanent injunction.

Therefore, the Defendants are directed to provide an accounting to the Plaintiff from the date of the jury verdict, December 6, 2010, through the effective date of the permanent injunction, July 25, 2011.

The final determination in this regard is what a reasonable royalty rate should be for this approximate seven month period. Neither party has put forward a recommendation. The

23

Plaintiff only points out that a reasonable royalty rate to be applied to the Defendants' post-verdict sales is not necessarily the same as the reasonable royalty that was applied to the Defendants' pre-verdict sales. "There is a fundamental difference . . . between a reasonable royalty for pre-verdict infringement and damages for post-verdict infringement." Amado v. Microsoft Corp., 517 F.3d 1353, 1361 (Fed. Cir. 2008). "Prior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty. Once a judgment of validity and infringement has been entered, however, the calculus is markedly different because different economic factors are involved." Id. The Federal Circuit has stated that various factors to take into account to determine a post-verdict reasonable royalty rate include "the parties' bargaining positions, and the resulting change in economic circumstances, resulting from the determination of liability—for example, the infringer's likelihood of success on appeal . . ." Id.

The Plaintiff has requested the Court to set a briefing schedule for the parties to propose a reasonable royalty rate for the Defendants' post-verdict sales of infringing screeners from the date of the jury verdict until the entry date of the permanent injunction. The Court grants this request. Once the Plaintiff obtains the relevant sales information, it is directed to provide this Court with a total damages request and a memorandum of law, not to exceed more than 5 pages, proposing a reasonable royalty rate for the Defendants' post-verdict sales of the infringing screeners. Within 14 days, the Defendants are directed to respond with their proposal for a reasonable royalty rate for the sale of the post-verdict screeners at issue, also not to exceed more than 5 pages. No reply will be accepted.

## 2. Pre-Verdict

The more complicated issue presented by the current motion is whether Metso is entitled to a supplemental accounting and damages award *pre*-verdict — from October 1, 2007 through December 6, 2010. The Defendants argue that the Plaintiff has waived this accounting and that there was no evidence presented at the trial to justify such an award.

This issue was previously considered by this Court in the context of the charging conference. At that time, the Defendants opposed limiting the jury's damages verdict to October 2007. The Court acknowledged that the Plaintiff had not explicitly requested restricting damages at the trial to the close of fact discovery until the charging conference. The Court, without the benefit of the parties' briefings or independent research of the relevant law, ruled that there would be no time limitation on the damages considered by the jury. The Court stated:

> Plaintiff is responsible for the fact that there was no discovery after October 2007.
>
> If plaintiff wanted to get additional discovery after October 2007, they could have appealed to me. They did not. They are responsible for any problems that occurred because they did not have discovery, like every other case.
>
> This case is no different. The plaintiff has the obligation to prove its damages, and can't rely on accountings later on, whatever that may be. *And I'm not making any comment, one way or the other, about that.* The important thing is the plaintiff consented to the termination of the discovery by not appealing to me, to say, I need more time.
>
> . . .
>
> If plaintiff's expert decided not to give an opinion beyond October 2007, so be it.
>
> But I am not helping in that regard. The damages are what she testified to, period. It's too late to do anything else right now. There could have been a request to me before the trial started.
>
> Judge, I need additional discovery here. Not a word was mentioned to me about that.

25

> You have waived it, Mr. Stuart, and this jury's going to decide damages
> not up until October 1, 2007, damages, period, and you have an exception.

(Trial Tr. at 5282:14-5283:17) (emphasis added).

After a careful review of the parties' post-trial submissions and the applicable case law, the Court now comments on what it previously declined to comment about: whether the Plaintiff may now rely on a supplemental accounting to cover an additional period of infringement. Although the Court previously commented on this subject, the Court now finds that the Plaintiff did not waive its right to a pre-verdict supplemental accounting and damages award.

As the Defendants point out, and as the Court considered when it initially found a waiver, the Plaintiff did fail in a number of respects to do everything in its power to present comprehensive evidence of damages at the trial. For example, although fact discovery was ordered by Judge Boyle to be completed by October 2007, the Plaintiff could have appealed to this Court for an order compelling discovery specifically related to sales information in order to continue ascertaining damages. As another example, the Plaintiff did not need to agree on November 17, 2008 to not supplement its expert testimony report, even though the Plaintiff knew its expert based its opinion on a time frame that ended a year prior and that the accused screeners were continuing to be sold. As a final example, the Plaintiff's expert Catherine Lawton could have testified to damages occurring after October 2007, based on either hypothetical extrapolations or UCC information that was publicly available. See, e.g., Joyal Prods. v. Johnson Electric N. Am., Inc. et al., No. 04 Civ. 5172, 2009 U.S. Dist Lexis 15531, at *40 (D. N.J. Feb. 27, 2009) (approving an accounting for a time period where the patentee's expert witness had to estimate the infringer's sales based upon forecasts provided in discovery).

