

**USFC2011-1572-04**
{1F7E0C07-875E-4121-8932-EC61974055E2}
{118244}{54-121119:113507}{101812}

# REPLY BRIEF

Nos. 2011-1572, 2012-1168, 2012-1169

# United States Court of Appeals for the Federal Circuit

METSO MINERALS, INC.,

*Plaintiff-Appellee,*



v.

POWERSCREEN INTERNATIONAL DISTRIBUTION LIMITED
(NOW KNOWN AS TEREX GB LIMITED), POWERSCREEN NEW YORK, INC. AND
EMERALD EQUIPMENT SYSTEMS, INC.,

AND

TEREX CORPORATION,

*Defendants-Appellants.*

Appeals from the United States District Court for the Eastern District of
New York in Case No. 06-CV-1446, Senior Judge Arthur D. Spatt

## RESPONSE BRIEF OF
## PLAINTIFF-APPELLEE METSO MINERALS, INC.

Michael C. Stuart
Lisa A. Ferrari
Marilyn Neiman
COZEN O'CONNOR
277 Park Avenue
New York, New York 10172
212-883-4900

October 18, 2012                    Attorneys for Plaintiff-Appellee
                                    METSO MINERALS, INC.

## CERTIFICATE OF INTEREST

Counsel for appellee, Metso Minerals, Inc., certifies the following:

1.    The full name of every party or amicus represented by me is:

METSO MINERALS, INC.

2.    The name of the real party in interest represented by me is:

METSO MINERALS, INC.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

METSO CORPORATION

4.    The names of all law firms and the attorneys, partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

COZEN O'CONNOR
COHEN PONTANI LIEBERMAN & PAVANE LLP
Michael C. Stuart
Lisa A. Ferrari
Marilyn Neiman
Teodor J. Holmberg

October 18, 2012

Michael C. Stuart

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iv

STATEMENT OF RELATED CASES ........................................ 1

STATEMENT OF THE ISSUES .................................................. 2

STATEMENT OF THE CASE .................................................... 3

SUMMARY OF THE ARGUMENT ........................................ 15

ARGUMENT ................................................................................ 17

I.    Claim Construction ............................................................ 17

    A.    "Mobile, Road Hauled" ........................................ 17

    B.    "Chassis" ................................................................. 19

    C.    "Wheel Mounted Chassis" ................................... 28

II.    Infringement ....................................................................... 31

    A.    "Wheel Mounted" Chassis ................................... 33

        i)    Literal Infringement ................................... 35

        ii)    Equivalents Infringement ........................... 38

    B.    "Not Project Laterally Beyond" ......................... 40

        i)    Literal Infringement ................................... 40

        ii)    Equivalents Infringement ........................... 41

    C.    Claim Vitiation Does Not Apply ......................... 43

III.    Non-Obviousness ............................................................... 44

    A.    The "Fully Functional" Jury Instruction Was Correct; If Not, No "Prejudicial Effect" ................... 44

    B.    The '618 Patent Is Not Obvious ......................... 46

    C.    The Jury's Verdict Must Stand ........................... 49

IV.    Willful Infringement ......................................................... 50

    A.    Objective Prong Decided By Court, Not Jury ......... 50

    B.    The District Court Ruled Correctly On Objective Willfulness ............................................ 51

**V.  The District Court Correctly Refused To Dismiss Terex Corporation** ...................................................................54

    **A.  Terex Waived Its Defense**...........................................54

    **B.  Overwhelming Evidence Establishes That Terex Infringed**...............................................................56

        **i)  Terex's Direct Infringement**.........................56

        **ii)  Terex Infringed Through Its Agent, Powerscreen** ..................................................59

        **iii)  Terex's Domination And Control Over Powerscreen** ..................................................60

        **iv)  Terex Induced Infringement**.........................65

    **C.  The District Court Properly Concluded That Terex And Powerscreen Were Alter Egos** ...............67

**CONCLUSION**...............................................................................70

# TABLE OF AUTHORITIES

## Cases

*A.Stucki Co. v. Worthington Indus.*, 849 F.2d 593 (Fed.Cir. 1988) ......... 56, 60, 61, 65

*Abraxis Bioscience, Inc. v. Mayne Pharma*, 467 F.3d 1370 (Fed. Cir. 2006)...............................................................................................30

*Akamai Tech., Inc. v. Limelight Networks, Inc.*, __F.3d__, 2012 WL 3764695 (Fed. Cir. 8/31/2012) .................................................56, 59, 66

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313 (Fed. Cir. 2003)...............................................................................................20

*AMW Materials Testing, Inc. v. Town of Babylon*, 584 F.3d 436 (2d Cir. 2009)...............................................................................................69

*Andujar v. Sears Roebuck & Co.*, 193 A.D.2d 415 (N.Y.A.D. 1993) .......................60

*Bangor Punta Operations, Inc. v. Bangor & A.R. Co.*, 417 U.S. 703 (1974) ...............................................................................................67

*Bard Peripheral Vascular v. W.L.Gore & Assoc.*, 682 F.2d 1003 (Fed. Cir. 2012) ...............................................................................................50

*Beckman Inst. v. LKB Produkter A.B.*, 892 F.2d 1547 (Fed. Cir. 1989).....................45

*BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565 (Fed. Cir. 1995)....................60

*Blair v. Infineon Tech. AG*, 720 F.Supp.2d 462 (D.Del. 2010)...................................67

*Branch v. U.S.*, 69 F.3d 1571 (Fed. Cir. 1995).............................................................61

*Broadcom Corp. v. Qualcom Inc.*, 543 F.3d 683 (Fed. Cir. 2008) .......................26, 66

*C.R.Bard Inc. v. Guidant Corp.*, 997 F.Supp. 556 (D.Del. 1998)...............................60

*Cephalon, Inc. v. Watson Pharm., Inc.* 629 F.Supp.2d 338 (D.Del. 2009)...............................................................................................59

*Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry*, 494 U.S. 558 (1990) ...............................................................................................67

*Concerned Area Residents v. Southview Farm*, 34 F.3d 114 (2d Cir. 1994)........................................................................................34, 49, 69

*Conoco, Inc. v. Energy & Envtl. Int'l*, 460 F.3d 1349 (Fed. Cir. 2006)...............26, 31

*Cordis Corp. v. Medtronic AVE Inc.*, 511 F.3d 1157 (Fed. Cir. 2008).......................24

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (*en banc*) ................................................................................................ 17

*Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314 (Fed. Cir. 2009) ....................................................................................... 49

*Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098 (Fed. Cir. 2003) ............... 38, 46

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309 (Fed. Cir. 1998) ........................................................................................... 44

*Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009) ................. 34

*First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.*, 2012 U.S.Dist.Lexis 67872 (E.D.N.Y. 5/15/2012) ................................. 68

*Fletcher v. Atex, Inc.*, 68 F.3d 1451 (2d Cir. 1995) ....................................... 65

*Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350 (Fed. Cir. 2005) ........................................................................................ 44

*Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573 (Fed. Cir. 1997) ............................................................................................ 49

*Glaxo, Inc. v. TorPharm, Inc.*, 153 F.3d 1366 (Fed. Cir. 1998) ......................... 56

*Gordon v. NYC Bd. of Ed.*, 232 F.3d 111 (2d Cir. 2000) ................................... 44

*Graham v. John Deere Co.*, 383 U.S. 1 (1966) ................................................. 48

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605 (1950) ................... 41

*Highland Capital Mgmt. v. Schneider*, 607 F.3d 322 (2d Cir. 2010) .................... 34, 69

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982 (Fed. Cir. 2007) ........................................................................................ 54

*Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337 (Fed. Cir. 2008) ........................................................................................ 30

*IFSC v. Chromas Tech. Canada, Inc.*, 356 F.3d 731 (7th Cir. 2004) ................... 67, 68

*IGT v. Global Gaming Tech., Inc.*, 1999 U.S.App.Lexis 13336 (Fed. Cir. 1997) (unpublished) ........................................................................ 45

*IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422 (Fed. Cir. 2000) ........................................................................................... 17

*In re Seagate Technology*, 497 F.3d 1360 (Fed. Cir. 2007) (*en banc*) ................... 50

*KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444 (Fed. Cir. 1993) ........................................................................................ 45

*Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*, 554 F.3d 1010 (Fed. Cir. 2009) ..................................................................68

*Kinzenbaw v. Deere & Co.*, 741 F.2d 383 (Fed. Cir. 1984) ........................................30

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) ....................................47

*Laryngeal Mask Co. v. Ambu A/S*, 618 F.3d 1367 (Fed. Cir. 2010) ...........................31

*Leader Tech., Inc. v. Facebook, Inc.*, 678 F.3d 1300 (Fed. Cir. 2012) ......................69

*Lindemann Masch. GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452 (Fed. Cir. 1984) ................................................................49

*Lockhard v. Pizza Hut, Inc.*, 162 F.3d 1062 (10th Cir. 1998) ....................................66

*Luciano v. Olsten Corp.*, 110 F.3d 210 (2d Cir. 1997) ...............................................68

*Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544 (Fed. Cir. 1990) ..........................................................................66, 67

*Marine Polymer Tech., Inc. v. HemCon, Inc.*, 672 F.3d 1350 (Fed. Cir. 2012) ............................................................................56

*Markman v. Westview Instr.*, 52 F.3d 967 (Fed. Cir. 1995) (*en banc*) .................20, 29

*MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323 (Fed. Cir. 2007) ............................................................................22

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369 (Fed. Cir. 2005) .......................................................58

*Metabolite Labs, Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354 (Fed. Cir. 2004) ..........................................................................66

*Milgo Elec. Corp. v. United Business Comm'ns, Inc.*, 623 F.2d 645 (10th Cir. 1980) ............................................................................65

*Mobil Oil Corp. v. Linear Films, Inc.*, 718 F.Supp. 260 (D.Del. 1989) ....................61

*Modine Mfg. Co. v. USITC*, 75 F.3d 1545 (Fed. Cir. 1996) ........................................23

*NTP Inc. v. RIM*, 418 F.3d 1282 (Fed. Cir. 2005) ...........................................26, 44, 46

*Ortho-McNeil Pharm. v. Mylan Labs*, 520 F.3d 1358 (Fed. Cir. 2008) ....................49

*Pandrol USA, LP v. Airboss Railway Products, Inc.*, 320 F.3d 1354 (Fed. Cir. 2003) .........................................................................55, 56

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).... 18, 20, 23, 29, 30

*Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.*, 842 F.2d 1466 (3d Cir. 1988) .....................................................................59, 60, 61

*Piesco v. Koch*, 12 F.3d 332 (2d Cir. 1993)...........................................................38, 46

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133 (2000) .................................34, 69

*Rolls-Royce v. United Tech. Corp.*, 603 F.3d 1325 (Fed. Cir. 2010)....................47, 49

*Rowe Int'l Corp. v. Ecast, Inc.*, 586 F.Supp.2d 924 (N.D.Ill. 2008)...........................58

*Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 98 F.3d 1318 (Fed. Cir. 1996) ..............................................................................................................45

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613 (Fed. Cir. 1985)...........................................................................................................45

*Siegel v. Warner Bros. Enter., Inc.*, 581 F.Supp.2d 1067 (C.D.Cal. 2008)...........................................................................................................................68

*Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363 (2d Cir. 1988) .............................34

*Soroof Trading Devel. Co. v. GE Fuel Cell Sys.*, 842 F.Supp.2d 502 (S.D.N.Y. 2012) ....................................................................................................68

*Spine Solutions v. Medtronic Sofamor Danek*, 620 F.2d 1305 (Fed. Cir. 2010)...........................................................................................................................50

*SRI Int'l, Inc. v. Internet Security Sys., Inc.*, 647 F.Supp.2d 323 (D.Del. 2009), *aff'd*, 401 Fed.Appx. 530 (Fed. Cir. 2010) .......................................................56

*Sykes v. Mel Harris & Assoc.*, 757 F.Supp.2d 413 (S.D.N.Y. 2010).........................60

*Symantec Corp. v. Computer Assoc. Int'l., Inc.*, 522 F.3d 1279 (Fed. Cir. 2008) ...........................................................................................................17, 18

*Takeda Chem. Indus. v. Alphapharm PTY*, 492 F.3d 1350 (Fed. Cir. 2007)...........................................................................................................................47

*Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353 (Fed. Cir. 1999)...........................................................................................................................49

*Tegal Corp. v. Tokyo Electron Co. Ltd.*, 248 F.3d 1376 (Fed. Cir. 2001) ............60, 61

*Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276 (Fed. Cir. 2011)...........................................................................................................................53

*This Is Me, Inc. v. Taylor*, 157 F.3d 139 (2d Cir. 1998)..............................................34

*Trading Tech., Int'l., Inc. v. eSpeed, Inc.*, 595 F.3d 1340 (Fed. Cir. 2010)...........................................................................................................................44

*Tull v. U.S.*, 481 U.S. 412 (1987).................................................................................67

*U.S. v. Golden Acres, Inc.*, 684 F.Supp. 96 (D.Del. 1988).........................................67

*Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007) ..............................................................................22

*Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)......................22

*Wang Labs v. AoL, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999) ............................................23

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997) ..............30, 41

*Williams v. County of Westchester*, 171 F.3d 98 (2d Cir. 1999)..................................35

*Wm. Passalacqua Builders, Inc. v. Resnick Devel., Inc.*, 933 F.2d 131 (2d Cir. 1991) ................................................................................67, 68

*Woodrow Woods & Marine Exhaust Sys., Inc. v. Deangelo Marine Exhaust, Inc.*, __F.3d__, 2012 U.S.App.Lexis 18227 (Fed. Cir. 8/28/2012) ..................................................................................55

*Wordtech Sys. Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308 (Fed. Cir. 2010)....................................................................69

**Statutes**

35 U.S.C. §102(b)...........................................................................................45

35 U.S.C. §271 ...............................................................................56, 58, 65

35 U.S.C. §282 ...................................................................................54, 55

**Rules**

Federal Circuit Rule 47.5 ....................................................................... 1

**Treatises**

Restatement (Second) Of Torts § 400 (1965)............................................60

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, there have been no previous appeals of this action in this Court or any other appellate court, and there is no other case known to be pending in this or in any other court that will directly affect or be directly affected by the Court's decision in this appeal.