JA0013034

However, the record does not reflect that the Plaintiff took any formal steps to obtain additional materials relating to the Defendants' most recent sales. While acknowledging that infringing activity continued, the Plaintiff's expert nevertheless based her damages theory on a time frame which ended with the close of fact discovery in October 2007. For more than three and one-half years, the Plaintiff merely relied on its intention to file a motion for a supplemental accounting post-trial in order to take account of any continuing infringement from the end of fact discovery. The Court has not found a case in which a patentee has filed for a supplemental accounting to capture such a significant period of time.

Overall, the Court does not condone the Plaintiff's approach to the recovery of damages in the present case. However, the Court also finds the Defendants behavior to be questionable. It cannot be that the Defendants sat idly by for over three years with the assumption that they could continue to sell the accused screeners and not be potentially liable for those sales if they were later found to be infringing. The Defendants must have recognized this potential avenue for relief. Neither party acted reasonably, but this does not entitle the Defendants to the windfall that would ensue if this Court were to exclude damages for this lengthy period of time.

Other district courts have awarded supplemental damages which, in part, include damages for sales after those considered by the jury but pre-verdict. See, e.g., ActiveVideo Networks, Inc. v. Verizon Commc'ns., Inc., No. 10 Civ. 248, 2011 WL 4899922, at *3 (E.D. Va. Oct. 14, 2011) (awarding supplemental damages for the approximate five month period pre-dating the trial and jury verdict); Semiconductor, Inc. v. Rambus, Inc., 609 F. Supp. 2d 951, 959–65, 987 (N.D. Cal. 2009) (awarding pre-verdict supplemental damages after the "the last date for which [the patentee] was able to present evidence of [infringing] sales to the jury"); Aero Products Int'l, Inc., et al. v. Intex Recreation Corp., No. 02 Civ. 2590, 2005 WL 1498667,

27

at *2, *11 (N.D. Ill. June 9, 2005) (awarding supplemental damages for the approximate one month period prior to start of the trial). While these cases have certain distinguishable facts, they stand for the proposition that this Court has the authority to award pre-verdict supplemental damages in the present case.

The Defendants assert that the Court should not award an accounting because there was a failure of proof on the issue of damages at trial. However, the present case is not similar to that cited by the Defendants for that proposition, E.G.L. Gem Lab Ltd., 90 F. Supp. 2d 277, 307-09 (S.D.N.Y. 2000). First and foremost, E.G.L. was a trademark case. The Honorable Lewis A. Kaplan recognized this distinction explicitly when he stated that "[t]he considerations in the trademark realm are quite different. Trademarks, unlike patents, do not confer legally protected monopolies on useful advances in science and technology in order to provide incentives for inventors." Id. at 292. Moreover, in the E.G.L. case, Judge Kaplan recognized that there was a complete failure of proof on the issue of damages, for which both sides bore some responsibility. The plaintiff in that case did not put in any damage proof and the plaintiff's counsel in his closing argument made no reference at all to the subject of damages. E.G.L. is simply not analogous to the present case, in which the Plaintiff's expert witness testified extensively as to damages, albeit limited to a specified time period.

The Defendants alternatively argue that Metso has waived any award of supplemental damages by failing to raise it in both its Complaint and the Joint Pretrial Order. On the other hand, the Plaintiff argues that this portion of its damages is not possible of being waived. Not so. While Section 284 states that "the court *shall* award the claimant damages adequate to compensate for infringement," meaning "full compensation for any damages the patent owner suffered as a result of the infringement," Grain Processing Corp. v. Am. Maize-Products Co.,

185 F.3d 1341, 1349 (Fed. Cir. 1999), courts have found waivers to be warranted under certain circumstances. See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., No. 04 Civ. 1371, 2008 U.S. Dist LEXIS 100533, at *3–4 (D. Del. Dec. 12, 2008); Lucent Technologies, Inc. v. Newbridge Networks Corp., 168 F. Supp. 2d 269, 271–73 (D. Del. 2001); Braintree Laboratories, Inc. v. Nephro-Tech, Inc., 81 F. Supp. 2d 1122, 1140 (D. Kan. 2000) ("The court considers a request for an accounting to be a significant claim for relief and not a mere clerical exercise which would routinely and readily follow from a verdict in plaintiff's favor. Failure to so preserve the request for an accounting acts as a waiver and closes the door on further inquiry.").