# STATEMENT OF THE ISSUES

Whether the district court correctly construed "chassis", "wheel mounted chassis" and "mobile, road-hauled" in claim 1 of Metso's U.S. Patent No. 5,577,618 ("the '618 patent")?

Whether the district court correctly refused to overturn the jury's verdict of patent infringement?

Whether the district court's jury instruction was correct on obviousness that defendants had to prove that certain prior art machines had to be fully operational and functional with respect to the manner that defendants alleged was pertinent to the claims of the '618 patent, and, if that instruction was not correct, whether that error had any prejudicial effect on the jury's verdict of non-obviousness in view of defendants' failure of proof?

Whether the district court was correct in its jury instruction on willful infringement and in its post-trial ruling that defendants infringed despite an objectively high likelihood that their actions constituted infringement of a valid patent where defendants' defenses were not "reasonable"?

Whether the district court was correct in ruling prior to jury submission that Powerscreen International Distribution Ltd. ("Powerscreen") and its parent, Terex Corporation ("Terex"), should be treated as a single entity for the jury's infringement verdict?

2

## STATEMENT OF THE CASE

Published district court decisions:

| | |
|---|---|
| 681 F.Supp.2d 309 | JA0007668-722 |
| 722 F.Supp.2d 316 | JA0007783-99 |
| 788 F.Supp.2d 71 | JA0000005-17 |
| 833 F.Supp.2d 282 | JA0012921-91 |
| 833 F.Supp.2d 321 | JA0012992-3008 |
| 833 F.Supp.2d 333 | JA0013009-47 |

The district court's decision of July 9, 2012 (JA0007783-99) reversed one aspect of partial summary judgment and granted further aspects.

During discovery, Terex never disclosed its defense that it was not an infringer because it was allegedly merely an absentee stockholder. Instead, Terex waited until the close of Metso's case during trial for this disclosure as a motion for JMOL. (JA0015721-30). After briefing (JA0027946-63, JA0027964-72, JA0027973-90) and oral argument (JA0017584-605), the district court ruled that Terex and Powerscreen should be treated as a single party for an infringement determination (JA0017605-7), and so instructed the jury. (JA0018289). Terex's subsequently renewed JMOL motion and motion for new trial (JA0010450.1-.2) were denied. (JA0012971-6).

## STATEMENT OF THE FACTS

This patent infringement case involves industrial machines, called "screeners", used to sort aggregate material into piles of similarly-sized material. There are three types of screeners: (1) large complex facilities permanently affixed to a foundation, typically assembled on site; (2) screeners on support legs that can be loaded onto a truck; and (3) screeners that fold and unfold and can be transported along a road -- for a tire-mounted screener by pulling it with a truck; for a track-mounted screener by mounting a tire-mounted "bogie" under the chassis and pulling it with a truck, or by driving the screener onto a truck-pulled trailer. (JA0013198, JA0013204-6, JA0013208, JA0013242-4, JA0000584-5, JA0021385, JA0001452, JA0026787-8, JA0026806). The '618 patent relates to the third type.

Metso's '618 patent (JA0000035-49) is directed to a mobile aggregate material processing plant with two lateral conveyors and one longitudinal conveyor to separate the aggregate input material into three different sizes. The machine can assume an "operative position" and a "transport position". Simplified side and end views of a preferred embodiment in the operative position are in FIGS. 1 and 2:

4



A backhoe or other machine deposits the input material into hopper 5. Grid bars 5a cause oversized stones to fall alongside. Material passing between the grid bars falls onto upwardly-sloped central conveyors 6, 7 to fall into a vibrating screen box 8 containing two spaced-apart screens of different grid sizes -- the coarsest screen at the top. As shown in orange, large stones are blocked by the coarsest screen and fall onto a first upwardly-sloped output lateral conveyor 20 and form a first pile 23. As shown in blue, smaller stones pass through the first screen, are blocked by the second screen, and fall onto a second upwardly-sloped output lateral conveyor 20 to form a second pile. As shown in green, dirt passes through both screens, falls onto an upwardly-sloping longitudinal conveyor 11 to form a third pile. The three conveyors extend upward and outward so that piles of material are separate and displaced from

5

the screener. (JA0013221-5, JA0026152). The two lateral conveyors 20 extend laterally, much like wings of an airplane. (JA0000046 (4:29-49)). Commercial embodiments of these screeners with their two lateral wing conveyors extended have a "wing span" of about 50 to 60 feet and are about 20 to 25 feet high. (JA0013248-9). Due to their cost (from $100,000 to $400,000 (JA0013511, JA0026267.1)), customers want to transport them on regular roads for use at different worksites. Ease and speed of setting up and taking down the machine are important. (JA0000045 (2:13-18, 2:28-30); JA0013725-6). These screeners cannot travel on roads unless the lateral conveyors are removed, folded, or retracted in some way so that they do not extend into other lanes of traffic, as one could not pull an airplane on a road with its projecting wings.

In their transport position, each lateral conveyor is folded twice, forming a first fixed "tail" section 40, a second pivoting "tail" section 41 pivoted and folded upward relative to the first section vertically against the side of the screener, and a third "head" section 22 pivoted longitudinally relative to the second section horizontally along the screener's length and side but, importantly, above most of the components of the screener including the entire control panel, and the diesel engine that powers and folds the conveyors. The folded second and third sections form an **L** on its side:



FIGS. 4 and 5 show that the pivoting part of the tail section 41 and the head section 22 of each folded lateral conveyor extend over the tires 3(a) and wheel arches 33 but do not extend, stick out or project beyond the outer-most edge of the tires 3(a), the wheel arches 33, or any other part of the screener:



Commercial embodiments of these folded screeners are 45 or more feet long, 9 or more feet wide, and 10 or more feet high. (JA0020235-8).

The '618 patent refers to six patents and discloses that for transport, the lateral conveyors of prior mobile plants were detached from the plant and then lifted by a loader onto upper support brackets mounted above the plant. (JA0000045 (1:32-42)). Alternately, each lateral conveyor was folded once so that the entire lateral conveyor

was stored along the length of the screener (JA0000045 (1:43–2:11), as shown in FIG. 3 of two patents issued to Eriksson of defendant Powerscreen (JA0020906-22, JA0019798-805). In the Powerscreen-Eriksson single-fold design, the length of the screener limited the length of the lateral conveyor (JA0000045 (1:49-52)), and the folded lateral conveyor obstructed access during an engine failure to a number of controls and to the diesel engine that powers and folds the conveyors. (JA0013726-30, JA0026253-9). The combined thicknesses of the two folded lateral conveyors alongside the central conveyor added to the over-all width of the machine, thus restricting the width of the central conveyor to meet vehicle width restrictions for road travel. (JA000045 (2:62-67), JA0013728).

The double-fold, **L** design of the '618 patent has advantages. Compared with the single-fold, Powerscreen-Eriksson design, the double-fold **L** design results in a much longer lateral conveyor:



Consequently, the end of the unfolded lateral conveyor is higher, allowing a taller and larger pile of screened material further away from the screener, reducing the frequency of screener shut-downs for product removal, and increasing productivity.

(JA0013250, JA0013725-6). Because the double-folded lateral conveyors are against and over the screener, they do not obstruct access to the controls or diesel engine during engine failure (JA0013301), and they allow the width of the central conveyor to increase from about 36" to about 48" while maintaining an acceptable overall screener width. (JA0000045 (1:53-58, 2:22-27, 2:62-67)). Increasing the central conveyor's width by 33% (i.e., from 36" to 48") results in an unexpected advantageous increase in the central conveyor's throughput of about 77% (JA0013300, JA0013723-4, JA0013728-9, JA0003417-9, JA0003615-6, JA0026712). The screener can be set up and taken down in 15 minutes or less with no disassembly, thereby reducing down time, and increasing productivity. (JA0013723, JA0013300).

Powerscreen, a Northern Ireland company, was the world-wide market leader in the mobile screener market at the time of the conception of the invention. (JA0026740-1). Powerscreen had been operating for 35 years and had developed many conveyor folding mechanisms (PSB 10)[1], and used its single-fold Eriksson design exclusively for its mobile screening machines for 10 years before copying the double-fold, **L** design of the '618 patent. (JA0013792-3, JA0013714-8, JA0013572-3, JA0026253-9). Powerscreen failed to preconceive of the double-fold, **L** design despite being the market leader and, as such, certainly aware of the Dominator

---

[1]    "PSB #" refers to page # of the PowerScreen Brief.

screener and the Masterstock conveyor (JA0016310, JA0016340), the two prior art machines relied upon by defendants in their obviousness defense.    When MastersKreen, a small Northern Ireland company later acquired by Metso, introduced its Senator screener, the first screener covered by the '618 patent, Powerscreen was losing its dominance in the mobile screener market to its main competitor, Extec. (JA0026760-1).    In response, from 1998 to 1999, Powerscreen redesigned its mobile screener line of machines (JA0015764-5, JA0026740-1), which included, for the first time, selling its mobile screeners on tracks rather than only on tires (JA0016181-2), copying Extec, which had recently introduced track-mounted screeners. (JA0015877-8).    When the priority application for the '618 patent was filed in 1993, all mobile screeners were mounted on a tire-mounted chassis; no screeners were mounted on a track-mounted chassis until the mid-1990's. (JA0013946-7, JA002761-2, JA0015805, JA0000089, JA00046671).    During Powerscreen's redesign, and by June 16, 1998, Powerscreen was aware of the Senator screener and the '618 patent (JA0015765, JA0020148), but viewed MastersKreen as an insignificant competitor. (JA0026742, JA0015827-8).    The district court found that defendants "evinced ostrich-like, head-in-the-sand behavior" in "willfully and deliberately cop[ying] the '618 patent". (JA0013014). There was no evidence that when defendants began their U.S. infringement in March 2000 that they had any belief that the '618 patent was invalid for any reason. (JA0013780).

Even a track-mounted chassis has "wheels", as defendants' employees admitted (JA0015960-3, JA0026724-5), as Powerscreen's operator's manuals admit ("Tracks – The beams, shapes, or formed section on which trolleys, rollers, shoes, or wheels roll or slide while propelled" (JA0025304, JA0025545, JA0025809)), as demonstrated by 61 U.S. patents from 1900 to 2007 (JA0000086-8, JA0000734-1342, JA0000553-70), and as testified to by Metso's technical expert, Stephen Whyte. (JA0015378-82, JA0021090). A track-mounted screener is typically used in places where the ground is uneven or muddy. (JA0016649-50). The machine lays down an endless track belt on the uneven or muddy surface to create a flat, even, stable and hard surface. The wheels mounted to the machine's chassis within the track belt support the weight of the screener and roll along the flat surface created by the track belt. The track belt is pulled up and then laid down again ahead of the wheels as the machine moves along the ground. (JA0015378-82, JA0016850, JA0013422-30, JA0021037). Track-mounted machines are thus wheel-mounted vehicles which roll upon tracks that are laid on the ground.