However, the majority of courts to have faced this issue, including the Federal Circuit, have found a waiver unjustified under circumstances similar to the facts in the present case. See Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197 (Fed. Cir. 2010) (finding that the plaintiff did not waive its right to supplemental damages because its amended complaint sought only "such damages as it shall prove at trial" and "such further and other relief as the Court and/or jury may deem proper and just"); TiVo, Inc., 2006 U.S. Dist. LEXIS 64291, at *6, 2006 WL 6830818 (E.D. Tex. Aug. 17, 2006) ("Failure to include a separate request for "supplemental" damages does not result in waiver because such damages are a component of any request for compensatory damages."); Mikohn Gaming, 2001 U.S. Dist. LEXIS 23416 at *54–56 (D. Nev. Aug. 1, 2001) (finding that the patentee's failure to separately request an "accounting" in the pre-trial order was "of no consequence" and did not waive an award of supplemental reasonable royalty damages). Here, the Plaintiff's Complaint sought damages and "such other and further relief as this Court or a jury may deem just and proper." (DE No. 1.) In addition, in Metso's "Statement Regarding Damages and Other Relief Sought" filed prior to the trial, the Plaintiff

29

specifically sought an award of damages under Section 284 for the Defendants' infringing

activities through the close of fact discovery and thereafter "in an amount to be determined after

post-trial submissions on the issue." (DE No. 403.)

Therefore, the Court finds that the Plaintiff has not waived its right to a supplemental

accounting for pre-verdict infringing sales.

However, the issue remains that the Court's instruction to the jury did not specifically

delineate the damages period to terminate in October 2007. Instead, the Court instructed the jury

to award all the damages that could be proven with reasonable certainty. Thus, the Defendants

argue that the jury here already determined the damages attributable to the period for which

Metso now seeks an accounting. In response, the Plaintiff argues that it is clear that the jury only

awarded damages for the period of time up until October 2007 and did not include damages for

any other time period, notwithstanding the Court's instruction. The Court agrees.

At the trial, the damage experts for both Metso and the Defendant agreed that the total

infringing sales between March 9, 2000 and October 2007 amounted to $158,740,988. Lawton,

the Plaintiff's expert, opined that Metso was entitled to $15,874,098.80, based upon a 10%

royalty rate. It was made clear in Lawton's testimony that her calculation did not encompass

sales for any period after October 2007. The jury subsequently awarded Metso $15,800,000.

This ultimate award of damages is a rounded number of the exact figure advanced by the

Plaintiff's damages expert. Thus, the jury's verdict mirrored Lawton's calculation. Given

Lawton's detailed testimony on damages from 2000 through 2007, and the clear exclusion of

testimony regarding any subsequent period, the Court concludes that the jury was not presented

with sufficient evidence from which to determine damages for infringement after the close of

30

fact discovery. Therefore, the verdict did not reflect damages for that time period. See Itron, Inc., 2003 U.S. Dist. Lexis 15039, at *49.

In addition, because it is clear that the jury's verdict was based only upon the time period up to October 2007, an award of supplemental damages would not implicate any constitutional considerations concerning reexamination of the jury's verdict, as the Defendants have contended.

Accordingly, irrespective of the Court's earlier statements at the charge conference, because the time period subsequent to September 2007 was not considered by the jury, the Court may now grant an accounting for October 2007 up to the date of the verdict. See Mikohn Gaming Corp., 2001 U.S. Dist. LEXIS 23416 at *52–54; Maxwell v. J. Baker, Inc., 879 F. Supp. 1007, 1011 (D. Minn. 1995), rev'd on other grounds, 86 F.3d 1098 (Fed. Cir. 1996) (finding that plaintiff was entitled to accounting for sales during period not considered by the jury). As requested by the Plaintiff, the Court will utilize a 10% royalty rate for the total sales of the Defendants' infringing screeners during this period of time. Although the jury did not expressly conclude that this was the royalty rate applied in its damages award, it is clear that this was the basis for their award, as explained above.