Powerscreen sold 1,271 infringing mobile screeners in the United States (JA0015215-9, JA0026267.1), in 11 different models (JA0000001, JA0020923-1183), using the double-fold, **L** design of the '618 patent from March 2000 to October 2007 (the close of fact discovery), for revenues of $158.7 million. JA0015215-9, JA0026267.1). Metso sold 365 screening machines in the United

States (JA0017445), in 10 different models (JA0021219-21369), using the double-fold, **L** design of the '618 patent, from March 2000 to October 2007, for revenues of $43.5 million. (JA0017445).

The Dominator screener and the Masterstock conveyor were cumulative of prior art considered by the U.S. Patent Office during the prosecution of the '618 patent. (JA0013004-5). There was no motivation to select either the Dominator screener or the Masterstock conveyor as a starting point for development from among the 50 other possible starting points (JA0016857-80, JA0016904-9, JA002748-922, JA0021434-59, JA0024999-5011, JA0026253-9, JA0018834-8, JA0018959-9025, JA0019637-69, JA0019745-828, JA0018805, JA0018645). The Dominator screener had no design problems. (JA0016909-14). There was no motivation or reason to combine the Dominator screener and Masterstock conveyor as defendants do without using hindsight. (JA0016904-6, JA0016909, JA0016917-8, JA0016930-2). If these machines were combined (after portions of the Masterstock conveyor are removed (JA0016916-8)), the invention would not result since there was no reason, suggestion or disclosure to keep the Masterstock conveyor unfolded at a 90° angle (i.e., in an **L** configuration) while being transported on a road. (JA0016918-23, JA0016929-30). There were also other ways to fold a lateral conveyor other than by using the '618 patent's **L** configuration. (JA0016914-6, JA0016925-34, JA0019798-805, JA0021187,

12

JA0026416, JA0020768-78, JA0019637-41, JA0021434-40, JA0003586). Non-obviousness is also established by the secondary considerations of failure of others and copying by others (Powerscreen Extec, Keestrack, Fintec and McClusky) (JA0016906-8, JA0013014, JA0015964-84, JA0016184-5, JA0016746-7, JA0021410, JA0021414, JA0021415-6, JA0021426, JA0021433, JA0026263, JA0026267), the commercial success of defendants and Metso (JA0017445-6, JA0015215-9, JAJA0026267.7, JA0017445), and the new and unexpected result of enabling dramatically higher product output and longer lateral conveyors. (JA0013250, JA0013723-9, JA0013300, JA0003417-9, JA0003615-6).

Terex acquired Powerscreen in 1999. (JA0016119-20). Terex organized Powerscreen, along with other similar businesses, into Terex's "Earth Moving" division, then the "Terex Construction" division, and then "Materials Processing." (JA0016120-1, JA0016123, JA0016126-7). In August, 2000, Terex appointed its Vice President, Kieran Hegarty, as General Manager of Powerscreen.

Terex and Powerscreen jointly manufactured, marketed and sold the infringing screeners, displaying "Terex" on the infringing screeners, in user manuals (on every single page), on its website, in SEC filings, at trade shows, on invoices, and in marketing materials that "Terex" manufactured and sold infringing screeners. (JA0020942, JA0020983, JA0021004, JA0021023, JA0021058, JA0021100, JA0021114, JA0021136, JA0021166, JA0021184, JA0025534, JA0020342,

JA0025012, JA0025798, JA0019104, JA0024960-98, JA0021568, JA0023693, JA0024225, JA0024229, JA0015987-90, JA0020270-341, JA0026394-9, JA0021374-407, JA0024959).    Terex offered financing to purchasers of the infringing screeners. (JA0016161).  Terex consolidated the Powerscreen dealership in the U.S. (JA0014390-2), and shortly before trial, changed Powerscreen's name to Terex GB without informing Metso's counsel. (JA0016165, JA0027991-9).

## SUMMARY OF THE ARGUMENT

The district court's construction of "chassis" is supported by the specification and drawings of the '618 patent and by the understanding of persons of ordinary skill, evidenced by prior art documents, defendants' documents, and expert testimony. Defendants' construction as being limited to "longitudinal beams" ignores the text of the '618 patent, its drawings and its file history and would exclude from claim coverage the only disclosed preferred embodiment. The district court's construction of "wheel mounted chassis" is supported by the understanding of persons of ordinary skill evidenced by 61 prior U.S. patents, defendants' documents, and expert testimony. The claim preamble's "mobile, road-hauled" phrase is not limiting.

The jury's verdict and the district court's finding of infringement is supported by overwhelming, uncontradicted evidence, especially since defendants had no defense to equivalents infringement.

The district court's obviousness jury instruction correctly stated that defendants had to prove that certain prior art machines had to be fully operational and functional with respect to the manner that defendants alleged was pertinent to the claims of the '618 patent, but, if incorrect, there was no prejudicial effect on the jury's verdict of non-obviousness in view of defendants' failure of proof on all of the obviousness factors.

The district court's willful infringement instruction was correct, especially since objective recklessness is not a jury issue. The district court's ruling on willfulness correctly found that defendants' defenses were not "reasonable" and did not raise a "substantial question" of non-infringement or invalidity -- the case was "not a close call".

Terex waived its defense of no liability by failing to disclose or assert it until mid-trial. The district court correctly instructed the jury to treat Powerscreen and Terex as a single entity for the jury's infringement verdict because there was overwhelming evidence of Terex's infringement directly and through its agent, Powerscreen, Terex's dominance and control of Powerscreen, Terex's induced infringement, and Powerscreen's and Terex's being alter egos.

## ARGUMENT

### I.    Claim Construction

Defendants challenge the district court's construction of the claim terms "chassis" (PSB 30-51), and "wheel" (PSB 51-59), and criticize the construction of "mobile, road hauled" as rendering "wheel" meaningless (PSB 26, 51, 52 n.4, 58, 83). The district court's claim construction is a question of law, reviewed *de novo*. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (*en banc*).

### A.    "Mobile, Road Hauled"

The "mobile, road-hauled" phrase in the preamble of claim 1 is not a separate limitation and has no limiting effect as a whole because the phrase merely states a purpose or intended use for the claimed invention, while the remainder of the claim describes a structurally complete invention. *Symantec Corp. v. Computer Assoc. Int'l., Inc.*, 522 F.3d 1279, 1288-9 (Fed. Cir. 2008); *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000). The district court agreed, construing "mobile, road hauled" as "capable of being hauled over long distances on a road, with or without other devices", noting that "in the context of the entire patent, the term 'mobile' refers to the plant's capability to be moved over large distances. It is sufficiently clear to the Court that the essence of the invention was to create a screening plant that [can] be moved among sites that are miles apart, and that the term 'mobile' refers to this quality." (JA0007679, see JA0000045-6 (1:22-29, 2:12-18, 2:67–3:5).

17

Neither claim 1 nor the specification of the '618 patent provides any special definition of "mobile", so "mobile" must have its ordinary meaning, and "extrinsic evidence", such as dictionaries, expert testimony, and learned treatises can be used to construe the claim term. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-3, 1317 (Fed. Cir. 2005) (*en banc*). Any dictionary defines "mobile" as "capable of moving or of being moved from place to place". (JA0000540-2; JA0000545-48). This definition conforms to six prior art patent examples of "mobile" machines referred to in the '618 patent (JA0000045 (1:32-2:19), JA0020889-905, JA0020906-22, JA0000482-6, JA0020881-8, JA0000461-9, JA0020867-71). As to the "road-hauled" element, neither claim 1 nor the specification provides any definition. However, the '618 patent refers (JA0000045 (1:7-11)) to two prior art patents as disclosing "mobile, road-hauled" machines. (JA0020783-90, JA0020791-8).

Citing to nothing in the '618 patent or its file history that indicates that "mobile, road hauled" should be construed as a separate limitation, defendants merely argue (PSB 26, 51, 52 n.4, 58, 83) that "mobile, road hauled" is "superfluous" as being duplicative of and vitiating the "wheel mounted chassis" phrase in the body of claim 1. Defendants' argument merely demonstrates that "mobile, road hauled" "gives context for what is being described in the body of the claim" as "merely duplicative of the limitations in the body of the claim" and therefore cannot be construed as a claim limitation. *Symantec*, 522 F.3d at 1288-9. Additionally, there

18

are two types of screeners that qualify as "mobile, road hauled": (1) screeners on support legs that can be loaded onto a truck; and (2) screeners that fold and unfold and can be transported along a road, either by pulling the screener by a truck, or by driving the screener onto a truck-pulled trailer. (JA0013198, JA0013204-6, JA0013208, JA0013242-4, JA0000584-5; JA0021385, JA0001452, JA0026787-8, JA0026806). This first type of screener has no "wheels", but is "mobile, road hauled". Thus, there are screeners that are "mobile, road hauled" which have no "wheels", making "mobile, road hauled" not duplicative of "wheel mounted chassis", as defendants contend.

### B. "Chassis"

The district court's construction of "chassis" is supported by the intrinsic and extrinsic evidence. The district court construed "chassis" as "the entire assembly of parts that rest beneath the plant support frame" and therefore includes more than the "longitudinal beams" and also includes the wheels and wheel arches. (JA0007683-4). Because the track assembly (including its tracks) is unquestionably located beneath the plant support frame and the functional parts of the screener, the district court appropriately instructed the jury that a "chassis" also included "the tracks and the assembly on which the tracks rotate and are mounted" (JA0018230), as Metso had proposed (JA0007817-8, JA0026622).

Claim 1 does not define "chassis", other than reciting that it is "wheel mounted". Defendants argue (PSB 31-6) that "chassis" should be construed as solely the "longitudinal beams". However, the <u>only</u> mention of "longitudinal beams" in the entire specification of the '618 patent is that the "chassis" <u>has</u> a pair of "longitudinal beams", <u>not</u> that the chassis <u>is solely</u> the "longitudinal beams":

> The plant 1 comprises a chassis 2 having a pair of longitudinal beams mounted on wheels 3(a) and supported on jack legs 3(b). (JA0000046 (3:46-8)).

Defendants ignore the remainder of the specification, the drawings, the claims, the file wrapper and the extrinsic evidence, even though "comprising" means that the named elements are essential, but other elements <u>may</u> be included. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1344-5 (Fed. Cir. 2003). The above passage states that "wheels" are part of a "chassis" and does not qualify as a patentee-lexicographer's "definition". If a patent describes only a single embodiment, the claims of the patent must not be construed as being limited to that embodiment because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments. *Phillips*, 415 F.3d at 1323.

When ascertaining the meaning of a patent's claims, the court must first look to the intrinsic evidence". *Markman v. Westview Instr.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*). The text of the '618 patent and its drawings demonstrate that

"chassis" was intended to include more than merely the "longitudinal beams":

> It will also be clear from FIGS. 3 to 5 that the lateral conveyors 20 are completely accommodated above the chassis and do not project laterally beyond it. ... Both lateral conveyors 20 are within both the lateral and height dimensions of the other parts of the plant and this provides for safety in addition to convenience and efficiency. For example, as is clear from FIG. 4, the lateral conveyors 22 do not project beyond the wheel arches 33. (JA0000047 (5:12-23)).

> As is clear from all three drawings [FIGS. 3-5], the lateral conveyors 20 each move to a transport position where they are within the lateral confines of the chassis 2 and do not protrude above the height of the hopper 5. (JA0000046 (4:58-61)).

These passages state that FIGS. 3, 4 and 5 show that the folded lateral conveyors lie above and do not project laterally beyond the "chassis", explaining that they do not project beyond the wheel arches. However, in FIG. 5 (below), the folded lateral conveyors 20 (which are comprised of a head section 22, a tail section 21, a pivoting part 41, and a pivot joint 42) clearly project laterally beyond the "longitudinal beams" (colored green), but not beyond the wheel arches 33 and the tires 3(a). FIG. 4 (below) similarly shows a folded lateral conveyor 20, 22, 21 projecting laterally beyond a "longitudinal beam", but not beyond the wheel arches 33 and tires 3(a).

21



longitudinal beams          *Fig.5*

longitudinal boom          *Fig.4*

Thus, according to the specification, the "chassis" must include more than merely the "longitudinal beams", and must also include at least the wheel arches 33 and the tires 3(a). (see also, JA0000045 (2:22-27), JA0000035, Abstract, lines 6-13).

Defendants' construction of "chassis" improperly excludes an embodiment disclosed in the specification and which the specification states meets the limitations of the claims.    A claim interpretation that excludes a preferred embodiment, or the only embodiment, is "rarely, if ever, correct". *Vitronics Corp. v. Conceptronics, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007); *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1305 (Fed. Cir. 2007).