In sum, the Defendants are directed to promptly provide the Plaintiff with documents that are sufficient to identify the exact number of infringing screeners sold from October 1, 2007 through July 25, 2011 to any distributor, entity or person in the United States. This information should include the purchase order number, date of sale, screener model sold, seller, purchaser, and selling price of each screener. In addition, the Defendants shall provide an affidavit attesting to the accuracy and completeness of the information provided. This amount of damages will then be entitled to enhancement and interest, as set forth above.

31

## V.   MOTION FOR ATTORNEYS' FEES AND COSTS

### A.  The Plaintiff's Fee Application and the Defendants' Objections

Finally, the Court will now address the Plaintiff's motion for an award of attorneys' fees

and costs pursuant to 35 U.S.C. § 285.   Initially, the Plaintiff sought a total fee award in the

amount of $7,864,985.03, which includes $2,801,277.28 in litigation costs, expenses, and

disbursements.   Subsequently, the Plaintiff has filed a supplemental motion seeking an additional

$649,769.00 in attorneys' fees.   The Plaintiff bases its request on several grounds: (1) that Metso

was the only prevailing party and succeeded on all of its claims; (2) that the Defendants'

infringement was found to be willful; and (3) that the Defendants engaged in litigation

misconduct, unprofessional behavior, and vexatious litigation tactics.   On the other hand, the

Defendants contend that the Court may not award the Plaintiff attorneys' fees in the first instance

because the predicate finding of willful infringement was erroneous as a matter of law.   In

addition, the Defendants point out that the Plaintiff cannot show any litigation misconduct

warranting a finding that this case is exceptional and that the circumstances here militate against

an exceptional case finding or an award of reasonable attorneys' fees and costs to the Plaintiff.

### B.  The Relevant Law For Awarding Attorneys' Fees in a Patent Case

Section 285 of the Patent Statute authorizes the Court "in exceptional cases" to award

"reasonable attorney fees" to the prevailing party.   Whether a case is "exceptional" is a

determination of fact, and the awarding of attorneys' fees in such cases is left to the court's

discretion.   35 U.S.C. § 285; Molins PLC v. Textron, Inc., 48 F.3d 1172, 1186 (Fed. Cir. 1995);

Amsted Indus., 24 F.3d at 184.   "Exceptional circumstances justifying an award of fees . . .

include unfairness, bad faith, inequitable conduct, vexatious or unjustified litigation, and

32

misconduct during litigation. This list is not exhaustive, and the existence of any one circumstance may make a case exceptional." <u>Molins</u>, 48 F.3d at 1191.

An express finding of willful infringement may be a sufficient basis for classifying a case as exceptional. <u>Id.</u> (citing <u>Modine Mfg. Co. v. Allen Group Inc.</u>, 917 F.2d 538, 543 (Fed. Cir. 1990)). However, even where willful infringement is proven, a case may, or may not, be deemed "exceptional" under Section 285. <u>Golight, Inc. v. Wal-Mart Stores, Inc.</u>, 355 F.3d 1327, 1340 (Fed. Cir. 2004) (explaining cases); <u>Lightwave Techs., Inc. v. Corning Glass Works</u>, No. 86 Civ. 759, 1991 U.S. Dist. LEXIS 543, at *39 (S.D.N.Y. Jan. 18, 1991) ("Indeed, the purpose of an increase in damages is different from that of an award of attorney fees: whereas an increase in damages based on willful infringement is based on the need to compensate the patentee and to deter and punish infringers, an award of attorneys' fees is based more appropriately on the conduct of the parties during the litigation."). "Attorney fees are not to be routinely assessed against a losing party in litigation in order to avoid penalizing a party for merely defending or prosecuting a lawsuit, and are awarded to avoid a gross injustice." <u>Revlon, Inc. v. Carson Prods. Co.</u>, 803 F.2d 676, 679 (Fed. Cir. 1986) (internal citations omitted).