Additionally, if "chassis" included only the "longitudinal beams", the '618 patent has no text or figure showing that the lateral conveyors should "not project laterally beyond" the "longitudinal beams", contrary to 37 C.F.R. §1.83(a). Because courts are to construe claims to preserve their validity, *Wang Labs v. AoL,*

*Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999); *Modine Mfg. Co. v. USITC*, 75 F.3d

1545, 1557 (Fed. Cir. 1996); *Phillips*, 415 F.3d at 1327, defendants' construction

of "chassis" would result in a lack of necessary support and is contrary to law.

Defendants argue (PSB 35) that FIGS. 4 and 5 "lack specificity" and "are

ambiguous", making it "not possible to evaluate whether the conveyor is

'projecting laterally beyond' anything." However, defendants' enlargement of

FIGS. 4 and 5 clarifies that the folded lateral conveyors <u>do</u> project laterally beyond

the "longitudinal beams" but <u>do not</u> project laterally beyond the tires and their

mudguards. In fact, the longitudinal beams cannot extend laterally outward to the

outer edge of the tires, as postulated (PSB 36) in the right side of defendants'

rendition of FIG. 5 because the longitudinal beams are shown in FIG. 4 as being

positioned inward of the tires -- there is no support in the '618 patent or its file

wrapper for this postulation.

There also is nothing in the file wrapper that defines "chassis" in any way

different than in the specification. In the single Amendment, applicant stated:

> Claims 1 and 12 are further amended to more clearly indicate what
> constitutes the operative and the transport position, the latter having
> no elements extending laterally of the chassis. <u>Preferred examples of
> the operative and transport positions are set forth in the specification
> and drawings.</u> (JA0000226) (emphasis supplied).

The file wrapper contains no disavowal or disclaimer that FIGS. 4 and 5 do <u>not</u>

show what claim 1 recites. *Cordis Corp. v. Medtronic AVE Inc.*, 511 F.3d 1157,

1177-8 (Fed. Cir. 2008) (an explanation of "what the claims already covered" is not a disclaimer).

Extrinsic evidence also supports the district court's construction. A person of ordinary skill in the pertinent art would have understood at the time the application for the '618 patent was filed that a "chassis" of a "mobile aggregate material processing plant", such as a screener, included more than the machine's longitudinal beams, and additionally included at least the tires and wheel assembly (a bogie), the support jack legs, the mud guards or wheel arches, the axles onto which the tires are mounted, and other fixed platforms that are mounted onto the lateral beams, the wheel assembly, and the wheel arches and the axles, as testified by Mr. Whyte. (JA0000083-4, JA0000081). One of the machines that defendants argue is prior art is the Dominator mobile screener which was made by the company owned by the '618 patent's inventor. A parts manual for the Dominator screener identifies the longitudinal beams ("Item 1") as a "chassis frame" and separately identifies the "wheel & tyres", "axle" and "jack leg" ("Item 5", "Item 2" and "Item 3", respectively), and all of these items are shown in the drawing entitled "FIG. 4 MAIN CONVEYOR & **CHASSIS**" (JA0007512-4):

24



**FIG. 4 MAIN CONVEYOR & CHASSIS**          File:dom\fig4

| PART No. | ITEM | DESCRIPTION | QTY | NOTE |
|----------|------|-------------|-----|------|
| 201 2101A | 1 | CHASSIS FRAME | 1 | |
| 201 2102 | 2 | AXLE | 1 | |
| 201 2103 | 3 | JACK LEG STRUT | 4 | |
| P25160 | 4 | PIN | 6 | |
| 201 2105 | 5 | WHEEL & TYRES COMPLETE | 4 | |
| 20 060 TW | 6 | BOLT, TAPERWASHER & LOCKNUT | 4 | |

Because the Dominator's "wheels & tyres" and "jack leg" are certainly not part of the upwardly-inclined "MAIN CONVEYOR" (labeled "84"), they must be part of the "CHASSIS".

U.S. Patent No. 4,997,135, from the file wrapper, indicates that the tires are part of a "chassis" and refers to a "mobile" machine as having a "chassis includ[ing] a frame mounted on wheels". (JA0020805-11 (2:60, 2:66-67)).

With respect to a tire-mounted screener, parts manuals for infringing Powerscreen screeners prepared by persons of ordinary skill refer to the tire or wheel assembly (including the tires), the support jack legs, the tire mud guards, the laterally extending fixed platforms, and the axles, among many other parts, as

being part of a "chassis" and, with respect to a track-mounted screener, defendants' parts manuals refer to the two tracks, the driven, guide and idler wheels, the frame, the roll-in bogie (including its tires, frames and mudguards), and the support jack legs, among many other parts, as being part of a "chassis". (JA0000083-6, JA0000587-713, JA0007683-4). Although these Powerscreen parts manuals were prepared after the issuance of the '618 patent, the district court ruled that defendants provided no evidence that an understanding as to what was a "chassis" "evolved after the '618 patent['s application] was prepared". (JA0007791). Mr. Whyte, who designed mobile screeners since 1993 when the application for the '618 patent was filed, confirmed that persons of ordinary skill in the screener art would have understood "chassis" as the district court construed it. (JA0000079-80, JA0000083-4).

Defendants argue (PSB 37-38) that the priority Irish patent application somehow relates to the construction of "chassis" or "project laterally beyond" in claim 1 of the '618 patent. Because this argument is presented here for the first time, it is waived and improper. *Broadcom Corp. v. Qualcom Inc.*, 543 F.3d 683, 694 (Fed. Cir. 2008); *Conoco, Inc. v. Energy & Envtl. Int'l*, 460 F.3d 1349, 1358-59 (Fed. Cir. 2006); *NTP Inc. v. RIM*, 418 F.3d 1282, 1296 (Fed. Cir. 2005). In any case, defendants fail to provide any legal authority that language in the Irish priority application should be imported into the '618 patent's claims, or how the "notice

26

function" as to the scope of a claim in a U.S. patent would be enhanced by resorting to an Irish patent application.

Defendants argue (PSB 34) that lead lines in some drawings of the '618 patent pointing to "longitudinal beams" should be completely effective, with nothing more, to limit construction of "chassis" to only the "longitudinal beams". However, these lead lines do not contradict, and are consistent with, the district court's construction that "chassis" includes the longitudinal beams, among other elements, and, in any event, these lines cannot repudiate the intrinsic and extrinsic evidence discussed above.

Defendants argue (PSB 30-1) that if "chassis" is construed to include the wheels that are mounted to the chassis, the claim terms "wheels" and "mounted" are "unnecessary", "superfluous" and "redundant". However, claim 1 recites that the chassis has wheels mounted to it; therefore, a "chassis" must include the "wheels" that are "mounted" to it because "mounted" is the linking word between the claim elements "chassis" and "wheels".

Defendants argue (PSB 59) that a track-mounted chassis is "significantly different" from a tire-mounted chassis and "they are not interchangeable". However, claim 1 does not describe the recited "chassis" other than reciting that it is "wheel mounted … extending in a longitudinal direction". The fact that later, commercial

27

embodiments of track-mounted chasses of screeners may be heavier and sturdier than tire-mounted chasses is irrelevant to the scope and infringement of claim 1.

The intrinsic evidence (the '618 patent and its file history) and extrinsic evidence (the Dominator screener parts manual, a prior art patent, the knowledge of persons of ordinary skill in the pertinent art, and the parts manuals of Powerscreen's infringing screeners) all support the district court's construction of "chassis".

### C.    "Wheel Mounted Chassis"

The district court's construction of "wheel" in "wheel mounted chassis" is well supported. The district court construed "wheel" as "a circular frame that has a hub at the center for attachment to or suspension from an axle, on which it revolves, and that serves to bear the weight of the screening plant" and "excludes wheels not used for bearing the plant's weight and moving it, but includes wheels that are not merely tire mounted". (JA0007686). The district court declined to limit "wheel" to "a wheel that is tire-mounted and rides directly on the road". (JA0007686).    Contrary to defendants' implication (PSB 52, 55-7), the district court did not hold that a track of a track-mounted screener qualifies as a "wheel" – to the contrary (JA 0007686), and the district court never instructed the jury that a track of the track-mounted screener qualifies as a "wheel" (JA0018230, JA0018232-4); however, the district court did

hold that it was possible for a track-mounted screener to have "wheels", and left that fact issue for the jury to decide. (JA0007709-10).

Claim 1 does not define "wheel", nor does the specification or file wrapper. With no pertinent intrinsic evidence, extrinsic evidence may be used, as the district court did, to determine how the claim term is understood by persons of ordinary skill. *Phillips*, 415 F.3d at 1317; *Markman*, 52 F.3d at 980. The district court relied upon certain definitions from Webster's Third New International Dictionary (1993), which the district court found to be pertinent to the '618 patent. That dictionary defines "wheel" as a "circular frame of metal, wood, or other hard material that may be solid, partly solid, or spoked and that has a hub at the center for attachment to or suspension from an axle on which it may revolve and bear a load; a circular framework often with cogs or teeth on the rim used to transmit or modify force and motion in machinery or a mechanical contrivance". (JA0000730-2). Uncontradicted expert testimony confirmed that, to those of ordinary skill, a "wheel" includes a rim on which a rubber tire is mounted, a sprocket wheel (both a driven wheel, and an non-driven or idler wheel) used on a tracked machine, and a guide or bogie wheel used on a tracked machine. (JA0000086-9). Sixty-one U.S. patents from 1900 to 2007 relating to track-mounted vehicles disclose that they have "wheels" in their track assemblies, and a "wheel mounted" chassis (JA0000086-8, JA0000734-1342, JA0000553-70), as so testified by Mr. Whyte. (JA0015378-82, JA0015404-13,

29

JA0021090).    Defendants' mobile screener documents, prepared by persons of ordinary skill in the art, state that track-mounted screeners have "wheels" – "tracks" are "the beams, shapes, or formed section on which trolleys, rollers, shoes, or **wheels** roll or slide while propelled". (JA0000089, JA0001344-54).    When the '618 patent's application was filed, all screeners were tire-mounted and none were track-mounted. It was not until later that track-mounted screeners were designed. (JA0013946-7, JA002761-2, JA0015805, JA0000089, JA00046671).    Thus, mounting a screener on a tracked chassis was after-developed technology, and the "wheel" limitation of claim 1 cannot be construed to exclude it. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 37 (1997); *Kinzenbaw v. Deere & Co.*, 741 F.2d 383, 389 (Fed. Cir. 1984); *Abraxis Bioscience, Inc. v. Mayne Pharma*, 467 F.3d 1370, 1382 (Fed. Cir. 2006).

Defendants' suggestion (PSB 51-8) to construe "wheel" and "wheel mounted chassis" as only including the wheels to which a tire is attached and as excluding the wheels which run on a track and are part of a track-mounted chassis improperly limits "wheel" to the disclosed embodiment in the '618 patent.    This Court has "repeatedly held that the fact that the specification describes only a single embodiment, standing alone, is insufficient to limit otherwise broad claim language." *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1345 (Fed. Cir. 2008); *Phillips*, 415 F.3d at 1323.    Additionally, the '618 patent's specification

does not "clearly indicate the patentee's intent to give [the disputed term] a unique meaning." *Laryngeal Mask Co. v. Ambu A/S*, 618 F.3d 1367, 1372 (Fed. Cir. 2010). Consequently, the district court was correct in construing "wheel" as including more than the tire-clad "wheels" disclosed as the preferred embodiment in the '618 patent but as also including "wheels" of a track-mounted screener, provided that they satisfy the other requirements of a "wheel", which the jury concluded, as a matter of fact, that they did, as discussed below.

Defendants argue (PSB 55-6) that "the prosecution history demonstrates that tracks are different from wheels". There is no evidence whatsoever of prosecution history estoppel by a narrowing amendment or by a clear, unmistakable surrender of subject matter in an argument to the patent examiner. *Conoco,* 460 F.3d at 1363-4. Although the district agreed that tracks are not "wheels" (JA0007686), defendants miss the point -- a track-mounted chassis has "wheels" riding on its track.

Thus, any definition of "wheel" and "wheel mounted chassis" that includes tire-mounted screeners, but excludes track-mounted screeners with their wheels running on their tracks, is contrary to what persons of ordinary skill in the pertinent art understood "wheel" and "wheel mounted chassis" to mean.

## II.    Infringement

After construing the claims, the district court ruled on summary judgment that certain limitations of claim 1 were present in all 11 models of defendants' screening

machines. (JA0007707, JA0007710, JA0007793-4). Consistent with that ruling, the district court instructed the jury that only three factual infringement issues remained with respect to claim 1. (JA0018221-2; JA0018228-9). Of these, defendants challenge:

1.   whether defendants' screeners with a track-mounted chassis have "wheels" in their "chassis";

2.   whether each of one of defendants' 11 screener models has a folding lateral conveyor that folds so that the head section "does not project beyond" the outer-most edge of the "chassis" of the screener.