There is a two-step inquiry that the Court must conduct. First, "[t]he district court must determine whether the case is 'exceptional'; if it is, then it is within the court's discretion to award attorneys' fees to the prevailing party." <u>J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.</u>, 822 F.2d 1047, 1050 (Fed. Cir. 1987); <u>see Interspiro USA Inc. v. Figgie Intern. Inc.</u>, 18 F.3d 927 (Fed. Cir. 1994). The moving party bears the burden to demonstrate by clear and convincing evidence that a case is exceptional. <u>Cambridge Prods., Ltd. v. Penn Nutrients, Inc.</u>, 962 F.2d 1048, 1050 (Fed. Cir. 1992). "However, even in cases where there is clear and convincing evidence of exceptional conduct under Section 285, the award of attorneys' fees is not

33

mandatory." Capital Bridge Co., Ltd. V. IVL Technologies Ltd., No. 04 Civ. 4002, 2007 WL

3168327, at *5 (S.D.N.Y. Oct. 26, 2007); see S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.,

781 F.2d 198, 201 (Fed. Cir. 1986) ("Even an exceptional case does not require in all

circumstances the award of attorney fees."); Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.,

393 F.3d 1378, 1382 (Fed. Cir. 2005) ("Even for an exceptional case, the decision to award

attorney fees and the amount thereof are within the district court's sound discretion."). There are

a number of factors a court can consider to determine whether attorneys' fees are appropriate,

including the "closeness of the case, tactics of counsel, the conduct of the parties and any other

factors that may contribute to a fairer allocation of the burdens of litigation as between winner

and loser." J.P. Stevens Co., 822 F.2d at 1051.

## C. As to Whether This Case is "Exceptional" Warranting Attorneys' Fees

The Court finds that Metso has failed to establish by clear and convincing evidence that

this case is "exceptional." Therefore, Metso is not entitled to attorneys' fees. The present action

was indeed hard-fought and rigorously contesded, necessitating discovery disputes, a lengthy

trial, and voluminous filings with this Court. However, a review of the record reveals that there

is simply no basis to find that the Defendants acted in bad faith, committed inequitable conduct,

or participated in vexatious activity. To the extent that Metso's theory is that the Defendants

should be liable for attorneys' fees because they ultimately lost the case at trial, the Court has

found that there were reasonable bases for Defendants' arguments, including the defenses of

inequitable conduct, obviousness, and non-infringement. "An award of attorney fees to a

prevailing party under Section 285 is unique to patent law, and must be predicated upon

something beyond the fact that the patent holder has prevailed. In other words, the case at hand

must be truly unusual to justify an award of attorney fees." Cornell Univ. v. Hewlett-Packard

34

Co., No. 01 Civ. 1974, 2009 WL 1405208, at *1 (N.D.N.Y. Mar. 15, 2009) (Radar, J., Circuit

Judge, United States Court of Appeals for the Federal Circuit, sitting by designation).

   While the jury has found that the infringing conduct was willful, there are no other

factors that would mark this case as exceptional, such as offensive litigation tactics, including

vexatious or unjustified litigation or frivolous filings, being employed; or that the losing party

litigated in bad faith. See Superior Fireplace Co. v. Majestic Prods. Co., 270 F.3d 1358, 1377-78

(Fed. Cir. 2001); Brasseler U.S.A. I, L.P. v. Stryker Sales Corp., 267 F.3d 1370, 1380 (Fed. Cir.

2001); Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1481-82 (Fed. Cir. 1998).

   After reviewing the entire record, including discovery over a four and one-half year

period, the Court finds that the Defendants did employ some marginally vexatious litigation

tactics. However, as both parties recognize, this case has been high stakes from its inception.

Litigation by its nature is adversarial and often zealous advocacy can cross the fine line between

fervor and offense. However, even taking all of the Plaintiff's allegations of misconduct as true

for purposes of this motion, Defendants' counsel did not act beyond the bounds of civility.

There was nothing "truly unusual" about the Defendants' conduct so as to characterize this case

as "exceptional". However, even if this case could be considered exceptional, the Court still

exercises its discretion to deny the Plaintiff's request for attorneys' fees. See McNeil-PPC, Inc.

v. Perrigo Co., 516 F. Supp. 2d 238, 260 (S.D.N.Y. 2007) ("However, even if Plaintiffs had

committed inequitable conduct, the Court would still decline to award fees.").

   As such, Metso's motion for attorneys' fees under 35 U.S.C. § 285 is denied.

**D. <u>As to Whether Costs Should Be Awarded</u>**

   Although the award of costs in a patent infringement case is not expressly stated in

Section 285, the Federal Circuit has held that an award of expenses under this section is

35

nevertheless appropriate. <u>Central Soya Co., Inc. v. Geo. A. Hormel & Co.</u>, 723 F.2d 1573, 1578 (Fed. Cir. 1983) ("The purpose of § 285 is, in a proper case and in the discretion of the trial judge, to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit. . . . We interpret attorney fees to include those sums that the prevailing party incurs in the preparation for and performance of legal services related to the suit."); <u>see Mathis v. Spears</u>, 857 F.2d 749, 759 (Fed.Cir.1988) (allowing for the award of expenses under § 285).