The district court instructed the jury on literal infringement (JA0018218-20) and infringement under the doctrine of equivalents (JA0018220-1), and defendants do not challenge those instructions. After seeing over 250 photographs of all 11 models of defendants' infringing screeners (JA0020923-21200) during the 7-week trial, after physically inspecting two models of infringing screeners which were described by Metso's director of U.S. sales, Ben Hansbury (JA0014266-79, JA0014289-96), and after days of expert and fact testimony by Metso's witnesses (Mr. Hansbury, Mr. Whyte) and defendants' witnesses (Tony Weir, Richard Byrne (defendants' supposed inventor of the '618 patent (JA007714-7)), and technical expert Frank Loeffler) concerning the lateral "projection" of the folded lateral conveyors of all 11 models of defendants' screeners, the jury found that 5 models of

32

defendants' screeners literally infringed claim 1, and 6 models of defendants' screeners infringed under the doctrine of equivalents. (JA0000001-2). Because the jury held that 2 track-mounted models (the Chieftain 2100, and H5163) literally infringed claim 1 (JA0000001), it is clear that the jury determined, as a finding of fact, that defendants' track-mounted screeners literally had a "wheel mounted chassis" because all of defendants' track-mounted screeners have the identical tracked chassis design. (JA0021128, JA0021187, JA0020994, JA0021037, JA0021080, JA0021140, JA0021168). It is also clear from the jury's factual infringement verdict that equivalents infringement was found due to the "not project beyond the chassis" claim limitation – for example, the Chieftain 1700 tire-mounted screener admittedly has "wheels", yet the jury determined that it infringed under the doctrine of equivalents and not literally. (JA0000001-2).

## A.    "Wheel Mounted" Chassis

Defendants do not deny that all 4 models of defendants' tire-mounted screeners have a "wheel mounted" chassis. However, defendants contend (PSB 51-9) that their 7 models of track-mounted screeners do not have a "wheel mounted" chassis, either literally or under the doctrine of equivalents. The district court held that the jury should factually decide whether defendants' track-mounted screeners had a "wheel" and a "wheel mounted" chassis. (JA0007709-10). The jury

found that they did, and, in particular, that track-mounted screeners literally had "wheels" and a "wheel-mounted chassis".

This Court reviews the denial of a motion for JMOL under the law of the regional circuit. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1317 (Fed. Cir. 2009). In the Second Circuit, denial of a JMOL motion is reviewed de novo: "In undertaking this review, 'we view the evidence in the light most favorable to the party against which the motion was made.' JMOL is properly granted 'only when, drawing all reasonable inferences regarding the weight of the evidence and the credibility of witnesses in favor of the non-movant, a reasonable jury could only have found for the movant.'" *Highland Capital Mgmt. v. Schneider*, 607 F.3d 322, 326-7 (2d Cir. 2010). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000). "To grant a judgment m.o.l., the court must find that there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [it]." *Concerned Area Residents v. Southview Farm*, 34 F.3d 114, 117 (2d Cir. 1994); *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 367 (2d Cir. 1988); *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998). The court may not itself weigh credibility or otherwise consider the

weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury. *Williams v. County of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999).

### i)    Literal Infringement

The jury determined that the Chieftain 2100 track-mounted, and H5163 track-mounted screeners literally infringed claim 1. (JA0000001).    Because all of defendants' track-mounted screeners have the same chassis design, the jury determined that all of defendants' track-mounted screeners literally infringed the "wheel mounted chassis" claim limitation.

There is overwhelming evidence supporting the jury's verdict that defendants' track-mounted screeners literally had "wheels". Mr. Whyte testified that defendants' tracked chasses have a driven wheel, an idler wheel and a number of guide wheels, in accordance with the district court's definition of "wheels". Referring to the photo below of a track-mounted Chieftain 1800 screener (JA0021090), he testified (JA0015378-82) that it had three types of "wheels":



The driven wheel is mounted on an axle and attached to the motor of the screener, is used to cause the track belt to move around the other wheels, rolls on the track belt as it is laid down upon the ground, and supports a part of the weight of the screener. The track belt moves around the idler wheel which rotates on an axle, and the idler wheel supports a part of the screener's weight as the idler wheel rolls on the track belt that has been laid down upon the ground. The guide wheels in a tracked chassis guide and support the weight of the machine as they roll on the track belt. (JA0015378-82). Mr. Hansbury similarly so testified. (JA0013422-30, JA0021037).

36

Mr. Whyte testified that he was aware of 61 U.S. patents, spanning over 90 years, relating to various track-mounted vehicles having "wheels" in their track assemblies and a "wheel mounted chassis". (JA0015404). The jury was shown four of these patents. (JA0024895-9, JA0024900-6, JA0024907-15, JA0024944-58, JA0015405-13).

The jury was shown defendants' mobile screener documents, prepared by persons of ordinary skill, which state that track-mounted screeners have "wheels". (JA0015385, JA0015390, JA0015394-7, JA0015402, JA0019116, JA0019395, JA0025545, JA0025809, JA0025304). These documents define "tracks" as "the beams, shapes, or formed section on which trolleys, rollers, shoes, or **wheels** roll or slide while propelled". Mr. Whyte opined, based upon his experience and all of these documents, that defendants' track-mounted screeners had a "wheel mounted chassis". (JA0015413-4).

Tony Weir, Powerscreen's customer service representative with more than 15 years in the mobile screener business, admitted that the idler and support elements of a track-mounted screener were "wheels". (JA0015961-2).

The evidence overwhelmingly supported the jury's verdict that track-mounted screeners literally have "wheels" which, instead of rolling directly on the ground, roll on tracks that are laid on the ground to provide a flat, stable and hard surface.

### ii)    Equivalents Infringement

Defendants did not make a pre-verdict JMOL motion for non-infringement of the "wheel" limitation under the doctrine of equivalents, only for no literal infringement. (JA0017625-39). Consequently, defendants post-trial JMOL motion to non-infringement by equivalents of the "wheel" or "wheel mounted chassis" claim limitation was improper because proving literal infringement is different than proving equivalents infringement. *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1105-8 (Fed. Cir. 2003). Any appeal as to non-infringement under the doctrine of equivalents of the "wheel" limitation is likewise improper because defendants failed to so move prior to jury submission and therefore failed to preserve, and thus waived, their right to appeal this issue. *Id.* at 1107; *Piesco v. Koch*, 12 F.3d 332, 340-1 (2d Cir. 1993). Also, as the district court noted, "Defendants did not present a defense at trial to infringement under the doctrine of equivalents". (JA0012960).

Nevertheless, defendants' track-mounted screeners infringe the "wheel" and/or "wheel mounted chassis" limitation under the doctrine of equivalents. The driven wheel, idler wheel and guide wheels of defendants' track-mounted screeners perform substantially the same function in substantially the same way to achieve substantially the same result as a wheel rim fitted with a rubber tire. A wheel rim fitted with a rubber tire rolls on the ground and partially supports the weight of the

machine as it rolls on the ground, while a wheel within a track belt rolls on the track belt and partially supports the weight of the machine as it rolls on the track belt. (JA0015378-82, JA0016850, JA0013422-30, JA0021037).    For a track-mounted screener, the track belt is effectively, and is substantially the same as, the ground since the track belt is laid on the ground.

Defendants' argue (PSB 59) that their track-mounted screeners cannot infringe the "wheel mounted chassis" limitation under the doctrine of equivalents because they "cannot independently travel on public roads – they are designed for off-road use".    However, these arguments are irrelevant to the "wheel mounted chassis" limitation because, as discussed above, defendants' track-mounted screeners have a "wheel mounted chassis".    As to whether defendants' track-mounted screeners are "mobile, road hauled" screeners as recited in the preamble of claim 1, the "mobile, road hauled" phrase is not a claim limitation, as discussed above.    And even if "mobile, road hauled" were a claim limitation, defendants' track-mounted screeners are "mobile, road hauled" because they can be moved from one location to another along a road by: (1) attaching a tire-mounted "bogie" under the chassis and pulling it with a truck, or (2) placing the screener onto a truck-pulled trailer. (JA0013198, JA0013204-6, JA0013208, JA0013242-4, JA0000584-5; JA0021385, JA0001452, JA0026787-8, JA0026806).    Defendants' advertising literature tout their track-mounted screeners as being "mobile" and able

to be transported on roads. (JA0024960-93). Defendants' documents admit that track-mounted screeners are road-hauled using a bogie or a trailer. (JA0000584-5). Two patents for track-mounted machines refer to them as "mobile" (JA0000554-70, JA0000573-81), the first depicting (in FIG. 8) the "mobile" track-mounted screener with folded lateral conveyors and loaded on a trailer for road transport.

The evidence established that defendants' track-mounted screeners infringe the "wheel" and "wheel mounted chassis" limitation under the doctrine of equivalents.

**B.    "Not Project Laterally Beyond"**

**i)    Literal Infringement**

The jury determined that 5 models of defendants' screeners literally infringed the "not project laterally beyond" limitation of claim 1. (JA0000001). Because there is overwhelming evidence supporting the jury's verdict as to these screeners, defendants' non-infringement argument (PSB 48) is that "chassis" should not be construed as "the entire assembly of parts that rest beneath the plant support frame", including the wheels and wheel arches, as shown and described in the '618 patent and its FIGS. 3, 4 and 5, but that "chassis" should be construed as only the "longitudinal beams", as <u>not</u> shown or described anywhere in the '618 patent or its drawings. Thus, if this Court affirms the district court's claim construction of "chassis", defendants express no basis for challenging the jury's factual literal infringement verdict as to these 5 models of screeners. However, if this Court construes the claim term "chassis" as defendants request, these 5 models of screeners

nevertheless infringe under the doctrine of equivalents as do the other 6 models, as discussed below.

### ii)    Equivalents Infringement

The jury determined that 6 models of defendants' screeners infringed the "not project laterally beyond" limitation under the doctrine of equivalents. (JA0000001-2).  Defendants cite to no evidence whatsoever that, with respect to these 6 models, any projection of the folded lateral conveyors beyond the "chassis" of the screener is not equivalent to folded lateral conveyors with no projection beyond the "chassis". The district court observed that "Defendants did not present a defense at trial to infringement under the doctrine of equivalents". (JA0012960).  In fact, all of the evidence establishes overwhelmingly that they perform the same function in substantially the same way to achieve substantially the same result to be equivalents. *Warner-Jenkinson*, 520 U.S. at 39-40.  "The essence of the doctrine is that one may not practice a fraud on a patent." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950). As the district court recognized:

> To construe the claims of the '618 patent as strictly as defendants urge would provide would-be infringers with a simple roadmap for evasion. Avoiding this is a primary basis for the doctrine of equivalents.  In the Court's view, the edge of the chassis serves as a practical reference point to describe one of the desired functions of the plant – namely, that it fold compactly.  The fact that the folded lateral conveyors strictly remain within the chassis is not an essential part of the inventive design. (JA0007705).

As to defendants' screeners that may "project laterally beyond" the "chassis",

all of the evidence, including that of defendants' witnesses, demonstrates that there is no difference between a screener with folded lateral conveyors that do not project beyond the outer edge of the "chassis" and those with folded lateral conveyors that do. The jury saw photographs of all of defendants' screeners and found those with "projecting" folded lateral conveyors (JA0020983-1003, JA0021023-45, JA0021004-22, JA0021058-87, JA0021136-65, JA0021166-83) to be equivalent to defendants' screeners with no "projecting" folded lateral conveyors. (JA0020923-82, JA0021046-57, JA0021100-13, JA0021114-35, JA0021184-200).

Mr. Whyte was fully familiar with all of defendants' screeners and testified that the projection on these screeners was "so minimal that it is of no consequence". (JA0015427-8, JA0015430-1, JA0015374, JA0015423-4, JA0015434). The only issue was whether any lateral projections affected the ability to obtain a road permit. However, Mr. Whyte and Mr. Hansbury testified that any lateral projection made no difference in obtaining a road permit (JA0013565-7, JA0013750, JA0015419-20), and defendants' expert, Mr. Loeffler, agreed. (JA0016771-4, JA0016815-7).

The uncontested evidence is that if a folded lateral conveyor on any of defendants' screeners projects laterally beyond the outer edge of the tires or tracks, there is no difference as compared to one that does not project beyond the tires or tracks – a screener with "laterally projecting" conveyors would operate in all material functions the same as one whose conveyors do not laterally project.

The same facts and conclusions of "no difference" as to function, way and result support a finding of equivalence even if this Court disagrees with the district court's construction of the claim term "chassis" and holds that a "chassis" is the "longitudinal beams". Defendants supplied no evidence either at trial or on appeal to prove a lack of equivalence.