Rule 54(d) provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d). "Costs" are defined by statute as follows:

> A judge or clerk of any court of the United States may tax as costs the following: (1) Fees of the clerk and marshal; (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and copies of papers necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920. Local Rule 54.1(c) has expanded upon § 1920, identifying ten categories of items and their respective taxability: (1) transcripts; (2) depositions; (3) witness fees, mileage, and subsistence; (4) interpreting costs; (5) exemplifications and copies of papers; (6) maps, charts, models, photographs, and summaries; (7) attorney fees and related costs; (8) fees of masters, receivers, commissioners, and court appointed experts; (9) costs for title searches; and (10) docket and miscellaneous fees. Local Civ. R. 54.1(c).

The Supreme Court has cautioned that "the discretion given district judges [by Rule 54(d)] to tax costs should be sparingly exercised with reference to expenses not specifically allowed by statute." <u>Farmer v. Arabian American Oil Co.</u>, 379 U.S. 227, 235, 85 S. Ct. 411, 13 L.Ed.2d 248 (1964).

36

Therefore, this Court has the authority to award costs to the prevailing party, the Plaintiff, in the current lawsuit. See Kohus v. Toys R US, Inc., 282 F.3d 1355, 1357 (Fed. Cir. 2002). Moreover, the award of costs may be appropriate even when an award of attorneys' fees is not granted. See iLOR, LLC v. Google, Inc., 631 F.3d 1372, 1380 (Fed. Cir. 2011) (vacating an award of attorneys' fees but allowing the award of costs and expense for copying, court reporting, transcripts, travel, research, obtaining documents and pleadings, and electronic document handling under § 285); Cf. Advanced Magnetic Closures, Inc. v. Rome Fastener Corp., 607 F.3d 817, 834 (Fed. Cir. 2010) (awarding attorneys' fees under § 285 but ordering that each party should bear its own costs). "The burden is on the prevailing party to establish to the court's satisfaction that the taxation of costs is justified." John and Kathryn G v. Board of Ed. of Mt. Vernon Public Schools, 891 F. Supp. 122, 123 (S.D.N.Y. 1995).

The Court has reviewed the hundreds of pages of documentation put forward by the Plaintiff in support of their motion for attorneys' fees and costs. While it appears that some of the costs fall into permissible categories, such as filing fees and copying expenses, many of the costs are for expenditures that are not allowable pursuant to the statute. The Plaintiff has not provided the Court with any breakdown of the total amount of costs, which they calculate to be $2,801.277.28.

Therefore, within 10 days of the date of this Order, the Plaintiff is directed to file with this Court a bill of costs, including an affidavit that the costs claimed are allowable by law, are correctly stated, and were necessarily incurred. Bills for the costs claimed shall be attached as exhibits pursuant to Local Rule 54.1(a). The Defendants will then have 5 days to object to any costs.

37

Finally, we note that the Plaintiff may not obtain the award of expert fees pursuant to §

285. A court can invoke its inherent power to award such fees in exceptional cases based upon a

finding of bad faith. See, e.g., Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc., 549 F.3d 1381,

1391 (Fed. Cir. 2008); Amsted Indus. v. Buckeye Steel Castings Co., 23 F.3d 374, 378 (Fed. Cir.

1994); Mathis v. Spears, 857 F.2d 749, 757–58 (Fed. Cir. 1988). However, as there is no basis

for a finding of bad faith here, the Court will not award expert fees. See iLOR, LLC, 631 F.3d at

1380.

## VI. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the Plaintiff's motion to enhance the damages award pursuant to 35

U.S.C. § 284 is **GRANTED**, but only to the extent that any damages award shall be doubled;

**and it is further**

**ORDERED** that the Plaintiff's motion for pre- and post-judgment interest is

**GRANTED**. With regard to pre-judgment interest, it shall be calculated according to the

formula prescribed in Part III of this Order. After the Defendants provide the Plaintiff with a

supplemental accounting, the parties shall meet and confer to arrive at a joint calculation

according to this formula. Within 10 days of the date the supplemental accounting is provided,

the parties shall provide to the Court a joint letter setting forth the correct calculation and amount

of prejudgment interest to the date of this Order; **and it is further**

**ORDERED** that the Plaintiff's motion for a supplemental accounting and damages

award for previously unaccounted-for infringing sales pursuant to 35 U.S.C. § 284 is