### C.    Claim Vitiation Does Not Apply

Defendants argue (PSB 48-9) that claim vitiation precludes infringement under the doctrine of equivalents. Because there is no "substantial difference or difference in kind" between those of defendants' screeners with folded lateral conveyors that laterally project minimally beyond their "chassis" and a screener with folded lateral conveyors that do not project laterally beyond their "chassis", the doctrine of claim vitiation does not apply here so as to preclude infringement under the doctrine of equivalents. Under the "all elements rule", a patentee may not assert "a theory of equivalen[ce] [that] would entirely vitiate a particular claim element." *Warner-Jenkinson*, 520 U.S. at 39 n.8. The "all-elements rule" requires consideration of "the totality of circumstances of each case [to] determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." Claim vitiation does not exist when there is merely a "subtle difference in degree", but exists when there is "a clear, substantial difference or difference in kind." *Trading*

*Tech., Int'l., Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1355 (Fed. Cir. 2010) (citing *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1359-60 (Fed. Cir. 2005)); *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1321 (Fed. Cir. 1998).

Defendants cite to no factual evidence whatsoever (PSB 50) to argue that the degree of lateral projection of the folded conveyors of certain of defendants' screeners results in "a clear, substantial difference or difference in kind" as compared to a screener with no lateral projection. In fact, as discussed above, there is overwhelming evidence establishing no difference whatsoever.

## III.    Non-Obviousness

Defendants argue that an aspect of the district court's jury instruction on obviousness was so incorrect as to justify abandonment of the jury's factual verdict of non-obviousness. The instruction was correct, but if not, as the district court held, it was "harmless" since it did not "influence the jury's verdict" or have any "prejudicial effect". *Gordon v. NYC Bd. of Ed.*, 232 F.3d 111, 116 (2d Cir. 2000); *NTP*, 418 F.3d at 1311-2. Additionally, the jury's verdict of non-obviousness was supported by overwhelming factual evidence.

### A.    The "Fully Functional" Jury Instruction Was Correct; If Not, No "Prejudicial Effect"

Defendants assert (PSB 60) that the district court erred in its instruction (JA0018253) that defendants had to prove that the alleged prior art machines had to

44

be fully operational and functional with respect to the manner that the defendants alleged was pertinent to the claims of the '618 patent.   Although defendants convinced the district court after trial that this statement of the law was incorrect (JA0012954), it was correct. *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1451 (Fed. Cir. 1993) (the "on sale bar determination requires that the claimed invention asserted to be on sale was operable"); *Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 623 (Fed. Cir. 1985) (whether the offers of sale involved "functional machines and processes"); *Seal-Flex, Inc. v. Athletic Track & Court Constr.*, 98 F.3d 1318, 1322 (Fed. Cir. 1996) (§102(b) requires that the device must be "known to work satisfactorily for its intended purpose"); *IGT v. Global Gaming Tech., Inc.*, 1999 U.S.App.Lexis 13336, at *6-*7 (Fed. Cir. 1997) (unpublished) (§102(b) requires that, as of critical date, a prototype containing all elements of claims "existed and worked satisfactorily").

But, even if the jury instruction were incorrect, it was defendants' obligation to proffer corrective evidence by expert and factual testimony. *Beckman Inst. v. LKB Produkter A.B.*, 892 F.2d 1547, 1551 (Fed. Cir. 1989).   The district court found (JA0012955) that defendants had actually done so by presenting evidence that the alleged prior art machines (the Dominator screener and the Masterstock conveyor) were fully operational and functional in the aspects pertinent to the claims of the '618 patent.  Defendants so admit. (PSB 63-4). Anthony Parascondo

45

testified that he and his father purchased a Dominator screener in 1993 in the United States that was fully operational and functional for 5-6 years thereafter. (JA0016558, JA0016559-60). Richard Byrne, testified that fully operational and functional Dominator screeners and Masterstock conveyors were shipped into the United States by 1990. (JA0016340, JA0016382, JA0016398-9, JA0016411-3, JA0016417). Yet, as discussed below, clear and convincing evidence does not establish that claim 1 is obvious in view of the Dominator and Masterstock machines, so if the "fully functional" jury instruction were erroneous, the error would not have changed the jury verdict of non-obviousness, and thus the error had no "prejudicial effect." *NTP*, 418 F.3d at 1311-2.

## B.    The '618 Patent Is Not Obvious

Prior to jury submission, defendants moved for JMOL that there was insufficient evidence to prove the non-obviousness secondary considerations of "copying by others", "praise by others" and "unexpected results". (JA0017642-52). However, defendants failed to move pre-verdict for JMOL that the claims of the '618 patent were obvious in view of the prior art, and therefore failed to preserve, and thus waived, their right to move for JMOL on this issue. *Piesco*, 12 F.3d at 340-1; *Duro-Last*, 321 F.3d at 1107. It would therefore be improper for this Court to grant defendants' request (PSB 75) to overturn the jury's verdict and find the '618 patent obvious.

Nevertheless, the Dominator screener and the Masterstock conveyor did not render the '618 patent obvious because defendants failed to prove the elements of obviousness. Initially, both the Dominator screener and the Masterstock conveyor were cumulative of prior art considered during the prosecution of the '618 patent. (JA0013004-5). Defendants failed to establish that there was a motivation to select either the Dominator screener or the Masterstock conveyor as a source for development of the invention of the '618 patent from among the 50 other possible starting points (JA0016857-80, JA0016904-9, JA002748-922, JA0021434-59, JA0024999-5011, JA0026253-9, JA0018834-8, JA0018959-9025, JA0019637-69, JA0019745-828, JA0018805, JA0018645). *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406, 424-5 (2007); *Takeda Chem. Indus. v. Alphapharm PTY*, 492 F.3d 1350, 1359-1360 (Fed. Cir. 2007). Defendants failed to establish that the Dominator screener had any known design problems (JA0016909-14), or that there was any motivation or reason to combine these machines to result in the invention other than, in hindsight, by using the '618 patent as a template for development. (JA0016904-6, JA0016909, JA0016917-8, JA0016930-2). *KSR*, 550 U.S. at 418-421; *Takeda*, 492 F.3d at 1356-7; *Rolls-Royce v. United Tech. Corp.*, 603 F.3d 1325, 1338 (Fed. Cir. 2010). Defendants' implication (PSB 69, 73-4) that the inventor may have used these machines as inspiration is irrelevant since the test is not what was obvious to the inventor. *KSR*, 550 U.S. at 420.

Defendants also failed to establish that the combination of the two machines would be claim 1. In particular, defendants failed to establish that there was any reason to keep the conveyor of the Masterstock conveyor unfolded at a 90° angle (i.e., in an L configuration) while being transported on a road, or that there was a mechanism to retain the conveyor at a 90° orientation. (JA0016918-23, JA0016929-30). In addition, portions of the Masterstock conveyor would have to be removed to combine it with the Dominator screener. (JA0016916-8). There were also other alternative ways to fold a lateral conveyor other than in the '618 patent's L configuration. (JA0016914-6, JA0016925-34, JA0019798-805, JA0021187, JA0026416, JA0020768-78, JA0019637-41, JA0021434-40, JA0003586). *KSR*, 550 U.S. at 421.

Secondary considerations establish the non-obviousness of the '618 patent. Powerscreen, the leader in the field for the previous decade with knowledge of these alleged prior art machines, failed to pre-conceive the invention but "willfully and deliberately copied the '618 patent" and Metso's Senator mobile screener. (JA0016906-8, JA0013014). Four other competitors, Extec, Keestrack, Fintec and McClusky, likewise copied, making the '618 patent design the industry standard. (JA0015964-84, JA0016184-5, JA0016746-7, JA0021410, JA0021414, JA0021415-6, JA0021426, JA0021433, JA0026263, JA0026267). *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *KSR*, 550 U.S. at 406; *Depuy Spine, Inc. v. Medtronic*

*Sofamor Danek, Inc.,* 567 F.3d 1314, 1328-29 (Fed. Cir. 2009); *Ortho-McNeil Pharm. v. Mylan Labs,* 520 F.3d 1358, 1365 (Fed. Cir. 2008); *Rolls-Royce,* 603 F.3d at 1340.  There was substantial commercial success of the patented invention, as embodied in the 1,271 mobile screeners sold by defendants for sales of $158.7 million and the 365 screeners sold by Metso for sales of $43.5 million. (JA0017445-6, JA0015215-9, JAJA0026267.7, JA0017445). *Tec Air, Inc. v. Denso Mfg. Michigan Inc.,* 192 F.3d 1353, 1360 (Fed. Cir. 1999); *Gambro Lundia AB v. Baxter Healthcare Corp.,* 110 F.3d 1573, 1579 (Fed. Cir. 1997).  The double-fold, **L** design of the '618 patent had the new and unexpected result of enabling dramatically higher product output and longer lateral conveyors. (JA0013250, JA0013723-9, JA0013300, JA0003417-9, JA0003615-6, JA0026712). *Lindemann Masch. GMBH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1461-2 (Fed. Cir. 1984); *Ortho-McNeil,* 520 F.3d at 1365; *Rolls-Royce,* 603 F.3d at 1340.

## C.     The Jury's Verdict Must Stand

This overwhelming evidence of non-obviousness supporting the jury's verdict of non-obviousness demonstrates that there was <u>not</u> "a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture". *Concerned Area,* 34 F.3d at 117.

## IV.    Willful Infringement

### A.    Objective Prong Decided By Court, Not Jury

Defendants argue (PSB 76-85) that the district court should have provided further

instructions to the jury on "objective recklessness" of the willfulness test set forth in

*In re Seagate Technology*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (*en banc*); that is,

whether defendants infringed despite an objectively high likelihood that their actions

constituted infringement of a valid patent.  However, the jury was correctly instructed

to determine whether defendants had any "reasonable basis" for non-infringement

(JA0018276-7), i.e., the "objective recklessness" test. *Spine Solutions v. Medtronic*

*Sofamor Danek*, 620 F.2d 1305, 1319 (Fed. Cir. 2010).  Defendants do not assert

error in the district court's jury instruction on "subjective recklessness"; that is,

whether this likelihood was either known or so obvious that it should have been

known to the defendants.  The jury found willful infringement even though the

district court precluded Metso from presenting certain "objective recklessness"

evidence through Metso's patent attorney expert, Arthur Steiner. (JA0027823-37,

JA0015045-54).  In any case, "objective recklessness" is a question for the judge not

the jury, *Bard Peripheral Vascular v. W.L.Gore & Assoc.*, 682 F.2d 1003, 1007-8

(Fed. Cir. 2012), so whether or not the district court correctly or fully instructed the

jury as to "objective recklessness" is irrelevant.  In fact, defendants admit (PSB 24)

that the district court's jury instructions focused on "subjective recklessness".

## B.    The District Court Ruled Correctly On Objective Willfulness

Relying upon *Spine*, the district court noted (JA0012958) that to avoid "objective recklessness", defendants' defenses had to be "reasonable" and raise a "substantial question".  The jury concluded that they were not, as did the district court which found that "neither the Defendants' noninfringement or invalidity defenses presented a 'close call'" or a "substantial question" (JA0012959, JA0012963), very far from "strong" defenses, as defendants argue (PSB 76).

Viewed objectively, there was a high likelihood that defendants' mobile screeners infringed and that the '618 patent's claims were valid and enforceable. *Seagate*, 497 F.3d at 1371.

Objectively, one would reasonably expect that the figures of a patent are covered by the patent's claims, and here, the words of claim 1 do, in fact, cover exactly what is shown in FIGS. 3, 4 and 5; that is, that the folded lateral conveyor folds into an **L** on its side, as defendants' screeners do:



'618 Patent (from JA0000039)



**Chieftain 1400** (from JA0020937)



'618 Patent (end view)    Chieftain 1400 (end view)
(from JA0000049)         (from JA0020932)
no lateral projection beyond chassis

Defendants copied Metso's Senator screener which was known to practice the '618 patent (JA0020148) and copied the '618 patent itself. (JA0013014).

Defendants presented _no_ defense at trial to infringement under the doctrine of equivalents. (JA0012960). Mr. Loeffler did not even believe in the doctrine of equivalents and had no response to it. (JA0016770-4, JA0012960). As the district court noted (JA0012960), defendants' non-infringement defense was reduced to arguing that their screeners had extra features that were not recited in claim 1: struts (JA0016636-8, JA0018070, JA0018072, JA0018075-7); method of folding (JA0018076-7); no maintenance position (JA0016663, JA0018074-7, JA0018112, JA0018120); position of hydraulic rams (JA0018070, JA0018072, JA0018075-7); and longitudinal position of a portion of the head section. (JA0018058-61, JA0018064). As to non-infringement of the "wheel" element, because defendants'

trial witnesses admitted that defendants' tracked-mounted screeners literally had "wheels" (JA0015961-3, JA0016841-50), defendants irrelevantly argued that a track-mounted chassis was stronger and heavier than a tire-mounted chassis. (JA0015845-9, JA0016649-50, JA0018078-82).