**GRANTED**. The Defendants shall provide a full accounting of all infringing sales from the

38

period beginning October 1, 2007 running through the effective date of the permanent injunction,

the July 25, 2011 Order; **and it is further**

ORDERED that the Plaintiff's motion for attorneys' fees pursuant to 35 U.S.C. § 285 is

DENIED; **and it is further**

ORDERED that the Plaintiff shall file a bill of costs with this Court within 10 days of

the date of this judgment.  The Defendants are directed to file any objections within 5 days of the

Plaintiff's submission.

**SO ORDERED.**

Dated: Central Islip, New York
December 8, 2011

        */s/ Arthur D. Spatt*
        ARTHUR D. SPATT
        United States District Judge

39

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
METSO MINERALS, INC.,

                                  Plaintiff,

                                                              **SHORT ORDER**
                    -against-                                 06-cv-1446 (ADS)(ETB)

POWERSCREEN INTERNATIONAL
DISTRIBUTION LIMITED, now known as
TEREX GB LIMITED, TEREX
CORPORATION, POWERSCREEN NEW
YORK, INC. and EMERALD EQUIPMENT
SYSTEMS, INC.,

                                  Defendants.
-----------------------------------------------------------X

**APPEARANCES:**

**Cozen O'Connor**
*Attorneys for the Plaintiff*
277 Park Avenue
New York, NY 10172
          By:     Michael C. Stuart, Esq.
                  Lisa Ferrari, Esq., of Counsel

**Squire Sanders & Dempsey LLP**
*Attorneys for all the Defendants*
30 Rockefeller Plaza
New York, NY 10112
          By:     George B. Yankwitt, Esq.
                  Mary Margaret Chang, Esq.
                  Andrew H Fried, Esq., of Counsel

**Merchant & Gould, P.C.**
*Attorneys for all the Defendants*
1050 17th Street
Suite 1950
Denver, CO 80265
          By:     Jon Trembath, Esq., of Counsel

**Clauss & Sabatini, PC**
*Attorneys for the Defendant Terex Corporation*
1350 Broadway
Suite 1710
New York, NY 10018
By:    Ava R. Maynard, Esq., of Counsel

**Forchelli, Curto, Schwartz, Mineo, Carlino & Cohn, LLP**
*Attorneys for the Defendant Powerscreen New York, Inc.*
330 Old Country Road
Suite 301
Mineola, NY 11501
By:    Andrew E. Curto, Esq., of Counsel

**SPATT, District Judge.**

The Plaintiff in this case, Metso Minerals, Inc. ("Metso"), has requested two

clarifications of and/or amendments to the Court's Memorandum of Decision and

Order, dated December 8, 2011 (Docket No. 688).

First, with regard to the production of additional information ordered by the

Court for the purposes of a supplemental damages accounting, the Plaintiff requests

that the serial number of each infringing screener be identified in the information

that the Defendants will be producing.  According to the Plaintiff, these unique

identifiers, routinely maintained by the Defendants, will both ensure that there is no

double accounting for infringing sales and enable Metso to independently verify

that the information provided is substantially complete and accurate.

As the Defendants have raised no opposition and there is nothing apparently

objectionable concerning this request, the Court now directs the Defendants to

produce the serial number of each infringing screener, along with the purchase

order number, date of sale, screener model sold, seller, purchaser, and selling price

of each screener. The Court's Memorandum of Decision and Order, dated December 8, 2011 (Docket No. 688), is hereby amended in this regard.

Second, with regard to post-judgment interest, the Court previously ruled that the Plaintiff should be awarded post-judgment interest pursuant to 28 U.S.C. § 1961 for any money judgment in this case. The Court went on to state that this money judgment would include the patent infringement damages awarded by the jury, any supplemental patent infringement damages awarded, as well as the pre-judgment interest on both the jury's damages award and the supplemental damages award. The Plaintiff now requests the Court to explicitly rule that the following categories of monetary awards are also part of the final money judgment in this case and accordingly subject to post-judgment interest: (1) the enhancement of the patent infringement damages awarded by the jury; (2) the enhancement of any supplemental patent infringement damages awarded; and (3) any award of Metso's litigation costs.