Defendants' pre-trial defenses to infringement were similarly weak. As here, defendants argued for claim constructions that had no support in the '618 patent itself or in its file wrapper. (JA0007682-6). Defendants' prosecution history estoppel and claim vitiation defenses lacked factual support. (JA0007704-6, JA0012947-51).

Defendants' obviousness defense was based solely upon the Dominator mobile screener and the Masterstock conveyor, cumulative prior art. (JA0013005, JA0007719). As discussed above, this defense was flawed in every possible technical and legal respect, and failed to take into account strong secondary considerations of non-obviousness.

As to defendants' inequitable conduct defense, the withheld prior art was cumulative and thus not material, it did not render the '618 patent invalid, and there was no intent to deceive the U.S. Patent Office (JA0013004-7), hardly a "reasonable" defense when three elements of the defense were missing. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290, 1296 (Fed. Cir. 2011); *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 1000

(Fed. Cir. 2007). Defendants' defenses of lack of standing, anticipation, lack of enablement, and naming the wrong inventor were dismissed on summary judgment. (JA0007711-17).

Additionally, defendants never established that they were aware of these invalidity defenses before commencing their infringement. (JA0012961). For a "reasonable" defense to negate willful infringement, the infringer should at least know of that defense and reasonably believe in it prior to infringing.

Although the district court held that defendants' defenses, "evincing ostrich-like, head-in-the-sand behavior" (JA0013014), did not raise a "substantial question" and were "not a close call", resulting in willful infringement (JA0012956-66) and entitling Metso to double damages (JA0013020-1), they were not so frivolous to sanction defendants with Metso's attorney fees (JA0013042-3) and treble damages (JA0013020-1). Those holdings do not elevate defendants' defenses to "objectively reasonable", as defendants argue. (PSB 80). The district court was correct in finding objective recklessness and willful infringement after considering the entire record of this litigation.

## V.    The District Court Correctly Refused To Dismiss Terex Corporation
### A.    Terex Waived Its Defense

Pursuant to 35 U.S.C. §282, Terex was obligated to plead and disclose its defense of no liability for infringement long prior to the close of Metso's case at trial. Terex was also required to assert the defense in opposition to Metso's motion for

summary judgment of infringement. *Pandrol USA, LP v. Airboss Railway Products, Inc.*, 320 F.3d 1354, 1366-67 (Fed. Cir. 2003). The defenses to patent infringement are set forth in 35 U.S.C. §282:

> The following shall be defenses in any action involving the validity or infringement of a patent and shall be pleaded:
> (1) Noninfringement, <u>absence of liability for infringement</u> or unenforceability ...

Both noninfringement and "absence of liability for infringement" are listed, and are required to be disclosed and pleaded. Nevertheless, prior to trial Terex never identified the defense in a pleading, a Section 282 statement, in any written notice, in its Answer or Amended Answer (JA0027873-83, JA0026908-33), in Responses or Supplemental Responses to discovery requests specifically seeking the basis for defendants' alleged non-infringement (JA0027926-7, JA0027938-41, JA0027976-83), or in the Pretrial Order. (JA0026437-588; JA0015721-30). Terex affirmatively misled Metso by disclosing <u>other</u> bases for its non-infringement defense based upon the technology, but violated its obligation to disclose this defense. *Woodrow Woods & Marine Exhaust Sys., Inc. v. Deangelo Marine Exhaust, Inc.*, __F.3d__, 2012 U.S.App.Lexis 18227, *15 (Fed. Cir. 8/28/2012). Had Terex timely disclosed this defense, additional discovery would likely have taken place and another summary judgment motion filed.

Terex's defense was not raised, pleaded or argued, as required, in response (JA0004604-39) to Metso's motion for summary judgment of infringement, resulting

in a waiver. *Pandrol*, 320 F.3d at 1366-67; *Marine Polymer Tech., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1359-60 (Fed. Cir. 2012).

This Court "may affirm a judgment of a district court on any ground the law and the record will support so long as that ground would not expand the relief granted." *Glaxo, Inc. v. TorPharm, Inc.*, 153 F.3d 1366, 1371 (Fed. Cir. 1998).

By failing to timely disclose and assert the defense, Terex waived it.

## B.    Overwhelming Evidence Establishes That Terex Infringed

A parent company may be liable for its subsidiary's patent infringement "if the evidence reveals circumstances justifying disregard of the[ir] status ... as distinct, separate corporations", *A.Stucki Co. v. Worthington Indus.*, 849 F.2d 593, 596 (Fed.Cir. 1988), or if the parent has itself or through an agent engaged in conduct giving rise to liability under 35 U.S.C. §271. *Akamai Tech., Inc. v. Limelight Networks, Inc.*, __F.3d__, 2012 WL 3764695, *1 (Fed. Cir. 8/31/2012). The district court properly relied upon Terex's domination and control of Powerscreen to conclude that Terex was liable either as a direct infringer or on a corporate veil-piercing theory. (JA0012975). Terex also induced patent infringement.

### i)    Terex's Direct Infringement

"Even a single infringing act may support a verdict of infringement." *SRI Int'l, Inc. v. Internet Security Sys., Inc.*, 647 F.Supp.2d 323, 338 n.10 (D.Del. 2009), *aff'd*, 401 Fed.Appx. 530 (Fed. Cir. 2010). As the district court correctly held, "there was

sufficient evidence to find that Terex Corporation was a direct infringer."
(JA0012975).

Terex identified itself to the world as the manufacturer and seller of the
infringing screeners. (JA0026337, JA0026395-96 (Terex informs "our customers"
that Terex Materials Processing Products include "Powerscreen® branded"
screeners, and that Terex obtained 11% of its profits from such screeners),
JA0022891, JA0022893, JA0022920-21, JA0023274, JA0023693, JA0023695
(Terex's 2004 10K filing that Terex consolidated its business operations under the
"Terex" brand, and that the "Terex Construction segment designs, manufactures, and
markets screeners")). The infringing machines bear the "Terex" name. (JA0020942,
JA0020983, JA0021004, JA0021023, JA0021058, JA0021100, JA0021114,
JA0021136, JA0021166, JA0021184).

Terex did much more than "market" infringing screeners. Terex offered
financing, with publicly available UCC filings identifying <u>Terex</u> as the party
financing the transaction. (JA0016161, JA0013796). Terex had "broad strategic
direction of the business units", and Mr. Hegarty had overlapping employment
responsibilities in both companies, switching between Terex and Powerscreen.
(JA0016112, JA0016128, JA0016159-60). Terex controlled Powerscreen's
distribution network for the infringing screeners. (JA0014390-92). Invoices to U.S.
distributors identified the seller of the screeners as "Terex Crushing & Screening."

(JA0020270-341).   Appellant Emerald believed it purchased the screeners from "Terex". (JA0016277-8).

Terex claims (TCB 29)[2] that Terex did not itself make or sell the infringing screeners.  Having represented on websites, on invoices, in user manuals, in 10K SEC reporting documents, and on the screeners themselves that the infringing screeners are Terex's, Terex cannot disavow them.  As the district court concluded, placing the "Terex" name on every promotional item and product "means something to the people that buy it.  It means they own the product.  It means they put out that product.  It means they manufacture the product.  That's what it means to anybody looking at it." (JA0017606-7). *Rowe Int'l Corp. v. Ecast, Inc.*, 586 F.Supp.2d 924, 933 (N.D.Ill. 2008).

Terex's reliance (TCB 31) on *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005), is misplaced since it dealt only with an "offer to sell" under 35 U.S.C. §271(a), concluding that, where the only activities inside the U.S. by the non-U.S. corporate parent consisted of the transmission of technical data that contained no price terms, the corporate parent could not be liable for direct infringement.  Here, however, Terex, the U.S. parent, engaged in essential activities that resulted in Terex's becoming Powerscreen's managing partner in the infringing sales.

---

[2]     "TCB #" refers to page # of Terex Corporation's Brief.

### ii)    Terex Infringed Through Its Agent, Powerscreen

A court "may attribute the actions of a subsidiary company to its parent where the subsidiary acts on the parent's behalf or at the parent's direction." *Cephalon, Inc. v. Watson Pharm., Inc.* 629 F.Supp.2d 338, 348 (D.Del. 2009); *Akamai,* 2012 WL 3764695, *3; *Phoenix Canada Oil Co. Ltd. v. Texaco, Inc.,* 842 F.2d 1466, 1477 (3d Cir. 1988). "This theory does not treat the parent and subsidiary as one entity, but rather attributes specific acts to the parent because of the parent's authorization of those acts." *Cephalon,* 629 F.Supp.2d at 348. "Total domination or general alter ego criteria need not be proven"; there must be "a relationship between the corporations and the cause of action." *Phoenix,* 842 F.2d at 1477; *Cephalon,* 629 F.Supp.2d at 348.

Powerscreen acted on Terex's behalf and at Terex's direction in the infringing sales. *Phoenix,* 842 F.2d at 1478. That "Terex" appeared on the infringing machines, on invoices, on Terex and Powerscreen's websites, in User Manuals and Spare Parts Manuals, in 10K documents, and at trade shows all demonstrate Terex's control over Powerscreen in making, using and selling infringing screeners. In addition to these manifestations of Terex's authority, Mr. Hegarty had responsibility for Powerscreen's financial performance (JA0016123-4), the two companies shared overlapping executives (JA0014367-9), and Terex offered financial assistance to U.S. purchasers for the purpose of the infringing screeners. (JA0016161). Terex exerted

control over Powerscreen's patent infringement.

Terex was alternatively liable as holding itself out to the world as the "apparent manufacturer" of the infringing screeners to induce customers to buy the screeners. Restatement (Second) Of Torts § 400 (1965); *Andujar v. Sears Roebuck & Co.*, 193 A.D.2d 415 (N.Y.A.D. 1993). The "Terex" name on every aspect of the infringing screeners identified Terex and Powerscreen as joint sources of the infringing screeners. *BellSouth Corp. v. DataNational Corp.*, 60 F.3d 1565, 1569 (Fed. Cir. 1995).

### iii) Terex's Domination And Control Over Powerscreen

In considering a parent's liability for a subsidiary's infringement, relevant are the domination and control by the parent in the infringement. *A.Stucki*, 849 F.2d at 596; *Tegal Corp. v. Tokyo Electron Co. Ltd.*, 248 F.3d 1376, 1379-80 (Fed. Cir. 2001).

The veil-piercing analysis under both New York and Delaware law is "substantially similar." *Sykes v. Mel Harris & Assoc.*, 757 F.Supp.2d 413, 430 (S.D.N.Y. 2010). Under Delaware law, which Terex maintains (TCB 14) is applicable, "a court may attribute the actions of a subsidiary to its parent and ignore corporate boundaries if the court finds that the subsidiary is a mere 'alter ego' of the parent." *C.R.Bard Inc. v. Guidant Corp.*, 997 F.Supp. 556, 559 (D.Del. 1998); *Phoenix*, 842 F.2d at 1476-77. A subsidiary corporation may be deemed the "alter

ego" of the parent where the parent "exercises complete domination and control over its subsidiary." *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260, 266 (D.Del. 1989); *Phoenix,* 842 F.2d at 1477.

Like under Federal Circuit law, this "domination and control" test is often considered separately from the alter ego considerations of "a lack of attention to corporate formalities, such as where the assets of two entities are commingled, and their operations intertwined." *Mobil,* 718 F.Supp. at 266; *A.Stucki,* 849 F.2d at 596; *Tegal,* 248 F.3d at 1379-80. Terex thus misses the point (TCB 15-16) in focusing on the list of factors typically required before holding individual shareholders liable, instead of focusing on Terex's domination and control of Powerscreen. *Branch v. U.S.,* 69 F.3d 1571, 1582 (Fed. Cir. 1995) (courts are "quicker ... [to disregard the corporate entity] when creditors are trying to reach the assets of corporate affiliates than when the assets of personal shareholders are at stake").

Overwhelming evidence established that Terex dominated and controlled Powerscreen:

- Terex controlled Powerscreen's financial, sales and marketing. (JA0016119-21, JA0016123-24, JA0016207, JA0024829-94). Mr. Hegarty's responsibilities as Terex's Vice President, Crushing and Screening International included "the sale and marketing of the crushing and screening related companies"; "the broad strategy" of sales and

marketing for the Terex companies in the "Crushing and Screening" operating segment, *i.e.,* Powerscreen.   The level of detailed financial control far exceeded merely taking an interest in Powerscreen's performance; it included "[p]roper business performance from a sales perspective"; "[e]ither the business makes money, or what level it makes money at or doesn't make money at"; "what levels of cash are tied up in the business in terms of the levels of inventory that the business may hold, the levels of receivables"; "[w]orking capital management." (JA0016123-4).