The Court now clarifies its previous Memorandum of Decision and Order, dated December 8, 2011 (Docket No. 688), that these categories of monetary awards are part of the final money judgment in this case and accordingly subject to post-judgment interest. First, the Court awards the Plaintiff post-judgment interest on both the enhancement of the patent infringement damages awarded by the jury and the supplemental patent infringement damages awarded. The Court notes that 28 U.S.C. § 1961 permits, but does not compel, the application of post-judgment interest on punitive damages. See TruePosition Inc. v. Andrew Corp., 611 F. Supp. 2d 400, 413 n.15 (D. Del 2009). However, the Court in its discretion awards post-

3

judgment interest on the enhanced damages because "awarding post-judgment interest on exemplary damages is consistent with the purpose of post-judgment interest — compensation to a successful plaintiff for the intervening time between entitlement to and actual payment of an award of damages." Brown v. Petrolite Corp., 965 F. 2d 38, 51 (5th Cir. 1992). See also Creative Internet Advertising Corp. v. Yahoo! Inc., 689 F. Supp. 2d 858, 874 (E.D. Tex. 2010) (awarding post-judgment interest on enhanced patent infringement damages).

In addition, the Plaintiff is entitled to post-judgment interest pursuant to 28 U.S.C. § 1961 for any award of Metso's litigation costs. See Standard Havens Prods., Inc. v. Gencor Indus., Inc., 897 F.2d 511, 516 (Fed. Cir. 1990) (awarding "post-judgment interest on the two judgment awards and the costs at the statutory rate"); Devex Corp. v. Gen. Motors Corp., 749 F.2d 1020, 1026 (Fed. Cir. 1984) ("We agree with the Fifth Circuit that allowing interest on costs [in a patent infringement case] better serves the purpose of awarding this expense to the prevailing party by more nearly compensating it for the litigation expenses.").

The Court's Memorandum of Decision and Order, dated December 8, 2011 (Docket No. 688), is hereby amended to reflect this award of post-judgment interest pursuant to 28 U.S.C. § 1961.

**SO ORDERED.**

Dated: Central Islip, New York
December 28, 2011

        _/s/ Arthur D. Spatt_____
        ARTHUR D. SPATT
        United States District Judge

| STATE OF NEW YORK | ) | | **AFFIDAVIT OF SERVICE** |
|---|---|---|---|
| | ) | *ss.:* | **BY OVERNIGHT FEDERAL** |
| COUNTY OF NEW YORK | ) | | **EXPRESS NEXT DAY AIR** |

EDWARD T. O'CONNEL
99-100 Broadway Apt.#2W
ELMWOOD PARK, NJ 07407 , being duly sworn, depose and say that deponent is not a
party to the action, is over 18 years of age and resides at the address shown above or at

On August 2, 2012

deponent served the within: **Brief for Defendant-Appellant Terex Corporation**

**Upon:**

**Michael C. Stuart**
**Cozen O'Connor**
**277 Park Avenue**
**New York, NY 10172**

**Jon R. Trembath**
**Merchant & Gould, P.C.**
**1050 17th Street, Suite 1950**
**Denver, CO 80265-0100**

the address(es) designated by said attorney(s) for that purpose by depositing **2** true
copy(ies) of same, enclosed in a properly addressed wrapper in an Overnight Next Day
Air Federal Express Official Depository, under the exclusive custody and care of Federal
Express, within the State of New York.

Unless otherwise noted, 12 copies have been have been sent to the court on the same date
as above for filing via Federal Express.

**Sworn to before me on August 2, 2012**

**Mariana Braylovskaya**
Notary Public State of New York
No. 01BR6004935
Qualified in Richmond County
Commission Expires March 30, 2014

**Job #  242971**

# CERTIFICATE OF COMPLIANCE
## PURSUANT TO FEDERAL CIRCUIT RULE 32

Certificate of Compliance with Type Volume Limitation, Typeface Requirements, and Type Style Requirements:

1. This brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   - this brief contains 8,744 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b)

2. This brief complies with the typeface requirements of the Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   - this brief has been prepared in a proportionally spaced typeface, using Microsoft Office Word 2003 in 14 Times New Roman font.

Dated: August 2, 2012

BRYAN CAVE LLP

By: _____
    Vincent Alfieri
    Michael G. Biggers
    Joseph Richetti
    1290 Avenue of Americas
    New York, New York 10104
    (212) 541-2000

*Attorneys for Defendant-Appellant*
*Terex Corporation*