- Powerscreen's profits were funneled to Terex and went directly to Terex's bottom line. (JA0026337, JA0016163, JA0016215, JA0024837, JA0024225).

- Terex consolidated the Powerscreen dealership under Terex's control. (JA0014390-2, JA0016204).

- Terex changed the name of Powerscreen to Terex GB. (JA0016165).

- Terex and Powerscreen executives overlap, move back and forth between the two companies, and often work simultaneously for both companies (JA0014367-69, JA0016114-23, JA0016128, JA0016159-60).

- Powerscreen's corporate filings state that Powerscreen's "ultimate parent undertaking and ultimate controlling party is Terex Corporation." (JA0012212, JA0012246, JA0012264, JA0012282).

- Terex makes financial assistance available to U.S. customers for the purchase of the infringing screeners. (JA0016161).

- Terex promotes the infringing screeners on Terex's website. (JA0024960-98).

- The infringing screeners have identification plates that state "Powerscreen, a Terex Company." (JA0020942, JA0020983, JA0021004, JA0021023, JA0021058, JA0021100, JA0021114, JA0021136, JA0021166, JA0021184).

- Powerscreen's invoices to its U.S. customers describe Powerscreen as "A Terex Company" and have "Terex Crushing & Screening", located in Louisville, Kentucky, as the seller's address. (JA0020270-341).

- Terex's promotional manual, "Introducing Terex Corporation" (JA0026329-401), provides an introduction, not to "our companies" or "our subsidiaries", but to "our products" and "our markets" (JA0026331). The manual tells customers that Terex is made up of "Terex Business Segments," a part of which is "Materials Processing" (the screener division). (JA0026337, JA0016162-65). The heading "Terex Materials Processing Products" lists the infringing screeners as "Powerscreen® branded mobile crushing, screening and washing equipment." (JA0026396).

- Every page of Powerscreen's User's and Spare Parts Manuals and sales brochures, and Powerscreen's and Terex's internet pages, identify Powerscreen as a "Terex Company" or a "Terex Brand". (JA0020342-602, JA0025534-797, JA0020342-602, JA0025012-269, JA0025798-6089, JA0019104-382, JA0024960-98, JA0020231-46, JA0021382-84, JA0021389-90, JA0021396-1407, JA0025534-797, JA0026394-9). These designations indicate to the world that Terex is the manufacturer of the infringing screeners and Powerscreen is merely a brand name.

- When Powerscreen sought funding from an Irish governmental agency, its presentation prominently displayed the Terex name alongside Powerscreen's. (JA0024622-76).

- At trade shows, the infringing screeners are displayed at the "Terex" booth. (JA0015987-90).

- Terex's Form 10K Statements describe Terex's acquisition of Powerscreen as making Terex a "world leader" in screening and crushing equipment; they identify Terex as selling screeners, describe Terex's manufacturing operations as including the Powerscreen brand, and describe Powerscreen as a brand name under which Terex sells products. (JA0021568, JA0021817, JA0022280, JA0023693, JA0024225, JA0024229).

- Terex had the ability to direct Powerscreen's activities, including stopping

its patent infringement, but chose not to do so. (JA0016140, JA0016146, JA0016159-60, JA0024840).

These acts are far more than "[m]ere ownership of stock." *A.Stucki,* 849 F.2d at 596; *Milgo Elec. Corp. v. United Business Comm'ns, Inc.,* 623 F.2d 645, 662 (10th Cir. 1980). Unlike this case, where the infringing screeners and promotional materials for the screeners were emblazoned with the "Terex" name, the cases cited by Terex (TCB 20) involved circumstances where the use of the parent's logo had nothing to do with the claims at issue.

The district court noted the unfairness that would result from allowing Terex to escape liability for its infringement: "Terex ... represents to the world that it is the manufacturer and seller of the infringing mobile screeners", and that that "means something to the people that buy it". (JA0012974, JA17606-7). *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1457 (2d Cir. 1995) (under Delaware law, injustice or unfairness pierces corporate veil). Although Terex asserts (TCB 27) that appellants' bond eliminates the risk to Metso in collecting damages, there is still the threat that if Terex is dismissed, Terex will avoid the injunction's effect by having another subsidiary resume infringement.

### iv)    Terex Induced Infringement

Terex also induced infringement under 35 U.S.C. §271(b) since (1) there was direct patent infringement by another (Powerscreen), and (2) Terex "knowingly

induced infringement and possessed specific intent to encourage another's infringement." *Broadcom*, 543 F.3d at 697-98; *Akamai*, 2012 WL 3764695, at *3.

A parent company may be liable for inducing its subsidiary to commit patent infringement regardless of whether it is the subsidiary's alter ego. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990); *Akamai*, 2012 WL 3764695, at *3.

Powerscreen directly infringed Metso's patent, and Terex knew of Metso's patent, knew of Powerscreen's infringing activities, and encouraged and profited from the infringement. (JA0013549-50, JA0016139-40, JA0016169). Terex affirmatively encouraged the sale of the infringing screeners by advertising them and instructing others how to infringe by providing links to dealers on the Terex website and offering financial assistance to purchasers. *MEMC*, 420 F.3d at 1379; *Metabolite Labs, Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1365 (Fed. Cir. 2004).

Metso requested a jury instruction on inducement (JA0026631-32), Metso's Complaint (JA0026419) asserted infringement under all sections of the patent laws, and there was evidence in the record from which the Court can conclude that Terex induced infringement. *Lockhard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1071 n.3 (10th Cir. 1998).

## C.    The District Court Properly Concluded That Terex And Powerscreen Were Alter Egos

Terex argues (TCB 14, 33) that a New York court considering alter ego liability would apply Delaware law, but that Second Circuit law applies to the question of the right to a jury trial on that issue.  The cases cited by Terex (TCB 33), do not relate to alter ego liability.  Terex relies upon <u>New York</u> law for a jury trial because in <u>Delaware</u>, alter ego liability is an equitable issue.  *Blair v. Infineon Tech. AG,* 720 F.Supp.2d 462, 469-70 (D.Del. 2010); *U.S. v. Golden Acres, Inc.,* 684 F.Supp. 96, 103 (D.Del. 1988) (citing *Bangor Punta Operations, Inc. v. Bangor & A.R. Co.,* 417 U.S. 703, 713 (1974)).  Actions that sound in equity do not carry a right to trial by jury.  *Golden Acres,* 684 F.Supp. at 103 (striking jury demand on alter ego issue); *IFSC v. Chromas Tech. Canada, Inc.,* 356 F.3d 731, 736-38 (7th Cir. 2004).

Terex wrongly (TCB 35) distinguishes *Golden Acres* as decided after *Chauffeurs, Teamsters and Helpers, Local No. 391 v. Terry,* 494 U.S. 558 (1990): the two-part analysis of the right to a jury trial had <u>already</u> been articulated in *Tull v. U.S.,* 481 U.S. 412, 417-18 (1987); *Bangor,* 417 U.S. at 713; *Manville,* 917 F.2d at 552.

Nor is the law of New York on this issue clear.  In *Wm. Passalacqua Builders, Inc. v. Resnick Devel., Inc.,* 933 F.2d 131, 136 (2d Cir. 1991), the issue was whether a judgment creditor of an insolvent corporate parent could pierce the veil to enforce its judgment against a subsidiary.  The Second Circuit recognized that the doctrine of

veil-piercing has roots in both equity and law, and the facts fell on the legal side. *Id.* at 136. Metso was not seeking to enforce a money judgment, but to pierce the corporate veil, which does not itself result in money damages. *Siegel v. Warner Bros. Enter., Inc.,* 581 F.Supp.2d 1067, 1075 (C.D.Cal. 2008) ("[I]t is the <u>nature</u> of the relief sought, not what ultimately results or is to be secured by the same, that should be dispositive."); *IFSC,* 356 F.3d at 737 ("the remedy of piercing the corporate veil does not itself result in money damages").

Whether the alter ego question was a jury issue is ultimately irrelevant, because there was insufficient evidence to raise a jury issue. (JA0012975). Courts have granted motions for summary judgment piercing the corporate veil where, as a matter of law, one corporation was the alter ego of another and an overall element of unfairness would result in the absence of veil-piercing. *Soroof Trading Devel. Co. v. GE Fuel Cell Sys.,* 842 F.Supp.2d 502, 521-22 (S.D.N.Y. 2012); *First Keystone Consultants, Inc. v. Schlesinger Elec. Contractors, Inc.,* 2012 U.S.Dist.Lexis 67872, *47-*57 (E.D.N.Y. 5/15/2012).

Terex claims (TCB 36-37) that the jury instructions were erroneous. A jury charge is erroneous "if the instruction misleads the jury as to the proper legal standard, or it does not adequately inform the jury of the law." *Luciano v. Olsten Corp.,* 110 F.3d 210, 218 (2d Cir. 1997); *Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.,* 554 F.3d 1010, 1021 (Fed. Cir. 2009). However, here there was no

68

requirement that the district court instruct the jury on alter ego as there was in *Wordtech Sys. Inc. v. Integrated Networks Solutions, Inc.,* 609 F.3d 1308, 1314-5 (Fed. Cir. 2010), where the alter ego issue under Nevada law <u>did</u> go to the jury but without instructions on veil-piercing to hold the <u>individual</u> corporate employees liable. Here, the alter ego issue was properly decided <u>prior</u> to jury submission.

The district court's ruling was correct, viewing the evidence in the light most favorable against the movant (Terex), disregarding all evidence favorable to Terex that the jury was not required to believe, and, in particular, in view of the overwhelming evidence of Terex's dominance, control and infringement. *Highland,* 607 F.3d at 326; *Reeves,* 530 U.S. at 151; *Concerned,* 34 F.3d at 117.

The denial of a new trial was also correct because, reviewed under regional circuit law, *Leader Tech., Inc. v. Facebook, Inc.,* 678 F.3d 1300, 1305 (Fed. Cir. 2012), a new trial may be granted if the court "determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." *AMW Materials Testing, Inc. v. Town of Babylon,* 584 F.3d 436, 456 (2d Cir. 2009), which is not the case here.

## **CONCLUSION**

For the foregoing reasons, affirmance of the district court's judgment and the

jury's verdict is appropriate.

October 18, 2012                                          Respectfully submitted,

*[signature]*

Michael C. Stuart
Lisa A. Ferrari
Marilyn Neiman
COZEN O'CONNOR
277 Park Avenue
New York, New York 10172
Tel: 212-883-4900
Fax: 212-656-1692

Attorneys for Plaintiff-Appellee
METSO MINERALS, INC.

NYO #1970696

## PROOF OF SERVICE

I hereby certify that I caused to be served on this day 2 complete and correct

copies of the foregoing:

### RESPONSE BRIEF OF
### PLAINTIFF-APPELLEE METSO MINERALS, INC.

by UPS overnight delivery upon the following:

> Jon R. Trembath, Esq.
> MERCHANT & GOULD, P.C.
> 1050 17th Street, Suite 1950
> Denver, CO 80265
>
> Vincent Alfieri, Esq.
> BRYAN CAVE LLP
> 1290 Avenue of the Americas
> New York, NY 10104

The original paper and 11 copies have been shipped via UPS (overnight delivery) to

the Clerk of Court, United States Court of Appeals for the Federal Circuit, 717

Madison Place, NW, Washington, DC 20439.

October 18, 2012

Michael C. Stuart
Attorney for Plaintiff-Appellee
METSO MINERALS, INC.

71

## <u>CERTIFICATE OF COMPLIANCE</u>

Certificate of Compliance with Type Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.  This brief complies with the type volume limitation of Rule 32(a)(7)(B), Fed. R. App. P. because:
    - this brief contains 13,931 words, excluding parts of the brief exempted by Rule 32(a)(7)(B)(iii), Fed. R. App. P., and Federal Circuit Rule 32(b)

2.  This brief complies with the typeface requirements of Rule 32(a)(5), Fed. R. App. P., and the type style requirements of Rule 32(a)(6), Fed. R. App. P. because:
    - this brief was prepared in a proportionally spaced typeface, using Microsoft Office Word 2010 in 14 Times New Roman font.

October 18, 2012                             Respectfully submitted,

*[signature]*

Michael C. Stuart
Lisa A. Ferrari
Marilyn Neiman
COZEN O'CONNOR
277 Park Avenue
New York, New York 10172
Tel: 212-883-4900
Fax: 212-656-1692

Attorneys for Plaintiff-Appellee
METSO MINERALS, INC.